Fee Paid

FILED
CLERK, U.S. DISTRICT COURT
5/24/21
CENTRAL DISTRICT OF CALIFORNIA
BY: cs DEPUTY

ROB HENNIG (STATE BAR NO. 174646)
SAM BROWN (STATE BAR NO. 308558)
HENNIG KRAMER RUIZ & SINGH LLP
3600 WILSHIRE BLVD., SUITE 1908
LOS ANGELES, CA 90010
TELEPHONE: (213) 310-8301
FAX: (213) 310-8302
ROB@EMPLOYMENTATTORNEYLA.COM
SAM@EMPLOYMENTATTORNEYLA.COM

LON R. LEAVITT (*PRO HAC VICE FORTHCOMING*)
HALUNEN LAW

Attorneys for Plaintiffs-Relators
Caleb Hernandez, D.O., and
Chionesu Sonyika, M.D.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America, State of California, State of Colorado, State of Connecticut, State of Delaware, District of Columbia, State of Florida, State of Georgia, State of Hawaii, State of Illinois, State of Indiana, State of Iowa, State of Louisiana, State of Maryland, Commonwealth of Massachusetts, State of Michigan, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of North Carolina, State of Oklahoma, State of Rhode Island, State of Tennessee, State of Texas, State of Vermont, Commonwealth of Virginia, State of Washington, County of Broward, City of Chicago, County of | Case No.: CV21-4324-VAP(ASx)<br><br>**COMPLAINT FOR DAMAGES UNDER THE FEDERAL FALSE CLAIMS ACT AND VARIOUS STATE FALSE CLAIMS ACTS**<br><br>**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>**JURY TRIAL DEMANDED**<br><br>**DO NOT ENTER INTO PACER**<br><br>**DO NOT PLACE IN PRESS BOX** |

HENNIG KRAMER RUIZ &

Allegheny, County of Miami-Dade, City of New York, and City of Philadelphia

*ex rel.*

Caleb Hernandez, D.O., and Chionesu Sonyika, M.D.,

Plaintiffs-Relators,

v.

ScribeAmerica, LLC, KKR & Co., Inc., Envision Healthcare Corporation, EmCare Holdings, Inc., EmCare, Inc., and Reimbursement Technologies, Inc.,

Defendants.

1. *Qui tam* plaintiffs and relators Dr. Caleb S. Hernandez, D.O., and Dr. Chionesu K. Sonyika, M.D. (collectively "Relators" or individually "Relator") bring this action on behalf of the United States of America ("the United States"), several states ("Plaintiff States"), and various municipalities ("Plaintiff Municipalities") (collectively referred to as the "Plaintiff Governments") under the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and analogous state FCAs[1] and municipal FCAs[2] to recover damages and civil penalties from Defendant ScribeAmerica, LLC ("ScribeAmerica") and Defendants K.K.R. & Co., Inc., Envision Healthcare Corporation, EmCare Holdings, Inc., EmCare, Inc., and Reimbursement Technologies, Inc. (collectively "EmCare" or "EmCare Defendants").[3]

---

[1] California False Claims Act, Cal. Gov't Code §§ 12650-12656; Colorado Medicaid False Claims Act, Col. Stat. § 25.5-4-303.5 *et seq.* (enacted effective May 26, 2010); Connecticut False Claims And Other Prohibited Acts Under State-Administered Health Or Human Services Programs, Conn. Gen'l Stat. tit. 4, ch. 55e § 4-274 *et seq.*; Delaware False Claims and Reporting Act, 6 Del. C. § 1201 *et seq.*; District of Columbia False Claims Act, D.C. Code § 2-308.07 *et seq.* (2000) and 2-308.13 *et seq.* (2011) and 2-381.01 *et seq.* (2013); Florida False Claims Act, Fla. Stat. § 68.081 *et seq.* (2000); Georgia State False Medicaid Claims Act, Georgia Code Ann. § 49-4-168 *et seq.*; Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.* (2006); Illinois False Claims Act, 740 ILCS § 175/1 *et seq.*; Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 *et seq.* (2007); Iowa False Claims Act, Iowa Code § 685.1 *et seq*. (2010); Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. § 46:437.1 *et seq.*; Maryland False Claims Act, MD Code § 8-101 *et seq.*; Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, § 5A *et seq.*; Michigan False Claims Act, Mich. Stat § 400.601 *et seq.*; Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.*; Montana False Claims Act, § 17-8-401 *et seq.*; Nevada False Claims Act, Nev. Rev. Stat. § 357.010 *et seq.* (2007); New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-1 *et seq.* (West 2007); New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.*; New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-1 *et seq.* (2007); New York False Claims Act, N.Y. State Fin. Law § 187 *et seq.* (McKinney 2010); North Carolina False Claims Act, NC Stat. § 1-605 *et seq.*; Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63 § 5053.1 *et seq.*; Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.* (2008); Tennessee Medicaid False Claims Act, Tenn. Code § 71-5-181 *et seq.*; Tennessee False Claims Act, Tenn. Code § 4-18-101 *et seq.*; Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. §§ 36.001 *et seq.*; Vermont False Claims Act, 32 VT Stat. § 630 *et seq.*; Virginia Fraud Against Taxpayers Act, VA Code § 8.01-216.1 *et seq.*; Washington State Medicaid Fraud False Claims Act, RCW § 74.66.005 *et seq*.

[2] Broward County [FL] False Claims Ordinance, Broward Cty Ord. § 1-276 *et seq.*; City of Chicago False Claims Act, Chic. Ord. § 1-21-010 *et seq.*; County of Allegheny [PA] False Claims Ordinance, Allegheny Cty Ord. § 485-1 *et seq.*; Miami-Dade County False Claims Ordinance, Miami-Dade Cty Ord. § 21-255 *et seq.*; New York City False Claims Act, NYC Ord. § 7-801 *et seq.*; and Philadelphia False Claims Act, Phil. Ord. § 19-3601 *et seq*.

[3] When all Defendants are referenced for a quality or in an allegation that applies to all of them, they are collectively referred to as "Defendants."

HENNIG KRAMER RUIZ &

## I. INTRODUCTION

2. This case concerns three interrelated schemes that Defendants have used since at least July 2007 through the present to systematically submit false claims to the Centers for Medicare and Medicaid Services ("CMS") concerning the Medicare program, to the Plaintiff States' Medicaid programs, and to federal, state and municipal employee healthcare programs and plans, by billing for services that were never provided. The schemes also implement a conspiracy between ScribeAmerica and the EmCare Defendants via the use of specially-trained medical scribes.

3. The first of these schemes involves the use of medical scribes to up-code/up-charge for evaluation and management ("E/M") services and smoking cessation counseling. ScribeAmerica and EmCare instruct medical scribes, who are assigned to physicians and function like secretaries, to add to the chart E/M and smoking cessation counseling services that the physician did not actually perform or provide ("the Scribe Scheme"). Defendants also use scribes to provide the false or misleading statements referenced in the two schemes described below (*i.e.*, the Critical Care Scheme and the Mid-Level Scheme).

4. The second of these schemes, which is also implemented through scribes, involves up-coding/up-charging for critical care services that were not rendered or did not qualify as critical care services even if falsely labeled as such ("the Critical Care Scheme"). This scheme is carried out in multiple ways, including false statements and misrepresentations as to the length of time spent with a patient, 1:1 focus time, and the procedures and services actually rendered to the patient.

5. The third of these schemes involves EmCare fraudulently billing for the services of a doctor/physician at EmCare emergency rooms when the patient has only been seen by a nurse practitioner or a physician assistant, known as "mid-level providers" or "mid-levels" ("the Mid-Level Scheme"). EmCare makes false statements about face-to-face interactions and falsely documents compliance with

legal requirements that are necessary to bill for a "shared visit." By doing this, EmCare knowingly carries out its unlawful Mid-Level Scheme to obtain grossly overpaid reimbursement amounts from CMS and Plaintiff States' Medicaid programs.

6. For nearly 20 years, ScribeAmerica has remained the nation's largest medical scribe company. Serving over 3,500 entities that it refers to as "partners" and "thought partners" in all 50 states, ScribeAmerica's business model depends on using a dedicated team of project managers to custom design, hire, train, and manage medical scribe programs specific to its partners' needs. ScribeAmerica's specialized teams work with its partners to align strategic goals to action, to track goals, and to measure proven ROI. This "work" includes conspiring to increase ROI through fraudulent means.

7. ScribeAmerica had an annual revenue of $32.1 million in 2012 and revenue of $76 million in 2014. In August 2014, ScribeAmerica had 4,100 scribes in 610 hospitals. As of December 2014, the company had 4,635 employees across 580 contracts. ScribeAmerica acquired PhysAssist, a competing scribe company, in November 2018. One of ScribeAmerica's co-founders, Michael Murphy, estimated in August of 2014 that 10,000 medical scribes work in the United States, mostly in emergency rooms. ScribeAmerica is the most frequently-used medical scribe provider in the United States and documented 7 million patient visits in 2012. Since the Health Information Technology for Economic and Clinical Health Act passed in 2009, the company has grown 90-100% each year. A significant portion of ScribeAmerica's revenue and market share is a result of the Scribe Scheme and associated schemes, as described below.[4]

[4] Because ScribeAmerica is a privately held company, more recent data is not readily available. This paragraph reflects publicly available information and is derived from https://en.wikipedia.org/wiki/ScribeAmerica#cite_note-fortune-1 (last accessed May 24, 2021).

8. EmCare is the largest emergency-department management company in the nation with physician services contracts covering more than 1,500 clinical departments in at least 45 states, including the states referenced in Counts 4 through 38 and the District of Columbia. In recent years, Envision has reported net revenues in the multiple billions of dollars. Relators allege that a significant portion of EmCare's revenue is derived through the schemes described in this complaint.

9. Relators bring this action pursuant to the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. § 3729 *et. seq*. ("FCA"), and the similar *qui tam* provisions of the states and municipalities referenced in Counts 4 through 38.

## II. PARTIES

### A. Relators

10. Relator Dr. Caleb S. Hernandez, D.O., is a citizen of the United States who resides in the State of Colorado. Since becoming a licensed physician, Dr. Hernandez has been employed as an emergency physician in numerous emergency departments by multiple employers in Arizona, Colorado, Kansas, Missouri, and the Caribbean. He brings this *qui tam* action based upon direct and unique information obtained during his employment with the following hospital emergency departments, all of which were managed and/or operated by EmCare: Tucson Medical Center in Tucson, Arizona (January 2012 through November 2012); Providence Medical Center in Kansas City, Kansas (December 2011 through October 2012); and St. Thomas Moore Hospital in Cañon City, Colorado (March 2009 through December 2009).

11. Relator Dr. Chionesu K. Sonyika, M.D., is a citizen of the United States who resides in the State of Georgia. Dr. Sonyika is licensed to practice medicine in Georgia and North Carolina. He is certified by the American Board of Emergency Medicine and was residency-trained specifically in emergency medicine. He brings this *qui tam* action based upon direct and unique information obtained during his

employment in the EmCare-managed emergency department at Alamance Regional Medical Center in Burlington, North Carolina from July 2007 through August 2010 and direct and unique information obtained during his employment in the EmCare-managed emergency department at Piedmont Fayette Hospital, Fayetteville, Georgia from 2018 to the present.

12. Through Relators' work at the above-mentioned EmCare-managed emergency departments, their work for EmCare as independent contractors, and their interactions with ScribeAmerica, Relators have acquired direct personal knowledge of and non-public information about Defendants' fraudulent schemes.

**B. Defendants**

13. Defendant ScribeAmerica, LLC is a California limited liability company and does business under the name "ScribeAmerica." It maintains an agent for service of process in the State of California at 4640 Admiralty Way, 5th Floor, Marina del Rey, California 90292.

14. Defendant KKR & Co., Inc. ("KKR") is a global investment company that manages multiple alternative asset classes, including private equity, energy, infrastructure, real estate, credit, and, through its strategic partners, hedge fund. KKR is headquartered at 9 West 57th Street, Manhattan, New York 10019. KKR conducts business in part through its wholly-owned subsidiary, Envision Healthcare Corporation, which it acquired in 2020.

15. Defendant Envision Healthcare Corporation is a corporation organized under the laws of Delaware. Its principal place of business is 1A Burton Hills Boulevard, Nashville, Tennessee 37215. Until April 5, 2017, it had a principal office at 6363 South Fiddlers Green Circle, Suite 1400, Greenwood Village, Colorado 80111. Before that, it had been located at 6200 South Syracuse Way, Greenwood Village, Colorado 80111. Previously known as Envision Healthcare Holdings, Inc., the company was formed in 2011 to facilitate a corporate merger, through which

Envision Healthcare Corporation (an entity formerly known as Emergency Medical Services Corporation) became a wholly-owned subsidiary of this Defendant, Envision Healthcare Corporation, an entity with the same name. (There are two entities named Envision Healthcare Corporation; one is a subsidiary of the other.) In December 2016, Envision Healthcare Holdings, Inc. merged with AmSurg and changed its registered name to Envision Healthcare Corporation. Under its previous and current registered names, Envision Healthcare Corporation has been a publicly traded company listed on the New York Stock Exchange under the ticker symbol EVHC since 2013. Envision Healthcare Corporation conducts its business in part through its wholly-owned subsidiary, EmCare Holdings, Inc.

16. Defendant EmCare Holdings, Inc. is a corporation organized under the laws of Delaware and has its principal place of business in Dallas, Texas. EmCare Holdings, Inc. is a wholly-owned subsidiary of Envision Healthcare Corporation, for which it serves as one of two primary operating entities.

17. Defendant EmCare, Inc. is a subsidiary of Envision Healthcare Corporation and does business under the name of "EmCare." EmCare, Inc. is a Delaware corporation with its principal place of business at 13737 Noel Road, Suite 1600, Dallas, Texas 75240.

18. Defendant Reimbursement Technologies, Inc. ("RTI") is a wholly-owned subsidiary of Envision Healthcare Corporation. RTI is EmCare's billing arm and performed most of EmCare's outsourced coding at off-site locations. RTI is a Pennsylvania corporation with its principal place of business at at 6200 Syracuse Way, Suite 200, Greenwood Village, Colorado 80111.

19. Defendants KKR & Co., Inc., Envision Healthcare Corporation, EmCare Holdings Inc., EmCare Inc., and Reimbursement Technologies Inc. are collectively referred to herein as ("EmCare").

## III. JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

20. This Court has subject matter jurisdiction under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1331 because this civil action arises under federal statutes.

21. The Court may exercise personal jurisdiction over Defendants under 31 U.S.C. § 3732(a) because they transact business within this district and the claim arises out of or relates to Defendants' contacts with California.

22. This Court has jurisdiction over Relators' state and municipal law claims pursuant to 31 U.S.C. § 3732 because those claims arise from the same transaction or occurrence as Relators' claims under § 3729. Additionally, this Court has supplemental jurisdiction over Relators' state and municipal law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy under Article III of the United States Constitution as Relators' claims under the federal FCA.

23. This Court may exercise personal jurisdiction over ScribeAmerica because ScribeAmerica transacts, operates, conducts, engages in, and carries out substantial business within the State of California.

24. This Court may exercise personal jurisdiction over EmCare because EmCare transacts, operates, conducts, engages in, and carries out substantial business within the State of California.

25. Moreover, ScribeAmerica and EmCare purposefully direct their services at the State of California, thereby purposefully availing themselves of the privilege of conducting business within the State of California and invoking the benefits and protections of its laws. This action arises out of that conduct. This Court's exercise of jurisdiction over Defendants does not offend traditional notions of fair play and substantial justice.

26. Venue is proper in the Central District of California pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b)–(c). ScribeAmerica and EmCare can be

found in, reside in, transact, and/or have during the relevant time period transacted substantial business in this judicial District. Additionally, one or more of the Defendants committed acts proscribed by 31 U.S.C. § 3729 in this judicial District by perpetrating the schemes described in this complaint within this District.

27. Relators bring this action under the FCA to recover treble damages, civil penalties, and costs of suit, including reasonable attorneys' fees and expenses. Relators have authority to bring this action and their claims on behalf of the United States pursuant to 31 U.S.C. §§ 3730(b) and 3730(e)(4), and Relators have satisfied all conditions precedent to their participation as Relators. Pursuant to 31 U.S.C. § 3730(e)(4)(A), the allegations contained in this complaint have not been publicly disclosed as defined by the FCA or, alternatively, Relators qualify as "original sources" within the meaning of 31 U.S.C. § 3730(e)(4)(A) and (B). Prior to filing this complaint, Relators voluntarily provided substantially all information in Relators' possession on which these allegations are based to the United States Attorney's Office for the Central District of California.

## IV. OVERVIEW OF DEFENDANTS' FRAUDULENT SCHEMES

### A. Introduction to the Scribe Scheme

28. To account for physicians who were hesitant to lie on their charts, which threatened the success of Defendants' schemes, Defendants implemented and pursued a scribe program.

29. The scribe program trained impressionable young people. Typically, they are 19- to 24-year-old students, usually pre-med or pre-nursing students, in conformity with directives from ScribeAmerica and EmCare. Defendants gave scribes promises and/or encouragement that the scribe program would help them make it into medical school or nursing school.

30. ScribeAmerica trained scribes in "the EmCare way." ScribeAmerica worked as a thought partner with EmCare in making sure that scribes placed in

medical charts the deceptive information EmCare needed to falsely bill. Scribes were instructed to maximize billing of a chart, which translated to documenting medical services that were not actually provided but were added solely to increase billing value.

31. Scribes should only document what they see a medical provider actually do. They should not, as Defendants did here, fill in information about activities that could or should have happened but did not actually happen. This false information later served as a mechanism to force medical providers to attest to things that did not happen. Scribes also should only classify the level of care consistent with the activities actually performed and/or per the physician's judgments. This is especially true in areas such as critical care, where only the physician is qualified to make the medical judgment of whether critical care occurred.

32. However, scribes were instructed to fill out the chart as if the highest level of care was provided for all patients, even if the highest level was not provided or warranted. EmCare then pressured physicians to rubber stamp the information that scribes placed in the chart. Defendants also pressured physicians and scribes to sign canned attestations.

33. To increase billing, Defendants instructed scribes to falsely add elements to make charts appear as if more comprehensive services were provided, even if a more comprehensive treatment was not provided. For example, Defendants instructed scribes to document a full neurologic examination even when the doctor only came in and looked at a twisted ankle.

34. Similarly, ScribeAmerica and EmCare instructed scribes to chart that the physician addressed all 10 review of systems ("ROS") items, even when they were not actually performed. Scribes were directed to use a template regarding ROS, or to add items via clicking boxes that add items to the chart in the laptop, mobile computer, or Computer on Wheels ("COW"), which added elements that did not

occur in the patient encounter but were required for billing those services (i.e., billing for items regardless of whether they occurred in the patient encounter). This was also at the direction of ScribeAmerica and EmCare.

35. For patients with a documented history of smoking, Defendants instructed scribes to document that physicians took a number of minutes (*e.g.*, 3-5, 5-10) to counsel those patients against smoking (*i.e.*, smoking cessation counseling), even when the physician did not mention smoking once in the conversation.

36. These fraudulent additions to the chart resulted in several millions of dollars' worth of up-coded claims.

**B. Introduction to the Critical Care Scheme**

37. Defendants billed for Critical Care services that were not performed. Critical Care is a "pass-through" bill for CMS, meaning that there was no risk of a front-end audit of the charges. As with the Mid-Level Scheme described below, physicians are also coerced to up-code, up-charge, and misclassify regular care as critical care. For example, physicians are told that giving a patient an IV qualifies as critical care regardless of the reason, which resulted in otherwise non-critical care being misclassified and fraudulently billed as critical care. As another example, although patients with kidney stones are nearly always classified as non-critical, if they were given an IV, then Defendants misclassified and fraudulently billed them as receiving critical care.

38. Defendants manipulated physicians in a variety of ways to motivate them to comply with the scheme and introduce critical care into the charts via scribes. If physicians complied, Defendants rewarded them with more RVUs,[5] profit sharing, bonuses, and ongoing pay in a difficult economy. In other words, Defendants provided kickbacks to physicians as an inducement to go along with the scheme. If

[5] "RVU" stands for Relative Value Unit and is used by Medicare and other third-party payors to determine reimbursement rates for physician services.

they did not comply, physicians were penalized, publicly shamed in group emails or meetings, and deemed a cost to the group and, therefore, bad partners; they risked losing privileges or being replaced by a higher performer (*i.e.*, a provider who was willing to comply with the scheme).

39. Physicians were given "canned notes" or "templates" that EmCare prepared and instructed them to use on all patients who "could have" critical care. These templates were biased and had elements designed to create critical care when it was not clinically indicated or actually rendered.

40. Billers were instructed to always code for critical care upon seeing a template regardless whether the chart matched the template in regard to the diagnosis or the work done.

41. Thus, what EmCare pressures to be submitted as critical care billings contrasts significantly and materially from the actual and legitimate requirements for critical care.

42. As noted later in this complaint, Defendants use scribes to insert critical care into a chart even though the rest of the chart shows there is no basis for a legitimate critical care classification. EmCare then pressures physicians to approve scribes' entries.

43. This Critical Care Scheme is a classic upcoding scheme: EmCare bills CMS and other government payors for "critical care"—the highest level of emergency treatment—when in fact critical care services were not rendered and/or were not medically necessary, thereby submitting false claims through fraudulent billing.[6] Because of the heightened skill and decision-making critical care requires, CMS and other government payors reimburse providers for those services at a significantly higher rate than standard emergency services. To capitalize on this up-

[6] Critical care is a heightened level of treatment necessary when a patient has a high probability of imminent or life threatening deterioration that requires healthcare providers to exercise a higher degree of medical decision-making and devote longer periods of time to that patient's treatment.

charge, EmCare requires its providers to: (1) approve critical care charting information that scribes have placed into the chart, even though not at the direction of the physician; (2) falsify critical care on patient medical records when the care provided did not meet the relevant billing requirements for critical care; and/or (3) perform and chart critical care services when those services were not medically necessary. Again "relying" on falsified medical records, EmCare coding and billing employees submit claims for reimbursement for the critical care services reflected in the patient chart.

44. EmCare's fraudulent billing policies and practices enable it to bill the Government Plaintiffs for millions of dollars for the claimed services. Through the Critical Care Scheme, EmCare has fraudulently obtained multiple millions of dollars *each year* since at least 2008 (when the critical care regulations were last updated).

45. EmCare's Critical Care Scheme violates the Government Plaintiffs' coverage limitations and causes the knowing and/or intentional submission of illegal and false claims for reimbursement under federal, state, and municipal laws, resulting in significant losses of taxpayer dollars.

### C. Introduction to the Mid-Level Scheme

46. With regard to emergency medicine and hospitalized patients, CMS and other government payors will not allow a shared visit between a mid-level provider and a supervising physician unless the physician: (1) has physically seen the patient face-to-face; and (2) modified the mid-levels' notes (Review of Systems ("ROS"), physical exam ("PE") or Assessment and Plan ("A&P")). Under government health care programs, an attestation is not enough; there must be evidence of a face-to-face encounter, such as separate documentation by the physician in the ROS, PE, or A&P in addition to the attestation. Thus, the Mid-Level Scheme involves four elements.

47. **The First Element**: A mid-level provider attests that the physician has supervised him or her "personally," although the physician has not seen the patient

face-to-face or even known that the mid-level has seen the patient. Because EmCare sends an electronic notice to physicians directing them to "sign-off" or "cosign" on what a mid-level has done, the physician is not typically notified until the mid-level has completed work, rendering compliant supervision a practical impossibility.

48. **The Second Element**: The physician, under pressure by EmCare and via ScribeAmerica, signs the attestation of the mid-level provider saying that the physician agrees with it.

49. **The Third Element**: Coders and billers hired by EmCare are instructed to bill a shared visit when they see a signature by the physician and attestation by the mid-level in a chart. This is the direction even when the required ROS, PE, or A&P element is missing in the chart, and even when physicians have not stated they saw the patient "Face-to-Face," which is an express requirement along with the ROS, PE or A&P elements.

50. **The Fourth Element**: At the instruction of EmCare, account managers at the hospital and EmCare personnel are responsible for calling up physicians and mid-level providers, sending them emails or other communications, and forcing them to make these attestations. Physicians and mid-levels are threatened with losing their jobs (which have non-compete clauses), losing hospital privileges and even eventual loss of medical licenses if they do not sign these charts. This is done through an agreement with the hospital where EmCare uses their knowledge of hospital policy to make this fraudulent signing a "hospital requirement" and then can use it to force the loss of privileges if the health care provider does not comply.[7]

51. Under the Mid-Level Scheme, EmCare uniformly and systematically overbills CMS and the Plaintiff States for services performed solely by mid-level physician assistants ("PAs") and nurse practitioners ("NPs")—by submitting claims for reimbursement of mid-level services under a physician's National Provider



[7] Relators have copies of such communications.

Identification ("NPI") number as if a physician, rather than a mid-level, had performed the services. When a mid-level performs services alone, without any physician involvement, CMS only reimburses those services at 85% of the physician rate. *See* 42 U.S.C. § 1395l(a)(1)(O).

52. The overwhelming majority of services provided to CMS beneficiaries by mid-levels at EmCare emergency departments are carried out with no physician involvement. Accordingly, under CMS regulations, EmCare should bill these services under the mid-level's NPI and be reimbursed at 85% of the physician rate. However, EmCare submits claims to CMS for these mid-level services under random on-duty physicians' NPIs, which triggers the full physician reimbursement rate. In other words, EmCare is systematically and unlawfully requesting reimbursement for mid-level services at 100% of the physician rate, rather than the proper 85% rate, thereby reaping a 15 percentage-point premium for mid-level services performed in its emergency departments.

53. Similarly, the Plaintiff States' respective Medicaid programs, and the federal, state, and municipal employee health care programs and plans, reimburse for mid-level services at lower rates than for physician services. However, because EmCare submits claims for mid-level services under physicians' NPIs, EmCare unlawfully requests reimbursement from the Plaintiff Governments for mid-level services at 100% of the physician rate, rather than the appropriate mid-level percentage paid by Plaintiff States' respective Medicaid programs and the Plaintiff Governments' employee health care programs and plans.

54. At the center of EmCare's Mid-Level Scheme is its "Golden Rule: You don't get paid for what you do; you get reimbursed for what you document!", which it admitted through its agent via email. Thus, to cover up its Mid-Level Scheme, EmCare manipulates patient medical charts to falsely document physician involvement in what is called a "shared visit." A shared visit occurs when a mid-level

treats a patient alongside a supervising physician, meaning that both the physician and the mid-level actually provide face-to-face services to the patient.

55. When a true shared visit occurs, CMS and other government payors reimburses for the mid-level services at the same rate as the physician's services, as if the mid-level were an extension of the physician. *See* 42 U.S.C. § 1395l(a)(1)(O). In the emergency department, a properly documented shared visit is the only circumstance under which mid-level services may be reimbursed at the full physician rate.

56. However, true shared visits are exceedingly rare in EmCare's emergency departments. Physicians and mid-levels very rarely see patients together. Instead, to maximize efficiency and avoid overlap, under EmCare's business model, mid-levels independently treat lower-acuity patients, while physicians independently treat higher-acuity patients.

57. Notwithstanding this reality, EmCare requires physicians and mid-levels to indicate in mid-level medical charts that the physician provided the services to the patient. However, the mechanics of this scheme, including the various time-stamps on the records, reveal that the mid-level selects a "supervising" physician after the encounter is completed, and that the physician never accesses the chart until hours or even days after the encounter. Nonetheless, EmCare demands that a physician sign every mid-level chart and indicate that the physician supervised the patient encounter. Relying on the cover provided by these manipulated charts, EmCare then bills for the mid-level services under the physician's NPI at the full physician rate. EmCare requires this even when, as is overwhelmingly the case, no true shared visit occurred.

58. EmCare ensures physician and mid-level compliance with the Mid-Level Scheme through threats. EmCare threatens that failure by mid-levels to assign every patient chart to a physician and failure by physicians to sign every mid-level

chart—regardless of whether there was any physician involvement—may lead to lower pay, suspension, or even termination. EmCare tells its employees, both in the emergency and billing departments, that physician signatures are required for the mid-level services to be billed and reimbursed. There is no such CMS requirement for Medicare. Nor is there any such requirement promulgated by the Plaintiff States concerning their Medicaid programs. Nor is there any such requirement by any of the federal, state, or municipal employee health care programs or plans.

59. EmCare knows this Mid-Level Scheme violates CMS regulations. Since at least 2007, EmCare's internal employee handbook has acknowledged—or at least paid lip services to—the very regulations the Mid-Level Scheme violates. But, by insisting that its employees comply with the Mid-Level Scheme, EmCare instructs its employees to ignore its own employee handbook and the federal and state regulations mentioned therein.

60. EmCare's Mid-Level Scheme violates CMS billing regulations and guidelines and causes the knowing and/or intentional submission of illegal and false claims for reimbursement under federal and state laws. It defrauds the federal and state health care programs on a nationwide basis, costing taxpayers significant sums of money each year.

**D. Proof of the Fraud**

61. The charting documents the fraud. EmCare keeps the full record of the chart at the hospitals with what can be thought of as "dual agents," individuals who are both hospital and EmCare employees. This version of the chart has all of the time and date stamps that reveal inconsistencies and misinformation. Due to HIPAA, Electronic Medical Records ("EMRs") must contain this information.

62. Because the charts are electronic, there are multiple "chart views" which are used by EmCare to obfuscate the fraud. Nonetheless, there still remain a number of chart views or chart versions that make the submission of false information plain

to someone who knows how and where to find EmCare's obfuscation. One such view is the "time stamp summary," which shows who accessed the chart and when. This is done for HIPAA compliance, yet also shows that physicians have never accessed the chart to do the required work for which EmCare is falsely billing.

63. EmCare sends to its billing staff a redacted version of the chart that eliminates this important information from the record. This results in coders and billers receiving partial information and manipulating the codes that billers are instructed to choose when billing Medicare, Medicaid, or government employee healthcare programs and plans. EmCare uses these protocols to create a degree of "plausible deniability," in which the "right hand does not know what the left hand is doing." Nonetheless, the falsity of the information and the intent to deceive the government is evident from the fact that ScribeAmerica and EmCare control the flow of the pertinent information as described in this complaint and then profit from their roles in providing false information to Medicare, Medicaid, and other government payors.

64. However, there are telltale signs in the full charts ultimately kept at the hospitals, and in other electronic sources, which can be used to pinpoint clear cases of fraudulent billing:

**With regard to the Scribe Scheme:**

65. The diagnosis does not match the level added by the scribe (*e.g.*, the proposition that every, or almost every, patient has comprehensive charting treatment provided during their visit is not realistic).

66. There are "canned notes" and other patterns evident in the charts and in the system of charting.

67. The charting shows that 100% of patients with a smoking history receive smoking counseling (and sometimes even when they don't smoke). This pattern does not reflect what actually occurs in the emergency department, where there are almost

always other pressing concerns that are being addressed in the short period of time the patient is being addressed by physicians. (A physician will not take the time to counsel a patient on smoking cessation when there is another patient in the emergency department with life-threatening injuries.)

68. Besides charting evidence, email communications include threats and rewards; scribes' training materials show that scribes are instructed to add extra elements to charts; and scribes have admitted that they are being instructed to add items to the charts.

**With regard to the Critical Care Scheme:**

69. The physician is not identifiable as being in 1:1 with the patient (a CMS requirement); for example, the EMR shows that, at the time, the physician was actively taking care of other patients, making it clear that critical care is not warranted.

70. The times reported do not match up, *e.g.*, the 30-, 75-, 90- or 120-minute intervals billed for do not match the chart (that is, CMS cannot be billed 120 minutes for critical care for a patient who was only in the emergency department for 90 minutes).

71. The diagnosis does not actually match critical care criteria, *e.g.*, abdominal pain (renal stone) is not a life-threatening condition (although painful, the condition will not kill the patient).

72. The chart does not ultimately support the services rendered.

73. Defendants double dip. For example, some ancillary procedures (*e.g.*, central venous catheterization) should be billed separately without also counting the time for those procedures as critical care time, but the chart nonetheless shows that EmCare included such items in the critical care time, artificially inflating the critical care time.

74. Besides charting evidence, email communications include threats and rewards.

**With regard to the Mid-Level Scheme:**

75. The physician time stamp is recorded after a patient has left the emergency department or was otherwise dispositioned.

76. The term "face-to-face" is not set out in the physician attestation.

77. There is a "shared visit" billing for a chart that includes "Time Seen By Mid-Level" without any entry indicating "Time Seen By Physician."

78. Even if "face-to-face" is somehow stated in the in physician attestation, there is no evidence of physician involvement or input in the care, such as entries in the ROS, PE, or A&P documented by the physician in the mid-level chart (another CMS requirement).

## V. THE FEDERAL FALSE CLAIMS ACT

79. The FCA makes it unlawful for any person to submit, directly or indirectly, false or fraudulent claims for payment to the Government. *See* 31 U.S.C. §§ 3729, *et seq*. Relators allege liability primarily under three of the FCA's seven liability provisions.

80. First, the FCA's "presentment" provision, 31 U.S.C. § 3729(a)(1)(A), imposes liability when a defendant (a) made, or caused to be made, a claim, (b) that was false or fraudulent, (c) knowing of its falsity.

81. Second, the FCA's "false records or statements" provision, 31 U.S.C. § 3729(a)(1)(B), imposes liability when a defendant (a) made, used, or caused to be made or used, a record or statement, (b) that was knowingly false, and (c) that was material to a false or fraudulent claim.

82. Third, the FCA's "conspiracy" provision, 31 U.S.C. § 3729(a)(1)(C), imposes liability when a defendant conspires to commit a violation of the FCA.

83. The "knowledge" element of the FCA is defined as (1) "actual knowledge of the [falsity of the] information"; (2) "deliberate ignorance of the truth or falsity of the information"; or (3) "reckless disregard of the truth or falsity of the information" provided to the Government. 31 U.S.C. § 3729(b)(1)(A). No specific intent to defraud need be shown. 31 U.S.C. § 3729(b)(1)(B).

84. Under the FCA, the term "claim" means any request or demand for money, whether under a contract or otherwise, presented to an officer, employee, or agent of the United States. 31 U.S.C. § 3729(b)(2)(A)(i). A "claim" is also a request or demand for money made to a contractor or other recipient if (a) the money is to be spent or used on the Government's behalf or to advance a Government program or interest and (b) if the Government provides, has provided, or will reimburse such contractor or other recipient for any portion of the money requested or demanded. 31 U.S.C. § 3729(b)(2)(A)(ii).

85. The FCA defines "material" objectively to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). The Supreme Court reaffirmed the natural tendency materiality test—even as to subsection (a)(1)(A), which does not explicitly use the term—and described a holistic approach to analyzing it. *See Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016).

86. The FCA empowers private persons having information regarding a false or fraudulent claim against the Government to sue on behalf of the Government and to share in any recovery. 31 U.S.C. § 3730(b).

87. The Federal FCA, the State FCAs, and the Municipal FCAs are, in general, *in pari material* for each other, and thus Relators here frame the law using the language of the Federal FCA. However, in the separate Counts and Requests for Relief as to each State and Municipality, Relator uses the precise language of each respective statute or ordinance.

## VI. MEDICARE AND MEDICAID PROGRAMS

88. "Medicare" is the popular name for the federal Health Insurance for the Aged and Disabled Act, which is Title XVIII of the Social Security Act. "Medicaid" is the popular name for Title XIX of the Social Security Act, which provides healthcare coverage for low-income and certain disabled persons. Both programs are administered by CMS, which is part of the Department of Health and Human Services ("HHS"). As the single largest healthcare payor in the United States, CMS' regulations and guidance governing the coverage of healthcare services drives the norms in the healthcare industry and are typically adopted by smaller government payers of healthcare services.

### A. The Medicare Program and Federal Administration

89. Medicare is a federally funded program administered by CMS that provides nearly every American 65 years of age and older a broad program of health insurance designed to assist the nation's elderly to meet hospital, medical, and other health costs. Medicare is funded in part by hundreds of billions in taxpayer revenue. Unfortunately, fraud and systematic overcharging are estimated at tens of billions of Medicare's costs every year.

90. Medicare is comprised of three primary insurance programs—Medicare Parts A, B and D—that cover different types of healthcare needs.[8] Medicare Part A (Hospital Insurance) covers institutional care such as inpatient hospital care, nursing services, drugs and biologicals necessary during an inpatient stay, and other diagnostic or therapeutic services. Medicare Part B (Supplementary Medical Insurance) covers non-institutional care such as physician services, medical equipment and supplies, and services performed by qualified mid-levels under the

[8] Medicare also includes Medicare Part C (also called Medicare Advantage), which is not a separate benefit, but a program whereby private companies approved by Medicare provide coverage under Medicare Part A and Part B.



HENNIG KRAMER RUIZ &

supervision of a physician. Medicare Part D (Drug Coverage) covers the cost of outpatient prescription drugs. This case involves Medicare Part B billings.

91. Under Medicare's programs, the federal government reimburses healthcare providers for their labor and medical decision-making on a fee-for-service basis according to predetermined fee schedules, including the Medicare Physician Fee Schedule ("MPFS"), which establishes annual rates for more than 10,000 services provided by physicians and other healthcare professionals. The rates established in the MPFS correspond to specific five-digit codes associated with each medical procedure or service provided. The American Medical Association publishes these Current Procedural Terminology ("CPT") codes annually.

92. The process by which healthcare services are submitted and reimbursed involves several steps and various entities. First, physicians and mid-levels must clearly and sufficiently document patient encounters in their medical charts. To ensure that documentation is clear and complete, CMS has developed specific documentation guidelines that it requires healthcare providers to use. Through the E/M documentation process, providers document their medical decision-making and care during a patient encounter so that providers and/or billing department coders can translate those services into the required CPT codes for billing purposes.

93. In addition to selecting the appropriate CPT codes, the provider or coder must submit the provider's National Provider Identifier ("NPI") and Provider Transaction Access Number ("PTAN") for billing. The NPI identifies the individual healthcare provider that performed the services to be reimbursed. All healthcare providers registered with CMS—including physicians and mid-levels—are assigned a unique NPI. The PTAN identifies the practice group or company for whom the provider works.

94. CMS reimburses different types of healthcare providers at different rates. For example, as discussed in detail below, CMS typically reimburses mid-

levels at 85% of the full physician rate under federal statute and CMS regulations. *See* 42 U.S.C. § 1395l(a)(1)(O). Accordingly, the coder must assign the appropriate provider's NPI to avoid improper billing, as the NPI triggers the billing rate for any particular E/M service. Once the coder has assigned the appropriate CPT codes and NPI to a medical record, the claim is submitted to a fiscal intermediary called a Medicare Administrative Contractor ("MAC") based on geographical location. The MAC then processes the claims and reimburses the provider according to Medicare's fee schedule. MACs are typically private insurance companies that have been contracted by the federal government to process medical claims, and are responsible for the majority of enforcement efforts when it comes to Medicare claims. For its part, CMS manually reviews a tiny fraction of the hundreds of millions of claims it receives each year. CMS does not and cannot review the overwhelming majority of submitted claims it receives.

**B. The Medicaid Program and State Administration**

95. The Medicaid Program ("Medicaid") is a Health Insurance Program administered by the Government of the United States and state agencies and is funded by state and federal taxpayer revenue. The United States Department of Health and Human Services oversees the administration of the program. Medicaid was designed to assist participating states in providing medical services, durable medical equipment, and prescription drugs to financially needy individuals who qualify for Medicaid.

96. While the federal government sets basic guidelines and pays between 50% and 80% of Medicaid costs (depending on the state's per capita income), each state establishes its own CMS-approved program, administers the program, decides provider qualifications, and reimburses providers for their services.

97. Under Title XIX of the Social Security Act, each state must establish an agency to administer its Medicaid program according to federal guidelines.

## VII. FACTUAL ALLEGATIONS

### A. ScribeAmerica

98. ScribeAmerica has remained the nation's largest medical scribe company for nearly 20 years. ScribeAmerica's business model depends on using a dedicated team of project managers to custom design, hire, train, and manage medical scribe programs specific to its partners' needs. ScribeAmerica's specialized teams work with its partners to align strategic goals to action. ScribeAmerica works with its partners to track goals and measure proven ROI.

99. ScribeAmerica has partnered with EmCare to use its scribes as a mechanism for conspiring with EmCare to implement the schemes outlined in this complaint. Further examples are provided in the Representative Examples section below.

### B. EmCare

100. EmCare is one of the nation's oldest, largest, and most profitable emergency department management companies.

101. EmCare generates the vast majority of its revenue by billing third-party payers, such as CMS or private insurers, for the services provided by EmCare healthcare providers.

102. EmCare bases its business model not on quality of care, but on reducing emergency department costs and maximizing revenues through increased patient turnover and efficient, standardized coding and billing practices. EmCare built its revenue-based business model on three primary goals: (1) treat and bill more patients by "monetizing flow"—*i.e.* move patients through the emergency department quickly; (2) cut costs by employing more mid-levels in place of more costly physicians; and (3) implement standard coding and billing procedures to capture as much revenue as possible from CMS and private payers.

103. First, an integral part of EmCare's business model is moving patients through the emergency department as quickly as possible—*i.e.*, increasing "flow." To accomplish this, EmCare uses floor-management models that often physically segregate physicians and mid-levels into different areas of the emergency department. These floor-management models enable EmCare to increase revenue by: (1) increasing the volume of patients treated; and (2) using lower cost staffing, such as PAs and NPs, instead of more expensive physicians to treat more patients.

104. Second, EmCare's business model seeks to reduce costs by relying heavily on mid-level service providers, such as PAs and NPs, in place of physicians. EmCare compensates mid-levels at a lower rate as compared to physicians; thus, using mid-levels to treat patients alone reduces EmCare's operating costs. However, EmCare derives significant revenue from its Mid-Level Scheme, described above, through which it obtains reimbursement from the Plaintiff Governments for mid-level services at the full physician rate. Thus, EmCare unlawfully inflates its revenue by relying heavily on lower-paid mid-levels to provide care, while collecting reimbursements from the Plaintiff Governments at the full physician rate.

105. Finally, EmCare's business model relies on the implementation of national, standardized billing and coding practices aimed at capturing as much revenue as possible from third-party payers, including the Plaintiff Governments. EmCare touted its in-house billing company's ability to anticipate and implement plans to mitigate the increasingly volatile regulatory and financial landscape and allow healthcare providers to succeed in the reimbursement races. Coding is the process by which a patient's medical chart is translated into billable services that are then submitted to the Plaintiff Governments for reimbursement. EmCare's standardized coding techniques are aimed at milking every last cent out of each medical chart.

### C. The Scribe Scheme

106. CMS and other government payors require that the physician seeing the patient document critical care. However, Defendants circumvent this requirement by using scribes to determine critical care.

107. The majority of scribes are 19- to 24-year old college students who have taken college biology but who have not yet graduated college. Most of them are attempting to get into advanced medical, physician assistant, nurse practitioner, or nursing school programs. These impressionable students are hired because they can be easily trained to act in conformity with directives from ScribeAmerica and EmCare and because they lack the qualifications to be able to question the propriety of what they are being trained and paid to do. Defendants also prey upon these students' ambitions through promises and/or encouragement that the scribe program will help them make it into medical school or nursing school. Conversely, EmCare set up this system to make sure impressionable young people do as they say and, if scribes do not obey, they are threatened with consequences that could affect their ability to get into medical school.

108. Below is a typical Envision scribe job posting. It shows that scribes are not licensed medical professionals and are not trained in diagnosis, management, or critical care. They can qualify for the position with less than 2.5 weeks (100 hours) of volunteering or shadowing experience in healthcare.

Envision HEALTHCARE

‹ Welcome page

CIM / MEDICAL SCRIBE

US-NY-Staten Island

**Requisition ID** 2021-26141 **Category** CIM **Location** Richmond University Medical Center

Qualifications

**REQUIRED EDUCATION AND WORK/VOLUNTEER EXPERIENCE:**

- Bachelor's degree preferred
- Biology coursework at the undergraduate level or above required; Anatomy and Physiology and Medical Terminology coursework preferred
- A minimum of 1 year of work experience in the healthcare field may be considered in lieu of the education requirement
- At least 100 hours of work, volunteer, or shadowing experience in the healthcare field required
- Experience in a direct patient care environment preferred i.e. EMT, scribe, clinical technician in a hospital, medical assistant in a doctor's office

109. Scribes have confirmed to Dr. Sonyika that if it was documented in the chart that a patient smoked, they were directed by ScribeAmerica to chart smoking cessation even if the provider did not document or talk about smoking cessation. Dr. Sonyika personally witnessed three individual scribes, on April 24, 2021, at approximately 6 p.m., stating that they were instructed by ScribeAmerica to add smoking cessation to every chart that had smoking listed per the patient's past history, regardless of whether a conversation concerning smoking cessation occurring in the patient care conversation. Subsequent conversations with these scribes revealed that only two doctors objected to the practice. The directive for this scribe practice was through ScribeAmerica.

110. Other ScribeAmerica scribes admitted that they were directed to use a template that added elements that were not actually performed during the treatment

of the patient but were required for billing. This was also at the direction of ScribeAmeric and EmCare.

111. The instructions given by ScribeAmerica and EmCare promote fraud by charting for claimed services regardless of whether they are done. This fraudulent behavior shows a callous disregard for the truth or falsity of what Defendants billed to the government. Nevertheless, ScribeAmerica trains its scribes that the problematic instructions are actually proper.

112. Enforcement of the instructions given by ScribeAmerica and EmCare is ensured by threats to scribes—many of whom aspire to be medical students—that failing to fill out charts according to ScribeAmerica's instructions, which include fraudulent billing related items, will be viewed as failing on the task of filling out charts. ScribeAmerica and EmCare further threatened that failing to follow directions could result in scribes being banned from all medical schools.

113. To prevent abuse and fraud, CMS and other government payors mandate that physicians must determine whether a patient received critical care.

114. In conjunction with the Critical Care Scheme described below, ScribeAmerica and EmCare falsely tell scribes that they will know more about determining what qualifies as critical care than physicians. There is no legitimate reason or purpose for giving scribes—who lack the necessary qualifications, and credentials—the perceived authority and discretion to determine when a patient's treatment should be billed as critical care.

115. Perhaps the most egregious aspect of the Scribe Scheme is the use of scribes to override physicians' medical judgment and determine which services should be classified as "critical care." The scribe's role is detailed in the next several paragraphs, while broader details are provided in the next section entitled Critical Care Scheme.

116. As discussed in detail below, to bill for critical care, CMS requires that the physician seeing the patient properly document and make the classification of "critical care." However, Defendants circumvent this requirement by using scribes to determine critical care classifications.

117. This fraudulent practice is a significant aspect of Defendants' fraud.

118. In one example, a patient came to the emergency department with sore throat. Vital signs were not critical. The emergency department physician admitted the patient to a basic (non-ICU) hospital bed. However, after the physician has made this disposition, the scribe made the critical care determination and added a "Critical Care" billing attestation to the record on behalf of the physician.

119. As noted in the chart, the physician had already signed off on the chart on the day of service; nonetheless, three days later the physician had to re-sign and agree with the scribe's note, at the pressure of EmCare, or risk punitive actions by EmCare and the hospital.

120. Not only was this diagnosis and treatment not warranted for critical care, but the person actually making the determination, with the full support of EmCare, had not even graduated from college.

121. Scribes were instructed to chart any visit involving a transfusion as critical care.

122. Scribes also were required to report situations when a doctor declined to add critical care, which is significant because it is a method of creating conformity by reporting doctors to EmCare for not going along with the Scribe Scheme.

123. Additional details about the Critical Care Scheme are provided in the next section.

**D. The Critical Care Scheme**

124. EmCare's second Scheme—the Critical Care Scheme—is classic upcoding. EmCare fraudulently billed CMS for critical care services that were either not provided or not medically necessary.

125. Critical care is a heightened level of emergency treatment necessary when a patient has a severe medical condition (usually, an imminently life-threatening condition) that requires healthcare providers to exercise a higher degree of medical decision-making and devote undivided attention to that patient's treatment.

126. CMS reimburses providers for critical care services at a much higher rate than standard emergency services. Thus, EmCare views critical care reimbursement as a lucrative opportunity.

127. ScribeAmerica and EmCare direct scribes to place critical care information in the chart under certain circumstances regardless of whether it is actually warranted.

128. Of course, EmCare and its employees have no control over the severity of the injuries and illnesses that their patients present with. True critical care situations should account for approximately 1% or less of emergency cases. Regardless, ScribeAmerica and EmCare instruct scribes—who have no actual capacity to identify this 1% of cases, as that is the purview of the physician in accordance with advanced medical training—to place critical care designations in charts as a matter of course for medical services that do not meet the criteria of critical care. Thus, EmCare trains and pressures providers to approve falsified medical charts to indicate that critical care is required when, in fact, only standard emergency treatment is required.

129. Furthermore, the way that ScribeAmerica and EmCare use the electronic system makes it almost impossible for a physician to disapprove critical care: the

system will usually give a physician the option to "approve" or "cancel," but there really is no choice because "cancel" only means canceling one's completion of the chart, leaving the chart in an unfinished limbo (it does not cancel the scribes' designation of critical care). EmCare then uses the falsified medical charts to submit claims to CMS and other government payors at the higher critical care rate.

130. EmCare has been systemically upcoding critical care since at least 2008 (when the critical care regulations were last updated). This Critical Care Scheme too accounts for millions of dollars in overpayment by CMS and other government payors to EmCare every year.

131. EmCare openly discusses with its employees the fact that its constant pressure for critical care classifications are to drive revenue.

132. As with the Mid-Level Scheme, EmCare forces healthcare providers to comply with its critical care policies by threatening pay reduction, privilege suspension, and even firing. However, healthcare providers have no control over the amount of true critical care that will be required in any given time period. Thus, EmCare encourages its healthcare providers to document critical care for patients who only required ordinary (*i.e.*, non-critical) emergency care. EmCare's Critical Care Scheme violates CMS regulations and the FCA.

133. Like the Mid-Level Scheme, the Critical Care Scheme begins when a patient enters an EmCare-operated emergency department. During or immediately after the administration of medical care, the provider completes the EMR (electronic medical record) like any other patient encounter, notating the required elements—*i.e.*, a detailed or comprehensive medical history, physical examination, identification of medicines administered, tests ordered, images ordered and a description of the medical decision-making required. The EMR will indicate to the coder the level of care provided.

134. CMS divides emergency medical treatment into five levels of care based on severity of the condition(s) presented. Level 1 represents the lowest severity condition, and Level 5 represents the highest severity condition. The higher the severity level, the higher the reimbursement rate CMS will pay. Specifically, according to the CMS Physician Fee Schedule, a Level 1 patient encounter is reimbursed at approximately $21.00, a Level 5 at approximately $175.00, and Levels 2, 3, and 4 at amounts in between. These reimbursement rates are flat payments and are *not* based on the amount of time the provider spends with the patient. Thus, a Level 1 encounter will be reimbursed at approximately $20.00 whether it lasts 10 minutes or 2 hours.

135. However, there is a level of care above Level 5: “critical care.” Critical care is the level of treatment and decision-making required by the highest severity conditions and can generally be described as that level of care required by imminently life-threatening emergency conditions. Specifically, CMS defines “critical care” as physician medical care for a critically ill or critically injured patient whose critical illness or injury acutely impairs one or more vital organ systems such that there is a high probability of imminent or life threatening deterioration in the patient’s condition.

136. True critical care conditions are rare and typically account for approximately 1% of all emergency department visits, with the overwhelming majority of critical patients ultimately being admitted to critical care units within the hospital. According to CMS, critical care involves high complexity decision making to assess, manipulate, and support vital system functions(s) to treat single or multiple vital organ system failure and/or to prevent further life threatening deterioration of the patient’s condition. Further, all critical care services must be medically necessary and reasonable.

137. Due to its complex nature, CMS reimburses critical care at a higher rate than standard emergency care. Also, unlike Levels 1 through 5, critical care billing is based on the amount of time the physician spends treating the critical patient such that the more time a physician administers critical care, the more reimbursement money the emergency department will receive.

138. Medicaid and other government healthcare programs and plans similarly reimburse critical care at a higher rate and require supporting documentation of the care actually provided.

139. According to EmCare, critical care provides a lucrative opportunity to increase reimbursement revenues. Indeed, the first 30 minutes of critical care alone provide a minimum of approximately $50 in additional revenue over and above an hours-long Level 5 encounter, with every additional subsequent 30-minute interval increasing the reimbursement as well.

140. EmCare administrators circulate communications to employees of EmCare-managed emergency departments, indicating that EmCare physicians should be billing critical care in the 6-12% range. These administrators further encourage EmCare providers to bill critical care time and to capitalize on opportunities to increase critical care billing.

141. To be reimbursed for critical care, a physician must properly record his or her critical care treatment in the EMR. The treating physician must specifically document that he or she performed "critical care" (using those words) and notate the amount of time (typically in minutes) such critical care was administered.

142. To meet its unrealistic critical care push, EmCare requires physicians to provide this documentation for encounters in which critical care treatment was not necessary and to maximize every possible minute of critical care billing.

143. Healthcare providers working for EmCare are desensitized to this over-charting and upcoding because EmCare constantly hammers them with training that

contradicts the medical education that providers received during medical school or residency. EmCare's training redefines what constitutes critical care for its healthcare providers. In addition, EmCare publicly calls out healthcare providers who fail to document critical care in situations where EmCare claims they should.

144. EmCare's training (or re-training) sessions are often conducted by non-physician coders. Further, EmCare coding specialists also regularly send "feedback" to healthcare providers, attaching specific patient charts and instructing them on what additional information should have been included so that a chart can meet the higher-revenue critical care billing requirements.

145. EmCare has implemented a uniform policy that pressures healthcare providers and scribes to memorize those medical conditions that, according to EmCare, will require critical care every time. EmCare systematically perpetrates this one-size-fits-all Critical Care Scheme nationwide, rather than relying on trained healthcare professionals to provide the level of care they believe to be most appropriate. EmCare emergency departments even have "critical care committees" that meet periodically to monitor critical care billing levels and brainstorm about how to increase those billing levels.

146. Evidencing this one-size-fits all approach to critical care charting, EmCare physicians typically use uniform critical care language in their EMR charts, such that the charts are merely rubber stamped with inexact statements such as "Aggregate critical care time was __________." This language simply parrots the critical care requirements so that EmCare can "check the box" for critical care billing. Indeed, EmCare EMRs contain literal boxes next to this type of formulaic language that a treating physician will click or check. Each click means more money for EmCare.

147. EmCare uses the falsified medical records to upcode for nonexistent or unnecessary critical care. With knowledge of the falsity of the medical records,

EmCare knowingly submits false claims to CMS and other government payors for reimbursement at the higher critical care rates.

148. Relators observed the same policies with respect to critical care in every EmCare emergency department where they worked. At each of these facilities healthcare providers were encouraged and/or required to increase the amount of critical care they performed and were consistently told that critical-care billing was a priority.

149. Importantly, as with the charges for mid-level billing, EmCare is able to disguise these fraudulent claims in plain sight because a critical care claim is a "pass through" claim for billing purposes, meaning there is no front-end auditing of these charges. The absence of auditing risk emboldens EmCare to encourage with impunity the submission of fraudulent claims for reimbursement of critical care services. And, even if EmCare is required to submit underlying EMRs (such as, in accordance with an ad hoc audit or probationary period implemented by a MAC), the EMRs will theoretically evidence the provision of critical care, when in fact critical care was not required or medically necessary.

150. The Critical Care Scheme reflects company-wide policy. National and regional EmCare administrators often send emails to EmCare physicians and mid-levels instructing and reminding them of EmCare's critical care policy.

**E. The Mid-Level Scheme**

151. Relators witnessed firsthand the unlawful practices that EmCare utilizes to fraudulently increase billing to and reimbursement from the Government. Through their personal knowledge, experience, and investigation, Relators uncovered the unlawful Mid-Level Scheme that Defendants use systematically and purposely to submit false claims to CMS.

152. Under the Mid-Level Scheme, EmCare overbills for services provided by mid-levels (*i.e.*, PAs and NPs) by fraudulently submitting claims for

reimbursement for those services under a physician's NPI to be paid at the higher physician rate. That is, although EmCare submits claims to CMS for reimbursement for mid-level services, it falsely indicates that a physician, rather than a mid-level, directed the medical care when in fact the physician had no input into the care of the patient.

153. Typically, services provided by mid-levels are reimbursed at 85% of the physician billing rate for E/M services.[9] *See* 42 U.S.C. § 1395l(a)(1)(O). To determine the allowable rate for a service provided by a mid-level, Medicare will select the proper amount based on the physician fee schedule and discount that amount by 15% to reach the appropriate 85% mid-level billing rate. The Plaintiff States have enacted similar reimbursement protocols for their Medicaid programs. When a mid-level performs services alone, without physician involvement, the proper procedure is to submit a claim for those services under the mid-level's NPI so the claim will be paid at the appropriate mid-level rate.

154. However, EmCare ignores these rules. Instead, it submits claims for mid-level services under the NPIs of random on-duty physicians. To cover its tracks in case of a CMS audit, EmCare requires its providers to manipulate mid-level charts to falsely reflect what is called a "shared visit."

155. Because the emergency room is an environment where serious medical conditions are time-sensitive and an expert decision could be the difference between life and death, CMS and other government payors require that shared visits include a face-to-face interaction with the physician and the patient to ensure the safety of the patient for more serious matters where a mid-level's training and experience may not be enough to protect the patient from harm. This ensures patients receive the life-

---

[9] The Medicare statute specifically states that "with respect to services described in 1861(s)(2)(K) [42 U.S.C. § 1395x(s)(2)(K)] (relating to services furnished by physician assistants, nurse practitioners, or clinic nurse specialists), the amounts paid shall be equal to 80 percent of (i) the lesser of the actual charge or 85 percent of the fee schedule amount provided under section 1848 [42 USCS § 1395w-4], or (ii) in the case of services as an assistant at surgery, the lesser of the actual charge or 85 percent of the amount that would otherwise be recognized if performed by a physician who is serving as an assistant at surgery[.]" 42 U.S.C. § 1395l(a)(1)(O).

saving care they deserve and is a protective measure implemented by CMS and other government payors to make sure cost-cutting would not detrimentally impact patient safety.

156. A true shared visit occurs when a physician and a mid-level treat a single patient in tandem with the physician documenting a face-to-face encounter with the patient as required by CMS and other government payors. Under an actual shared visit, CMS and other government regulations allow the submission and reimbursement of the mid-level's services under the physician's NPI along with the physician's services, as if the mid-level were an extension of the physician. This is the only situation in the emergency context allowing reimbursement of mid-level services at the full physician rate.

157. In most circumstances, mid-levels and physicians in EmCare's emergency departments treat patients separately. Under EmCare's business model, physicians and mid-levels rarely, if ever, work alongside each other to perform true shared visits. Mid-levels treat lower acuity patients and physicians treat higher acuity patients. Accordingly, the vast majority of claims EmCare submits for services provided by its emergency department mid-levels should be submitted under the mid-levels' NPIs. However, that is not what EmCare does. Although mid-levels perform the vast majority of their services alone (without the physician having any input into the case and without a face-to-face encounter by the physician), EmCare uniformly submits claims for services provided solely by mid-levels under physician NPIs claiming the physician directed the medical decision making after a face-to-face encounter with the patient.

158. The Mid-Level Scheme starts with the use of floor-management models EmCare employs to increase "flow." Again, in most EmCare facilities, physicians and mid-levels often work in different "zones" of the emergency department. Upon admission to the emergency department, patients are assigned to either a physician

or a mid-level depending on the severity of the patient's condition or injury. Dividing the emergency department in this way all but eliminates direct interaction between physicians and mid-levels. This is intentional; the system prevents overlap (that is, prevents a physician and a mid-level from both seeing the patient together) and maximizes the number of patients each individual healthcare provider treats. However, the system also complicates communication between emergency department personnel and thereby facilitates EmCare's Mid-Level Scheme.

159. Those patients assigned to mid-levels typically receive care from the mid-level alone without any physician involvement at all and without the physician having any face-to-face encounter with the patient or input into the medical decision making. Under EmCare's floor-management model, it is extremely rare that mid-levels and physicians ever see the same patient or even discuss a patient's diagnosis or treatment plan.

160. During or following treatment, the mid-level will create and complete an EMR for the patient, documenting all of the elements of treatment. This EMR will later inform the patient's bill and the reimbursement claim made to CMS. These EMRs includes a detailed or comprehensive medical history, physical examination, identification of medicines administered, tests ordered, images ordered, and a description of the medical decision making required. EmCare's Mid-Level Scheme continues here; EmCare requires mid-levels to indicate on their EMRs that they were supervised by a physician during the patient's treatment, whether or not the physician actually supervised the mid-level, or even knew the mid-level was seeing the patient, and without a face-to-face interaction by the physician with the patient or any physician input into the medical decision making.

161. After the patient visit is over and the mid-level completes the EMR, EmCare should code and submit the claim to CMS for the mid-level's services under the mid-level's NPI so that CMS will appropriately reimburse EmCare at the 85%

rate for mid-level's services. But, that is not what EmCare does. Instead, after mid-levels complete their EMRs, EmCare requires them to assign and send each EMR to a physician for signature before the EMR can be sent on for coding and billing purposes. This requirement exists regardless of whether the physician supervised the mid-level and actually saw the patient. The result is that each mid-level chart is assigned to a physician for signature.

162. Once the mid-level completes the EMR and assigns it to a physician, EmCare requires physicians to add their signature to each EMR. EmCare requires physicians and mid-levels to document on every mid-level chart that the physician supervised the patient encounter and requires physicians to sign every mid-level chart, even when, as is overwhelmingly the case, no shared visit occurred.

163. This fraudulent workflow organization by EmCare creates two significant problems. First, it results in patients and government payors being improperly billed for physician medical services that were not necessary. Second, it compromises patient safety because many problems that require the expertise of a physician are not receiving that expertise (*e.g.*, warning signs for cancer masquerading as a mouth sore that require urgent coordinated care) are missed even though the patient is charged as if the physician provided that protective expertise.

164. Physicians have no option to disagree with the mid-level's care or documentation because mid-level charts are typically assigned to physicians *after* the patient has been treated by the mid-level and discharged—sometimes even days later. Nonetheless, EmCare requires emergency physician to sign and approve *every* mid-level chart assigned to him or her. This is true despite the fact that it would often be physically impossible for the physician to have actually supervised the number of mid-level charts EmCare requires the physician to countersign.

165. EmCare hounds its mid-levels to assign every chart to a physician and harasses physicians to countersign outstanding mid-level charts. Further, EmCare

HENNIG KRAMER RUIZ &

ensures employee compliance with these requirements by admonishing its healthcare providers that physician signatures are required to bill for mid-level services, even though there is no such CMS requirement. Worse still, EmCare ensures that its employees comply with EmCare's charting requirements by threatening that failure to do so may result in pay cuts, suspension, or even termination.

166. EmCare employs billing coordinators—whose primary job function includes collection of physician signatures on medical charts—to press mid-levels and physicians to assign and countersign the charts. EmCare instructs its billing coordinators that of all the information on the patient charts, the physician signature is the most important because it allows EmCare to bill at the physician rate. This physician signature requirement is especially enforced for Medicare and Medicaid patients. Again, there is no CMS requirement that physicians sign mid-level charts in order to obtain reimbursement for mid-level services.

167. EmCare goes to great lengths to ensure that physician signatures are obtained. In fact, EmCare suspended Dr. Hernandez's privileges at Tucson Medical Center for failing to sign charts for patients he did not see and/or mid-levels he did not supervise.

168. In addition to harassing and threatening its physicians, EmCare has instructed customer service representatives to fraudulently sign unsigned claim forms on behalf of physicians. This practice is in violation of CMS signature requirements requiring authentication by the practitioner who provided the services for which reimbursement is being sought.

169. EmCare's billing coordinators maintain detailed records attributing mid-level services to physicians by means of these signatures. These records track in the aggregate the specific services and billing codes derived from the charts each physician signs for mid-level providers. These records do not indicate that the services were performed entirely by a mid-level; rather, they misleadingly attribute

those services (and their corresponding billing codes) to the physician who signed the chart.

170. The experiences of EmCare employees confirm the unlawful lengths EmCare will pursue to obtain valuable physician signatures. Indeed, one RTI call center supervisor was given a stack of CMS 1500 claims forms lacking physician signatures with instructions to distribute the forms to call center employees who should sign the forms on behalf of the physicians. This practice violates the CMS requirement that "services provided/ordered be authenticated by the author" by means of a handwritten or electronic signature.

171. A former EmCare billing coordinator corroborated this practice, stating that EmCare required a physician signature for every patient even if the physician did not treat the patient. The coordinator noted that this requirement was especially enforced for patients relying on Medicare or Medicaid coverage and was told that EmCare could bill at a higher rate with a physician signature on a chart than if only an NP signed the chart. Among the seven key pieces of information that the coordinator checked on each EMR received, the physician signature was mandatory, and EmCare impressed upon the coordinator that it was the most important piece of information because EmCare could not bill for physician services without it. If one of the key pieces of information, including the physician signature, was not included in a chart the coordinator forwarded, the chart would be returned to the coordinator to track down the information from the practitioner.

172. Once the mid-level chart is signed by a physician, it automatically is sent to EmCare's coding and billing specialists, who reduce the falsified charts to CPT codes and select the physician's NPI for billing purposes, despite the fact that the physician performed no services at all. The NPI tied to the CPT code triggers the reimbursement rate CMS will apply. Thus, when EmCare uses a physician NPI to request reimbursement for mid-level services, CMS applies 100% of the physician

rate to the request and, therefore, reimburses EmCare for the services of a mid-level as if a physician had performed them. This Mid-Level Scheme violates the FCA and state counterparts.

173. Importantly, the underlying EMRs are not submitted to CMS along with the claim for reimbursement, but EmCare must maintain the EMRs in case of a CMS audit. Thus, the manipulated charts provide some—albeit flimsy—cover for EmCare's fraudulent claims since the charts are made to superficially appear as if shared visits occurred. EmCare's stockpiles of manipulated EMRs cannot ultimately provide plausible deniability in the case of an audit, as CMS has made clear that a physician signature and statement of supervision alone are insufficient to support a shared visit claim.

174. EmCare employees are in siloed departments, with different departments—sometimes even different legal entities—handling chart completion, coding, billing, and customer service, respectively. These employees rarely communicate with one another. This ensures that no individual employee will be able to see the whole picture and detect the Mid-Level Scheme.

175. EmCare has employed this company-wide Mid-Level Scheme despite knowing it violates CMS requirements and results in the submission of false claims for overpayment to CMS. As early as 2007, EmCare published an internal policy in its Employee Handbook making it clear that submitting mid-level charts for reimbursement from CMS at the full physician rate was prohibited absent an actual face-to-face patient encounter by the physician.

176. Despite its knowledge of CMS regulations, EmCare has implemented a detailed Mid-Level Scheme that wholly ignores and contradicts CMS regulations and its own claimed policy regarding the submission of claims under the appropriate NPR and the proper documentation of shared visits. Accordingly, it is apparent that EmCare willfully has designed and perpetrated the Mid-Level Scheme with full

knowledge of its unlawfulness. Thus, each fraudulent claim for mid-level services EmCare has submitted to CMS has been submitted with the requisite knowledge under the FCA. *See* 31 U.S.C. § 3729.

177. EmCare also submits these false claims to CMS and other government payers with knowledge of the falsity underlying the EMRs (*i.e.*, knowledge that a shared visit did not truly occur despite the physician attestations and signatures on the EMRs) and the falsity of the resulting claims for reimbursement at the full physician rate for services *never* provided by a physician. At the very least, EmCare submits a claim with reckless disregard for the truth or falsity of the information upon which the claims are made.

178. EmCare systematically perpetrates the Mid-Level Scheme nationwide. Relators observed the exact same policies and procedures regarding mid-level charting and physician countersignatures at each of the 4 EmCare emergency departments they have worked in around the country. Additionally, the uniformity of EmCare's information systems, procedures, policies, training, and penalties confirms that the Mid-Level Scheme is embedded in EmCare's business model. Furthermore, reports of former EmCare customer service representatives who fielded persistent billing inquiries from patients across the country as to why the patients were being billed for physician services when they had not been seen by a physician confirm the pervasiveness of the Mid-Level Scheme.

179. EmCare's Mid-Level Scheme violates CMS regulations governing reimbursement for E/M services performed by mid-levels and thus the FCA.

180. Finally, EmCare could not have fully executed the three schemes described above without conspiring with ScribeAmerica, which provided the training related to the schemes and ensured scribe compliance with the schemes and, on information and belief, without conspiring with RTI to execute the billing consistent with and without questioning those schemes. The extent of the false billing is strong

evidence of RTI's participation in the conspiracy. A reputable billing company would monitor for such schemes and would not cooperate in their implementation when detected.

## VIII. REPRESENTATIVE EXAMPLES

### A. Patient 1[10]

181. As indicated by the following patient charts, Defendants' schemes continue to the present time. The facts reflecting evident use of the fraudulent schemes—in this case the Mid-Level Scheme and the Scribe Scheme—are present in Patient 1's chart. The chart for Patient 1, a Medicaid patient, demonstrates the Mid-Level Scheme because even though the chart is in different levels of completion, it shows what the physician is being required to cosign and—as is evident from other exhibits—that the patient left an hour before the record shows being seen by the physician. Thus, the physician could never have taken part in a shared visit in conformity with CMS standards.

182. Patient 1's chart also refers to what time and by whom the patient was seen. The chart notes that the patient was seen by the mid-level at 5:16 p.m., but was not even "assigned" by the mid-level to the physician until 8:02 p.m. Significantly, given how EmCare utilizes the software chart program, a doctor is not even notified that the mid-level is assigning a patient to the doctor until the mid-level files the assignment, which in this case was 8:02 p.m. There is no way the physician supervised the mid-level if the physician did not even know about the treatment that the mid-level was providing or that the mid-level was thinking of later sending the assignment, when that assignment was ultimately filed, to the physician.

183. Patient 1's chart also demonstrates that the doctor has not had access to the chart. In the chart, which is an example of a "canned note,", the scribe placed

[10] For purposes of complying with privacy interests, complying with HIPAA, and safeguarding protected health information, Relators identify patients by number. Relator can and will provide additional identifiers for all patients referenced in this complaint upon request by Defendants or order of the Court.

information in the chart that the doctor could not have even known about, let alone directed or performed on the patient. Scribes should document only what they are actually seeing done by the physician; they are not to force information into the chart that is then practically impossible for a doctor to remove, particularly, as with the Mid-Level Scheme, when physicians are pressured and threatened by EmCare to approve and attest to such false information. The work process of the electronic charts and the notification system only send relevant information to the physician, such as the notification that he has been "assigned" a patient for cosigning until after the mid-level and the mid-level's scribe file their information and send it to the physician, *i.e.*, the "file time." Before this happens, the physician has no notification of what the mid-level and scribes have been entering or even doing.

184. The chart also notes the physician is "directing" the care. This is not only false, given the background information, but it is also non-compliant with CMS standards for a true shared visit. This patient was gone for two hours, rendering a true shared visit impossible.

185. The chart also shows that it was impossible for the physician to have a truthful face-to-face encounter charted for the patient because the time listed for the mid-level provider is "10:02." During their time in the emergency department, physicians have their own patients to see and are only sent charts for cosign by mid-levels as something collateral to the care they are providing after the fact. This means that physicians—who are busy saving the lives of their own patients during their shift—will typically only have time to see the mid-level provider charts that they have been sent to cosign at the end of their shift, having never seen (nor ever having the opportunity to see) the patient for whom they are being asked to cosign. Evidence of this practice is also apparent in Patient 1's chart, which reflects a box for chart completion and lists the number of charts that a physician is being compelled by EmCare to "complete." Roughly half of such charts are mid-level charts for which a

HENNIG KRAMER RUIZ &

physician is being asked to cosign and provide an attestation for billing as a shared visit despite the fact that the physician has not conducted any face-to-face visit with the patient and was not even assigned the chart until the patient was already dispositioned from the emergency department.

186. Patient 1's chart also shows that the patient was discharged at 5:37 p.m. Because the "file time" was 8:02 p.m., this shows that it was impossible for the physician to have a true shared visit or for the physician to have seen the patient face-to-face because the physician did not even see the chart until 10:34 p.m. The shared visit billed along with this visit is therefore fraudulent and a false claim.

**B. Patient 2**

187. The facts reflecting evident use of the fraudulent schemes—in this case the Critical Care Scheme and the Scribe Scheme—are present in the chart for Patient 2, a Medicaid patient.

188. Patient 2's chart shows that the scribe is creating the critical care note, which can be seen with regard to the core measures, sepsis protocol, and critical care attestations of the chart. It appears that all of this information was created by the scribe and are "canned notes," *i.e.*, examples of pre-populated text. Scribes have no critical care training that would give them the capacity to make a judgment call as to what actually is critical care pursuant to CMS guidelines. Nurses know that they are not qualified to make a judgment as to critical care, but scribes, who have no medical licensed training even approaching that of a nurse, have been falsely informed by ScribeAmerica and EmCare that they have been trained better at determining critical care than doctors. Significantly, scribes are also emboldened by the false notion that if they have entered something improperly, the coders and billers will not bill for it.

189. The chart also shows how scribes insert into the charts services and procedures for which EmCare bills. The chart reveals that the patient was not on a critical care floor, but was on a "regular" floor. The "***" identified in the charts

shows where there is a canned note awaiting input at a later time. In the context of Defendants' schemes, scribes have a computer that includes a number of items they are instructed to click to add to the chart. As per conversations Relators had with scribes working under EmCare's direction, scribes are instructed to click items such as "smoking cessation" whenever possible. Scribes admitted that they are encouraged to do so because there is no way that the government can know what is happening because critical care is "pass-through billing."

190. The chart also shows that the scribe provided the critical care core measures and counseling information. If anyone amends the note, even a scribe, the doctor has to re-sign, which is evident in the chart. The different dates noted in the chart for when the physician saw the patient, when the scribe added new information, and when the physician was then compelled to attest to what the scribe added are all present in the chart.

**C. Patient 3**

191. The facts reflecting evident use of the fraudulent schemes—in this case the Mid-Level Scheme and the Scribe Scheme—are present in the chart for Patient 3, a Medicare patient.

192. Patient 3's chart shows the Mid-Level Scheme along with the Scribe Scheme. The chart shows a discrepancy between when the mid-level saw the patient and when the physician provided an attestation. The exhibit shows that the mid-level saw the patient at "14:58," while the physician did not even get the chart until "19:56" and did not know before then that the mid-level would later send the chart to the physician. According to the chart, the scribe entered all of the notes.

193. The chart shows the time of service as being 11:23 a.m., with radiology at 12:41 p.m., medicines at 2:58 p.m., and the mid-level and scribe finishing their notes at 2:58 p.m. Most significantly, however, the patient was discharged at 3:12 p.m., hours before the physician even saw the chart and was then asked to "cosign"

an attestation for a shared visit at 7:53 p.m. A shared visit with the required face-to-face component was impossible under these facts.

**D. Patient 4**

194. The chart for Patient 4, a Medicare patient, is an example of the Mid-Level Scheme. The chart shows via the time entries that the physician did not even know the patient was assigned to the physician until after the mid-level sent the assignment to the doctor. The background information demonstrates that a true shared visit was an impossibility.

195. The chart is an example of the Scribe Scheme and the Mid-Level Scheme. The "***" shows that the field is empty and that this is a "canned template" entered by the scribe. Every "***" in the progress notes shows that the scribe is selecting what will ultimately be billed as physician treatment even though there is no physician treatment that has happened yet: the physician is left only as a "***" in this chart, having not even been selected by the mid-level at this point. The "Time Seen By Mid-Level Provider" is "17:08," which is signed as if it were completed, although nothing has been filled in. This shows that the scribe is populating the progress notes as a matter of course. Given how charting functions, the mid-level had not even started clicking boxes on the computer at the time the scribe started entering this information. In fact, if a physician had seen the patient at this time, the chart would show "Time Seen By Physician" alongside "Time Seen By Mid-Level Provider." Thus, all information the scribe entered charted attestations that the work had been done, even though the physician had not seen the patient.

196. The chart reflects time disparities proving an example of the Mid-Level Scheme. The most recent of the "Recent Notes" shows the chart was last notated at "19:28" on "Yesterday." The "Progress Notes" show the patient was discharged at "20:09," but the mid-level attestation sent the chart to the physician at "20:14." The

physician did not see the chart until roughly 2:00 a.m. the next day, long after discharge.

**E. Patient 5**

197. The chart for Patient 5, a Medicaid patient, shows the Mid-Level Scheme and the Scribe Scheme through the "counseling" and "smoking cessation" entries on the chart. These entries were auto-populated, since the counseling did not happen. This chart also shows that a physician does not have the option to get rid of the information after the scribe enters it. The "cancel" command merely means the chart is not "completed" but will remain in limbo.

198. The chart also demonstrates that the scribe added information after the physician had seen the patient and left. The physician originally saw the patient on Monday. The scribe then added information on Tuesday, and the physician was compelled to approve what had been added to the chart, which he did on Friday.

**F. Patient 6**

199. The chart for Patient 6, a Medicaid patient, shows that the scribe selected smoking cessation simply because the patient was a smoker. The chart also shows that the scribe supplied an entire "canned" portion of the chart not because it was witnessed, but as part of the scribe's instructions from ScribeAmerica and EmCare. The physician, however, confirmed that the patient did not receive smoking cessation counseling.

**G. Patient 7**

200. The chart for Patient 7, a Medicaid patient, is a clear example of the Mid-Level Scheme and the Scribe Scheme. According to this chart, the physician whom the mid-level and scribe assigned to see the patient did not do so until four hours after discharge—making a properly billable shared visit an obvious impossibility.

**H. Patient 8**

201. The chart for Patient 8, a Medicaid patient, shows all of the features of fraud that are evident in Patient 4's chart, but with regard to another patient. The same schemes are demonstrated on this chart in the same ways.

202. The chart shows that the patient was discharged before the physician saw the patient. This can be seen from the fact that the most recent note in the chart's "Recent Notes" section is "Yesterday at 17:51." The patient was discharged at roughly "20:29." All decisions in the "Progress Notes" were done the day before the physician even accessed the chart, which can be noted by referring to the "Progress Notes." The chart has no "Time Seen By Physician" entry, and the physician attestation has not been added, although EmCare used its machinery to send the chart to the physician to have a "cosign" added in an attestation for purposes of submitting a shared visit billing.

**I. Patient 9**

203. The chart for Patient 9, a Medicare patient, demonstrates the Mid-Level Scheme by identifying "Time Seen By Mid-Level Provider," while not including "Time Seen By Physician." Significantly, the physician did not see the patient since the physician did not even access the chart until four hours after the mid-level filed the note.

204. The chart shows that the physician did not even access the chart until after the patient was discharged. The patient was discharged at 10:35 p.m., but the physician did not access the chart until 2:26 a.m. the following day. The only thing the doctor provided was an electronic signature after the fact for what was billed as a shared visit.

205. The chart also demonstrates the Mid-Level Scheme by providing a picture of two days of care. On the first, the doctor was never involved in the care. The patient was discharged at 10:35 p.m. on Saturday, but the doctor was not sent

HENNIG KRAMER RUIZ &

the chart for attestation until 11:01 p.m. ("Filed"). The physician attestation shows the physician signed the chart on Sunday at 2:26 a.m. "Cosign Needed" is listed on the second day.

**J. Patient 10**

206. The chart for Patient 10, a Medicare patient, is an example of the Mid-Level Scheme. The chart shows the physician did not see the chart until 2:38 a.m., long after the patient had already been sent to another floor (no longer in the emergency department).

**K. Patient 11**

207. The chart for Patient 11, a Medicaid patient, shows a clear example of the Mid-Level Scheme. The mid-level discharged the patient at 7:52 p.m. ("Yesterday at 19:52"); nonetheless, the mid-level submitted the chart to the physician for an attestation at 8:23 p.m., as noted from the time it was "Filed." It was "cosigned" at 1:39 a.m. the following day.

**L. Patient 12**

208. The chart for Patient 12, a Medicaid patient, shows both the Critical Care Scheme and the Scribe Scheme. The scribe included "canned content," such as "smoking cessation" counseling, in the chart for fraudulent billing purposes. The chart shows the scribe added the "canned language" for critical care despite the fact that the chart also lists the patient's condition as fair. The "***" at the end of the chart demonstrates that the chart was awaiting physician attestation at the time the scribe entered these determinations.

## IX. COUNTS

### Count 1: Federal False Claims Act
### (Presentation of False Claims for Payment)
### 31 U.S.C. § 3729(a)(1)(A)

209. Relators re-allege and incorporate by reference paragraphs 1 - 208.

210. This a claim for treble damages and penalties under the FCA.

HENNIG KRAMER RUIZ &

211. The FCA, 31 U.S.C. § 3729(a)(1)(A), imposes liability upon those who knowingly present or cause to be presented false claims for payment or approval.

212. Through the acts described above and otherwise, Defendants knowingly presented, or caused to be submitted, materially false or fraudulent claims for payment or approval to the United States by billing, or causing to be billed, federal health care programs for services that were not rendered, were up-coded, or were performed solely by non-physician practitioners (*i.e.*, mid-levels) in EmCare emergency departments but billed as if they were performed by or in conjunction with a physician in violation of 31 U.S.C. § 3729(a)(1).

213. Each of the false or fraudulent claims submitted, or caused to be submitted, by Defendants is a separate violation of 31 U.S.C. § 3729(a)(1)(A).

214. The United States was unaware of the false or fraudulent nature of the claims Defendants submitted or caused to be submitted.

215. The false or fraudulent claims Defendants knowingly submitted or caused to be submitted to the United States were material to the United States' decisions to pay claims.

216. Had the United States actually known of the false or fraudulent nature of the claims, it would have been prohibited by law from making corresponding payments.

217. Because of these false or fraudulent claims Defendants submitted or caused to be submitted, the United States has been damaged in an amount to be determined at trial.

**Count 2: Federal False Claims Act**
**(Use of False Statements Material to False Claims)**
**31 U.S.C. § 3729(a)(1)(B)**

218. Relators re-allege and incorporate by reference paragraphs 1 - 208.

219. This is a claim for treble damages and penalties under the FCA.

220. The FCA, 31 U.S.C. § 3729(a)(1)(B), imposes liability upon those who knowingly make, use, or cause to be made or used false records or statements material to a false or fraudulent claim.

221. Through the acts described above and otherwise, Defendants knowingly made, used, or caused to be made or used false records or statements material to the payment of false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

222. Defendants' false certifications and representations were made for the purpose of ensuring that the United States paid the false or fraudulent claims, which was a reasonable and foreseeable consequence of Defendants' statements and actions.

223. Each false record and statement material to a false or fraudulent claim submitted to the United States is a separate violation of 31 U.S.C. § 3729(a)(1)(B).

224. The United States was unaware of the falsity of the records, statements, and claims Defendants made or submitted and, because of the inaccuracy of these records or statements, authorized payments to be made, made such payments, and has been damaged.

225. The false records or statements were knowingly made by Defendants and were material to the United States' decisions to make payments.

226. Had the United States actually known of the false nature of Defendants' representations, it would have been prohibited by law from making corresponding payments.

227. Because of these false records or statements, the United States paid claims, resulting in damages to the United States in an amount to be determined at trial.

228. By reason of Defendants' actions, the United States has incurred and continues to incur damages.

**Count 3: Federal False Claims Act**
**(Conspiracy)**
**31 U.S.C. § 3729(a)(1)(C)**

229. Relators re-allege and incorporate by reference paragraphs 1 - 208.

230. This is a claim for treble damages and penalties under the FCA.

231. The FCA, 31 U.S.C. § 3729(a)(1)(C), imposes liability upon those who conspire to commit a violation of another sub-section of the FCA.

232. Through the acts described above and otherwise, Defendants, by and through their agents and employees, knowingly conspired to commit a violation of the FCA in the manner set forth in Counts I, II, and III above in violation of 31 U.S.C. § 3729(a)(1)(C).

233. Had the United States actually known of the false or fraudulent nature of Defendants' representations and claims, it would have been prohibited by law from making corresponding payments.

234. Because of these conspiracies, and the resulting false or fraudulent claims Defendants submitted or caused to be submitted, the United States paid the claims, resulting in damages to the United States in an amount to be determined at trial.

**Count 4: California FCA**

235. Relators re-allege and incorporate by reference paragraphs 1 - 208.

236. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented false or fraudulent claims for payment or approval, in violation of Cal. Gov't Code § 12651(a)(1).

237. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used false records or

statements material to false or fraudulent claims, in violation of Cal. Gov't Code § 12651(a)(2).

238. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the state of California and/or its political subdivisions, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the state of California and/or its political subdivisions, all in violation of Cal. Gov't Code § 12651(a)(7).

239. At minimum, Defendants were beneficiaries of an inadvertent submission of a false claim, and failed to disclose the false claim to the state of California and/or political subdivisions within the time set forth by statute after discovery of the false claim, in violation of Cal. Gov't Code § 12651(a)(8).

240. The state of California and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid for benefits funded by the state of California and/or its political subdivisions.

241. As a result of Defendants' actions, the state of California and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count 5: Colorado Medicaid FCA**

242. Relators re-allege and incorporate by reference paragraphs 1 - 208.

243. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of Col. Rev. Stat. § 25.5-4-305(1)(a).

HENNIG KRAMER RUIZ &

244. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used false records or statements material to false or fraudulent claims, in violation of Col. Rev. Stat. § 25.5-4-305(1)(b).

245. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used false records or statements material to an obligation to pay or transmit money to the state of Colorado in connection with the Colorado Medical Assistance Act, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the state of Colorado in connection with the Colorado Medical Assistance Act, all in violation of Col. Rev. Stat. § 25.5-4-305(1)(f).

246. The state of Colorado and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid for benefits funded by the state of Colorado and/or political subdivisions.

247. As a result of Defendants' actions, the state of Colorado and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count 6: Connecticut False Claims Act**

248. Relators re-allege and incorporate by reference paragraphs 1 - 208.

249. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of Conn. Gen'l Stat. § 4-275(1).

250. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the

information, knowingly made, used or caused to be made or used false records or statements material to false or fraudulent claims, in violation of Conn. Gen'l Stat. § 4-275(2).

251. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the state of Connecticut and/or its political subdivisions, in violation of Conn. Gen'l Stat. § 4-275(7).

252. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed, avoided or decreased an obligation to pay or transmit money to the state of Connecticut and/or its political subdivisions, in violation of Conn. Gen'l Stat. § 4-275(8).

253. The state of Connecticut and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid for benefits funded by the state of Connecticut and/or its political subdivisions.

254. As a result of Defendants' actions, the state of Connecticut and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count 7: Delaware False Claims And Reporting Act**

255. Relators re-allege and incorporate by reference paragraphs 1 - 208.

256. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented false or fraudulent claims for payment or approval, in violation of 6 Del. C. § 1201(a)(1).

257. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used false records or statements material to false or fraudulent claims, in violation of 6 Del. C. § 1201(a)(2).

258. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the state of Delaware and/or its political subdivisions, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the state of Delaware and/or its political subdivisions, all in violation of 6 Del. C. § 1201(a)(7).

259. The state of Delaware and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid for benefits funded by the state of Delaware and/or its political subdivisions.

260. As a result of Defendants' actions, the state of Delaware and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count 8: District of Columbia FCA**

261. Relators re-allege and incorporate by reference paragraphs 1 - 208.

262. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented to an officer or employee of the District and/or its political subdivisions, false or fraudulent claims for payment or approval, in violation of D.C. Code § 2-308.14(a)(l).

263. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be used false records or statements to get false claims paid or approved by the District and/or its political subdivisions, in violation of D.C. Code § 2-308.14(a)(2).

264. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the District and/or its political subdivisions, in violation of D.C. Code § 2-308.14(a)(7).

265. The District of Columbia and/or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid for benefits funded by the District and/or its political subdivisions.

266. As a result of Defendants' actions, the District of Columbia and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count 9: Florida FCA**

267. Relators re-allege and incorporate by reference paragraphs 1 - 208.

268. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented to an officer or employee of the state of Florida and/or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Fla. Stat. § 68.082(2)(a).

269. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used false records or

statements to get false or fraudulent claims paid or approved by the state of Florida and/or its political subdivisions, in violation of Fla. Stat. § 68.082(2)(b).

270. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the state of Florida and/or its political subdivisions, in violation of Fla. Stat. § 68.082(2)(g).

271. The state of Florida and/or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid for benefits funded by the state of Florida and/or its political subdivisions.

272. As a result of Defendants' actions, the state of Florida and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count 10: Georgia State False Medicaid Claims Act**

273. Relators re-allege and incorporate by reference paragraphs 1 - 208.

274. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented false or fraudulent claims for payment or approval, in violation of Ga. Code Ann. § 49-4-168.1(a)(1).

275. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used false records or statements material to false or fraudulent claims, in violation of Ga. Code Ann. § 49-4-168.1(a)(2).

276. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the

information, knowingly made, used or caused to be made or used false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the state of Georgia and/or its political subdivisions, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the state of Georgia and/or its political subdivisions, all in violation of Ga. Code Ann. § 49-4-168.1(a)(7).

277. The state of Georgia and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid for recipients of benefits funded by the state of Georgia and/or its political subdivisions.

278. As a result of Defendants' actions, the state of Georgia and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count 11: Hawaii FCA**

279. Relators re-allege and incorporate by reference paragraphs 1 - 208.

280. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the state of Hawaii and/or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Haw. Rev. Stat. § 661-21(a)(l).

281. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made and used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the state of Hawaii and/or its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(2).

282. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the state of Hawaii and/or its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(7).

283. The state of Hawaii and/or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of Hawaii and/or its political subdivisions.

284. As a result of Defendants' actions, the state of Hawaii and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count 12: Illinois FCA**

285. Relators re-allege and incorporate by reference paragraphs 1 - 208.

286. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of 740 ILCS § 175/3(a)(1)(A).

287. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of 740 ILCS § 175/3(a)(1)(B).

288. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be

making, using or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the state of Illinois and/or its political subdivisions, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the state of Illinois and/or its political subdivisions, all in violation of 740 ILCS § 175/3(a)(1)(G).

289. The state of Illinois and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of Illinois and/or its political subdivisions.

290. As a result of Defendants' actions, the state of Illinois and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count 13: Indiana False Claims and Whistleblower Protection Act**

291. Relators re-allege and incorporate by reference paragraphs 1 - 208.

292. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented, or caused to be presented, and may still be presenting or causing to be presented, false claims to the state of Indiana and/or its political subdivisions, for payment or approval, in violation of Ind. Code § 5-11-5.5-2(b)(l).

293. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to obtain payment or approval of false claims from the state of Indiana and/or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(2).

294. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to avoid an obligation to pay or transmit money to the state of Indiana and/or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(6).

295. The state of Indiana and/or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for benefits funded by the state of Indiana and/or its political subdivisions.

296. As a result of Defendants' actions, the state of Indiana and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count 14: Iowa FCA**

297. Relators re-allege and incorporate by reference paragraphs 1 - 208.

298. Defendants, in reckless disregard or deliberate ignorance for the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Iowa Code § 685.2(1)(a).

299. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Iowa Code § 685.2(1)(b).

300. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still me

making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the state of Iowa and/or its political subdivisions, in violation of Iowa Code § 685.2(1)(g).

301. The state of Iowa and/or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid for benefits funded by the state of Iowa and/or its political subdivisions.

302. As a result of Defendants' actions, the state of Iowa and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count 15: Louisiana Medical Assistance Programs Integrity Law**

303. Relators re-allege and incorporate by reference paragraphs 1 - 208.

304. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly offered or paid remuneration, including but not limited to kickbacks, bribes, or rebates, directly or indirectly, overtly or covertly, in cash or in kind:

(1) In return for referring an individual to a health care provider, or for referring an individual to another person for the purpose of referring an individual to a health care provider, for the furnishing or arranging to furnish any good, supply, or service for which payment may be made, in whole or in part, under the medical assistance programs;

(2) In return for purchasing, leasing, or ordering, or for arranging for or recommending purchasing, leasing, or ordering, any good, supply, or service, or facility for which payment may be made, in whole or in part, under the medical assistance programs;

(3) To a recipient of goods, services, or supplies, or his representative, for which payment may be made, in whole or in part, under the medical assistance programs; or

(4) To obtain a recipient list, number, name, or any other identifying information, all in violation of La. Rev. Stat. § 46:438.2(A).

305. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of La. Rev. Stat. § 46:438.3(A).

306. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of La. Rev. Stat. § 46:438.3(B).

307. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the State of Louisiana or its political subdivisions, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the state of Louisiana and/or its political subdivisions, all in violation of La. Rev. Stat. § 46:438.3(C).

308. The state of Louisiana and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may

continue to pay, for benefits funded by the state of Louisiana and/or its political subdivisions.

309. As a result of Defendants' actions, the state of Louisiana and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count 16: Maryland FCA**

310. Relators re-allege and incorporate by reference paragraphs 1 - 208.

311. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of MD Code § 8-102(b)(1).

312. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of MD Code § 8-102(b)(2).

313. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to an obligation to pay or transmit money to the state of Maryland and/or its political subdivisions, in violation of MD Code § 8-102(b)(7).

314. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed, or knowingly and improperly avoided or decreased, an obligation to pay or transmit money to the state of Maryland and/or its political subdivisions, all in violation of MD Code § 8-102(b)(8).

315. At minimum, Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made any other false or fraudulent claim against a governmental entity, in violation of MD Code § 8-102(a)(9).

316. The state of Maryland and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of Maryland and/or its political subdivisions.

317. As a result of Defendants' actions, the state of Maryland and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count 17: Massachusetts FCA**

318. Relators re-allege and incorporate by reference paragraphs 1 - 208.

319. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of Mass. Gen. Laws c. 12 § 5B(a)(1).

320. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Mass. Gen. Laws c. 12 § 5B(a)(2).

321. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal,

avoid or decrease an obligation to pay or transmit money to the Commonwealth of Massachusetts and/or its political subdivisions, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the Commonwealth of Massachusetts and/or its political subdivisions, all in violation of Mass. Gen. Laws c. 12 § 5B(a)(9).

322. At minimum, Defendants were beneficiaries of an inadvertent submission of a false claim, and failed to disclose the false claim to the Commonwealth of Massachusetts and/or its political subdivisions within the time set forth by statute after discovery of the false claim, in violation of Mass. Gen. Laws c. 12 § 5B(a)(10).

323. The Commonwealth of Massachusetts and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the Commonwealth of Massachusetts and/or its political subdivisions.

324. As a result of Defendants' actions, the Commonwealth of Massachusetts and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count 18: Michigan Medicaid FCA**

325. Relators re-allege and incorporate by reference paragraphs 1 - 208.

326. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information involved, solicited or offered a kickback or bribe in connection with the furnishing of goods or services for which payment was or may be made in whole or in part pursuant to the Michigan Medicaid program, in violation of Mich. Stat. § 400.604.

327. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of Mich. Stat. § 400.607(1)

328. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Mich. Stat. § 400.603.

329. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the state of Michigan and/or its political subdivisions, all in violation of Mich. Stat. § 400.607(3).

330. The state of Michigan and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of Michigan and/or its political subdivisions.

331. As a result of Defendants' actions, the state of Michigan and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count 19: Minnesota FCA**

332. Relators re-allege and incorporate by reference paragraphs 1 - 208.

333. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the

information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of Minn. Stat. § 15C.02(a)(1).

334. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Minn. Stat. § 15C.02(a)(2).

335. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the state of Minnesota and/or its political subdivisions, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the State of Minnesota and/or its political subdivisions, all in violation of Minn. Stat. § 15C.02(a)(7).

336. The state of Minnesota and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of Minnesota and/or political subdivisions.

337. As a result of Defendants' actions, the state of Minnesota and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count 20: Nevada FCA**

338. Relators re-allege and incorporate by reference paragraphs 1 - 208.

339. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the

information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false claims for payment or approval, in violation of Nev. Rev. Stat. § 357.040(1)(a).

340. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain payment or approval of false claims, in violation of Nev. Rev. Stat. § 357.040(1)(b).

341. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the state of Nevada and/or its political subdivisions, in violation of Nev. Rev. Stat. § 357.040(1)(g).

342. The state of Nevada and/or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of Nevada and/or its political subdivisions.

343. As a result of Defendants' actions, the state of Nevada and/or its political subdivisions have been, and may continue to be, severely damaged.

## Count 21: New Jersey FCA

344. Relators re-allege and incorporate by reference paragraphs 1 - 208.

345. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented or caused to be presented, and may still be presenting or causing to be presented, to an employee, officer or agent of the state of New Jersey and/or its political subdivisions, or to any contractor, grantee, or

other recipient of state and/or political subdivision funds, false or fraudulent claims for payment or approval, in violation of N.J. Stat. § 2A:32C-3(a).

346. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the state of New Jersey and/or its political subdivisions, in violation of N.J. Stat. § 2A:32C-3(b).

347. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the state of New Jersey and/or its political subdivisions, in violation of N.J. Stat. § 2A:32C-3(g).

348. The State of New Jersey, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of New Jersey and/or by its political subdivisions.

349. As a result of Defendants' actions, the state of New Jersey and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count 22: New Mexico Medicaid FCA**

350. Relators re-allege and incorporate by reference paragraphs 1 - 208.

351. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.M.S.A. 1978 § 27-14-4(A).

352. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.M.S.A. 1978 § 27-14-4(C).

353. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the state of New Mexico and/or its political subdivisions, in violation of N.M.S.A. 1978 § 27-14-4(E).

354. The state of New Mexico and/or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of New Mexico and/or its political subdivisions.

355. As a result of Defendants' actions, the state of New Mexico and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count 23: New Mexico Fraud Against Taxpayers Act**

356. Relators re-allege and incorporate by reference paragraphs 1 - 208.

357. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.M.S.A. 1978 § 44-9-1(A)(1).

358. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be

HENNIG KRAMER RUIZ &

making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.M.S.A. 1978 § 44-9-1(A)(2).

359. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the state of New Mexico and/or its political subdivisions, in violation of N.M.S.A. § 44-9-1(A)(4).

360. The state of New Mexico and/or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of New Mexico and/or its political subdivisions.

361. As a result of Defendants' actions, the state of New Mexico and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count 24: New York FCA**

362. Relators re-allege and incorporate by reference paragraphs 1 - 208.

363. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.Y. State Fin. Law § 189(1)(a).

364. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.Y. State Fin. Law § 189(1)(b).

365. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to an obligation to pay or transmit money to the state of New York and/or its political subdivisions, in violation of N.Y. State Fin. Law § 189(1)(g).

366. The state of New York and/or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of New York and/or its political subdivisions.

367. As a result of Defendants' actions, set forth above, the state of New York and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count 25: North Carolina FCA**

368. Relators re-allege and incorporate by reference paragraphs 1 - 208.

369. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of NC Stat. § 1-607(a)(1).

370. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of NC Stat. § 1-607(a)(2).

371. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the

information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the state of North Carolina and/or its political subdivisions, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the state of North Carolina and/or its political subdivisions, all in violation of NC Stat. § 1-607(a)(7).

372. The state of North Carolina and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of North Carolina and/or its political subdivisions.

373. As a result of Defendants' actions, the state of North Carolina and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count 26: Oklahoma FCA**

374. Relators re-allege and incorporate by reference paragraphs 1 - 208.

375. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of Okla. Stat., tit. 63 § 5053.1.B.1.

376. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get a false or fraudulent claim paid or approved by the state, in violation of Okla. Stat., tit. 63 § 5053.1.B.2.

377. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the state of Oklahoma and/or its political subdivisions, in violation of Okla. Stat., tit. 63 § 5053.1.B.7.

378. The state of Oklahoma and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of Oklahoma and/or its political subdivisions.

379. As a result of Defendants' actions, the state of Oklahoma and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count 27: Rhode Island FCA**

380. Relators re-allege and incorporate by reference paragraphs 1 - 208.

381. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Rhode Island and/or its political subdivisions, or a member of Rhode Island's National Guard, false or fraudulent claims for payment or approval, in violation of R.I. Gen. Laws § 9-1.1-3(a)(1).

382. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false records or statements to get false or fraudulent claims paid

or approved by the State of Rhode Island and/or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(2).

383. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the state of Rhode Island and/or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(7).

384. The state of Rhode Island and/or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of Rhode Island and/or its political subdivisions.

385. As a result of Defendants' actions, the state of Rhode Island and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count 28: Tennessee FCA and/or Tennessee Medicaid FCA**

386. Relators re-allege and incorporate by reference paragraphs 1 - 208.

387. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of Tenn. Code § 4-18-103(a)(1) and/or § § 71-5-182(a)(1)(A).

388. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get a false or fraudulent claim paid or approved by the state of Tennessee and/or its political

subdivisions, in violation of Tenn. Code § 4-18-103(a)(2) and/or § 71-5-182(a)(1)(B).

389. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the state of Tennessee and/or its political subdivisions, in violation of Tenn. Code § 4-18-103(a)(7) and/or § 71-5-182(a)(1)(D).

390. At minimum, Defendants were beneficiaries of an inadvertent submission of a false claim, and failed to disclose the false claim to the state of Tennessee and/or its political subdivisions within a reasonable time after discovery of the false claim, in violation of Tenn. Code § 4-18-103(a)(8).

391. The state of Tennessee and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of Tennessee and/or its political subdivisions.

392. As a result of Defendants' actions, the state of Tennessee and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count 29: Texas MFPA**

393. Relators re-allege and incorporate by reference paragraphs 1 - 208.

394. Defendants, in reckless disregard of or conscious indifference to the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment

under the Medicaid program that was not authorized or that was greater than the benefit or payment that is authorized.

395. Defendants, in reckless disregard of or conscious indifference to the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose information that permitted a person to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the benefit or payment that was authorized.

396. Defendants, in reckless disregard of or conscious indifference to the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, caused to be made, induced, or sought to induce the making of a false statement or misrepresentation of material fact concerning information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program.

397. Defendants, in reckless disregard of or conscious indifference to the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented a claim for payment under the Medicaid program for a service rendered by a person who was not licensed to render the service, if a license is required, or was not licensed in the manner claimed.

398. Defendants, in reckless disregard of or conscious indifference to the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made a claim under the Medicaid program for a service that had not been approved or acquiesced in by a treating physician or health care practitioner.

399. Defendants, in reckless disregard of or conscious indifference to the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made a claim under the Medicaid program and knowingly failed to

indicate the type of license and the identification number of the licensed health care provider who actually provided the service.

400. Defendants conspired to commit the violations of the Texas MPFA at § 36.002, subds. (1), (2), (4), (6), (7), and (8).

401. The state of Texas and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of Texas and/or its political subdivisions.

402. As a result of Defendants' actions, the state of Texas and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count 30: Vermont FCA**

403. Relators re-allege and incorporate by reference paragraphs 1 - 208.

404. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of VT Stat. § 631(a)(1).

405. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of VT Stat. § 631(a)(2).

406. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, a claim that includes items or services resulting from a violation of 13 V.S.A. chapter 21 ["Bribery"] or

HENNIG KRAMER RUIZ &

section 1128B of the Social Security Act, 42 U.S.C. § 1320A-7b [Medicare/Medicaid Anti-Kickback Statute], in violation of VT Stat. § 631(a)(2)

407. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to an obligation to pay or transmit money to the state of Vermont and/or its political subdivisions, in violation of VT Stat. § 631(a)(9).

408. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the state of Vermont and/or its political subdivisions, in violation of VT Stat. § 631(a)(10).

409. At minimum, Defendants were beneficiaries of an inadvertent submission of a false claim, and failed to disclose the false claim to the state of Vermont and/or political subdivisions within the time set forth by statute after discovery of the false claim, in violation of VT Stat. § 631(a)(11).

410. The state of Vermont and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of Vermont and/or its political subdivisions.

411. As a result of Defendants' actions, the state of Vermont and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count 31: Virginia Fraud Against Taxpayers Act**

412. Relators re-allege and incorporate by reference paragraphs 1 - 208.

413. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of VA Code § 8.01-216.3(A)(1).

414. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of VA Code § 8.01-216.3(A)(2).

415. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the Commonwealth of Virginia and/or its political subdivisions, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the Commonwealth of Virginia and/or its political subdivisions, all in violation of VA Code § 8.01-216.3(A)(7).

416. The Commonwealth of Virginia and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the Commonwealth of Virginia and/or its political subdivisions.

417. As a result of Defendants' actions, the Commonwealth of Virginia and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count 32: Washington State Medicaid Fraud FCA**

418. Relators re-allege and incorporate by reference paragraphs 1 - 208.

419. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of RCW § 74.66.020(1)(a).

420. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of RCW § 74.66.020(1)(b).

421. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the state of Washington and/or its political subdivisions, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the state of Washington and/or its political subdivisions, all in violation of RCW § 74.66.020(1)(g).

422. The state of Washington and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of Washington and/or its political subdivisions.

423. As a result of Defendants' actions, the state of Washington and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count 33: Broward County False Claims Ordinance**

424. Relators re-allege and incorporate by reference paragraphs 1 - 208.

425. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of Broward Cty Ord. § 1-279(a)(1).

426. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get a false, fraudulent or inflated claims paid or approve by the County of Broward and/or its political subdivisions, in violation of Broward Cty Ord. § 1-279(a)(2).

427. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the County of Broward and/or its political subdivisions, in violation of Broward Cty Ord. § 1-279(a)(7).

428. At minimum, Defendants were beneficiaries of an inadvertent submission of a false claim, and failed to disclose the false claim to Broward County and/or its political subdivisions within the time set forth by statute after discovery of the false claim, in violation of Broward Cty Ord. § 1-279(b).

429. The County of Broward and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may

continue to pay, for benefits funded by the County of Broward and/or its political subdivisions.

430. As a result of Defendants' actions, the County of Broward and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count 34: Chicago FCA**

431. Relators re-allege and incorporate by reference paragraphs 1 - 208.

432. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of Chicago Ord. § 1-22-020(1).

433. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the City of Chicago and/or its political subdivisions, in violation of Chicago Ord. § 1-22-020(2).

434. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the City of Chicago and/or its political subdivisions, all in violation of Chicago Ord. § 1-22-020(7).

435. The City of Chicago and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may

continue to pay, for benefits funded by the City of Chicago and/or its political subdivisions.

436. As a result of Defendants' actions, the City of Chicago and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count 35: County of Allegheny [PA] False Claims Ordinance**

437. Relators re-allege and incorporate by reference paragraphs 1 - 208.

438. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of Allegheny Cty Ord. § 485-2(A)(1).

439. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Allegheny Cty Ord. § 485-2(A)(2).

440. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the County of Allegheny and/or its political subdivisions, all in violation of Allegheny Cty Ord. § 485-2(A)(7).

441. The County of Allegheny and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the County of Allegheny and/or its political subdivisions.

442. As a result of Defendants' actions, the County of Allegheny and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count 36: Miami-Dade County False Claims Ordinance**

443. Relators re-allege and incorporate by reference paragraphs 1 - 208.

444. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of Miami-Dade Cty Ord. § 21-258(1)(a).

445. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved, in violation of Miami-Dade Cty Ord. § 21-258(1)(b).

446. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to Miami-Dade County and/or its political subdivisions, all in violation of Miami-Dade Cty Ord. § 21-258(1)(g).

447. At minimum, Defendants were beneficiaries of an inadvertent submission of a false claim, and failed to disclose the false claim to the County of Broward and/or its political subdivisions within the time set forth by statute after discovery of the false claim, in violation of Miami-Dade Cty Ord. § 21-258(2).

448. The County of Miami-Dade and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the County of Miami-Dade and/or its political subdivisions.

449. As a result of Defendants' actions, the County of Miami-Dade and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count 37: New York City FCA**

450. Relators re-allege and incorporate by reference paragraphs 1 - 208.

451. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of NYC Ord. § 7-803(a)(1).

452. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of 7-803(a)(2).

453. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the City of New York and/or its political subdivisions, all in violation of 7-803(a)(7).

454. The City of New York and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants,

and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the City of New York and/or its political subdivisions.

455. As a result of Defendants' actions, the City of New York and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count 38: Philadelphia FCA**

456. Relators re-allege and incorporate by reference paragraphs 1 - 208.

457. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of Phil. Ord. § 19-3601(1).

458. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the City of Philadelphia and/or its political subdivisions, in violation of Phil. Ord. § 19-3601(2).

459. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the City of Philadelphia and/or its political subdivisions, all in violation of Phil. Ord. § 19-3601(7).

460. The City of Philadelphia and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid,

and may continue to pay, for benefits funded by the City of Philadelphia and/or its political subdivisions.

461. As a result of Defendants' actions, the City of Philadelphia and/or its political subdivisions have been, and may continue to be, severely damaged.

**WHEREFORE**, Relators, on behalf of themselves, the United States Government, and the State and Municipal Plaintiffs, demand judgment against Defendants, ordering that:

**As to the Federal Claims:**

a. Pursuant to 31 U.S.C. § 3729(a), Defendants pay: an amount equal to three times the amount of damages the United States Government has sustained as a result of Defendants' actions, plus the maximum civil penalty available for each violation of 31 U.S.C. §§ 3729, *et seq.,* or such other penalty as the law may permit and/or require for each violation of other laws which governed Defendants' conduct;

b. Relators be awarded their relator's share of the judgment to the maximum amount available under 31 U.S.C. § 3730(d) of the False Claims Act and/or any other applicable provision of law;

c. Relators be awarded all costs and expenses of this action, including attorneys' fees, as provided by 31 U.S.C. § 3730(o) and any other applicable provision of the law; and

d. Relators and the United States of America be awarded such other and further relief as the Court may deem to be just and proper.

**As to the State and Municipal Claims:**

e. Relators and the State and Municipal Plaintiffs be awarded statutory damages in an amount equal to three times (except for Texas, which is two times) the amount of actual damages sustained by each State and Municipality as a result of Defendants' actions, as well as the maximum statutory civil penalty for each violation by Defendants within each State and Municipality, all as provided by:

Cal. Gov't Code § 12651;
Colo. Rev. Stat. § 25.5-4-305(1);
Conn. Gen. Stat. § 17b-301b(b);
6 Del. Code Ann. § 1201;
Fla. Stat. Ann. § 68.082;
Ga. Code. Ann. § 49-4-168.1(a);
Haw. Rev. Stat. § 661-21;
740 Ill. Comp. Stat. § 175/3;
Ind. Code § 5-11-5.5-2(b);
46 La. Rev. Stat. Ann. ch. 3, § 438.6(B)(1);
Md. Code Ann. Health-Gen. §§ 2-601 – 2-611;
Mass. Gen. Laws ch. 12 § 5B;
Mich. Comp. Laws § 400.612;
Minn. Stat. § 15C.02(a);
Nev. Rev. Stat. Ann. § 357.050;
N.J. Stat. Ann. § 2A:32C-3;
N.M. Stat. Ann. § 44-9-3(C);
N.Y. Fin. Law § 189.1(g);
N.C. Gen Stat. §1-607(a);
63 Okla. Stat. Ann. § 5053.1(B);
R.I. Gen. Laws § 9-1.1-3;
Tenn. Code Ann. § 71-5-182;
Tex. Hum. Res. Code Ann. §§ 36.052;
Va. Code Ann. § 8.01-216.3;
Wash. Rev. Code §§ 74.09.210(2) and 74.09.230;
D.C. Code Ann. § 2-308.14;
Broward Cty Ord. § 1-279(c)(1);
Chicago Ord. § 1-22-020;
Allegheny Cty Ord. § 485-2A;
Miami-Dade Cty Ord. § 21-258(3)(a);
NYC Ord. § 7-803; and
Phil. Ord. § 19-3602.

f. Relators be awarded their relator's share of any judgment to the maximum amount provided pursuant to:

Cal. Gov't Code § 12652(g);
6 Del. Code Ann. § 1205;
Fla. Stat. Ann. § 68.085;
Ga. Code. Ann. § 49-4-168.2(h);
Haw. Rev. Stat. § 661-27;

740 Ill. Comp. Stat. § 175/4(d);
Ind. Code § 5-11-5.5-6;
46 La. Rev. Stat. Ann. c. 3, §§ 437.1, *et seq*.;
Mass. Gen. Laws ch. 12 § 5F;
Mich. Comp. Laws § 400.610a;
Nev. Rev. Stat. Ann. § 357.210;
N.J. Stat. Ann. § 2A:32C-7;
N.M. Stat. Ann. § 44-9-7;
N.Y. Fin. Law § 190.6;
63 Okla. Stat. Ann. § 5053.4;
R.I. Gen. Laws § 9-1.1-4;
Tenn. Code Ann. § 71-5-183(c);
Tex. Hum. Res. Code Ann. §§ 36.110;
Va. Code Ann. § 8.01-216.7;
D.C. Code Ann. § 2-308.15;
Broward Cty Ord. § 1-282;
Chicago Ord. § 1-22-030(d)(1)&(2);
Allegheny Cty Ord. § 485-2G(1)(&2);
Miami-Dade Cty Ord. § 21-261;
NYC Ord. § 7-804i; and
Phil. Ord. § 19-3603(8).

g. Relators be awarded all costs and expenses associated with each of the pendent State and Municipal claims, plus attorney's fees as provided pursuant to:

Cal. Gov't Code § 12652(g)(8);
6 Del. Code Ann. § 1205;
Fla. Stat. Ann. § 68.086;
Ga. Code. Ann. § 49-4-168.2(h);
Haw. Rev. Stat. § 661-27;
740 Ill. Comp. Stat. § 175/4(d);
Ind. Code § 5-11-5.5-6;
46 La. Rev. Stat. Ann. c. 3, § 438.6(D);
Mass. Gen. Laws ch. 12 § 5F;
Mich. Comp. Laws § 400.610a;
Nev. Rev. Stat. Ann. § 357.180;
N.J. Stat. Ann. § 2A:32C-7;
N.M. Stat. Ann. § 44-9-7(D);
N.Y. Fin. Law § 190.7;
63 Okla. Stat. Ann. § 5053.4;
R.I. Gen. Laws § 9-1.1-4,

Tenn. Code Ann. § 71-5-183(c);
Tex. Hum. Res. Code Ann. §§ 36.110;
Va. Code Ann. § 8.01-216.7;
D.C. Code Ann. § 2-308.15;
Broward Cty Ord. § 1-283;
Chicago Ord. § 1-22-030(d)(3);
Allegheny Cty Ord. § 485-2H(1);
Miami-Dade Cty Ord. § 21-262(2);
NYC Ord. § 7-804j; and
Phil. Ord. § 19-3603(9).

h. Relators and the State and Municipal Plaintiffs be awarded such other and further relief as the Court may deem to be just and proper.

## X. REQUEST FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Relators request trial by jury.

Dated: May 24, 2021

HENNIG KRAMER RUIZ & SINGH

By: ______________________
Rob Hennig
Sam Brown

HALUNEN LAW

Lon R. Leavitt*
One Renaissance Tower
Two North Central Avenue, Suite 1800
Phoenix, Arizona 85004
Telephone: (602) 254-6494
Fax: (612) 605-4099
Email: leavitt@halunenlaw.com

Attorneys for Plaintiffs-Relators
Caleb Hernandez, D.O., and
Chionesu Sonyika, M.D.

(* *pro hac vice* application forthcoming)