J.D. HERNANDEZ (*Pro Hac Vice*)
**J.D. HERNANDEZ, OF COUNSEL**
6924 Bay Parkway
Brooklyn, NY 11204-5508
Telephone: (929) 627-4706
Fax: (718) 837-5555
j.d.hernandez@counsellor.com

*Attorney for Plaintiffs-Relators*
*Caleb Hernandez, D.O., and*
*Chionesu Sonyika, M.D.*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

United States of America, State of California, State of Colorado, State of Connecticut, State of Delaware, District of Columbia, State of Florida, State of Georgia, State of Hawaii, State of Illinois, State of Indiana, State of Iowa, State of Louisiana, State of Maryland, Commonwealth of Massachusetts, State of Michigan, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of North Carolina, State of Oklahoma, State of Rhode Island, State of Tennessee, State of Texas, State of Vermont, Commonwealth of Virginia, State of Washington, County of Broward, City of Chicago, County of Allegheny, County of Miami-Dade, City of New York, and City of Philadelphia

*ex rel.*

Caleb Hernandez, D.O., and Chionesu

CASE NO.: 2:21-cv-04324-FLA-AS

HON. FERNANDO L. AENLLE-ROCHA

**AMENDED COMPLAINT FOR DAMAGES UNDER THE FEDERAL FALSE CLAIMS ACT AND VARIOUS STATE FALSE CLAIMS ACTS, PURSUANT TO FED. R. CIV. P. 15(a)(1)(B) AND CIVIL STANDING ORDER (10-1-24), § IV, SPECIFIC MOTION REQUIREMENTS (A)**

**DEMAND FOR JURY TRIAL**

Sonyika, M.D.,

Plaintiffs-Relators,

*v.*

ScribeAmerica, LLC, KKR & Co., Inc., Envision Healthcare Corporation, EmCare Holdings, Inc., EmCare, Inc., and Reimbursement Technologies, Inc.,

Defendants.

1. *Qui tam* plaintiffs and relators Dr. Caleb S. Hernandez, D.O., and Dr. Chionesu K. Sonyika, M.D. (*collectively* "Relators" *or individually* "Relator") bring this action on behalf of the United States of America ("the United States"), several states ("Plaintiff States"), and various municipalities ("Plaintiff Municipalities") (*collectively referred to as the* "Plaintiff Governments") under the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and analogous state FCAs[1] and municipal FCAs[2] to

---

[1] California False Claims Act, Cal. Gov't Code §§ 12650-12656; Colorado Medicaid False Claims Act, Col. Stat. § 25.5-4-303.5 *et seq.* (enacted effective May 26, 2010); Connecticut False Claims And Other Prohibited Acts Under State-Administered Health Or Human Services Programs, Conn. Gen'l Stat. tit. 4, ch. 55e § 4-274 *et seq.*; Delaware False Claims and Reporting Act, 6 Del. C. § 1201 *et seq.*; District of Columbia False Claims Act, D.C. Code § 2-308.07 *et seq.* (2000) and 2-308.13 *et seq.* (2011) and 2-381.01 *et seq.* (2013); Florida False Claims Act, Fla. Stat. § 68.081 *et seq.* (2000); Georgia State False Medicaid Claims Act, Georgia Code Ann. § 49-4-168 *et seq*.; Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.* (2006); Illinois False Claims Act, 740 ILCS § 175/1 *et seq.*; Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 *et seq.* (2007); Iowa False Claims Act, Iowa Code § 685.1 *et seq.* (2010); Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. § 46:437.1 *et seq.*; Maryland False Claims Act, MD Code § 8-101 *et seq.*; Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, § 5A *et seq.*; Michigan False Claims Act, Mich. Stat § 400.601 *et seq.*; Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.*; Montana False Claims Act, § 17-8-401 *et seq.*; Nevada False Claims Act, Nev. Rev. Stat. § 357.010 *et seq.* (2007); New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-1 *et seq.* (West 2007); New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.*; New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-1 *et seq.* (2007); New York False Claims Act, N.Y. State Fin. Law § 187 *et seq.* (McKinney 2010); North Carolina False Claims Act, NC Stat. § 1-605 *et seq.*; Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63 § 5053.1 *et seq.*; Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.* (2008); Tennessee Medicaid False Claims Act, Tenn. Code § 71-5-181 *et seq.*; Tennessee False Claims Act, Tenn. Code § 4-18-101 *et seq.*; Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. §§ 36.001 *et seq.*; Vermont False Claims Act, 32 VT Stat. § 630 *et seq.*; Virginia Fraud Against Taxpayers Act, VA Code § 8.01-216.1 *et seq.*; Washington State Medicaid Fraud False Claims Act, RCW § 74.66.005 *et seq*.

[2] Broward County [FL] False Claims Ordinance, Broward Cty Ord. § 1-276 *et seq.*; City of Chicago False Claims Act, Chic. Ord. § 1-21-010 *et seq.*; County of Allegheny [PA] False Claims Ordinance, Allegheny Cty Ord. § 485-1 *et seq.*; Miami-Dade County False

recover damages and civil penalties from Defendant ScribeAmerica, LLC ("ScribeAmerica"), as well as Defendant KKR & Co., Inc. ("KKR"), Envision Healthcare Corporation, EmCare Holdings, Inc., EmCare, Inc., and Reimbursement Technologies, Inc. (*collectively* "EmCare" *or the* "EmCare Defendants").[3] In this regard, whenever a reference is to all of the EmCare Defendants except for KKR, the term "Envision Defendants" will be used. Similarly, for all allegations referring to "EmCare" that address periods before KKR acquired Envision Healthcare Corporation, it should be understood as referring to these Envision Defendants (*including their prior forms and successors*).

## I. INTRODUCTION

2. This case concerns three (3) interrelated schemes that Defendants have used since at least July 2007 through the present to systematically submit false claims to the Centers for Medicare and Medicaid Services ("CMS") concerning the Medicare program, to the Plaintiff States' Medicaid programs, and to federal, state and municipal employee healthcare programs and plans, by billing for services that were never provided. The schemes also implement a conspiracy between ScribeAmerica and the EmCare Defendants via the use of medical scribes who have been trained to document in medical charts in accordance with EmCare's illegal medical billing and coding model.

3. The first of these schemes involves the use of medical scribes to up-code/up-charge for evaluation and management ("E/M") services and smoking cessation counseling. ScribeAmerica and EmCare instruct medical scribes, who are assigned to physicians and function like secretaries, to add to the chart E/M and smoking cessation counseling services that the physician did not actually perform or provide ("the Scribe Scheme"). Defendants

---

Claims Ordinance, Miami-Dade Cty Ord. § 21-255 *et seq.*; New York City False Claims Act, NYC Ord. § 7-801 *et seq.*; and Philadelphia False Claims Act, Phil. Ord. § 19-3601 *et seq*.

[3] When all Defendants are referenced for a quality or in an allegation that applies to all of them, they are collectively referred to as "Defendants."

also use scribes to provide the false or misleading statements referenced in the two schemes described below (*i.e.*, the Critical Care Scheme and the Mid-Level Scheme).

4. The second of these schemes, which is also implemented through scribes, involves up-coding/up-charging for critical care services that were not rendered or did not qualify as "critical care" even if falsely labeled as such ("the Critical Care Scheme"). This scheme is carried out in multiple ways, including false statements and misrepresentations as to the length of time spent with a patient, as to 1:1 focus time, and as to the procedures and services actually rendered to the patient.

5. The third of these schemes involves EmCare fraudulently billing for the services of a doctor/physician at EmCare emergency rooms when the patient has only been seen by non-physician providers (NPPs), such as a nurse practitioner or a physician assistant, who are also known as "mid-level providers" or "mid-levels" (*hence* "the Mid-Level Scheme"). In this, EmCare creates false documentation as to face-to-face interactions and falsely documents compliance with legal requirements that are necessary to bill for a "shared visit." By doing this, EmCare knowingly carries out its unlawful Mid-Level Scheme to obtain grossly overpaid reimbursement amounts from CMS and Plaintiff States' Medicaid programs and to charge for Physician services that were not provided.

6. As to the Defendants, ScribeAmerica has remained the nation's largest medical scribe company for roughly 20 years. Serving over 3,500 entities that it refers to as "partners" and "thought partners" in all 50 states, ScribeAmerica's business model depends on using a dedicated team of project managers to custom design, hire, train, and manage medical scribe programs specific to its partners' needs. ScribeAmerica's specialized teams work with its partners to align strategic goals to action, to track goals, and to measure proven ROI for those thought partners. *See* § VII, *particularly* ¶¶ 145-156, *infra*.

7. ScribeAmerica had an annual revenue of $32.1 million in 2012 and revenue of $76 million in 2014. In August 2014, ScribeAmerica had 4,100 scribes in 610 hospitals. As of December 2014, the company had 4,635 employees across 580 contracts. ScribeAmerica acquired PhysAssist, a competing scribe company, in November 2018. One

of ScribeAmerica's co-founders, Michael Murphy, estimated in August of 2014 that 10,000 medical scribes work in the United States, mostly in emergency rooms. ScribeAmerica is the most frequently-used medical scribe provider in the United States and documented 7 million patient visits in 2012. Since the Health Information Technology for Economic and Clinical Health Act passed in 2009, the company has grown 90-100% each year. A significant portion of ScribeAmerica's revenue and market share is a result of the Scribe Scheme and associated schemes, as described below.[4]

8. Similarly, EmCare is the largest emergency-department management company in the nation with physician services contracts covering more than 1,500 clinical departments in at least 45 states, including the states referenced in Counts 4 through 38 and the District of Columbia. In recent years, Envision has reported net revenues in the multiple billions of dollars. Relators allege that a significant portion of EmCare's revenue is derived through the schemes described in this Amended Complaint.

9. Relators bring this action pursuant to the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. § 3729 *et. seq*. ("FCA"), and the similar *qui tam* provisions of the states and municipalities referenced in Counts 4 through 38.

## II. PARTIES

### *A. RELATORS*

10. Relator Dr. Caleb S. Hernandez, D.O., is a citizen of the United States who resides in the State of Colorado. Since becoming a licensed physician, Dr. Hernandez has been employed as an emergency physician in numerous emergency departments by multiple employers in Arizona, Colorado, Kansas, Missouri, and the Caribbean. He brings this *qui tam* action based upon direct and unique information obtained during his employment with the following hospital emergency departments, all of which were

[4] Because ScribeAmerica is a privately held company, more recent data is not readily available. This paragraph reflects publicly available information and is derived from https://en.wikipedia.org/wiki/ScribeAmerica - cite_note-fortune-1 (last accessed May 21, 2021).

managed and/or operated by EmCare: Tucson Medical Center in Tucson, Arizona (January 2012 through November 2012); Providence Medical Center in Kansas City, Kansas (December 2011 through October 2012); and St. Thomas Moore Hospital in Canon City, Colorado (March 2009 through December 2009).

11. Relator Dr. Chionesu K. Sonyika, M.D., is a citizen of the United States who resides in the State of Georgia. Dr. Sonyika is licensed to practice medicine in Georgia and North Carolina. He is certified by the American Board of Emergency Medicine and was residency-trained specifically in emergency medicine. He brings this *qui tam* action based upon direct and unique information obtained during his employment in the EmCare-managed emergency department at Alamance Regional Medical Center in Burlington, North Carolina from July 2007 through August 2010 and upon direct and unique information obtained during his employment in the EmCare-managed emergency department at Piedmont Fayette Hospital, Fayetteville, Georgia from 2018 until May 31, 2024, when EmCare's management contract ended following its bankruptcy.

12. Through Relators' work at the above-mentioned EmCare-managed emergency departments, through their work for EmCare as employees/independent contractors,[5] and through their interactions with ScribeAmerica, Relators have acquired direct personal knowledge of and non-public information about Defendants' fraudulent schemes. Having become members of the EmCare community and being privy to its

[5] Although EmCare attempts to misclassify its physicians as independent contractors, that is not legally permitted given: (**1**) the characteristics of the worker's opportunity for profit or loss, where EmCare profits off of the physicians' labor in the way that an employer does with an employee; (**2**) a comparison of the investments by the worker and potential employer, wherein EmCare is primarily involved in the investment, management and operation of the operations concerned, as noted below; (**3**) the degree of permanence of the relationship, which mirrors a typical employee/employer relationship; (**4**) the nature and degree of the potential employer's control over the work, wherein EmCare has an enormous amount of management and control over its physicians, as noted below in this Amended Complaint; (**5**) the extent to which the work is "integral" to the potential employer's business; and (**6**) the worker's initiative, which is almost completely governed by EmCare in the relationship.

corporate culture, Relators have also provided allegations herein concerning what is generally known in the EmCare community, as well as that community's customs, including knowledge of the general and historical events important to that community, as noted throughout this Amended Complaint, and the community's lingo and jargon.

### *B. DEFENDANTS*

13. Defendant ScribeAmerica, LLC is a California limited liability company and does business under the name "ScribeAmerica." It maintains an agent for service of process in the State of California at 4640 Admiralty Way, 5th Floor, Marina del Rey, California 90292. Whenever an action is attributed to scribes in this Amended Complaint, it should be understood as an action, practice, or admission of ScribeAmerica.

14. Defendant KKR & Co., Inc. ("KKR") is a global investment company that manages multiple alternative asset classes, including private equity, energy, infrastructure, real estate, credit, and, through its strategic partners, hedge funds. KKR is headquartered at 9 West 57th Street, Manhattan, New York 10019. KKR conducts business in part through its wholly-owned subsidiary, Envision Healthcare Corporation. (On June 11, 2018, Envision Healthcare Corporation announced that it had entered into a definitive agreement to be acquired by KKR in what purported to be an all-cash transaction for approximately $9.9 billion, including the assumption or repayment of debt.) As such, KKR acquired Envision for $9.9 billion through a leveraged buyout that imposed approximately $7 billion of debt onto Envision as part of the acquisition.[6]

15. Defendant Envision Healthcare Corporation is a corporation organized under the laws of Delaware. Its principal place of business is 1A Burton Hills Boulevard,

---

[6] *Envision U.S.$5.45bn TLB sinks as US healthcare debate rages,* REUTERS (Aug. 28, 2019) (https://www.reuters.com/article/envision-us545bn-tlb-sinks-as-us-healthc-idCNL2N25O14W/). *Envision Healthcare and KKR, Envision Healthcare to be Acquired by KKR for $46.00 Per Share in All-Cash Transaction*, (June 11, 2018) (https://www.sec.gov/Archives/edgar/data/1678531/000119312518188699/d606502dex991.htm); *The Debt Deal That Shows How Ugly Things Are Getting For Lenders*, BLOOMBERG (Oct. 5, 2022) (https://www.bloomberg.com/news/articles/2022-10-05/kkr-s-envision-deal-shows-how-ugly-creditor-battles-are-getting).

Nashville, Tennessee 37215. Until April 5, 2017, it had a principal office at 6363 South Fiddlers Green Circle, Suite 1400, Greenwood Village, Colorado 80111. Before that, it had been located at 6200 South Syracuse Way, Greenwood Village, Colorado 80111. Previously known as Envision Healthcare Holdings, Inc., the company was formed in 2011 to facilitate a corporate merger, through which Envision Healthcare Corporation (an entity formerly known as Emergency Medical Services Corporation) became a wholly-owned subsidiary of this Defendant, Envision Healthcare Corporation, an entity with the same name. (There have been two entities named Envision Healthcare Corporation; one is a subsidiary of the other.) In December 2016, Envision Healthcare Holdings, Inc. merged with AmSurg and changed its registered name to Envision Healthcare Corporation. Under its previous registered names, Envision Healthcare Corporation has been a publicly-traded company listed on the New York Stock Exchange under the ticker symbol EVHC since 2013. Envision Healthcare Corporation conducts its business in part through its wholly-owned subsidiary, EmCare Holdings, Inc., and Envision Healthcare Operating, Inc. is the successor in interest to Envision Healthcare Corporation following its bankruptcy in 2023. (All references concerning Envision Healthcare Corporation that concern a time following this change should be understood as referring to Envision Healthcare Operating, Inc.)

16. Defendant EmCare Holdings, Inc., a/k/a EmCare Holdings, LLC, as per its filings in the afore-referenced Envision Healthcare Corporation bankruptcy, is a corporation organized under the laws of Delaware and has its principal place of business in Dallas, Texas. EmCare Holdings, Inc. is a wholly-owned subsidiary of Envision Healthcare Corporation, for which it serves as one of two primary operating entities.

17. Defendant EmCare, Inc., a/k/a EmCare, LLC, as per its filings in the afore-referenced bankruptcy, is a subsidiary of Envision Healthcare Corporation and does business under the name of "EmCare." EmCare, Inc. is a Delaware corporation with its principal place of business at 13737 Noel Road, Suite 1600, Dallas, Texas 75240.

18. Defendant Reimbursement Technologies, Inc. ("RTI") is a wholly-owned subsidiary of Envision Healthcare Corporation. RTI is EmCare's billing arm and performs

most of EmCare's coding at off-site locations. RTI is a Pennsylvania corporation with its principal place of business in Conshohocken, PA, though registered at 6200 Syracuse Way, Suite 200, Greenwood Village, CO 80111, an Envision Healthcare Corporation address.

19. Because of the top/down management concerned and because of the systemwide model implemented throughout Envision HealthCare Corporation's subsidiaries, as alleged herein, Defendants KKR & Co., Inc., Envision Healthcare Corporation, EmCare Holdings Inc., EmCare Inc., and Reimbursement Technologies Inc. are collectively referred to herein as ("EmCare"). *See* THE EMCARE DEFENDANTS section, ¶¶ 157-192, *infra*. Whenever, however, an action is particular to one of these Defendants, that Defendants will be identified by name. Whenever a reference is to all of the EmCare Defendants except for KKR, the term "Envision Defendants" will be used. Similarly, for all allegations referring to "EmCare" that address periods before KKR acquired Envision Healthcare Corporation, the allegation concerns the Envision Defendants.

## III. JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

20. This Court has subject matter jurisdiction under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1331 because this civil action arises under federal statutes.

21. The Court may exercise personal jurisdiction over Defendants under 31 U.S.C. § 3732(a) because they transact business within this district and the claim arises out of or relates to Defendants' contacts with California.

22. This Court has jurisdiction over Relators' state and municipal law claims pursuant to 31 U.S.C. § 3732 because those claims arise from the same transaction or occurrence as Relators' claims under § 3729. Additionally, this Court has supplemental jurisdiction over Relators' state and municipal law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy under Article III of the United States Constitution as Relators' claims under the federal FCA.

23. This Court may exercise personal jurisdiction over ScribeAmerica because ScribeAmerica transacts, operates, conducts, engages in, and carries out substantial business within the State of California.

24. This Court may exercise personal jurisdiction over EmCare because EmCare transacts, operates, conducts, engages in, and carries out substantial business within the State of California.

25. Moreover, ScribeAmerica and EmCare purposefully direct their services at the State of California, thereby purposefully availing themselves of the privilege of conducting business within the State of California and invoking the benefits and protections of its laws. This action arises out of that conduct. This Court's exercise of jurisdiction over Defendants does not offend traditional notions of fair play and substantial justice.

26. Venue is proper in the Central District of California pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b)–(c). ScribeAmerica and EmCare can be found in, reside in, transact, and/or have during the relevant time period transacted substantial business in this judicial District. Additionally, one or more of the Defendants committed acts proscribed by 31 U.S.C. § 3729 in this judicial District by perpetrating the schemes described in this Amended Complaint within this District.

27. Relators bring this action under the FCA to recover treble damages, civil penalties, and costs of suit, including reasonable attorneys' fees and expenses. Relators have authority to bring this action and their claims on behalf of the United States pursuant to 31 U.S.C. §§ 3730(b) and 3730(e)(4), and Relators have satisfied all conditions precedent to their participation as Relators. Pursuant to 31 U.S.C. § 3730(e)(4)(A), as the allegations contained in this Amended Complaint have not been publicly disclosed as defined by the FCA or, alternatively, because Relators qualify as "original sources" within the meaning of 31 U.S.C. § 3730(e)(4)(A) and (B), as further noted below.

28. Prior to filing the Complaint in this action, Relators voluntarily provided substantially all information in Relators' possession on which these allegations are based to the United States Attorney's Office for the Central District of California. That information was investigated for years by the Government following the filing of this suit. *See* Dkt. 38 at 2:14; Dkt. 35 at 1-2. Additionally, prior to that, Relators systematically investigated these

matters and the fraud concerned, doing so since the year 2015, and provided the fruit of those investigations to the Government, as noted both above and below.

29. Furthermore, as early as June 7, 2016, the Relators informed the Government of the fraud concerned and the basis for these claims before there was any public disclosure whatsoever thereof, wherein Relator Dr. Caleb S. Hernandez, DO voluntarily informed the Attorney General of the United States and the United States Attorney's Office for the Eastern District of Texas of the EmCare Defendants' fraud and FCA violations, as concerned in this case, doing so in an interview on June 7, 2016 with regard to an action against certain other defendants in a separate FCA action (the "TeamHealth Defendants"), in *U.S. ex rel. Hernandez v. Team Health Holdings, Inc*., No. 2:16-cv-00432 (E.D. Tex. Apr. 25, 2016), informing the Government that EmCare was also committing the same fraudulent schemes that the TeamHealth Defendants were alleged to have committed in the afore-referenced action. Similarly, Relator Dr. Chionesu K. Sonyika, M.D. voluntarily informed the Attorney General of the United States and the United States Attorney's Office for the Southern District of Florida of the EmCare Defendants' fraud and FCA violations, as concerned in this case, doing so with regard to an FCA action that was filed against ApolloMD, on January 3, 2017 (the "ApolloMD Complaint"), *U.S. ex rel. Sonyika v. ApolloMD, Inc.*, No. 1:20-cv-03213 (N.D. Ga. Jan. 3, 2017), wherein, in an interview that occurred before April 25, 2017, Relator Dr. Chionesu K. Sonyika, M.D. informed the Government, in detail, that EmCare was perpetuating the same schemes as ApolloMD, and going into further detail as to that fraud. These disclosures the Government were predicates to bringing this FCA litigation against the EmCare Defendants.

30. The Relators also disclosed the fraud concerned to the Government prior to filing their first FCA action against Envision Healthcare Corporation in 2017, again providing information as to the Critical Care Scheme and as to the Scribe Scheme, although focusing more on the Mid-Level scheme. *U.S. ex rel. Hernandez v. Envision Healthcare Corp*., No. 1:17-cv-23535 (S.D. Fla. Sept. 26, 2017) (*hereinafter* "*Envision I*"). The case was voluntarily dismissed without prejudice upon the motion of the Relators on May 8,

2020, after which they continued to investigate the matters concerned in preparation for the filing of the present action.[7]

31. Although, prior to May 24, 2021, when the Complaint in this action was filed, there were other public reports pointing out that whenever "EmCare entered a hospital … use of the highest billing code increased," those reports fall well short of alleging any fraud or of even alleging upcoding. *See* Julie Creswell, *The Company Behind Many Surprise Emergency Room Bills*, N.Y. TIMES (July 24, 2017).

32. As such, those reports also lack the material elements of fraud identified herein, as they do not even allege upcoding or fraud. As such, those "disclosures" are not public disclosures of the fraud concerned herein. Relators are nonetheless original sources (*even if the report concerned were a public disclosure, which it is not*), as noted above, and also because of the fact that the information they have alleged herein materially adds to what would be the completely deficient "allegations" of the aforementioned N.Y. Times article, as that article does not allege fraud, upcoding, or even the bases thereof.

33. In the same way, although a securities action was filed in 2017 that ultimately made "allegations," in 2018, of "systemic, illegal upcoding in an effort to improperly boost revenue," those allegations were *entirely* based on the claim that the "likelihood of a patient being coded as 'most severe' increased by 42% … when EmCare took over management," something which the plaintiff set forth in a January 26, 2018 amendment to the 2017 complaint that began that litigation. *See In re Envision Healthcare Corp. Sec. Litig*., No. 3:17-cv-01112, 2019 WL 6168254 at *7–8 (M.D. Tenn. Nov. 19, 2019). These "allegations," therefore, came *after* the Relators' aforementioned 31 U.S.C. § 3730(e)(4)(b)(i) disclosures. Furthermore, even though certain media, *i.e.*, the Class Action Reporter, "covered" that securities lawsuit, the lawsuit concerned did not even mention those deficient allegations until January 26, 2018, and the Class Action Reporter did not cover that information until February 19, 2020, which was, as noted, long after the Relators

[7] *See* https://ecf.flsd.uscourts.gov/doc1/051122076188.

made their disclosures of the fraud concerned in this action to the Government pursuant to 31 U.S.C. § 3730(e)(4)(B)(i).

34. Significantly, the allegations referenced from *In re Envision Healthcare Corp. Sec. Litig*., as noted above, are also *entirely* based on one piece of factual information: that patients were being "coded as 'most severe' increased by 42% … when EmCare took over management," and those allegations, *therefore*, fall well short of alleging any fraudulent acts, let alone of providing any basis for fraudulent acts, falling well short of the material elements of fraud identified in this action. As specifically noted by the Court in *In re Envision Healthcare Corp. Sec. Litig*.:

> **[T]he allegations of upcoding improper hospital admissions and procedures are based entirely on one statistic from the NBER study**, which showed the likelihood of a patient being coded as "most severe" increased by 42%, and the likelihood of a patient being admitted to the hospital increased by 23% when EmCare took over management of the emergency department. The NBER study relied on data from one insurer and covered 16 of EmCare's 900 hospitals. (Compl., ¶¶ 63, 67; Article, Doc. No. 127-39). **Neither the NBER study nor the Article made accusations of upcoding.**

*In re Envision Healthcare Corp. Sec. Litig.*, No. 3:17-CV-01112, 2019 WL 6168254, at *8 (M.D. Tenn. Nov. 19, 2019) (emphasis added).

35. Although, on June 12, 2019, other relators filed an FCA case against Envision Healthcare Corporation and KKR, alleging illegal upcoding, that action was unsealed on August 6, 2020, long after the Relators' afore-referenced 31 U.S.C. § 3730(e)(4)(B)(i) disclosures. *See United States ex rel. Florence v. Envision Healthcare*, No. 3:19-cv-00493, Dkt. 1 (M.D. Tenn. June 12, 2019) (*hereinafter* "*Florence*"); *id*. at Dkt. 41.

36. Additionally, the *Florence* Complaint alleged a scheme to "'upcode[]' emergency department visits to receive higher payments from medical payers" *by means of* a materially distinct mechanism and scheme than that alleged by the Relators, as the

*Florence* action alleged the use of a nurse acuity score being used to trigger upcoding. *See, e.g.,* Dkt. 112-8 at 6-7. As noted in the *Florence* Complaint:

> To support the inference that the doctor made a high complexity medical decision, Envision used ***the nurse acuity score*** to ***generate*** the equivalent emergency department level ("ED level") notation on the chart. The ED level would support the equivalent HCPCS code. For example, a nurse acuity level 5 would equal an ED level 5, which would be billed as an HCPCS code 99285. This method is fraudulent as (i) the Nurse Acuity Level is used for nurse staffing decisions and has no relation to the medical decision complexity or the patient's level of risk, and (ii) the physician codes are scaled through five levels (HCPCS 99281-99285) and the nurse acuity levels are scaled at levels 1 through 8. In other words, a score created for nurse staffing information is used as conclusive proof for the physician's diagnosis of the severity level of the injury or sickness. Further, an average nurse acuity score is used to support the highest HCPCS code.

*See id*. (emphasis added).

37. In contrast, the Relators have alleged a different and ***district mechanism*** of hiding upcoding with regard to critical care, the use of scribes, as well as admission by EmCare of the scheme, and Relators have also alleged two completely different schemes for billing for services that were not rendered, *i.e*., the Mid-Level Scheme and the Scribe Scheme. (In contrast, upcoding is a method of billing more than is permitted for work that was actually.) In short, upcoding is a generic wrong, and someone—*such as the Government*—looking for fraud that is hidden by the improper use of a nurse acuity score for upcoding will not be aided in looking for fraud being hidden by means of another discrete method that is truly only evident when looking at the artifacts and metadata left in the electronic medical record, and its audit trail, which is the case with the Scribe Scheme

mechanism. *See* REPRESENTATIVE EXAMPLES OF FALSE CHARTS AND BILLINGS, § VIII section, *infra*. As noted below, the mechanisms are materially different.

38. As such, the *Florence* Complaint lacks material items of the distinct fraud and concealment that are alleged in this action, along with the very material distinctions of the Scribe Scheme and the Mid-Level Scheme, which are two separate schemes, aided by a different mechanism, which are based on the Government paying for things that were never provided at all, as opposed to upcoding treatment that was billed as though it was a higher degree of care, as was alleged in *Florence*. *See Florence*, Dkt. 1 at 6-7; *cf.* ¶¶ 51-94, 99-112, § VII, particularly ¶¶ 145-156, 193-289, and § VIII, *infra*. (Another material difference is the presence of a completely separate and distinct Defendant, *i.e.*, ScribeAmerica, which is a material distinction as to all allegations and claims related to that new defendant.) As such, the *Florence* case fell short of providing the public or the Government with significant material elements of the fraud and FCA violations identified in this litigation.

39. Regardless, even if *Florence* were a public disclosure, as defined under the governing law (*which it is not*), the Relators are nonetheless "original sources" on account of their aforementioned 31 U.S.C. § 3730(e)(4)(B)(i) disclosures, which predated *Florence*, and *also* because the Relators have knowledge that is independent of and which materially adds to anything that was alleged in the *Florence* Complaint, given their aforementioned investigation, which preceded *Florence*, and the material differences between the two suits noted above and in throughout this Amended Complaint.

40. Significantly, this litigation is not barred by the first-to-file bar. In this regard, there has been no prior FCA litigation against the EmCare Defendants and ScribeAmerica even remotely involving the Mid-Level Scheme or the Scribe Scheme, which are both described below in their respective sections and subsections of this Amended Complaint.

41. Furthermore, there is no pending FCA litigation concerning any of the facts concerned in this Amended Complaint by any other relators, and this Amended Complaint has been filed when no other action is pending. As such, there is no first-to-file bar, as the

*Florence* action is no longer pending and as only pending actions can serve as a bar (*even if the Florence case were considered a first-filed case, which it is not*).

42. Additionally, although the *Florence* Complaint was filed on June 12, 2019, and then dismissed on June 14, 2021, it was filed while Relators' initial suit against the EmCare Defendants was pending and was, thus, barred on account of Relators' initial suit being the first-filed suit and also on account of *Florence* being based on less-specific information from Relators' prior disclosures. *Florence*, Dkt. 56–57. Additionally, and as noted above, the *Florence* litigation has been dismissed and is no longer pending litigation at the time of the filing of this Amended Complaint. *See id*.

43. Nonetheless, the Relators' present suit: (**1**) is "more than a slight variation" of the *Florence* Complaint; (**2**) has provided an additional benefit to the Government, given that the government actually investigated the fraud concerned; (**3**) alleges different underlying facts and schemes of fraud; and (**4**) the "alleged frauds are materially different," as [the first] fraud allegations are based on government payment for [services] which were [provided] …. while the [subsequent] fraud allegations are based on the government paying for devices that were never [provided] at all." As such, the Relators' present suit cannot be barred by the first-to-file bar on account of the rule stated in *United States ex rel. Hartpence v. Kinetic Corp*., 792 F.3d 1121, 1131–32 (9th Cir. 2015).

44. Additionally, Relators' present suit cannot be barred by the first-to-file bar given the rule in *Hartpence*, *supra*, as: (**i**) dismissal of Relators' claims would not "necessarily serve the dual purposes of the first-to-file bar: 'to promote incentives for whistle-blowing insiders and prevent opportunistic successive plaintiffs'"; (**ii**) "allowing claims for related but distinct fraud claims encourages broader investigation and increases the total potential for recovery"; (**iii**) "dismissal of Relators' claims would not serve to discourage opportunistic 'piggyback claims, which would have no additional benefit for the government'"; and (**iv**) Relators "provided information about a different form of fraud, and without that information, the [G]overnment might not have investigated beyond Defendants' smaller set of fraudulent coding practices conveyed to the government earlier."

## IV. OVERVIEW OF DEFENDANTS' FRAUDULENT SCHEMES

45. The three (3) schemes concerned have been disseminated and communicated within EmCare throughout its organizational structure, via its subsidiaries, and to Emcare's employees and medical providers.

46. An example of one such dissemination was a meeting held for EmCare, Inc.'s Tuscan, Arizona facility on November 19, 2012.[8]

47. In that meeting, there was a "Coding Discussion" helmed by Helen Dowling CPC Director, Practice Enhancement Services, from EmCare, Inc., who discussed what EmCare expected on documentation to increase RVU's and reimbursement, wherein she provided those in attendance with several handouts and reviewed them explaining what the coders at RTI wanted the providers to include in the chart documentation. (Richard Rosenthal, MD also asked Helen Downing CPC to send monthly newsletters to this effect so as to facilitate this implementation.)

48. Nurse Director, Melissa Moreno then spoke about the use of the Quality Score

[8] Those in attendance included: Richard Rosenthal, MD; Julie Klein, MD; Patricia Hiebert, FNP; Rich Beamon, MD; Brent Lorenzen, MD; Gary Parker, PAC; Patti Daly, FNP; Venessa Saldana, NP; Melissa Moreno, ED Director; Melissa Zukowski, MD; Elizabeth McCarrell, MD; Brian TenElshof, MD; Dawn Bauman, NP; Eric Ruhe, MD; Tim Bohan, FNP; John Hall, MD; Roger Ottman, MD; Carrie Serra, MD; Elizabeth Warren, Director of Professional Staff. The meeting minutes were then sent via e-mail by Martha Escamilla, Practice Manager, EmCare, Inc., TMC 5301 E. Grant Rd., Tucson, AZ 85712, on November 26, 2012, to the following individuals at TMC as part of an ongoing effort to implement the performance gaps and culture gaps referenced in the meeting: Ajai Sawhney; Brent Lorenzen; Brian Hagerty; Brian Tenelshof; Bruce Ogg; Candace Engelhardt; Carol Marquez; Carrie Serra; Charles Peterson; Clifford Janke; Desai, Heeten; Donna Woods; Elizabeth McCarrell; Eric Ruhe; John Hall; Julie Klein; Lori-Ann Tracy; Lowry Jonathan; Melissa Zukowski; Michael Karadsheh; Michelle Williams; Mickey Miller; Richard Beamon; Richard Rosenthal; Roger Ottman; Serge Hougeir; Theresa Cullen; Alan Grenke; Ciara Aparicio; Dana Robinson; Dawn Bauman; Gary Parker; George Jicha; Georgette George; Leda Hankins; Michael Jackson; Patricia Baird; Patricia Daly; Patricia Hiebert; Rebecca Winfield; Robert Rodriguez; Scott Wiley; Timothy Bohan; Venessa Saldana; Caleb Hernandez; Claudette Rodriguez; Desmond Nunan; Heidi Brown; Paula Mayer; Seema Nair; and, Shereaf Walid.

Card by EmCare and its relationship to billing CMS, where the scribes were used to target the quality measures used in CMS billing, and wherein EmCare knew that the scribe attestations were not accurate, including a measure of time that was used to inflate billing critical care time. (A focus of the meeting and of the implementations that followed—*in conformity with Studer Group and EmCare's model*—was to specifically focus on CMS billing as the main measure of quality in the system, where the complexity, *i.e.*, quality, in terms of more expensive care for which one was billing CMS, was the measure of quality.)

49. Richard Rosenthal, MD also received and spoke as to a report from RTI that showed what EmCare, via RTI, claimed to be what they termed "down-coded" charts and that he would then forward the report(s) to the appropriate providers, *i.e.*, those whom EmCare accused of "down-coding." Two individuals, Billing Coordinator Esther Alcantar and an EmCare employee named Joan, then presented on the importance to EmCare of charts not being "down-coded," and how to achieve that. Those in attendance were then informed that RTI was working on report to show how each provider was doing with regard to "down-coding," which would be ready for January of 2013.

50. Helen Dowling, CPC Director, Practice Enhancement Services, who was introduced as the "EmCare Speaker," also stated to those in attendance that they would see her shadowing providers to make sure that these implementations would be made. She mentioned an area that needed "improvement" was critical care, wherein Dr. Rosenthal added that all of the time before a patient arrives and after a patient leaves the emergency department (ED) counts for critical care (CC) time, and wherein Helen Dowling CPC agreed. (From the perspective of ER charting, this is an evident falsehood, as noted below.) They both also discussed the following with the group: (**1**) HPI ("lack of urgency");[9] (**2**)

---

[9] With regard to "lack of urgency" in the HPI (History of Present Illness), it should be noted that the History of Present Illness (HPI) is a section of the medical record where a provider explains the patient's current medical problem. Pursuant to EmCare's directives, HPI must always be documented to have up to eight (8) elements (four of which had to be, per EmCare, documented at a full-level code, *i.e.*, level 5). This would be followed by documenting a review of organ systems (ROS), which would, in real life, require looking

methods of documenting Pulse Ox so as to increase critical care billing (*due to changes that were coming soon to EPIC which would facilitate such documentation*); and (**3**) "Smart Phrase" coming soon for mid-level provider (MLP) attestations.[10] Helen Dowling, CPC Director stated that she would meet with the lead scribe to review everything that the scribes should be doing to implement these goals with the providers.[11] (Handouts on these points

---

at all of the major organ systems followed by physical examinations, including a full neurological exam, a full cardiac exam, etc., and similar exam for every major system, regardless of how unnecessary this is given what the patient has arrived in the ER to have addressed. (As an example, a patient coming into the ER with a broken foot would receive documentation that they had all major organ systems inspected, which is completely unnecessary even if it were true, which was, as a rule, not the case, as noted below.) However, because one cannot lie about providing critical care without adding notes about "urgency" to the HPI, EmCare was demanding that urgency be improperly added to the documentation. The idea was to try to make some complaints look more urgent and then pepper them with references to things that were also being systematically pushed to be done on most everyone (*e.g.,* pulse oximetry to measure oxygen level at triage). This way, EmCare could "set up" the charts to be primed for increasing critical care claims for something that was not actually happening. The scribes were instructed to automatically document these items regardless of whether they saw them occur so that EmCare, via its billers, could then insert a critical care template and say to the physician, "You know we could code critical care for this."

[10] The "smart phrase" was a canned note that would imply that the doctor saw the patient face-to-face; however, it was purposefully subtle enough that it could "fly under the radar" with physicians, as the doctors were upset about signing charts for MLPs for patients they could not see due to the segregation and isolation of physicians from mid-level providers inEmCare's flow model. As such, "smart phrases" were a mechanism for EmCare to get physician attestations that it could then use to code and bill as supervised split/shares even though the physicians were segregated from the mid-levels by EmCare's flow model and could not have done the requisite face-to-face encounter. In fact, the physicians were in a completely different part of the hospital from mid-levels and it was physically impossible for them to provide supervision of the kind required for a split/shared visit to be billed.

[11] Helen Dowling met with Michael Russo, the Lead Scribe, and he was instructed by her to make custom "smart phrase" templates and to instruct the scribes on all the items EmCare wanted them to pre-populate in a physician's chart so as to ensure that there was no "down coding." In short, by documenting everything as a level 5, every chart was being documented for upcoding purposes. There was also a push to get what EmCare

were provided to those in attendance.)[12]

51. As per EmCare's model, the meeting was about closing the "performance gaps" and "culture gaps" noted by EmCare, *supra*.[13] "Smart Phrase" was a name used for

---

termed "low hanging fruit" like smoking cessation, critical care, the elements of the ROS, and the physical exam that would be automatically checked by EmCare via RTI to ensure that no chart was ever "down coded." The change was so abrupt that many physicians instantly complained about the scribes inserting all of this information into the charts and said that they could not ethically document things that they were not doing. Michael Russo worked for MSS, a California-based competitor of ScribeAmerica that merged with ScribeAmerica in 2015. https://www.scribeamerica.com/press_release/scribeamerica-announces-merger-of-southern-california-based-competitor-medical-scribe-systems/.

[12] Immediately following this meeting, there was a "full-court press" implemented by the EmCare personnel present at the meeting to have providers document for billing in conformity with the practices complained of in this Amended Complaint, which was palpably noted by the physicians. As per an e-mail sent by Martha Escamilla, Practice Manager, EmCare, Inc. – TMC, 5301 E. Grant Rd., Tucson, AZ 85712 on December 12, 2012, these meetings were part of a change following the takeover of the ER by EmCare, as also known and experienced by Relator Dr. Caleb S. Hernandez, DO given that he was part of the ER culture at the facility that was experiencing the changes brought on by EmCare.

[13] EmCare had just acquired the hospital contract and fired many of the past physicians. Their goal was now to teach everyone "the EmCare way" and they did not want any doctors who were doing things "the old way," that is, who were not up-coding. EmCare looked at the performance numbers, which EmCare considered a performance gap and also identified doctors who "charted a level 3 chart," instead of documenting every chart as level 5, as "performance gaps." Even if the patient did not want or need a level 5, *i.e.*, the most thorough, comprehensive, and complicated history, review, and physical exam that any physician ever does in the ER, EmCare insisted on this being documented. A level 5 assessment is literally a top-to-bottom evaluation of the patient from "head to toe," looking at all major organ systems, and is so thorough that CMS will pay you more for it because it is hard, high-quality work and takes up a lot of time, roughly an hour, and sometimes more if the patient is slow or frail, talkative, a poor communicator, or if there is a language barrier. (This is significant because EmCare's flow procedures require physicians to see three to four (3-4) patients per hour, but EmCare simultaneously expects physicians to document roughly three to four (3-4) hours of HPI and evaluations—*that EmCare reasonably know did not occur*—in that one (1) hour, as that would be a total impossibility.)

the implementation of canned notes in the electronic charting system, but especially with regard to mid-level charting. It was also recognized in the meeting that physicians were reticent to draft supervision notes in the electronic chart (EMR) that could satisfy EmCare's interest in billing mid-levels at 100% of the physician rate, so the "Smart Phrase" was implemented to introduce the kind of billing language that EmCare desired into the chart. Mid-levels and scribes were to introduce the Smart Phrase material into the EMR ahead of time, prior to the physicians even accessing those portions of the EMR.

52. As noted above, the meeting was also about addressing what EmCare, Inc. and RTI saw as a problem that they had labeled "down-coding." In this, "down-coding" is an *ad hoc* term created as part of EmCare's endeavors to close the "performance gaps" and "culture gaps" of physicians not upcoding, particularly for critical care.[14] In short, it was an effort, within the EmCare community and culture to demonize physician reticence to up-code. (The relationship between charting and billing cannot be overstated.)

a. As per EmCare's business model, its policies on charting are directly related to billing, and it practices identified herein are all about billing. As it has admitted, its Billing Coordinators' negative treatment of physicians on behalf of EmCare, as recounted herein, is directly related to charting for the explicit purpose of billing, wherein it even openly states: "This is your Billing Coordinator when your documentation holds up the billing process!!" (including a picture of a screaming toddler having a tantrum).[15]

---

[14] As noted herein, this terminology was jargon developed by EmCare as code that was used between those who were part of the culture within EmCare, including its billers, coders, scribes, physicians, and MLPs, etc. It was used to hide upcoding, and the associated illegal activities, in plain sight by "flipping the script," so to speak: physicians were punished in the EmCare culture for the *ad hoc* classification of "down-coding," which took a focus off of the efforts to pressure them to up-code in violation of CMS certification requirements. Physician reticence to up-code was identified as a "culture gap."

[15] *See* https://slideplayer.com/slide/15773855/.

b. As also stated by Martha Escamilla, Practice Manager, EmCare, Inc – TMC, located 5301 E. Grant Rd., Tucson, AZ 85712, on December 7, 2012, in an e-mail directed to Relator Dr. Caleb Hernandez, DO and a number of other physicians that worked at TMC: "The billing coordinators need to get these charts to RTI so they can be billed and reimbursed and RTI also has deadlines to meet."

### *A. Introduction to the Scribe Scheme*

53. As such, to account for physicians who were hesitant to lie on their charts, which threatened the success of Defendants' schemes, Defendants implemented and pursued a scribe program.

54. The scribe program trained impressionable young people. Typically, they are 19- to 24-year-old students, usually pre-med or pre-nursing students, in conformity with directives from ScribeAmerica and EmCare. Defendants gave scribes promises and/or encouragement that the scribe program would help them make it into medical school or nursing school.

55. As per their thought partnership, and as noted above, ScribeAmerica trained scribes in "the EmCare way." ScribeAmerica worked as a thought partner with EmCare in making sure that scribes placed in medical charts the deceptive information EmCare needed to falsely bill. Scribes were instructed to maximize billing of a chart, regardless of veracity or the medical judgment of a physician, which translated to documenting medical services that were not actually provided but were added solely to increase billing value.

56. Contrary to the EmCare way, scribes should only document what they see a medical provider actually do. They should not, as Defendants did here, fill in information about activities that could have happened, or that EmCare hoped to have happened according to "the EmCare way," yet which did not actually happen or which they did not see happen.

a. This false information later served as a mechanism to force medical providers to attest to things that did not happen. Scribes also should only classify the level of care consistent with the activities actually performed and/or per the

physician's judgments. This is especially true in areas such as critical care, where only the physician is qualified to make the medical judgment of whether critical care occurred.[16]

57. However, despite the fact that only the physician is qualified to make the medical judgment of whether critical care should occur (*by actually doing all the things required by CMS*), scribes were instructed to fill out the chart as if the highest level of care was provided for *all* patients, even if the highest level was not provided. Despite the fact that only the physician is qualified to make the medical judgment of whether critical care should occur (*and then to actually do the work that is necessary for that billing*), scribes were instructed to fill out the chart as if the highest level of care was provided for ***all*** patients, even if the highest level was not warranted, let alone even done. EmCare then pressured physicians to rubber stamp the information that scribes placed in the chart. Defendants also pressured physicians and scribes to sign canned attestations, and even tried to use the scribes to pressure physicians. (Defendants miseducated the scribes to this end, as noted below.)

58. To increase billing, Defendants instructed scribes to falsely add elements to charts that anyone familiar with the correct CMS standards would know had not been done, and Defendants did so to make the charts appear as if more comprehensive services were provided, even if not provided. (For example, Defendants instructed scribes to document a full neurologic examination and full evaluations of all major organ systems even when the doctor only came in and looked at a twisted ankle.)

59. For example, ScribeAmerica and EmCare instructed scribes to chart that the physician addressed all 10 review of systems ("ROS") items as a routine, doing so even

[16] By training scribes to make chart entries that correspond to information that they did not witness and which they do not have the medical judgment to legally make, especially in a system where other EmCare personnel then pressure the physicians to abide by such changes under the threat to their career, EmCare and ScribeAmerica have displayed a reckless disregard for the truth of information that EmCare and ScribeAmerica know is used in billing the various government payors identified in this action. *See also* ¶¶ 51-94, 99-112, § VII, particularly ¶¶ 193-289, and § VIII, *infra*.

when they were not actually performed. (As noted, *supra*, by this instruction, EmCare and ScribeAmerica have displayed a reckless disregard for the truth of information that EmCare and ScribeAmerica know is used in billing the various governments identified in this action.) Scribes were directed to use a template regarding ROS, or to add items via clicking boxes that added items to the chart in the laptop, mobile computer, or Computer on Wheels ("COW"), and which added elements that did not occur in the patient encounter but were required for billing those services (*i.e.*, billing for items regardless of whether they occurred in the patient encounter). This, as noted, was also at the direction of ScribeAmerica and EmCare.

60. For patients with a documented history of smoking, Defendants instructed scribes to document that physicians took a number of minutes (*e.g.*, 3-5, 5-10) to counsel those patients against smoking (*i.e.*, smoking cessation counseling), doing so as a matter of course regardless of whether it was witnessed and even when the physician did not mention smoking once in the conversation that the physician had with the patient(s). (As noted above, by this instruction, EmCare and ScribeAmerica have displayed a reckless disregard for the truth of information that EmCare and ScribeAmerica know is used in billing the various governments identified in this action, as they knew the physicians were not actually doing this given EmCare's "flow" requirements, which limited time with patients in a way that made the falsely added items practically impossible.)

61. These fraudulent additions to charts have resulted in several millions of dollars' worth of up-coded claims.

### ***B. <u>Introduction to the Critical Care Scheme</u>***

62. Defendants also charted and billed for Critical Care services that were not performed. Critical Care is a "pass-through" bill for CMS, meaning that there was no risk of a front-end audit of the charges. As with the Mid-Level Scheme described below, physicians are also coerced to up-code, up-charge, and misclassify regular care as critical care. For example, physicians are told by EmCare that giving a patient an IV qualifies as critical care regardless of the reason, which resulted in otherwise non-critical care being

misclassified and fraudulently billed as critical care. (Significantly, the Scribes are also informed of this half-truth, which results in the scribes documenting numerous things as critical care that are simply not critical care.) As another example, although patients with kidney stones are classified as non-critical, if they were given an IV, then the Defendants misclassified and fraudulently billed them as receiving critical care, while EmCare instructed and pressured physicians that they should not fight this, especially to keep their employer content.

63. Defendants manipulated physicians in a variety of ways to motivate them to comply with the scheme and introduce critical care into the charts via scribes. If physicians complied, Defendants rewarded them with more RVUs,[17] profit sharing, bonuses, and ongoing pay in a difficult economy. In other words, Defendants provided kickbacks to physicians as an inducement to go along with the scheme. If they did not comply, physicians were penalized, publicly shamed in group e-mails or meetings, and deemed a cost to the group and, therefore, bad partners; they risked losing privileges or being replaced by a "higher performer" (*i.e.*, a provider who was willing to comply with the scheme).

64. Physicians were given "canned notes" or "templates" that EmCare prepared and instructed them to use on all patients who "could have" critical care and such notes were also simultaneously introduced by the scribes. These templates were biased and inaccurate and had elements designed to document critical care in the chart when it was not clinically indicated or actually rendered.

65. Billers were instructed to always code for critical care upon seeing a template regardless of whether the chart matched the template in regard to the diagnosis or the work done. Billing coordinators would then also give doctors negative feedback from RTI when charts were not documented to the highest level of care, *i.e.*, when they were "down-coded."

66. Thus, what EmCare pressures to be submitted as critical care billings contrasts significantly and materially from the actual and legitimate requirements for critical

[17] "RVU" stands for Relative Value Unit and is used by Medicare and other third-party payors to determine reimbursement rates for physician services.

care as per the CMR certification requirements, as noted in the MEDICARE and CRITICAL CARE SCHEME subsections of this Amended Complaint, *infra*.

67. As noted later in this Amended Complaint, Defendants use scribes to insert critical care into a chart even though the rest of the chart shows there is no basis for a legitimate critical care classification. EmCare then pressures physicians to approve scribes' entries.

68. Aside from its dependence on many participants that are orchestrated by EmCare's LEAN model and "thought partnerships" with other entities that have adopted the Studer Group model, this Critical Care Scheme is a classic upcoding scheme: EmCare bills CMS and other government payors for "critical care"—*the highest level of emergency treatment*—when in fact critical care services were not rendered and/or were not medically necessary, thereby submitting false claims through fraudulent billing.[18] Because of the heightened skill and decision-making critical care requires, CMS and other government payors reimburse providers for those services at a significantly higher rate than standard emergency services. To capitalize on this up-charge as part of its Value-Based Purchasing model, EmCare requires its providers to: (**1**) approve critical care charting information that scribes have placed into the chart, even though that is not documented at the direction of the physician; (**2**) falsify critical care on patient medical records when the care provided did not meet the relevant billing requirements for critical care; and/or (**3**) document critical care services even though those services were not medically necessary. Based on these documents, and thus "relying" on falsified medical records, EmCare coding and billing employees then submit claims for reimbursement for the critical care services falsely reflected in the patient chart.

---

[18] As known by EmCare prior to all of these implementations, critical care is a heightened level of treatment necessary when a patient has a high probability of imminent or life-threatening deterioration that requires healthcare providers to exercise a higher degree of medical decision-making and devote longer periods of time to that patient's treatment. *See* EMCARE COMPLIANCE PROGRAM, POLICY No. 308 Critical Care, Page 1 of 2 (Revised – January 2007).

69. EmCare's fraudulent billing policies and practices enable it to bill the Government Plaintiffs for millions of dollars for the claimed services. Through the Critical Care Scheme, EmCare has fraudulently obtained multiple millions of dollars *each year* since at least 2008 (when the critical care regulations were last updated).

70. EmCare's Critical Care Scheme violates the Government Plaintiffs' coverage limitations and causes the knowing and/or intentional submission of illegal and false claims for reimbursement under federal, state, and municipal laws, resulting in significant losses of taxpayer dollars.

### *C. Introduction to the Mid-Level Scheme*

71. As noted below, a significant feature of EmCare's Mid-Level Scheme is to orchestrate and coordinate its personnel (*within different subsidiaries*), to improperly apply the incident-to requirements in the emergency department setting—*doing so in contravention of the governing legal requirements in that very different setting*—so that EmCare can then bill CMS as though a split/shared visit actually occurred.

72. CMS Requirements that EmCare Violates Through This Scheme: On Oct. 25, 2002, the Center for Medicare & Medicaid Services (CMS) issued Transmittal 1776 giving non-physician practitioners (NPPs),[19] *herein also referred to as* "mid-levels," requirements for hospital and office billing of evaluation and management (E/M) services. These instructions provide how and when NPPs and physicians who work for the same employer/entity can share patient visits on the same day by billing the combined work under the physician's provider number for 100% of the Medicare physician fee schedule (MPFS) reimbursement—even in circumstances where the NPP may have done the majority of the work. These instructions are referred to as Medicare's Split/Shared Visit Policy.[20] (Without meeting these requirements, an NPP can only be billed at 85% of the physician rate.)

---

[19] Medicare defines NPPs as physician assistants (PAs), nurse practitioners (NPs), and clinical nurse specialists (CNSs). *See* 42 C.F.R. § 403.902.

[20] www.cms.hhs.gov/transmittals/downloads/R1776B3.pdf.

73. THERE ARE, HOWEVER, DIFFERENT RULES FOR DIFFERENT SETTINGS: The two categories are: (1) "Incident to"; and (2) "Split/Shared". The split/shared E/M visit policy applies in institutional facilities (*i.e*., the emergency department). In contrast, "incident-to" is for non-institutional facilities (*i.e*., physician offices). "Incident-to" is not applicable in the hospital setting and, as such, is not applicable in the emergency department. *See* 42 C.F.R. § 410.26(a)(6); 42 C.F.R. § 415.140; *see also* 42 C.F.R. § 489.24(b) ("*Dedicated emergency department* means any department or facility of the hospital, regardless of whether it is located on or off the main hospital campus") (emphasis in original). The service billed incident-to must take place in a "non-institutional setting," which the Centers for Medicare & Medicaid Services (CMS) defines as "all settings other than a hospital or skilled nursing facility." 42 C.F.R. § 410.26(a)(6); *see also* 42 C.F.R. § 415.140.

74. According to the Medicare Benefit Policy Manual, incident-to rules apply only to non-institutionalized settings (*i.e*., not hospital or SNF settings); Section 60.1B of the Medicare Claims Processing Manual states:

> For hospital patients and for SNF patients who are in a Medicare covered stay, there is no Medicare Part B coverage of the services of physician-employed auxiliary personnel as services incident to physicians' services under 279H§1861(s)(2)(A) of the Act. Such services can be covered only under the hospital or SNF benefit and payment for such services can be made to only the hospital or SNF by a Medicare intermediary.

75. As such, with regard to emergency medicine and hospitalized patients, CMS and other government payors do not allow a shared visit between a mid-level provider and a supervising physician to be billed under the physician's NPI at a the higher physician rate *unless* the physician: (**1**) has physically seen the patient face-to-face; and also (**2**) modified the mid-levels' notes (Review of Systems ("ROS"), physical exam ("PE") or Assessment

and Plan ("A&P")).[21] Under government health care programs, an attestation is not enough; there must be evidence of a face-to-face encounter, such as separate documentation by the physician in the ROS, PE, or A&P in addition to the attestation of a face-to-face encounter. *See id*. (If this evidence is false, then so is the certification and documentation.)

76. The definition of split/shared visits can be found in the CMS Internet Only Manual (IOM): Medicare Claims Processing Manual Publication 100-04, chapter 12, section 30.6.1.H Split/Shared E/M Visit (Prior to May 3, 2024):

> A split/shared E/M visit is defined by Medicare Part B payment policy as a medically necessary encounter with a patient where the physician and a qualified NPP each personally perform a substantive portion of an E/M visit face-to-face with the same patient on the same date of service. A substantive portion of an E/M visit involves all or some portion of the history, exam or medical decision making key components of an E/M service. The physician and the qualified NPP must be in the same group practice or be employed by the same employer.

---

[21] *See, e.g.,* § 15501. EVALUATION AND MANAGEMENT SERVICE CODES - GENERAL (CODES 99201-99499) B., *Carriers Manual Centers for Medicare & Medicaid Services (CMS), Part 3 - Claims Process, Transmittal 1776*, Medicare Department of Health & Human Services (DHHS), (OCTOBER 25, 2002) (emphasis added):

> When a hospital inpatient/hospital outpatient or **emergency department** E/M is shared between a physician and an NPP from the same group practice and the **physician provides any face-to-face portion** of the E/M encounter with the patient, the service may be billed under either the physician's or the NPP's UPIN/PIN number. **However, if there was no face-to-face encounter between the patient and the physician (e.g., even if the physician participated in the service by only reviewing the patient's medical record) then the service may only be billed under the NPP's UPIN/PIN.**

https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/r1776b3.pdf (emphasis added).

77. As noted below, EmCare, Inc. knew the proper requirements yet implemented a scheme across different subsidiaries to use improper and illegal requirements, including its use of "incident-to" criteria in the ER setting (*which is illegal, as noted herein*), instead of those certification requirements mandated by CMS, which EmCare does so as to bill for physician services that were never actually provided. *See* EMCARE COMPLIANCE PROGRAM, POLICY NO. 310, at 2 of 3 (Revised - January 2007).

78. In this light, the Mid-Level Scheme involves four (4) elements, noted below.

79. **THE FIRST ELEMENT**: EmCare redefines the plain language of the CMS guidelines to set up false equivalents. A mid-level provider is instructed by EmCare to use a boilerplate attestation that the physician has supervised him or her "personally," intentionally leaving out the face-to-face language required by CMS, which the mid-level provider is then instructed to include even though the physician has not seen the patient face-to-face or even known that the mid-level has seen the patient. Because EmCare sends an electronic notice to physicians directing them to "sign-off" or "cosign" on what a mid-level has done retroactively, the physician is not typically notified until the mid-level has completed work, rendering true and compliant face-to-face supervision a practical impossibility. Moreover, EmCare intentionally segregates the midlevel providers and the physicians, to make them "more efficient" at seeing patients individually (*a cost-cutting measure*), yet something which also makes face-to-face shared visits a practical impossibility. The omission of face-to-face language is intentional on EmCare's part, as the misclassified independent contractors they hire would be reticent to attest to something that they knew to be false (*i.e.*, directly stating that a face-to-face physician visit occurred). Instead, mid-levels are the focus at this stage, where they are intentionally misled and manipulated by EmCare in these ways to take the first step in tricking physicians into signing an attestation that EmCare can then use to improperly bill Medicare for a split/shared visit that never occurred.

80. **THE SECOND ELEMENT**: The physician, under pressure by EmCare, signs the attestation of the mid-level provider saying that the physician agrees with it. Here too,

EmCare leadership intentionally omits the required face-to-face language. EmCare does this because physicians have complained about attesting to false statements and are also likely to complain that they have not seen the patients face-to-face, let alone supervised the visit. As such, EmCare uses carefully crafted language, here too, to deceive and manipulate the physicians into signing the attestations that are neither required nor, ultimately, permitted according to CMS guidelines. In these ways, EmCare intentionally creates confusion regarding the purpose of the signature in order to trick the physicians into signing an attestation that EmCare can then use to falsely bill Medicare for a split/shared visit that never occurred.

81. **THE THIRD ELEMENT**: Coders and billers hired by EmCare are instructed to bill a shared visit when they see a signature by the physician and attestation by the mid-level in a chart. They are told falsehoods and half-truths by EmCare, such as that the signature together with the attestation is equivalent to a "face-to-face" visit, or that "personally supervised" is equivalent to "face-to-face." This is the direction even when the required ROS, PE, or A&P documentation by the physician is missing in the mid-level chart, and even when physicians have not stated that they saw the patient "face-to-face," which is an express requirement along with the physician's edits to the ROS, PE or A&P elements in the mid-level's chart.

82. **THE FOURTH ELEMENT**: At the instruction of EmCare, account managers at the hospital and EmCare personnel are responsible for calling up physicians and mid-level providers, sending them e-mails or other communications, and forcing them to make these attestations. Physicians and mid-levels are threatened with losing their jobs—*with regard to which the contracts include non-compete clauses*—and losing hospital privileges (*which imperils a physician's license, threatens a potential loss of medical licenses, and becomes—at best—a significant legal headache for a physician with the licensing bodies*)[22] if they do

[22] When physicians lose privileges, it is a serious mark against their record, imperiling their license. *See* https://www.npdb.hrsa.gov/guidebook/EClinicalPrivilegesQA.jsp; https://www.hollandhart.com/files/90910_consequences-of-adverse-credentialing-

not sign these charts. This is done through an agreement with the hospital where EmCare uses their knowledge of hospital policy, and partnerships therein, to make this fraudulent signing a "hospital requirement" which it can then use to force the loss of privileges if the health care provider does not comply with EmCare's demands.[23]

83. Under the Mid-Level Scheme, EmCare uniformly and systematically overbills CMS and the Plaintiff States for services performed solely by mid-level physician assistants ("PAs") and nurse practitioners ("NPs")—by submitting claims for reimbursement of mid-level services under a physician's National Provider Identification ("NPI") number as if a physician, rather than a mid-level, had performed the services. When a mid-level performs services alone, without any physician involvement, CMS only reimburses those services at 85% of the physician rate. *See* 42 U.S.C. § 1395l(a)(1)(O) (identifying the *typical* percentage differences between physician and mid-level rates); *cf.* 42 CFR § 415.140 (noting that the "incident to" rules are not permitted in the facility setting and setting forth the conditions of split/shared billing in a facility, such as the ER); CMS, MEDICARE CLAIMS PROCESSING MANUAL, pub 100-04, Ch. 12, § 30.6.1(B); CMS, MEDICARE CLAIMS PROCESSING MANUAL, pub 100-04, Ch. 12, § 30.6.18 ("**Facility setting** means an **institutional setting** in which **payment for services and supplies_furnished incident to** a physician or practitioner's professional services is **prohibited under our regulations**.") (emphasis added).

84. Given EmCare's "flow" models and LEAN program, the overwhelming majority of services provided to CMS beneficiaries by mid-levels at EmCare emergency departments are carried out with no physician involvement. Accordingly, under CMS regulations, EmCare should bill these services under the mid-level's NPI and be reimbursed at 85% of the physician rate. However, EmCare submits claims to CMS for these mid-level

---

decisions.pdf.

[23] Relators have copies of such communications, and some examples of these communications are included in the MID-LEVEL SCHEME subsection, *infra*.

services under random on-duty physicians' NPIs, which triggers the full physician reimbursement rate. In other words, EmCare is systematically and unlawfully requesting reimbursement for mid-level services at 100% of the physician rate, rather than the proper 85% rate, thereby reaping a 15 percentage-point premium for mid-level services performed in its emergency departments.

85. Similarly, the Plaintiff States' respective Medicaid programs, and the federal, state, and municipal employee health care programs and plans, reimburse for mid-level services at lower rates than for physician services. However, because EmCare submits claims for mid-level services under physicians' NPIs, EmCare unlawfully requests reimbursement from the Plaintiff Governments for mid-level services at 100% of the physician rate, rather than the appropriate mid-level percentage paid by Plaintiff States' respective Medicaid programs and the Plaintiff Governments' employee health care programs and plans.

86. At the center of EmCare's Mid-Level Scheme is its "Golden Rule: You don't get paid for what you do; you get reimbursed for what you document!", which it admitted through one of its agents via e-mail. On May 19, 2009, at the North Carolina facility where Relator Dr. Chionesu Sonyika, MD worked, Sherry Winstead of EmCare, sent the e-mail concerned, titled, "May chart review – not too promising," sending it to Relator Dr. Sonyika, MD and a number of other providers.

87. Thus, to cover up its Mid-Level Scheme, EmCare manipulates patient medical charts to falsely document physician involvement in what is called a "shared visit." A shared visit occurs when a mid-level treats a patient alongside a supervising physician who sees the patient face-to-face, meaning that both the physician and the mid-level actually provide face-to-face services to the patient. *See* 42 U.S.C. § 415.140.

88. When a true shared visit occurs, CMS and other government payors reimburses for the mid-level services at the same rate as the physician's services, as if the mid-level were an extension of the physician. *See* 42 U.S.C. § 1395l(a)(1)(O) (identifying the *typical* percentage differences between physician and mid-level rates); *cf.* 42 CFR §

415.140 (noting that the "incident to" rules are not permitted in the facility setting and setting forth the conditions of split/shared billing in a facility, such as the ER); CMS, MEDICARE CLAIMS PROCESSING MANUAL, pub 100-04, Ch. 12, § 30.6.1(B); *see also id*. at § 30.6.18 ("**Facility setting** means an **institutional setting** in which **payment for services and supplies furnished incident to** a physician or practitioner's professional services is **prohibited under our regulations**.") (emphasis added). (In the emergency department, a properly documented shared visit, where the physician also sees the patient face-to-face, is the only circumstance under which mid-level services may be reimbursed at the full physician rate.)

89. However, true shared visits are exceedingly rare in EmCare's emergency departments, especially as they go against the LEAN model and against the "flow" requirements of EmCare's model. In EmCare's model, physicians and mid-levels very rarely see patients together. Instead, to maximize efficiency and avoid overlap, under EmCare's business model, mid-levels are segregated to independently treat lower-acuity patients, while physicians independently treat higher-acuity patients. Kirk B. Jensen, EmCare's Chief Innovation Officer and the Chief Medical Officer for EmCare affiliate BestPractices, Inc., describes hospitals as profit centers where revenue can be maximized through patient turn over. Indeed, Dr. Jensen illustrates EmCare's emphasis on patient turnover by likening hospital beds to restaurant tables.[24]

90. Notwithstanding this backdrop, EmCare requires physicians and mid-levels to indicate in mid-level medical charts that the physician provided the services to the patient. However, the mechanics of this scheme, including the various timestamps on the records, reveal that the mid-level selects a "supervising" physician after the encounter is completed and that the physician never accesses the chart until hours or even days after the encounter.

---

[24] *See* Kirk B. Jensen, *Optimizing the Patient Flow in the Emergency Department*, 2014 Presentation at ACEP Scientific Assembly in Chicago, Ill., http://clinicalphysician.net/wp-content/uploads/2015/01/Improving-the-Patient-Flow-in-the-Emergency-Department.pdf, at Slides 33, 37-39.

Nonetheless, EmCare demands that a physician sign <u>every</u> mid-level chart and indicate that the physician supervised the patient encounter. Relying on the cover provided by these manipulated charts, EmCare then bills for the mid-level services under the physician's NPI at the full physician rate. EmCare improperly requires this even when, as is overwhelmingly the case, no true shared visit occurred. (The timestamps in the EMR, however, are the tell-tale sign that the documentation and its associated billing and coding are false.)

91. EmCare ensures physician and mid-level compliance with the Mid-Level Scheme through threats. EmCare threatens that failure by mid-levels to assign every patient chart to a physician and failure by physicians to sign every mid-level chart—*regardless of whether there was any physician involvement*—may lead to lower pay, suspension, or even termination. EmCare tells its employees, both in the emergency and billing departments, that physician signatures are required for the mid-level services to be billed and reimbursed.

92. As noted herein, there is, however, no such CMS requirement for Medicare. Nor is there any such requirement promulgated by the Plaintiff States concerning their Medicaid programs. Nor is there any such requirement by any of the federal, state, or municipal employee health care programs or plans.

93. Even worse, EmCare knows this aspect of the Mid-Level Scheme actually violates CMS regulations. Since at least 2007, EmCare's internal employee handbook has acknowledged—or at least paid lip services to—the very regulations the Mid-Level Scheme violates, to wit:

> ***Billing the MLP Benefit Only***
>
> <u>**When the physician only supervises and does not treat, bill the MLP benefit under the MLP's own provider number, and with expected payment at 85% of the physician fee schedule for Medicare**</u>**.** Naturally, this requires Medicare enrollment of MLPs, in order to obtain the provider numbers for billing purposes. Other payors that recognize MLPs as providers have varying payor guidelines.
>
> ***Billing Physician Services with MLP Involvement***

> When the MLP assists the physician, but the physician examines the patient and performs medical decision-making, a physician service may be billed. **If the physician is providing face-to-face time with the patient, being present for, or performing, the key portion of the procedure, as determined by the physician's own judgment, the service becomes billable under the physician's provider number.**

EMCARE COMPLIANCE PROGRAM, POLICY NO. 310, at 2 of 3 (Revised - January 2007) (emphasis added).

94. But, by insisting that its employees comply with the Mid-Level Scheme, EmCare instructs its employees to ignore its own past employee handbook and the federal and state regulations mentioned therein.

95. EmCare's Mid-Level Scheme violates CMS billing regulations and guidelines and causes the knowing and/or intentional submission of illegal and false claims for reimbursement under federal and state laws. It defrauds the federal and state health care programs on a nationwide basis, costing taxpayers significant sums of money each year. (EmCare's actions have also similarly plundered and abused the public resources of the Plaintiff States.)

96. As such, EmCare implemented a scheme wherein the organizational structure of its different subsidiaries concerned is used in a coordinated way to have their cake and eat it too—*in terms of hiring teams of less expensive mid-levels, yet billing them out at physician rates in the ER*—at the expense of public safety, while defrauding the taxpayer and plundering a fund, *i.e.*, Medicare, that exists for the benefit of the Country:

> On average, an ER physician these days cost about $180 an hour and can see about 6.8 RVUs per hour. A family practitioner or internal medicine doc in the ER runs at about $110 an hour; they can see about 5.8 RVUs per hour. A mid-level practitioner runs about $60 an hour (the price may be going up) and they can see about 5.5 RVUs per hour. In a dedicated

> fast track they can see the 2's, 3's, and 4's versus the 4's, 5's, and critical care patients.

WHITE PAPER, *Staffing Your Emergency Department*, Kirk B. Jensen, MD, MBA, FACEP, at 10, BESTPRACTICES, INC., AN EMCARE AFFILIATE (2011).

### *D. IDENTIFYING THE PROOF OF THE FRAUD*

97. The electronic charting documents document the fraud. EmCare keeps the full record of the chart at the hospitals with what can be thought of as "dual agents," *i.e.*, individuals who are both hospital and EmCare employees. This version of the chart has all of the time and date stamps that reveal inconsistencies and misinformation. Due to HIPAA, Electronic Medical Records ("EMRs") must contain this information.

98. Because the charts are electronic, there are multiple "chart views" which are used by EmCare to obfuscate the fraud. Nonetheless, there still remain a number of chart views or chart versions that make the submission of false information plain to someone who knows how and where to find EmCare's obfuscation. One such view is the "time stamp summary," which shows who accessed the chart and when. This is done for HIPAA compliance, yet also shows that physicians have never accessed the chart to do the required work for which EmCare is falsely billing.

99. EmCare sends to its billing staff a redacted version of the chart that eliminates this important information from the record. This results in coders and billers receiving partial information and manipulating the codes that billers are instructed to choose when billing Medicare, Medicaid, or government employee healthcare programs and plans. EmCare uses these protocols to create a degree of "plausible deniability," in which the "right hand does not know what the left hand is doing." Nonetheless, the falsity of the information and the intent to deceive the government is evident from the fact that ScribeAmerica and EmCare control the flow of the pertinent information as described in this Amended Complaint and then profit from their roles in providing false information to Medicare, Medicaid, and other government payors.

100. However, there are telltale signs in the full charts ultimately kept at the hospitals, and in other electronic sources, which can be used to pinpoint clear cases of fraudulent billing:

***i. With regard to the Scribe Scheme:***

101. The diagnosis does not match the level added by the scribe (*e.g.*, the proposition that every, or almost every, patient has comprehensive charting treatment provided during their visit is not realistic).

102. There are "canned notes" and other patterns evident in the charts and in the system of charting.

103. The charting shows that 100% of patients with a smoking history receive smoking counseling (and sometimes even when they don't smoke). This pattern does not reflect what actually occurs in the emergency department, where there are almost always other pressing concerns that are being addressed in the short period of time the patient is being addressed by physicians. (A physician will not take the time to counsel a patient on smoking cessation when there is another patient in the emergency department with life-threatening injuries.)

104. Besides charting evidence, email communications include threats and rewards; scribes' training materials show that scribes are instructed to add extra elements to charts; and scribes have admitted that they are being instructed to add items to the charts.

***ii. With regard to the Critical Care Scheme:***

105. The physician is not identifiable as being in 1:1 with the patient (a CMS requirement); for example, the EMR shows that, at the time, the physician was actively taking care of other patients, making it clear that critical care is not warranted.

106. The times reported do not match up with the requisite critical care times as per CMS, *e.g.*, the 30-, 75-, 90- or 120-minute intervals billed for do not match the chart (that is, CMS cannot be billed 40-60 minutes for critical care for a patient who was only seen by the physician for 15-20 minutes). (As noted below, EmCare requires documentation

of 40-60 minutes of physician time with a patient on every chart but also requires that physicians see 3-4 patients per hour.)

107. The diagnosis does not actually match critical care criteria, *e.g*., abdominal pain (renal stone) is not a life-threatening condition (although painful, the condition will not kill the patient).

108. The chart does not ultimately support the services rendered.

109. Defendants double dip. For example, some ancillary procedures (*e.g*., central venous catheterization) should be billed separately without also counting the time for those procedures as critical care time, but the chart nonetheless shows that EmCare included such items in the critical care time, artificially inflating the critical care time.

110. Besides charting evidence, email communications include threats and rewards.

***iii. With regard to the Mid-Level Scheme:***

111. The physician time stamp is recorded after a patient has left the emergency department or was otherwise dispositioned.

112. The term "face-to-face" is not set out in the physician attestation.

113. There is a "shared visit" billing for a chart that includes "Time Seen By Mid-Level" without any entry indicating "Time Seen By Physician."

114. Even if "face-to-face" is somehow stated in the in physician attestation, there is no evidence of physician involvement or input in the care, such as entries in the ROS, PE, or A&P documented by the physician in the mid-level chart (another CMS requirement).

## V. THE FEDERAL FALSE CLAIMS ACT

115. The FCA makes it unlawful for any person to submit, directly or indirectly, false or fraudulent claims for payment to the Government. *See* 31 U.S.C. §§ 3729, *et seq*. Relators allege liability primarily under three of the FCA's seven liability provisions.

116. First, the FCA's "presentment" provision, 31 U.S.C. § 3729(a)(1)(A), imposes liability when a defendant (a) made, or caused to be made, a claim, (b) that was false or fraudulent, (c) knowing of its falsity.

117. Second, the FCA's "false records or statements" provision, 31 U.S.C. § 3729(a)(1)(B), imposes liability when a defendant (a) made, used, or caused to be made or used, a record or statement, (b) that was knowingly false, and (c) that was material to a false or fraudulent claim.

118. Third, the FCA's "conspiracy" provision, 31 U.S.C. § 3729(a)(1)(C), imposes liability when a defendant conspires to commit a violation of the FCA.

119. The "knowledge" element of the FCA is defined as (1) "actual knowledge of the [falsity of the] information"; (2) "deliberate ignorance of the truth or falsity of the information"; or (3) "reckless disregard of the truth or falsity of the information" provided to the Government. 31 U.S.C. § 3729(b)(1)(A). No specific intent to defraud need be shown. 31 U.S.C. § 3729(b)(1)(B).

120. Under the FCA, the term "claim" means any request or demand for money, whether under a contract or otherwise, presented to an officer, employee, or agent of the United States. 31 U.S.C. § 3729(b)(2)(A)(i). A "claim" is also a request or demand for money made to a contractor or other recipient if (a) the money is to be spent or used on the Government's behalf or to advance a Government program or interest and (b) if the Government provides, has provided, or will reimburse such contractor or other recipient for any portion of the money requested or demanded. 31 U.S.C. § 3729(b)(2)(A)(ii).

121. The FCA defines "material" objectively to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). The Supreme Court reaffirmed the natural tendency materiality test—even as to subsection (a)(1)(A), which does not explicitly use the term—and described a holistic approach to analyzing it. *See Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016).

122. The FCA empowers private persons having information regarding a false or fraudulent claim against the Government to sue on behalf of the Government and to share in any recovery. 31 U.S.C. § 3730(b).

123. The Federal FCA, the State FCAs, and the Municipal FCAs are, in general, *in pari material* for each other, and thus Relators here frame the law using the language of the Federal FCA. However, in the separate Counts and Requests for Relief as to each State and Municipality, Relator uses the precise language of each respective statute or ordinance.

## VI. MEDICARE AND MEDICAID PROGRAMS

124. "Medicare" is the popular name for the federal Health Insurance for the Aged and Disabled Act, which is Title XVIII of the Social Security Act. "Medicaid" is the popular name for Title XIX of the Social Security Act, which provides healthcare coverage for low-income and certain disabled persons. Both programs are administered by CMS, which is part of the Department of Health and Human Services ("HHS"). As the single largest healthcare payor in the United States, CMS' regulations and guidance governing the coverage of healthcare services drives the norms in the healthcare industry and are typically adopted by smaller government payers of healthcare services.

### *A. The Medicare Program and Federal Administration*

125. Medicare is a federally funded program administered by CMS that provides nearly every American 65 years of age and older a broad program of health insurance designed to assist the nation's elderly to meet hospital, medical, and other health costs.[25] Medicare is funded in part by hundreds of billions in taxpayer revenue. Unfortunately, fraud and systematic overcharging are estimated at tens of billions of Medicare's costs every year.[26]

---

[25] CMS, MEDICARE GENERAL INFORMATION, ELIGIBILITY, AND ENTITLEMENT MANUAL, pub. 100-01, Ch. 1 § 10 (2015), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/ge101c01.pdf (*hereinafter* "MEDICARE GENERAL INFORMATION MANUAL").

[26] Reed Abelson & Eric Lichtblau, *Pervasive Medicare Fraud Proves Hard to Stop*, N.Y. TIMES, Aug. 15, 2014:

http://www.nytimes.com/2014/08/16/business/uncovering-health-care-fraud-proves-elusive.html.

126. Medicare is comprised of three primary insurance programs—Medicare Parts A, B and D—that cover different types of healthcare needs.[27] Medicare Part A (Hospital Insurance) covers institutional care such as inpatient hospital care, nursing services, drugs and biologicals necessary during an inpatient stay, and other diagnostic or therapeutic services. Medicare Part B (Supplementary Medical Insurance) covers non-institutional care such as physician services, medical equipment and supplies, and services performed by qualified mid-levels under the supervision of a physician. Medicare Part D (Drug Coverage) covers the cost of outpatient prescription drugs. This case primarily involves Medicare Part B billings. *See* 42 U.S.C. §§ 1395j, *et seq*.; 1395l (payment of benefits); 42 U.S.C. §§ 1395k, 1395m, 1395x. Physicians, nonphysician practitioners, and other healthcare suppliers must enroll in the Medicare program to be eligible to receive Medicare payments for covered services provided to Medicare beneficiaries. 42 C.F.R. § 424.505. Payments are made with federal funds. *See* 42 U.S.C. § 1395h; 42 C.F.R. §§421.3, 421.100.

127. Under Medicare's programs, the federal government reimburses healthcare providers for their labor and medical decision-making on a fee-for-service basis according to predetermined fee schedules, including the Medicare Physician Fee Schedule ("MPFS"), which establishes annual rates for more than 10,000 services provided by physicians and other healthcare professionals. The rates established in the MPFS correspond to specific five-digit codes associated with each medical procedure or service provided. Principal codes used in the ER setting, and the bases for using such codes, are significant and material to how Medicare will be billed. *See* CPT CODE 99285 Fact Sheet, CGS ADMINISTRATORS, LLC (Feb. 12, 2019).[28]

---

[27] Medicare also includes Medicare Part C (also called Medicare Advantage), which is not a separate benefit, but which is a program whereby private companies approved by Medicare provide coverage under Medicare Part A and Part B. *See* HOW DO MEDICARE ADVANTAGE PLANS WORK?" https://www.medicare.gov/sign-up-change-plans/medicare-health-plans/medicare-advantage-plans/how-medicare-advantage-plans-work.html (last visited Aug. 10, 2017).

[28] https://www.cgsmedicare.com/partb/mr/pdf/99285.pdf.

128. In this, CMS has established that its reimbursement levels correspond to each of such Codes. In short, providers submit claims for treatment given to Medicare patients which is then paid according to Medicare's reimbursement schedule. The American Medical Association publishes these Current Procedural Terminology ("CPT") codes annually.

129. The process by which healthcare services are submitted and reimbursed involves several steps and various entities. First, physicians and mid-levels must clearly and sufficiently document patient encounters in their medical charts. To ensure that documentation is clear and complete, CMS has developed specific documentation guidelines that it requires healthcare providers to use. Through the E/M documentation process, providers document their medical decision-making and care during a patient encounter so that providers and/or billing department coders can translate those services into the required CPT codes for billing purposes.

130. In addition to selecting the appropriate CPT codes, the provider or coder must submit the provider's National Provider Identifier ("NPI") and Provider Transaction Access Number ("PTAN") for billing. The NPI identifies the individual healthcare provider that performed the services to be reimbursed. All healthcare providers registered with CMS—including physicians and mid-levels—are assigned a unique NPI. The PTAN identifies the practice group or company for whom the provider works.

131. CMS reimburses different types of healthcare providers at different rates. For example, as discussed in detail below, CMS typically reimburses mid-levels at 85% of the full physician rate under federal statute and CMS regulations. *See, e.g.,* 42 U.S.C. § 1395l(a)(1)(O). Accordingly, the coder must assign the appropriate provider's NPI to avoid improper billing, as the NPI triggers the billing rate for any particular E/M service. Once the coder has assigned the appropriate CPT codes and NPI to a medical record, the claim is submitted to a fiscal intermediary called a Medicare Administrative Contractor ("MAC") based on geographical location. The MAC then processes the claims and reimburses the

provider according to Medicare's fee schedule.[29] MACs are typically private insurance companies that have been contracted by the federal government to process medical claims and are responsible for the majority of enforcement efforts when it comes to Medicare claims.

132. For its part, CMS manually reviews a tiny fraction of the hundreds of millions of claims it receives each year. CMS does not and cannot review the overwhelming majority of submitted claims it receives. EmCare knows this, and one of the mantras that was repeated to its physicians was that the critical care and false billings identified in this case were "pass-through" billings, which was uniformly noted by EmCare personnel touching upon the subject with the fact that it would be very difficult for CMS to scrutinize such billings.

133. Instead, CMS expects truthfulness, as well as accurate certifications and implied certifications from its providers as a condition of payment.

134. All institutional providers must submit an enrollment application to the program on CMS's Form CMS 855A, which requires providers to sign and certify the following as a condition to receiving Medicare payments:

> Section 15: CERTIFICATION STATEMENT
>
> A. Additional Requirements for Medicare Enrollment …
>
> 3. I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the

---

[29] *See* MEDICARE PROGRAM INTEGRITY MANUAL Ch. 3, § 3.3.2.5(A)-(B). The MACs, CERT, Recovery Auditors, and ZPICs shall not consider any entries that do not comply with the principles listed in section B. Regardless of whether a documentation submission originates from a paper record or an electronic health record, documents submitted containing amendments, corrections or addenda must: (1) clearly and permanently identify any amendment, correction or delayed entry as such; (2) clearly indicate the date and author of any amendment, correction or delayed entry; and (3) not delete, but instead clearly identify all original content.

> claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.
>
> ***
>
> 5. I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

Medicare Enrollment Application, Institutional Providers, CMS – 855A;[30] *see also* 42 C.F.R. § 424.515.

135. Providers submitting claims electronically to CMS must certify that they "will submit claims that are accurate, complete, and truthful," and must acknowledge that "all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that **anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim** that is required pursuant to this agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law." *See* DHHS & CMS, Pub 100-04, MEDICARE CLAIMS PROCESSING, ch. 24, § 30.2.A (2019) (emphasis added).

136. Providers must also contemporaneously create and maintain accurate medical records that support the providers' claims for reimbursement:

> Providers/suppliers should maintain a medical record for each Medicare beneficiary that is their patient. Remember that medical records must be accurately written, promptly completed, accessible, properly filed and retained.

CMS, MLN MATTERS NUMBER: SE1022 (2012) (https://www.cms.gov/outreach-and-education/medicare-learningnetwork-mln/mlnmattersarticles/downloads/se1022.pdf).

[30] https://www.cms.gov/medicare/cms-forms/cms-forms/downloads/cms855a.pdf.

137. Falsification of records, upcoding, and billing for services not rendered violate Medicare standards requiring that submitted claims accurately reflect the services actually rendered. *See, e.g.,* HHS OFFICE OF INSPECTOR GENERAL, ROADMAP FOR NEW PHYSICIANS, AVOIDING MEDICARE AND MEDICAID FRAUD AND ABUSE, at 9-12 (http://oig.hhs.gov/fraud/PhysicianEducation/).

138. In short, there is a general requirement for billing accurately, wherein upcoding specifically violates that requirement, as does billing for services that were not rendered, and billing more than once for the same service. *See id*. This requirement fits hand-in-glove with the requirement to maintain accurate and complete medical records and documentation of the services provided so as to ensure that submitted claims are supported by true and accurate records. *See id*.

139. Medicare also requires, as a condition of coverage, that services be medically necessary and reasonable. 42 U.S.C. § 1395y(a)(1)(A); *see also* 42 U.S.C. § 1395ff(f)(1)(B), (2)(B).

140. It is the obligation of providers of healthcare services to ensure that the services provided to Medicare beneficiaries are "provided economically and only when, and to the extent, medically necessary" and that they are "supported by evidence of medical necessity." 42 U.S.C. § 1320c-5(a)(1), (3). (As such, falsifying the evidence of medical necessity, *e.g*., the information in the medical charts, violates this requirement.)

141. Additionally, providers must ensure that services provided are not substantially in excess of the needs of patients. 42 U.S.C § 1320a-7(b)(6).

142. As such, because: (**a**) the rates established in the MPFS correspond to specific five-digit codes associated with medical procedures or services that are to have been actually provided (*including principal codes used in the ER setting*); and because those codes are associated with distinct patient needs and also determine how Medicare will be billed, recordkeeping that places care within one of those codes that was not needed, or even

provided in real life, violates these requirements. *See* CPT CODE 99285 Fact Sheet, CGS ADMINISTRATORS, LLC (Feb. 12, 2019).[31]

143. As noted in this Amended Complaint, the Defendants' actions, as alleged throughout this Amended Complaint, violate the certification requirements concerned and implicated in both the admissions of the schemes and specific examples provided. Additionally, those wrongful actions provide for factually identified false billing-related recordkeeping and documentation that directly leads to false claims being made to CMS in violation of the certification requirements (*which, of course, also apply to them*):

> In this Manual, many policies are described using the term "physician." Unless otherwise indicated, the use of this term does not restrict the application of policies to physicians only.
>
> Rather, the policies apply to all practitioners, hospitals, providers, or suppliers eligible to bill the relevant HCPCS/CPT codes pursuant to applicable portions of the Social Security Act (SSA) of 1965, the Code of Federal Regulations (CFR), and Medicare rules.

CHAPTER I, GENERAL CORRECT CODING POLICIES FOR NATIONAL CORRECT CODING INITIATIVE POLICY MANUAL FOR MEDICARE SERVICES, § A. https://www.cms.gov/files/document/chapter1generalcorrectcodingpoliciesfinal11.pdf.

***B. The Medicaid Program and State Administration***

144. The Medicaid Program ("Medicaid") is a Health Insurance Program administered by the Government of the United States and state agencies and is funded by state and federal taxpayer revenue. The United States Department of Health and Human Services oversees the administration of the program. Medicaid was designed to assist participating states in providing medical services, durable medical equipment, and prescription drugs to financially needy individuals who qualify for Medicaid.

[31] https://www.cgsmedicare.com/partb/mr/pdf/99285.pdf.

145. While the federal government sets basic guidelines and pays between 50% and 80% of Medicaid costs (depending on the state's per capita income), each state establishes its own CMS-approved program, administers the program, decides provider qualifications, and reimburses providers for their services.

146. Under Title XIX of the Social Security Act, each state must establish an agency to administer its Medicaid program according to federal guidelines.

## VII. ALLEGATIONS CONCERNING INVOLVEMENT IN THE SCHEMES

### *A. SCRIBEAMERICA*

147. ScribeAmerica has remained the nation's largest medical scribe company for nearly 20 years. ScribeAmerica's business model depends on using a dedicated team of project managers to custom design, hire, train, and manage medical scribe programs specific to its partners' needs. ScribeAmerica's specialized teams work with its partners to align strategic goals to action. ScribeAmerica works with its partners to track goals and measure proven ROI.

148. ScribeAmerica has partnered with EmCare to use its scribes as a mechanism for conspiring with EmCare to implement the schemes outlined in this Amended Complaint. Further examples are provided in REPRESENTATIVE EXAMPLES OF FALSE CHARTS AND BILLINGS, § VIII, below.

149. As per ScribeAmerica, LLC, its operations are "coast-to-coast" and it was the first medical scribe company to manage programs on both coasts.[32] As per ScribeAmerica, LLC, "[w]e are the nation's most frequently used ***medical scribe company*** with more than 25,000 employees in 50 states providing professional services for over 3,500 clients." (emphasis in original). *See id.*

150. "For nearly two decades, ScribeAmerica's expert team has served as a thought partner to leading health systems aiming to bolster efficiency[.]"[33]

---

[32] https://www.scribeamerica.com/who-we-are/.

[33] *See* https://www.scribeamerica.com/solutions-medical-scribes/.

151. As per ScribeAmerica, LLC, it partners with its clients, on the level of being a thought partner, developing a personalized model that drives improvement of the client's goals, wherein ScribeAmerica, LLC has taken the position that the role of the traditional medical scribe has evolved from documentation assistant to "productivity partner."[34] Though also focused on reducing the clerical burden of Electronic Medical Records (EMRs), ScribeAmerica, LLC's medical scribes are focused on improving the efficiency of "entire care teams," which—*as noted below*—is something distinct from simply reducing the clerical burden of Electronic Medical Records (EMRs). *See id.* As noted below, this efficiency involves increasing billings, especially in the ways identified in the allegations concerning the Scribe Scheme and REPRESENTATIVE EXAMPLES OF FALSE CHARTS AND BILLINGS, § VIII, *infra*.

152. As per ScribeAmerica, LLC "ScribeAmerica equips [its] partners with dynamic, innovative and intelligent solutions[.]"[35] (It does not merely provide scribing services to its thought partners.)

153. As per ScribeAmerica, LLC, its clients have a particular mentality and understanding related to "synergy" and to "partnership":

> Our clients believe in the productive synergy of the scribe/MD/EMR paradigm… As the **EMR**, **federal**, and insurance **regulations** continue to impact **physician productivity**, the need for assisted documentation will grow. We ask that you consider the enduring value of a partnership with ScribeAmerica.

https://www.scribeamerica.com/who-we-are/ (emphasis added).

As per ScribeAmerica, LLC, "[they] were the first company to demonstrate that the synergy of the Scribe/MD/EMR model could overcome productivity losses experienced by

---

[34] *See* https://www.scribeamerica.com/solutions-medical-scribes/; https://www.scribeamerica.com/evolution-of-the-scribe/.

[35] https://www.scribeamerica.com/mission-vision-values/.

unassisted physicians using [the electronic medical record] EMR." *Id*. (As noted in this Amended Complaint, *infra*, ScribeAmerica, LLC and EmCare partnered to classify physician reticence to up-code and to illegally attest to critical care, along with physician reticence to falsely document mid-level services for billing purposes, as productivity losses and performance gaps, even employing the term "down-coding" in an effort to demonize physician reticence and refusal to up-code.[36] (This does not just show concerted action, but it also shows agreement.)

154. ScribeAmerica, LLC allows its clients like EmCare to "[d]etermine what metrics are important to [the thought partner]," allowing the client thought partner to review and define key performance indicators (KPIs)[37] and benchmarks, to conducting pre-scribe data collection and surveys, wherein ScribeAmerica, LLC will deliver on ROI and reporting metrics. https://www.scribeamerica.com/solutions-medical-scribes/. As ScribeAmerica, LLC puts it:

> ScribeAmerica is a partner that supports the way you work. Our solutions range from single-provider support to solutions for large health systems, and everything in between. However you work, wherever you work, ScribeAmerica works with you.

https://www.scribeamerica.com.

155. As noted, ScribeAmerica, LLC's medical scribe programs are customized to the requests of its client organizations:

> Through our **valued relationships with leading healthcare organizations**, and our proven track record of success, today the role of

[36] This is a method of EmCare "correcting" what it perceives and identifies as a "culture gap," as per the November 19, 2012 meeting addressed herein, *supra*.

[37] KPIs are simply a quantifiable measure of performance over time for a specific objective. In this regard, they are essentially *ad hoc* and created by companies to achieve *ad hoc* ends. KPIs provide targets for teams to shoot for, milestones to gauge progress, and insights that help people across the organization measure progress toward a certain goal or set of goals.

> the scribe has evolved and expanded, and so have our solutions …Our **medical scribe programs are customizable** with Artificial Intelligence chatbots, referral management software, **billing & coding capabilities** and more.

https://www.scribeamerica.com/evolution-of-the-scribe/ (emphasis added).

156. "ScribeAmerica provides a scribe-and-coding solution that connects front-end providers with back-office coders in real time."[38] That "synergy," as ScribeAlerica, LLC puts it, "improves efficiency" and "increases revenue." *See id.*

157. As admitted by ScribeAmerica, LLC, its services to providers such as EmCare are for "Bridging the Gap Between Providers and Coding & Billing Staff." *See id.* Examples of this bridging of the gap and its features are set out in the allegations concerning the SCRIBE SCHEME section and REPRESENTATIVE EXAMPLES OF FALSE CHARTS AND BILLINGS, § VII, *infra*. As per ScribeAmerica, LLC, one of its services is to so "Improve [the] Efficiency of [its] Providers."[39] "As a total solution, the technology also helps promote understanding of [relative value units] RVUs, and other operational and financial metrics."[40]

158. As per ScribeAmerica, LLC, the examples of fraud concerned in this Amended Complaint are no accident: "[o]ur **strategists** identify the trends and opportunities to boost the return on investment of your **tailored scribe program**."[41]

///

///

---

[38] https://www.scribeamerica.com/blog-post/bridging-the-gap-between-providers-and-coding-billing-staff/.

[39] https://www.scribeamerica.com/improve-efficiency-of-our-providers/.

[40] https://www.scribeamerica.com/blog-post/bridging-the-gap-between-providers-and-coding-billing-staff/.

[41] https://www.scribeamerica.com/improve-efficiency-of-our-providers/.

***B. THE EMCARE DEFENDANTS***

159. As noted in the Parties section of this Amended Complaint, *supra*, the EmCare Defendants are referred to as a group for all allegations in which their efforts are joint efforts, while the individual allegations regarding their particular efforts, which are made out to each such Defendant by name, individually.

160. **KKR & CO., INC.**: As long admitted by KKR, it does not merely invest in companies but, instead, becomes a "trusted partner" with those companies, wherein it actually works with its companies to achieve what it considers operational excellence, which it does through familiarizing itself with their efforts to a level of expertise and then providing expertise and consulting to those companies, leading them to change their operations so as to increase its return on investment to KKR. *See, e.g.,* https://www.kkr.com. During the time of its ownership and control of Envision Healthcare Corporation, it was known in the EmCare community that the EmCare community could not rebuff or refuse KKR's dictates, consulting, or expertise on a subject, and that KKR ran operations from the top down through expertise, consulting and guidance that could not be refused. (It was also known in the EmCare community that the physicians and employees in the EmCare community could not rebuff or refuse EmCare's dictates, consulting, or expertise on a subject without negative consequences.) In this, KKR was specifically and intimately involved in the billing practices and billing-related operations of the other EmCare Defendants, which is part of what it does,[42] providing consulting and expertise, as well as the ultimate decisions as to whether a practice conformed to what it considered operational excellence. (After all, Envision Healthcare Corporation and its subsidiaries—*particularly*

[42] *See, e.g.,* Appelbaum, Eileen, and Rosemary Batt, *Envision Healthcare Hits the Skids*, THE AMERICAN PROSPECT, March 14, 2022 (https://prospect.org/api/content/dee32e40-a176-11ec-bb52-12f1225286c6/); Appelbaum, Eileen, and Rosemary Batt, *Private Equity and Surprise Medical Billing*, INSTITUTE FOR NEW ECONOMIC THINKING, September 4, 2019 (https://www.ineteconomics.org/perspectives/blog/private-equity-and-surprise-medical-billing).

*those named herein*—are a medical billing business.) Envision Healthcare Corporation included these billing practices and other unsavory billing practices before KKR's acquisition of Envision Healthcare Corporation, but the problems associated with such billing have intensified after KKR's acquisition.[43]

a. Envision Healthcare Corporation has had an aggressive financial strategy largely due to its private equity ownership by KKR.[44]

b. KKR employees who oversaw the top-down involvement of KKR in its subsidiaries, and who are also knowledgeable as to KKR's involvement in the billing practices, from the top, include Joseph Bae, Co-Chief Executive Officer of KKR & Co. Inc. and Scott Nuttall, Co-Chief Executive Officer of KKR & Co. Inc.

c. As set forth below in this Amended Complaint, what KKR considered operational excellence included the billing practices outlined in this Amended Complaint. *See, e.g.,* ¶¶ 51-94, 99-112, § VII, particularly ¶¶ 145-156, 193-289, and § VIII, *herein*. KKR had the power to stop these billing practices, though becoming familiar with them to a level of expertise, yet continued to allow them to go forward, profiting from them.

161. **<u>ENVISION HEALTHCARE CORPORATION</u>**: As noted throughout this Amended Complaint, Envision Healthcare Corporation and its subsidiaries function like a single

---

[43] *See, e.g.,* Sweeney, Evan, *As UnitedHealth Negotiations Intensify, Envision Targets Surprise Billing with New Marketing Blitz*, FIERCE HEALTHCARE, October 4, 2018, sec. FIERCE HEALTHCARE HOMEPAGE, HOSPITALS, FINANCE (https://www.fiercehealthcare.com/payer/envision-emcare-surprise-billing-emergency-care-network-unitedhealthcare); Liss, Samantha, *UnitedHealthcare Fires Back, Sues Envision for Allegedly Exaggerating Patient Claims*, HEALTHCARE DIVE, September 12, 2022 (https://www.healthcaredive.com/news/unitedhealthcare-lawsuit-envision-upcoding/631611/).

[44] *See, e.g., Moody's Investor Service, Moody's Downgrades Envision Healthcare Corporation to C, Outlook Stable*, MOODYS.COM, September 21, 2022 (http://www.moodys.com:18000/research/Moodys-downgrades-Envision-Healthcare-Corporation-to-C-outlook-stable--PR_469479).

company with different departments, with decisions and policy being mandated from the top down. In this, Envision Healthcare Corporation, which conducts its business through its wholly-owned subsidiary, EmCare Holdings, Inc., coordinates the operations of their subsidiaries, wherein specific examples are provided below. An Envision employee who has overseen the top-down involvement of Envision in its subsidiaries, and who is also knowledgeable as to its involvement in the billing practices, from the top, is Henry Howe Chief Financial Officer of Envision Healthcare.

162. As per corporate admissions, Envision Healthcare Corporation implements this model upon first welcoming any team member to the Envision/EmCare organizational structure, educating them about the relationship profile between its companies and noting that local practice is managed nationwide through divisional support and Envision Healthcare Corporation's national resources.[45] In short, a macro approach. This also

---

[45] *See, e.g.,* https://slideplayer.com/slide/14559378/. As an example of who was involved in divisional support for the West Division, on May 18, 2012, and who was implementing EmCare's model, Kathy Coleman of EmCare sent the West Division Spring Newsletter to all EmCare personnel in the West Division, including Relator Dr. Caleb S. Hernandez, DO, via e-mail. The last page of that newsletter, includes the names of the West Division Support Team members who implemented EmCare's model throughout the West Division: Angel L. Iscovich, M.D. West Division C.E.O.; Chris Richardson West Division C.O.O.; Sean Richardson West Division C.O.O.; Douglas Webster, D.O. Executive Vice President; Fred Dennis, M.D., VP of Clinical Operations & Risk Management; Jill Meredith, Operations Director; Byron Scott, M.D., Executive Vice President; Harold Bolnick, M.D., Senior Vice President; David Samuels, Senior Vice President; Zack Meyers, Regional Finance Manager; Pamela Marie Senior Financial Analyst; David Copple VP of Business Development; Frank Boggio, VP of Business Development; Tony Mauk, VP of Business Development; Jennifer Bock VP of Clinical Services; Wes Brasell, Director of Finance; Shawna Smith, Financial Analyst Associate; Mike Foster, Senior Financial Analyst; Ashley Fernandes-Chapman, Payroll Benefits Supervisor; Jennifer Alldredge, HR Benefits Coordinator; Sheri Kent, Payroll/Benefits Coordinator; Keely Eccles Payroll/Benefits Coordinator; Brendan Lafranchi Payroll/Benefits Coordinator; Matt Mastalka Financial Accountant; Jennifer Raburn, Payroll Benefits Coordinator; Sherry Sanchez, Payroll Benefits Coordinator; Ben Wheeler, Payroll Benefits Coordinator; Heather Rude, Payroll Benefits Coordinator; Angela Cooper, HR Benefits Coordinator; Shelly Wright, HR Benefits Coordinator; Taj Lewis, Enrollment Specialist;

includes introducing new team members to the "Envision Organizational Footprint" wherein the Envision Healthcare Corporation model is employed, which is mapped out on a nationwide level for new team members to see. *See id*.

---

Carol Castiglione, Enrollment Manager; Mark Spencer, Enrollment Specialist; Ilene Gutierrez, Enrollment Specialist; Angeliis Duplechain, Enrollment Manager; Jennifer Alvarez, Enrollment Specialist Senior; Nichole Chavez, Enrollment Specialist; Cassie Hostrup, Enrollment Specialist; Jake Munnerlyn, Enrollment Specialist; Jennifer Riley, Enrollment Specialist; Donna Greenhalgh, Director of Clinical Service; Yolanda Marrs, Director of Clinical Services; Shelly Brewer, Director of Clinical Services; Amanda Ephrom, Clinical Services Coordinator; Reba Reed, Director of Practice Improvement; Mary Elliot, Director of Practice Improvement; Melinda Chayra, Billing Manager; Yolanda Ruedas, Billing Supervisor; Christina Rafferty, Billing Supervisor; Gloria Naidoo, Billing Supervisor; Danielle Scroggins, Billing Supervisor; Susie DesLauriers, Division Client Administrator; Steve Schaerrer, Division Client Administrator; Cristoffer Lee, Division Client Administrator; Janet Nelson, Division Client Administrator; Anita Tomczak, Division Client Administrator; Greg Kennedy, Division Client Administrator; Andrea Airhart, Director of Clinical Services; Stacy Bruneau, Director of Clinical Services; Karen Haley, Director of Clinical Services; Glenda Yates, Director of Clinical Services; Chris Thompson, Director of Recruiting; Jackie Foster, Physician Recruiter; Jamie Weaver, Physician Recruiter; John Torres, Physician Recruiter; Jeff Nelson, Physician Recruiter; Terri Harper, Physician Recruiter; Craig Parker, Physician Recruiter; Christina Plain, Physician Recruiter; Jennifer Bullard, Recruiting Assistant; Rita Coleman, Recruiting Assistant; Gina Allgeier, Recruiter/Recruiting Assistant; Kathy Coleman, Recruiting Assistant; Shannelle Woodruff, Staffing Coordinator Manager; Jessica Lesher Staffing Coordinator; Barbara James, Scheduling Coordinator; Cynthia McComb, Scheduling Coordinator; Brandy Evans Scheduling Coordinator; Carol Volz, Scheduling Coordinator; April Thurman, Credentialing Coordinator; Shirlean Morten, Credentialing Manager; Gloria Herrera, Credentialing Coordinator; Elaine Grinnell, Credentialing Coordinator; Sean Williams, Regional Manager Credentialing/Scheduling; Kimberly Harper, Credentialing Coordinator Senior; LaShawn Handy, Credentialing Coordinator; Bobbi Faulkner, Credentialing Coordinator; Dawn Reeves, Credentialing Coordinator; Melissa O'Guinn, Executive Assistant to CEO & COO; Curtis Christian, Administrative Assistant; Jayne Howarth, Office Manager; Sheri Brinkman, DMS/Las Vegas; Katie Van Ness, DMS/Las Vegas; Ambur Cambern, DMS/Las Vegas; Natalee Zielinski, DMS/Las Vegas; Janet Morabe, EmCare/Phoenix; Stephanie Gillard, EmCare/Phoenix; Ann Rhoades, EmCare/Phoenix; Varina Samuels, Administrative Assistant; Linda Wright, Administrative Assistant; Amanda Simmons, Administrative Assistant.

163. The EmCare National Footprint, which is a component of the Envision National Footprint, accounts for the size, presence, stability, resources, metric improvement programs, integrated solutions and leadership that are employed in the EmCare National Footprint. There are only a handful of states that have not been included in this National Footprint. *See id.*

164. In this, EmCare implements the "EmCare Practice Profile," which is a comprehensive system of EmCare resources, applying its approach nationally from the top down, wherein Local Practice is implemented through On-Site Local Medical Director and On-Site Local Staff Physicians. "Divisional Support" of EmCare's model is then implemented through Management Teams - CEO/COO/DCA, which include Divisional Medical Directors, Divisional Directors of Clinical Services, Full Time Physician Credentialers, Full Time Physician Recruiters and Schedulers, Full Time Billing Enrollment Specialists, and Full Time Physician Payroll /Benefits Coordinators. "National Resources" that are applied in implementing EmCare's model nationwide include: "Comprehensive Billing/Reimbursement Resources"; "Risk Management/Compliance Resources"; "Quality Management Resources - Lean, Studer,[46] [and] Fail Safe"; "Physician Education Resources"; and "Professional Liability Insurance/Legal Support." *See id.*

165. The North Division of EmCare is mapped out North-East from Nebraska, Iowa, Illinois, Kentucky, and Virginia. *See id.*

166. EmCare-West Division is active in Arizona, Arkansas, California, Colorado, Kansas, Florida, Georgia, Hawaii, Illinois, Indiana, Kentucky, Michigan, Nevada, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Texas,

---

[46] On May 18, 2012, Kathy Coleman of EmCare sent the West Division Spring Newsletter to all EmCare personnel in the West Division, including Relator Dr. Caleb S. Hernandez, DO, via e-mail. That newsletter contained a section titled the "Studer Corner," which addressed EmCare's focus on Value-Based Purchasing, where EmCare specifically focuses on what indicators of value and quality are used by CMS so that they can be focused on in EmCare's model. *See id.* at 4 of 6.

Washington, and Wyoming. **EmCare-West Division is located at 3916 State Street - Suite 300 Santa Barbara, CA 93105**.

167. Envision Healthcare implements its model at the facility level though its On-Site Medical Directors[47] to provide leadership/management of site departments, *e.g*., emergency departments, via clinical quality review and risk reduction initiatives, implementing compliance with Envision Healthcare Corporation's Core Measures, managing EmCare's clinical peer review process, recommending EmCare's policies and procedures to hospitals which concern the administration of the department, coordinating physician coverage schedules, and providing leadership within EmCare a liaison between physicians, medical staff, the administration, and EmCare itself. *See id*. Assistant Medical Directors learn about the committee structures, medical structures, and the "collaborative approach to emergency medicine" that exist in the EmCare model. *See id*.

168. Envision Healthcare Corporation also implements its nationwide model through EmCare Divisional Medical Directors, who provide support to EmCare's Studer Group Implementation with EmCare Director Clinical Services, and who are responsible for mentoring/coaching On-Site Medical Directors, addressing clinical issues with Medical Director and/or staff with regard to deviations from EmCare's goals, assist in recommending EmCare policies and procedures concerning the operation of the departments, and consultative support services to enhance throughput efficiency in line with EmCare's goals, to "improve: EmCare resource utilization, the implementation of clinical care guidelines, implementing peer review and risk reduction initiatives, conducting practice operational reviews on compliance with Envision Healthcare Corporation's model.

169. As part of its national model, Envision Healthcare Corporation utilizes a STUDER GROUP/EMCARE NATIONAL STRATEGIC PARTNERSHIP, wherein it implemented methodologies taken from its Studer Group/EmCare National Strategic

[47] These personnel are paid more to make sure that everyone at a facility up-codes and have a role of redefining "culture" and "performance" so as to align physicians with EmCare's billing schemes.

Partnership with Studer Group, utilizing dedicated Studer Group® Resources, and access to all Studer Group® Resources/Programs/Coaches. *See id*. In this, Studer Group is a firm that partners with other companies to help them build "evidence-based leadership," which involves building a culture of execution of the client company's goals. *See* https://www.studergroup.com/evidence-based-leadership. Studer Group has also worked with TeamHealth and other large national medical billing companies. The Studer Group Implementations are essentially the three (3) schemes identified in this Amended Complaint and their associated practices.

170. As admitted by EmCare in a document titled "MAKING HEALTHCARE WORK BETTER, EMERGENCY MEDICINE," which was published in 2016, it entered a "national partnership" with Studer Group, wherein EmCare was a leader in the implementation of Studer Group's "lean for healthcare,"[48] a methodology for increasing "flow," which it extended to its hundreds of hospitals nationally. *See* MAKING HEALTHCARE WORK BETTER, EMERGENCY MEDICINE, at 14 (2016). "Under EmCare's unprecedented strategic partnership with Studer Group Consulting, all EmCare clients have access to a Studer coach, on-site support, national seminars and a dedicated EmCare/Studer Group website." *See id*. "Through those resources," EmCare created

---

[48] This involves the implementation of a "Lean Six Sigma" approach, where EmCare makes the most money with the least resources, which is accomplished in part by setting up systems of systematic processes so that everyone is doing things in a standardized way throughout EmCare, with each pawn/component being controlled and coordinated by EmCare. In this model, leaving money on the table is defined as "waste" and, when applied to healthcare, "down coding" is therefore defined as waste. As such, LEAN is part of a system set up with the coders all up-coding, the billers all up-coding, and the providers all up-coding via their documentation, wherein everyone that physicians interact with is encouraging and pressuring physicians to document for up-coding purposes, while simultaneously implementing corrective action whenever the physician is "down-coding." Significantly, a physician actually supervising mid-level in the ways required by CMS for a split/shared visit is considered waste in the EmCare system.

"access tools designed to help hardwire the fundamentals" of its formula into emergency rooms. *See id*. Studer training was mandatory for EmCare physicians.[49]

171. In fact, Kirk Jensen, MD, MBA, FACEP, was the Chief Innovation Officer, EmCare, Inc. and the Chief Medical Officer, BestPractices, Inc. (another Envision Healthcare Corporation company) at the same time, while also being a national speaker for Studer Group, as noted in a November 13, 2018 presentation he gave titled, "Engineering Patient Flow in Your Emergency Department: I: Theory, Metrics, and Application II: Directing Change." As per a presentation he gave on October 30, 2014, titled "Optimizing the Patient Flow in the Emergency Department," Kirk B. Jensen, MD, MBA, FACEP was Chief Medical Officer for BestPractices, Inc. (*an EmCare affiliate*), Executive VP for EMCare, and a national speaker for Studer Group at that time.

172. As part of its national model, Envision Healthcare Corporation utilized a METRIC IMPROVEMENT SOLUTIONS for HARDWIRING FLOW, wherein Kirk Jensen, MD, MBA Chaired the IH Emergency Department and Inpatient Flow Collaboratives, which involved BestPractices, Inc., who invented the concept of "Front-Loaded Flow." *See, e.g.,* https://slideplayer.com/slide/14559378/.

173. The BestPractices, Inc./EmCare advantage is, thus, an "approach to the frontiers of flow" and includes a LEAN Definition of Flow focused on "Adding Value" as defined by EmCare and "Reducing Waste" as also defined by EmCare to produce "Industry-Leading Metrics"[50] that focus on "The Business Case for Flow." (Examples of

[49] As per an e-mail sent on July 26, 2012 by Jennifer Alldredge, HR Benefits Coordinator, West Division, EmCare of CA, Inc., located at 3916 State St., Ste. 300, Santa Barbara, CA 93105, to its Arizona Medical Services Employees, including Relator Dr. Caleb S. Hernandez, DO, titled, "EmCare - TMC - Compliance Course Update," EmCare employees were required to take Studer Group courses.

[50] Basically, EmCare keeps track of how many patients a physician sees per hour, how many critical care patients a physician sees, how many are billed and at what level, how many MLP charts a physician signs, and then EmCare implements ever-increasing goals from an arbitrary baseline that is gauged simply to generate more profits. For example, if physicians are currently billing 0.5% critical care, EmCare notes that it needs this to be

this are provided in this Amended Complaint.) In this vein, "Flow Matters"[51] for EmCare, wherein it provides "A Suite of Solutions" to increase flow. *See id*. In this, EmCare modeled and implemented a methodology for hardwiring flow through "Metric Improvement Solutions" into the emergency room (ER), as set forth in the book "The Hospital Executive Guide to Emergency Department Management," written by Dr. Kirk Jensen and Dr. Daniel Kirkpatrick, which according to EmCare, "offers effective strategies and solutions to help hospitals meet the challenges emergency departments face in the post-ACA climate." *See id*. (Palpable tension with regulations is a significant aspect of the model, as further noted below.)

174. A significant part of EmCare's homogenous national model is that Envision Healthcare Corporation has implemented an integrated clinical technology platform as part of its nationwide model, which is considered one of its STRATEGIC GROWTH PROGRAMS: BETTER TOGETHER- INTEGRATED CLINICAL TECHNOLOGY, including the ED/HM Door to Discharge™ with RAP&GO Program, which is proprietary

---

3% and then, once that is met, EmCare pushes the physician to get it to 5%, even though a physician can't control how many critical patients come through the ER door. (The only thing that can be controlled is false documentation, which is what EmCare expects through its model and implements in the ways referenced throughout this Amended Complaint.) *See also* MONITORING AND AUDITING, Policy No. 302, Revised – January 2007, at 1 of 5.

[51] Flow matters to EmCare because it means how to get the patient through the absolute fastest and make the most money off of the patient encounter in the least time possible. However, if every patient was truly getting a level 5 history, review, and physical exam, then the number of patients seen by physicians would go to one per hour or less (*as opposed to the 3-4 patients required under EmCare's flow model*). For flow to work in the EmCare model, EmCare needs 3-4 patients per provider per hour. EmCare knows CMS has set the system up so that providers get paid more if they spend more time with the patient and do more quality work, *i.e*., more difficult and costly work. In an effort to have their cake and eat it too, EmCare's flow model has patients flying through in a fraction of the time that it would take to actually do everything being systematically documented, while simultaneously documenting that it was done at the slow rate and charging CMS for the slow, thorough high level of quality documented (*although that never occurred*).

evidence-based software with predefined protocols for facilitating hand-offs between EM and HM physicians for those patients admitted from the ED (emergency department). It also includes the RAP&GO software and integration process to decrease normal boarding time for patients awaiting disposition in the ED so as to open up significant opportunity for new ED volume and metric improvement. It also involves CMORx, a software that evaluates patient data related to severity and complexity of care. *See id.*

175. As per EmCare, "[t]he sophisticated software program identifies previously undocumented secondary diagnosis in order to improve outcomes and maximize appropriate reimbursable charges." *See id*. The system also includes DASH - Direct Admit System for Hospitals, which allows for community-based PCPs, FSEDs, UCCs, and for outlying hospitals to direct admit patients to client hospitals, along with Operational Dashboards, providing "Metric Improvement," positive HCAHPS reimbursement, and Qualitick, a "Patient Experience Measuring Tool" whose principal role is "Flow Management". The system redefines patient experience in terms of flow. As such "patient experience" is a term of art in EmCare, predominantly used as a euphemism for flow. As noted herein, EmCare's national approach is integrated into an integrated clinical technology platform that is applied nationally. *See id.*

176. **EMCARE, INC.**: As per an EmCare White Paper titled "A System-Wide Approach to Creating High Performance Emergency Departments," which was drafted on November 21, 2011 with the aid of the EmCare Marketing Department, and with a request that all questions be directed to its Vice President of Marketing at 1717 Main Street, Suite 5200, Dallas, TX 75201, EmCare, Inc. implements a systemwide approach, where regional medical directors who oversee numerous emergency departments work to recognize what EmCare, Inc. sees as "performance gaps" and to then calculate the "cultural gaps" involved so as to close them with strategic leadership.[52] *See id.* at 2. In short, EmCare, Inc. has a

[52] In the EmCare model "performance gaps" are when the billing metrics are low and "culture gaps" are when a physician has ethical qualms about documenting something that EmCare wants but that the physician believes to be inaccurate or dishonest. EmCare

culture that it proliferates throughout its system and model which is focused on closing what it considers to be “performance gaps” and “culture gaps.” Examples of this approach are provided throughout this Amended Complaint, including in this section, below. Significantly, EmCare created a system-wide model to address these factors with regard to how it would run emergency departments (ED). In short, “EmCare applies best practices, risk mitigation, process improvement and established care guidelines **at all of its affiliated facilities**.” *See id*. at 4. (emphasis added). EmCare, Inc.’s advice and involvement even influences the design of its affiliated facilities. Physician reticence to up-code is a significant example of a “culture gap” for EmCare.

177. EmCare and Studer redefine value and quality in light of what it takes to get CMS to pay; thus, although it may seem to someone outside of the EmCare community that they are speaking of quality and value in their normal use, the measurements and usages of these terms all have to do with getting CMS to pay more money—it is somewhat like "pushing buttons" in this sense. Aspects of that can be seen in the following excerpt from the EmCare-West Division 2012 Spring Newsletter:

> The Division continues to provide educational sessions and resources on the latest developments with hospital Value-Based Purchasing (VBP). As CMS provides updated information regarding VBP calculations and indicators, it is important our teams are up-to-date on the latest rulings as well as understand key tactics to improve results.

EMCARE-WEST DIVISION 2012 SPRING NEWSLETTER at 4.

178. In a Studer Group paper titled, “How to Improve Flow for a High-Performing Emergency Department,” written on February 11, 2013, as an interview with Dan Smith, MD, Studer Group coach, Dan Smith, MD lays out how the tactics of Studer Group are

---

implements a culture where everyone is encouraged to compete to “up code,” where everyone is excited to “up code,” and where everyone will be critical of each other for any “down-coding.” It is a way to use peer pressure and threats to encourage and enforce conformity. It also includes a variety of Orwellian doublespeak.

based on "quality and perception of care [being] increasingly linked to reimbursement," while also noting that "CMS will begin collecting data on key ED throughput metrics … [which] will likely further impact hospital reimbursement in the near future." *See id*. at 1.

179. As per an EmCare White Paper titled OPERATIONAL INTEGRATION: CREATING A HIGH-PERFORMING HEALTHCARE ORGANIZATION, written by Thomas Peck, FACHE, EmCare speaks of the importance of getting physicians to adopt a view of quality that is defined by triggering regulators and payors to pay:

> When physicians are involved in the process and concerned about the measures that regulators and payers use to determine quality and value, the healthcare organization will likely achieve greater success. By aligning and creating a win/win scenario, physicians and hospitals can maximize competitive advantages and achieve the desired results envisioned by pay-for performance and value-based purchasing.

*See id*. at 6 (emphasis added).

180. However, EmCare also explicitly recognizes the difficulty of getting physicians to abandon the ethics and morals "hindering," as it puts it, the adoption of EmCare's redefinition of quality care and patient experience, and all aspects of care, in terms of what it takes to trigger payors to pay: "as most healthcare leaders have discovered, culture trumps vision and the norms within the culture can make or break efforts to achieve the vision." *See id*. at 5. EmCare then goes on to note that "cultural assessment," *i.e*., understanding "the group of norms of behavior and the underlying shared values that help keep those norms in place" is the first step to changing the culture of physicians so that they will thereafter implement EmCare's model. *See id.* at 6.

181. As witnessed by Relator, Dr. Caleb S. Hernandez, DO, when EmCare took over a hospital's ED, it would typically fire half the physicians there, scaring all who remained into submission before implementing its model (*and hiring outsourced staff to make up the deficiency they had just created*), or as EmCare puts it:

> The most common alignment strategies pursued by healthcare organizations include employing physicians, using gain-sharing for specific initiatives and outsourcing to physician practice management companies. Far too many healthcare CEOs have learned that employing physicians doesn't guarantee the physician's willingness to align with the organization's goals. While gain-sharing offers physicians the ability to appropriately share in the financial rewards of cost saving initiatives, its value is often limited to niche areas within the hospital or health system.
>
> Proper outsourcing provides a team of experts that:
>
> • works side-by-side with organizational leaders to improve clinical quality and operational efficiency[;]
>
> • has the knowledge and ability to overcome political challenges[;]
>
> • anticipates and implements plans to mitigate the increasingly volatile[;] regulatory and financial landscape of today's healthcare environment[;]
>
> • absorbs the financial risk of reaching alignment goals.

*Id*. at 7.

182. The redefinition of quality into billing terms is evidenced in EmCare's model and its policies, where Defendant Reimbursement Technologies, Inc. (RTI), EmCare's billing arm, was, per EmCare, Inc. policy, in charge of evaluating EmCare, Inc. personnel from a "quality" perspective:

> POLICY AND PROCEDURES:
>
> Billing and Coding Compliance Monitoring
>
> Monitoring systems enable EmCare to monitor the Compliance Program's effectiveness and target additional training efforts. There are three concurrent monitoring processes in place:
>
> • RTI Management reviews on a monthly basis key indicator reports which analyze practice acuity levels, payor mix, charges and cash receipts, critical care and percentage of admits. Based on a defined set of

> criteria this will trigger a focused review performed by a coding supervisor. The criteria are:
>
> • A change in average charge >5% increase or >3% decrease as compared to previous month.
>
> • A change in % of critical care either >1.0% increase or >0.6% decrease over previous month.
>
> • A change in the % of level 5's over admits. If this dips below 80% when it was previously 80% the prior month this will trigger a focused review.
>
> • Internal quality assurance retrospective reviews are performed on a daily basis by RTI.
>
> • The EmCare Ethics and Compliance Department directs quarterly billing reviews of government payor claims by outside third party consultants.

MONITORING AND AUDITING, POLICY NO. 302, at 1 of 5 (Revised – January 2007).

183. As per an EmCare, Inc. Compliance Director Richard Boyer, who worked for EmCare, Inc. in Texas in 2010 and 2011, in March 17, 2016 and April 1, 2016 conversations from The Colony, TX, there were approximately five (5) people who worked for EmCare, Inc. in compliance in Dallas, Texas and about three (3) people who did so in Greenwood Village, Colorado. One of the Compliance Directors stationed in Texas was Amanda Doran. Scott Wicke was the Compliance Director for ER (emergency room), employed by EmCare, Inc. and was involved in determining the billing guidelines for the physicians when scribes were used.

a. These people reported to Chief Compliance Officer Ross Ronan, who worked for Envision Healthcare Corporation and had a dotted line to the Board thereof and worked via the headquarters in Colorado. Chief Compliance Officer Ross Ronan, the EMSC CEO, COO, and the CFO made up a Compliance Committee. The Compliance Committee was regularly briefed on the status of

complaint investigations stemming from an EmCare, Inc. 24/7 hotline wherein employees, patients, or anyone could call to complain.

b. The Compliance Committee met on a quarterly basis, and Em Care, Inc. conducted regular audits of each business segment. Each billing center was audited on a quarterly basis. For Compliance Directors, it was known that, given the way the audits were conducted, the billing at physician rates for mid-levels would not be caught. The audit would not have looked at multiple claims by one doctor on the same day to see if there were concurrent time stamps. With regard to the Critical Care Scheme, the auditors did not run concurrency reports that would have indicated whether the records reflected doctors were seeing multiple patients at the same time.

c. EmCare, Inc. personnel, particularly in compliance, were aware that Medicare submits concurrency denials where a claim is denied with Medicare citing that they have already been paid for something at the same time. EmCare, Inc.'s audits were more concerned with whether something was submitted as a Level 2 that should have been, according to EmCare, a Level 3, and they were concerned with this instead of any misuse of physician billing, including applying incident-to billing methodologies, which are not legal in the ER, to the ER.[53]

d. Given the nature of the audits, the scheme to bill mid-levels at the physician rate at EmCare, Inc., was circumvented in the compliance department audits. Compliance Directors were aware that there was an emphasis on using "incident-to" billing for billing Medicare for ER visits. (EmCare, Inc. had this emphasis even though incident-to billing procedures violate the procedures identified for the ER by CMS, as noted below.) The Compliance Director concerned

[53] EmCare purposefully advocates for using the incorrect standard, despite knowing that such incident-to billing is not permitted in the ER setting, as doing so causes confusion, which makes it easier to deceive all personnel concerned, *e.g.*, billing personnel, physicians, mid-levels, scribes, etc.

said the emphasis at EmCare, Inc. was educating physicians about annotating all information in the chart as though it were incident-to billing.

e. The Compliance Directors understood, as communicated to them by EmCare, Inc., that it was a challenge to get ER physicians to adopt incident-to billing. When the Compliance Directors learned about the "incident-to" billing, in training, they became aware of the potential issues with billing physicians at the physician rate. There was not any investigation by Compliance into billing at physician rates for mid-levels in the ER, and as Compliance was set up and what it focused on, any such billing would go on without the knowledge of Compliance.

184. As per the Compliance Director concerned, there were employees who physically collected the records from the medical charts used for billing, which were stored in lockboxes on-site at hospitals. The data from those records would be in put into a system that generates the billing. This process was handled by the billing center, and Reimbursement Technologies, Inc. ("RTI") in Conshohocken, PA handled the billing, which was considered part of EmCare, Inc., and which created such relationships through Envision Healthcare Corporation's acquisition of companies. In fact, EmCare, Inc.'s Compliance Directors would internally investigate matters at RTI as though it were any other part of Envision Healthcare Corporation and EmCare, Inc., indicating the extent of their involvement and interaction. Compliance Directors would also investigate matters involving Medicaid in California.

185. As per an individual who had the title of Billing Coordinator, Shaney Jackson, being employed in that capacity by EmCare, Inc. on-site at West Houston Medical Center (WHMC), who was working in that capacity with regard to the ER (emergency room) in 2014, and as recounted by her on December 17, 2015 from Houston, TX, EmCare, Inc. coordinates with Reimbursement Technologies, Inc. in concerted action, wherein Reimbursement Technologies, Inc. would communicate to this Billing Coordinator what it required from her in the way of RTI getting physicians to enter in their charts and to

document that they had supervised physician assistants and nurse practitioners who treated government payor patients even when such mid-levels had actually not been supervised.

a. In this role, she was responsible for making sure that ER (emergency room) patient charts were completed to EmCare, Inc. and Reimbursement Technologies, Inc. specifications for billing purposes. (Em Care, Inc. only provided billing services for the ER of the hospital.) The Billing Coordinator concerned worked with one other Billing Coordinator, Brenda Ramsey, wherein they both reported to Area Manager and Billing Supervisor Ashley Rathbun, who was located in Clearwater, Florida. The Billing Coordinator concerned was responsible for making sure ER patient charts were completed for billing purposes in conformity with EmCare, Inc. and Reimbursement Technologies, Inc.'s requirements and communicating directly with physicians about any information that was missing for business purposes.

b. Once completed in that fashion, she was responsible for forwarding the ER patient charts for coding and billing purposes. The Billing Coordinator concerned also confirmed that it was the job of Billing Coordinators to send the charts electronically to Reimbursement Technologies, Inc. There was an electronic system through which Billing Coordinators viewed and sent the charts to Reimbursement Technologies, Inc.

c. When the charts were a certain number of days old (90 days), Billing Coordinators were then required to print the chart and send it via Federal Express to Reimbursement Technologies, Inc. Before forwarding the chart electronically or otherwise, Billing Coordinators were required to review the chart for a physician signature.

d. As per the Billing Coordinator concerned, the physician signature was mandatory, and it was impressed upon Billing Coordinators that it was most important item period because "the company" could not bill for physician services

without it.[54] When Billing Coordinators completed a chart and sent it electronically, it disappeared from their "tracker" in the electronic system—*which was a mechanism EmCare, Inc. and Reimbursement Technologies, Inc. used to notify Billing Coordinators of charts they needed to ensure were populated with information*—but it would reappear if Reimbursement Technologies, Inc. personnel noticed that the Billing Coordinator had missed a physician signature. Billing Coordinators did not communicate directly with the Reimbursement Technologies, Inc. personnel that were responsible for the charts once submitted, but interacted via the electronic system that served as a communication and coordination nexus between both companies.

e. When the Billing Coordinator concerned first joined EmCare, Inc., a physician signature was required for billing purposes on all charts, including those in which only the midlevel had treated the patient, regardless of payor. However, after one physician in the ER objected to this practice and refused to sign charts saying that he could be held liable and potentially sued if something went wrong when he did not actually treat the patient himself, EmCare, Inc. did some research internally to determine whether the physician had a "valid concern."

f. The research involved and was performed by Area Manager and Billing Supervisor Ashley Rathbun. After this research was conducted, the Billing Coordinators were told by Billing Supervisor Ashley Rathbun that physicians no longer had to sign every chart if the physician did not physically treat the patient when the payor was an insurance company. However, if the patient had a government payor, such as Medicare or Medicaid, a physician signature was still required by EmCare for every patient, even if the physician did not treat the patient. This was EmCare's position and policy: it was not a legal requirement.

---

[54] Basically, and as noted throughout this Amended Complaint, the reason that EmCare makes all the physicians sign the charts is so that it can fraudulently bill mid-level provider (MLP) charts under that physician's NPI number.

g. In short, EmCare was still going to require the physician signature, which EmCare used to attest to supervision, even when the physician did not see the patient or meet the CMS requirements for physician supervision in the ER. {Even though a physician signature is not required by CMS when a mid-level sees a patient on their own (*i.e.*, when a mid-level is not supervised by a physician in a face-to-face encounter in the ER), and even though a signature attesting to supervision is *not permitted* and *prohibited* by CMS when the physician did not see the patient face-to-face, EmCare made signatures a requirement of its physicians for the purpose of billing for something that was not done.}[55]

h. Billing Coordinator Brenda Ramsey, who was more senior than the Billing Coordinator concerned, explained that EmCare, Inc. could bill at a higher rate with a physician's signature on a chart than if only a mid-level signed the chart.

186. **REIMBURSEMENT TECHNOLOGIES, INC.**: As admitted by an individual who had the title of Customer Service Rep. for Reimbursement Technologies, Inc. ("RTI"), in Conshohocken, PA, Kimberly Murray, who had been employed by RTI from 2013 to 2014, and as stated on February 23, 2016, from Conshohocken, PA, EmCare, Inc. and RTI

[55] *See, e.g.,* § 15501. EVALUATION AND MANAGEMENT SERVICE CODES - GENERAL (CODES 99201-99499) B., *Carriers Manual Centers for Medicare & Medicaid Services (CMS), Part 3 - Claims Process, Transmittal 1776*, Medicare Department of Health & Human Services (DHHS), (OCTOBER 25, 2002) (emphasis added):

> When a hospital inpatient/hospital outpatient or **emergency department** E/M is shared between a physician and an NPP from the same group practice and the **physician provides any face-to-face portion** of the E/M encounter with the patient, the service may be billed under either the physician's or the NPP's UPIN/PIN number. **However, if there was no face-to-face encounter between the patient and the physician (e.g., even if the physician participated in the service by only reviewing the patient's medical record) then the service may only be billed under the NPP's UPIN/PIN.**

https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/r1776b3.pdf (emphasis added).

functioned as and were part of the same company and system. The Customer Service Rep. concerned reported to Team Lead Aqueenah Anderson.

a. There were over one hundred (100) people working in customer service, between one hundred twenty-five (125) and one hundred fifty (150). As a Customer Service Rep., the individual concerned received calls from patients (mostly) with questions about emergency room (ER) bills. The Customer Service Rep. concerned explained that the bills were for professional services, meaning the physician portion of the ER visit.

b. The physicians and other medical professionals were not directly employed by the hospitals and thus, the services provided were billed separately from the ER visit. As informed by RTI, the physicians and other medical staff were independent contractors at EmCare.

c. When the Customer Service Rep. concerned joined RTI, that individual received approximately five weeks of training on ER billing for physicians and medical professionals. The Customer Service Rep. concerned was trained by RTI and tasked with answering patient billing questions related to billing. In this, Medicare patients often asked why the ER bill listed the name of a doctor they did not recognize.

d. The patients would often tell the Customer Service Rep. that they did not see the doctor whose name appeared on their bill but instead were treated by someone else in the ER, either a NP (nurse practitioner) or a PA (physician assistant). The Customer Service Rep. concerned was tasked with explaining to the patient that though they were seen by someone else, because that person is a PA or NP, the doctor's name appears on the bill because the doctor was supervising the PA or NP. (This, as later noted below, is a falsity or, at best, a half-truth, and is an example wherein EmCare employees are controlled by EmCare through deception.) In this, the Customer Service Rep. concerned was informed by RTI that PA's and NP's legally could not sign off on the ER visit. (This too, as noted below,

is a falsity or, at best, a half-truth, and is an example wherein EmCare employees are controlled by EmCare through deception.)

e. The Customer Service Rep. concerned frequently asked RTI how it could bill for a doctor if the patient did not see a doctor. It was not explained to the Customer Service Rep. in additional detail beyond what the Customer Service Rep. concerned was instructed to tell patients, which was that the doctor was supervising the patient's care. The Customer Service Rep. concerned received calls from all over the country, including California, the Midwestern states and the Southern states. The Customer Service Rep. concerned even received some calls from outside of the country when tourists visited the ER during a trip to the United States.

f. The Customer Service Rep. concerned worked a shift from 11:00 a.m. to 7:00 p.m. Eastern time and as such, received numerous calls from California during the shift. The Customer Service Rep. concerned could see what the patient saw, meaning that the Customer Service Rep. concerned could access the bill in the electronic system used by RTl.

g. The Customer Service Rep. concerned confirmed that RTI's billing department was located in the same building as Customer Service but was located upstairs. The billing personnel were segregated, however, and were not available to Customer Service Representatives that had questions regarding a billing. Everyone, however, knew that coders reviewed the charts and then sent codes to the billing department.

187. The following was admitted by an individual employed by RTI as a Call Center Supervisor in Conshohocken, PA from April 1, 2013 to August 2014, Gary Schantz, as stated on March 9, 2016, from Whitehall, PA, who answered to the RTI Call Center Director was Stacy Bendon, who reported to Murray D. Fein, the RTI President and COO:

a. As per the Call Center Supervisor concerned, Call Center Supervisors oversaw Customer Service Representatives making outbound calls to patients who had recently visited the ER.

b. The Call Center Supervisor concerned confirmed that the people called included all types of visitors to the ER from all over the country, including those with private insurance and Medicare. Though the Call Center Supervisor's group received calls from all over the country, they received a higher number of calls from California.

188. The Call Center Supervisor concerned said reps accessed an electronic system at RTI through which the information was received electronically from the hospital, a system that was used throughout RTI, including in its billing department. He recalled that the information available to reps in the system about an ER visit included patient name, social security number, physician name, and insurance information (*if already collected*).

a. The Customer Service Reps. added the information collected from patients that was needed to complete EmCare and RTI's billing requirements, and then they selected that the information was complete, in the electronic system, sending the information to the billing department. In addition to the electronic system with patient information, there was also a dial-up system used in the call center.

b. The Call Center Supervisor concerned explained that a common question from patients was why they were going to receive a bill from a doctor if they did not see a doctor but, instead, saw a nurse practitioner (mid-level). The Call Center Supervisor concerned said the reps would inform the patient that the doctor was the attending physician that signed off on the nurse practitioner's treatment.

c. The Call Center Supervisor concerned understood that sometimes the physician did not see the patient at all. The Call Center Supervisor concerned would sometimes get on a call with a patient and a Customer Service Rep., as a supervisor, to talk to patients when this question was posed. The Call Center Supervisor concerned said that this question was posed by Medicare patients as well as patients with private insurance.

d. The Call Center Supervisor concerned recalled that the call center frequently received the question about receiving a doctor's bill when they did not see a doctor. The understanding of the Call Center Supervisor concerned was that the doctor's name was associated with the visit because he/she would receive "credit" for the ER visits while supervising the ER even if the physician did not actually see the patient. (This, as noted below, however, is a falsehood: doctors cannot receive credit for patients they have not seen).

e. The Call Center Supervisor concerned understood that physicians were independent contractors of EmCare. The Call Center Supervisor concerned understood that RTI/EmCare billed patients.

189. As per the Call Center Supervisor concerned, approximately three hundred (300) people worked for RTI in Conshohocken, PA, when including its billing department and customer service department. The Call Center Supervisor concerned was sometimes provided with a hard copy or printed bill if an address was not entered correctly or some other information needed to be corrected.

a. The Call Center Supervisor concerned had the hard copy and would then make the correction directly into the system. The Call Center Supervisor concerned recalled that the doctor was listed by name. As part of the job, the Call Center Supervisor concerned was provided with billing statements. In addition, The Call Center Supervisor concerned was provided stacks of 1500 Forms by Call Center Director was Stacy Bendon to divide among the reps to sign on behalf of the physicians. Call Center Director was Stacy Bendon received these forms from the billing department.

b. The Call Center Supervisor concerned said the 1500 Forms went to Medicare and to insurance companies. The Call Center Supervisor concerned recalled that the top of the form listed the hospital information where the care occurred. It was the understanding of Call Center Supervisor concerned that the contract between EmCare/RTI and those providing the care allowed the Customer

Service Representatives to sign on behalf of the physicians. (This, as later noted herein, is a falsity or, at best, a half-truth, and is an example wherein EmCare employees are controlled by EmCare through deception.)

190. The Envision Defendants generate the vast majority of their revenue by billing third-party payers, such as CMS or private insurers, for the services provided by EmCare healthcare providers.

191. EmCare bases its business model not on quality of care, but on reducing emergency department costs and maximizing revenues through increased patient turnover and efficient, standardized coding and billing practices.[56] EmCare built its revenue-based business model on three primary goals: (**1**) treat and bill more patients by "monetizing flow"—*i.e.* move patients through the emergency department quickly; (**2**) cut costs by employing more mid-levels in place of more costly physicians; and (**3**) implement standard coding and billing procedures to capture as much revenue as possible from CMS and private payers.

192. First, an integral part of EmCare's business model is moving patients through the emergency department as quickly as possible—*i.e.*, increasing "flow." To accomplish this, EmCare uses floor-management models that often physically segregate physicians and mid-levels into different areas of the emergency department. These floor-management models enable EmCare to increase revenue by: (1) increasing the volume of patients treated; and (2) using lower cost staffing, such as PAs and NPs, instead of more expensive physicians to treat more patients.

193. Second, EmCare's business model seeks to reduce costs by relying heavily on mid-level service providers, such as PAs and NPs, in place of physicians. EmCare compensates mid-levels at a lower rate as compared to physicians; thus, using mid-levels

[56] As noted in this Amended Complaint, EmCare's model involves cutting costs by charging for professional services that were not provided, such as with the Mid-Level Scheme, which it considers a cost savings, since paying for Mid-Levels but charging them to Medicare and Medicaid at the full physician rate is—*despite its illegality*—a cost savings to EmCare that increases its ROI (return on investment).

to treat patients alone reduces EmCare's operating costs. However, EmCare derives significant revenue from its Mid-Level Scheme, described above, through which it obtains reimbursement from the Plaintiff Governments for mid-level services at the full physician rate. Thus, EmCare unlawfully inflates its revenue by relying heavily on lower-paid mid-levels to provide care, while collecting reimbursements from the Plaintiff Governments at the full physician rate.

194. Finally, EmCare's business model relies on the implementation of national, standardized billing and coding practices aimed at capturing as much revenue as possible from third-party payers, including the Plaintiff Governments. EmCare touted its in-house billing company's ability to anticipate and implement plans to mitigate the increasingly volatile regulatory and financial landscape and allow healthcare providers to succeed in the reimbursement races. Coding is the process by which a patient's medical chart is translated into billable services that are then submitted to the Plaintiff Governments for reimbursement. EmCare's standardized coding techniques are aimed at milking every last cent out of each medical chart.

### *C. THE SCRIBE SCHEME*

195. As noted in the MEDICARE and the THE CRITICAL CARE subsections, *supra*, CMS and other government payors require that providers truthfully document and certify patient treatment as it occurred, especially with regard to critical care and other medically necessary care. Nonetheless, the Defendants violate these certification requirements by creating a model where scribes, instead of doctors, determine the presence of critical care and medical necessity in the chart for billing purposes—inserting those elements into the chart with protocols established so that the physician cannot practically remove them. Defendants also use scribes to provide the false and/or misleading statements referenced in the two (2) additional schemes described below (*i.e.*, the Critical Care Scheme and the Mid-Level Scheme).

196. The majority of scribes are 19- to 24-year old college students who have taken college biology but who have not yet graduated college. As admitted by ScribeAmerica,

LLC, "[o]ur medical scribes are often pre-med students eager to gain healthcare experience." https://www.scribeamerica.com/solutions-medical-scribes/. Most of them are attempting to get into advanced medical, physician assistant, nurse practitioner, or nursing school programs. These impressionable students are hired because they can be easily trained to act in conformity with directives from ScribeAmerica and EmCare and because they lack the qualifications to be able to question the propriety of what they are being trained and paid to do.[57] They can qualify for the position with less than 2.5 weeks (100 hours) of volunteering or shadowing experience in healthcare.

197. Below, is a typical Envision scribe job posting, showing that scribes are not licensed medical professionals, nor trained in diagnosis, management, or critical care:



Envision HEALTHCARE

‹ Welcome page

CIM / MEDICAL SCRIBE

US-NY-Staten Island

**Requisition ID** 2021-26141 **Category** CIM **Location** Richmond University Medical Center

Qualifications

**REQUIRED EDUCATION AND WORK/VOLUNTEER EXPERIENCE:**

- Bachelor's degree preferred
- Biology coursework at the undergraduate level or above required; Anatomy and Physiology and Medical Terminology coursework preferred
- A minimum of 1 year of work experience in the healthcare field may be considered in lieu of the education requirement
- At least 100 hours of work, volunteer, or shadowing experience in the healthcare field required
- Experience in a direct patient care environment preferred i.e. EMT, scribe, clinical technician in a hospital, medical assistant in a doctor's office

198. Scribes have confirmed to Dr. Sonyika that if it was documented in the chart that a patient smoked, they were directed by ScribeAmerica to chart smoking cessation even

[57] Defendants also prey upon these students' ambitions through promises and/or encouragement that the scribe program will help them make it into medical school or nursing school. (Impressionable young people to do as they are told and, if they do not obey, are threatened with consequences that could affect their ability to get into medical school.)

if the provider did not document or talk about smoking cessation, including Simren Dhani, Stanton Davis (Chief Scribe), Emma Forkin, Ashley, and Joanna Jacob. Dr. Sonyika personally witnessed three (3) individual scribes, on April 24, 2021, at approximately 6:00 p.m., stating that they were instructed by ScribeAmerica to add smoking cessation to every chart that had smoking listed per the patient's past history, regardless of whether a conversation concerning smoking cessation occurring in the patient care conversation. These scribes were Emma Forkin, Ashley, and Joanna Jacob. This took place at Piedmont Fayette Hospital, Fayetteville, Georgia. Subsequent conversations with these scribes revealed that only two doctors objected to the practice, Dr. Matt Rudy and Dr. David Price. As per the admissions of the scribes, the directive for this scribe practice was through ScribeAmerica. Other scribes at the facility include Rebecca Bryant (Co-Chief Scribe), Sophia Bonser, Brandi Jarvis, Karrington Smith, Aliyah Crosby, Evelyn Orusa, Seth Triplett, Mikaya Franklin, Austin Fry, Darien Sey, Asila Mohammed, Kevin Tanusang, Orchesa LNU, Chassidy LNU, and Chelsea LNU.

199. Other ScribeAmerica scribes admitted that they were directed to use a template that added elements that were not actually performed during the treatment of the patient but were required for billing, including scribes Emma Forkin and Taylor John. This was also admitted by the scribes concerned to be at the direction of ScribeAmerica and EmCare.

200. For example, the following slide from a training presentation for EmCare medical directors at the facilities explains that scribes are to "complete the chart" and "prompt [physicians] for elements that will result in optimizing coding":




STAFFING YOUR EMERGENCY DEPARTMENT, EFFICIENTLY, EFFECTIVELY AND SAFELY: CORE CONCEPTS, Kirk Jensen, MD, MBA, FACEP, The ED Patient Flow Collaborative, at 40 (Envision Physician Services, July 2017).

201. The instructions given by ScribeAmerica and EmCare promote fraud by charting for claimed services regardless of whether they are done. This fraudulent behavior shows a callous disregard for the truth or falsity of what Defendants billed to the government. Nevertheless, ScribeAmerica trains its scribes that the problematic instructions are actually proper.

202. Enforcement of the instructions given by ScribeAmerica and EmCare is ensured by threats to scribes—many of whom aspire to be medical students—that failing to fill out charts according to ScribeAmerica's instructions, which include fraudulent billing related items, will be viewed as failing on the task of filling out charts. ScribeAmerica and EmCare further threatened that failing to follow directions could result in scribes being banned from all medical schools.

203. To prevent abuse and fraud, CMS and other government payors mandate that physicians must determine whether a patient received critical care.

204. In conjunction with the Critical Care Scheme described below, ScribeAmerica and EmCare falsely tell scribes that they will know more about determining what qualifies as critical care than physicians. There is no legitimate reason or purpose for giving scribes—who lack the necessary qualifications, and credentials—the perceived authority and discretion to determine when a patient's treatment should be billed as critical care.

205. Perhaps the most egregious aspect of the Scribe Scheme is the use of scribes to override physicians' medical judgment and determine which services should be classified as "critical care." The scribe's role is detailed in the next several paragraphs, while broader details are provided in the next section entitled Critical Care Scheme.

206. As discussed in detail below, to bill for critical care, CMS requires that the physician seeing the patient properly document and make the classification of "critical care." However, Defendants circumvent this requirement by using scribes to determine critical care classifications.

207. This fraudulent practice is a significant aspect of Defendants' fraud.

208. In one example, a patient came to the emergency department with sore throat. Vital signs were not critical. The emergency department physician admitted the patient to a basic (non-ICU) hospital bed. However, after the physician has made this disposition, the scribe made the critical care determination and added a "Critical Care" billing attestation to the record on behalf of the physician.

209. As noted in the chart, the physician had already signed off on the chart on the day of service; nonetheless, three days later the physician had to re-sign and agree with the scribe's note, at the pressure of EmCare, or risk punitive actions by EmCare and the hospital.

210. Not only was this diagnosis and treatment not warranted for critical care, but the person actually making the determination, with the full support of EmCare, had not even graduated from college.

211. Scribes were instructed to chart any visit involving a transfusion as critical care.

212. Scribes also were required to report situations when a doctor declined to add critical care, which is significant because it is a method of creating conformity by reporting doctors to EmCare for not going along with the Scribe Scheme.

213. Additional details about the Critical Care Scheme are provided in the next section.

### *D. THE CRITICAL CARE SCHEME*

214. As noted herein, Defendants violate the certification requirements identified in the MEDICARE and the INTRODUCTION TO THE CRITICAL CARE SCHEME subsections, *supra*. In this, EmCare's second Scheme—*the Critical Care Scheme*—is classic upcoding. EmCare fraudulently billed CMS for critical care services that were either not provided or not medically necessary in contravention of CMS certification requirements.

215. On May 19, 2009, at the North Carolina facility where Relator Dr. Chionesu Sonyika, MD worked, Sherry Winstead of EmCare, sent the e-mail concerned, titled, "May chart review – not too promising" to Relator Dr. Sonyika and a number of other providers:[58]

> "ED Golden Rule: You don't get paid for what you do; you get reimbursed for what you document!"
>
> **"The Review of Systems (ROS) is the number one weakest link chart component** that results in **down codes**. A single missing ROS element may potentially create a down coding effect of one or two Evaluation Management (EIM) levels. Not only is this unacceptable from a coding

---

[58] Bacon, PA, Jenise; Bowen MD, Margaret-Mary; Carducci, MD, Dr. Bryan; Finnell MD, Alice C.; Fisher PA, Susan; Gerlach MD; David, Goli MD; Devainder; Gottlieb, MD, Sheryl; Greenberg MD, Mike G; Griner MD, Eugene W.; Kaminski MD, David W.; Malinda MD, Paul F.; Mclaurin, MD Noelle S.; McShane MD, James A.; Mueller MD Howard; Page PA, Roger D.; Ratcliffe PA, Heather Rosier MD, Maggie; Smith PA, Ronald; Stiehl MD, Barbara J.; Summers PA, Rhonda L.; Sung MD, Jade J.; Taylor MD, Linda; Tumey PA, Rob.

> perspective but think of the lost revenue to your group! **Remember, the ROS requires questions about ten different systems, not two different systems!** It is noteworthy to say that the controversy continues on use of the statement "all systems negative". The prudent approach is to definitively document all ten systems.

*Id*. (quotation marks included in original and emphasis added). As noted, *infra*, this is significant because it is an example of EmCare noting that Defendants Reimbursement Technologies, Inc. (RTI) and EmCare, Inc. were working in concert to require physicians to document all charts so as to be coded and billed by RTI at a level 5, something that would require roughly an hour per patient (*although EmCare was requiring physicians, as part of its "flow" model to actually see 3-4 patients per hour, as noted below*).

216. It goes *almost without saying* that it is not surprising that the ROS was the "weakest link," as EmCare puts it, given that physicians simply do not have the time to actually do all of the unnecessary reviews of all of the major organ systems of a patient, *e.g.,* full neurological workup, full cardiac workup, full gastrointestinal workup, etc., when that patient was entering the ER for something like a sprained ankle or broken foot. (As noted below, this is a real example.) There are patients who have to be attended to in real life, and a physician does not have time to run unnecessary exams that take roughly an hour when other people need urgent care. As also noted herein, doctors are not permitted by CMS to do unnecessary workups, let alone to document that they did so in every chart regardless of whether it occurred, which—*as per EmCare's "flow" model and LEAN model*—it did not occur (*as a general rule*).

217. In this regard, it should be noted that critical care is a heightened level of emergency treatment necessary when a patient has a severe medical condition (usually, an imminently life-threatening condition) that requires healthcare providers to exercise a

higher degree of medical decision-making and devote undivided attention to that patient's treatment.[59]

218. CMS reimburses providers for critical care services at a much higher rate than standard emergency services. Thus, EmCare views critical care reimbursement as a lucrative opportunity.

219. ScribeAmerica and EmCare direct scribes to place critical care information in the chart under certain circumstances regardless of whether it is actually warranted.

220. Of course, EmCare and its employees have no control over the severity of the injuries and illnesses that their patients present with. True critical care situations should account for approximately 1% or less of emergency cases. Regardless, ScribeAmerica and EmCare instruct scribes—who have no actual capacity to identify this 1% of cases, as that is the purview of the physician in accordance with advanced medical training—to place critical care designations in charts as a matter of course for medical services that do not meet the criteria of critical care. Thus, EmCare trains and pressures providers to approve falsified medical charts to indicate that critical care is required when, in fact, only standard emergency treatment is required.

221. Furthermore, the way that ScribeAmerica and EmCare use the electronic system makes it almost impossible for a physician to disapprove critical care: the system will usually give a physician the option to "approve" or "cancel," but there really is no choice because "cancel" only means canceling one's completion of the chart, leaving the chart in an unfinished limbo (it does not cancel the scribes' designation of critical care). EmCare then uses the falsified medical charts to submit claims to CMS and other government payors at the higher critical care rate.

---

[59] *See* Medicare Program, Revisions to Payment Policies Under the Physician Fee Schedule and Other Revisions to Part B for CY 2017; Medicare Advantage Bid Pricing Data Release; Medicare Advantage and Part D Medical Loss Ratio Data Release; Medicare Advantage Provider Network Requirements; Expansion of Medicare Diabetes Prevention Program Model; Medicare Shared Savings Program Requirements, 81 Fed. Reg. 80170, 80196 (Nov. 15, 2016) ("2016 Rule").

222. EmCare has been systemically upcoding critical care since at least 2008 (*when the critical care regulations were last updated*). This Critical Care Scheme too accounts for millions of dollars in overpayment by CMS and other government payors to EmCare every year.

223. EmCare openly discusses with its employees the fact that its constant pressure for critical care classifications is to drive revenue.

224. As with the Mid-Level Scheme, EmCare forces healthcare providers to comply with its critical care policies by threatening pay reduction, privilege suspension, and even firing. However, healthcare providers have no control over the amount of true critical care that will be required in any given time period. Thus, EmCare encourages its healthcare providers to document critical care for patients who only required ordinary (*i.e.*, non-critical) emergency care. EmCare's Critical Care Scheme violates CMS regulations and the FCA.

225. Like the Mid-Level Scheme, the Critical Care Scheme begins when a patient enters an EmCare-operated emergency department. (However, in the EmCare model, critical care time will be billed for periods before and even after the patient leaves the ER, as noted below.)

226. During or immediately after the administration of medical care, the provider completes the EMR (electronic medical record) like any other patient encounter, notating the required elements—*i.e.*, a detailed or comprehensive medical history, physical examination, identification of medicines administered, tests ordered, images ordered and a description of the medical decision-making required. The EMR will indicate to the coder the level of care provided.

227. CMS divides emergency medical treatment into five levels of care based on severity of the condition(s) presented. Level 1 represents the lowest severity condition, and Level 5 represents the highest severity condition. The higher the severity level, the higher the reimbursement rate CMS will pay. Specifically, according to the CMS Physician Fee Schedule, a Level 1 patient encounter is reimbursed at approximately $21.00, a Level 5 at

approximately $175.00, and Levels 2, 3, and 4 at amounts in between. These reimbursement rates are flat payments and are *not* based on the amount of time the provider spends with the patient. Thus, a Level 1 encounter will be reimbursed at approximately $20.00 whether it lasts 10 minutes or 2 hours.

228. However, there is a level of care above Level 5: "critical care." Critical care is the level of treatment and decision-making required by the highest severity conditions and can generally be described as that level of care required by imminently life-threatening emergency conditions. Specifically, CMS defines "critical care" as physician medical care for a critically ill or critically injured patient whose critical illness or injury acutely impairs one or more vital organ systems such that there is a high probability of imminent or life-threatening deterioration in the patient's condition.

229. True critical care conditions are rare and typically account for approximately 1% of all emergency department visits, with the overwhelming majority of critical patients ultimately being admitted to critical care units within the hospital. According to CMS, critical care involves high complexity decision making to assess, manipulate, and support vital system functions(s) to treat single or multiple vital organ system failure and/or to prevent further life-threatening deterioration of the patient's condition. Further, all critical care services must be medically necessary and reasonable.

230. Due to its complex nature, CMS reimburses critical care at a higher rate than standard emergency care. Also, unlike Levels 1 through 5, critical care billing is based on the amount of time the physician spends treating the critical patient such that the more time a physician administers critical care, the more reimbursement money the emergency department will receive.

231. Medicaid and other government healthcare programs and plans similarly reimburse critical care at a higher rate and require supporting documentation of the care actually provided.

232. As an example, on November 26, 2012, Martha Escamilla, Practice Manager, EmCare, Inc – TMC, located at 5301 E. Grant Rd., Tucson, AZ 85712 sent an e-mail to

Relator Dr. Caleb S. Hernandez, DO, and to all the providers in the ER,[60] including a presentation from Helen Dowling, CPC, Director of Practice Improvement, EmCare – West Division, titled West Division 2012 Documentation, wherein EmCare instructed its physicians on how it wanted them to document critical care. In this, EmCare stated that documenting critical care was as easy as 1-2-3, wherein the first step (**1**) was to no longer use the term "critical," which CMS required, but to instead use the term "compromised medical condition," which was actually a much broader term than the CMS term "critical," and ultimately included many non-critical patients, such as patients that had a slight exacerbation of a chronic condition, including routine things like a patient who lives with supplemental oxygen being classified by EmCare as a critical patient who is about to die if not treated in the ER, or someone who showed up with routine nausea and vomiting. The second step (**2**), was to redefine the CMS criteria of "a high probability of sudden, clinically significant, or life threatening deterioration in the patient's condition, which requires the highest levels of physician preparedness to intervene urgently" with "Aggressive Active Intervention," which EmCare then redefined as being such routine things as administering an IV. The third step (**3**) was to redefine the time component of critical care to not be the time that the doctor actually spent with the patient, but as EmCare had noted in the November 19, 2012 meeting referenced above, to include the time that the scribe clicks on the patient in the scribe's computer. (At that meeting, Dr. Rosenthal falsely mentioned that all time before a patient arrives and after a patient leaves the emergency department counts

[60] Ajai Sawhney; Brent Lorenzen; Brian Hagerty; Brian Tenelshof; Bruce Ogg; Candace Engelhardt; Carol Marquez; Carrie Serra; Charles Peterson; Clifford Janke; Heeten Desai; Donna Woods; Elizabeth McCarrell; Eric Ruhe; John Hall; Julie Klein; Lori-Ann Tracy; Lowry Jonathan; Melissa Zukowski; Michael Karadsheh; Michelle Williams; Mickey Miller; Richard Beamon; Richard Rosenthal; "Roger Ottman; Serge Hougeir; Theresa Cullen; Alan Grenke; Ciara Aparicio; Dana Robinson; Dawn Bauman; Gary Parker; George Jicha; Georgette George; Leda Hankins; Michael Jackson; Patricia Baird; Patricia Daly; Patricia Hiebert; Rebecca Winfield; Robert Rodriguez; Scott Wiley; Timothy Bohan Venessa Saldana; Claudette Rodriguez; Desmond Nunan; Heidi Brown; Paula Mayer; Seema Nair; Shereaf Walid.

for critical care time, in a gross and false broadening of CMS criteria.) What is significant about this is that, in that same meeting, EmCare had also noted knowledge that this was not an accurate measure of critical care time, as many patients would still be waiting to see the physician after being so selected, even though EmCare sought to use such scribe documentations as a measure of critical care time when billing CMS.

233. It should be noted that any information not conforming to the actual CMS certification requirements that is entered in a chart as to either of the three (3) elements in the 1-2-3 noted above are violations of the CMS certification requirements and, hence, violations of the FCA, subject to penalties, particularly given the systematic operation of billing based upon them. (Such is simply false information.) Take for example the dishonesty as to the time element of critical care: that alone is a violation of the CMS certification requirements governing time. (CMS does not allow critical care billing for time less than 30 minutes.) When one considers that the 1-2-3 is a compounded formula for skirting the CMS certification requirements on three separate points (*which EmCare identifies as "high-yield" within its culture and community*), the wholesale nature of the Defendants' insertion of false certifications into each chart can begin to be appreciated.[61] It is a systematic pollution of all of EmCare's ER charts: each chart is polluted to some degree.

234. This redefinition is significant because CMS pays for critical care time in increments,[62] where thousands of dollars are paid in multiples of the base amount for every increment above 30 minutes of critical care billed. *See id*. at 16.

---

[61] In addition to the other CMS certification requirements identified earlier, this practice violates the CMS requirements that "services provided/ordered be authenticated by the author" by means of a handwritten or electronic signature and that it be done at the time that the service is rendered. *See* https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/se1419.pdf (at 1 of 4); *see also* MEDICARE PROGRAM INTEGRITY MANUAL, CHAPTER 3 - VERIFYING POTENTIAL ERRORS AND TAKING CORRECTIVE ACTIONS (Rev. 12772; Issued: 08-09-24), at § 3.3.2.4 (D); *see also id.* at § 3.3.2.5 ("All services provided to beneficiaries are expected to be documented in the medical record at the time they are rendered."); *see* MEDICARE and THE CRITICAL CARE SCHEME subsections, *supra*.

[62] *See, e.g.,* https://www.kansashealthsystem.com/-/media/Project/Website/PDFs-for-

235. Additionally, instead of training and providing scribes with the tools needed to identify and notate when they witnessed a physician actually conducting critical care, EmCare and ScribeAmerica trained EmCare scribes to use anything that fit into these "alternative" measures, which do not actually conform to the CMS certification criteria, as they are extremely overly broad. EmCare knew this to be incorrect, as EmCare was well familiar with the correct standard. *See* EMCARE COMPLIANCE PROGRAM, POLICY No. 308 Critical Care, Page 1 of 2 (Revised – January 2007).

236. According to EmCare, critical care provides a lucrative opportunity to increase reimbursement revenues. Indeed, the first 30 minutes of critical care alone provide a minimum of approximately $50 in additional revenue over and above an hours-long Level 5 encounter, with every additional subsequent 30-minute interval increasing the reimbursement as well. (It should be noted that, due to EmCare's flow models and LEAN requirements, where physicians must see 3-4 patients per hour, this 30-minute measure is seldom if eve reached, wherein the critical care charting is simply false, and knowingly so on the part of EmCare, who manages every part of the LEAN model.)

237. Additionally, and as a separate added feature, EmCare administrators communicate to employees of EmCare-managed emergency departments, indicating that EmCare physicians should be billing critical care in the 6-12% range. These administrators further encourage EmCare providers to bill critical care time and to capitalize on opportunities to increase critical care billing.

238. To be reimbursed for critical care, a physician must properly record his or her critical care treatment in the EMR. The treating physician must specifically document that he or she performed "critical care" (using those words) and notate the amount of time (typically in minutes) such critical care was administered.

Download/COVID19/surge/Inpatient-Provider-ICU-Surge-Quick-Start-Guide.pdf?la=en&hash=53D06963FF069DB7682A2A63045FEEE00010A794.

239. To meet its unrealistic critical care push, EmCare requires physicians to provide this documentation for encounters in which critical care treatment was not necessary and to maximize every possible minute of critical care billing.

240. Healthcare providers working for EmCare are desensitized to this over-charting and upcoding because EmCare constantly hammers them with training that contradicts the medical education that providers received during medical school or residency. EmCare's training redefines what constitutes critical care for its healthcare providers. In addition, EmCare publicly calls out healthcare providers who fail to document critical care in situations where EmCare claims they should.

241. EmCare's training (or re-training) sessions are often conducted by non-physician coders. Further, EmCare coding specialists also regularly send "feedback" to healthcare providers, attaching specific patient charts and instructing them on what additional information should have been included so that a chart can meet the higher-revenue critical care billing requirements.

242. EmCare has implemented a uniform policy that pressures healthcare providers and scribes to memorize those medical conditions that, according to EmCare, will require critical care every time. EmCare systematically perpetrates this one-size-fits-all Critical Care Scheme nationwide, rather than relying on trained healthcare professionals to provide the level of care they believe to be most appropriate. EmCare emergency departments even have "critical care committees" that meet periodically to monitor critical care billing levels and brainstorm about how to increase those billing levels.

243. Evidencing this one-size-fits all approach to critical care charting, EmCare physicians typically use uniform critical care language in their EMR charts, such that the charts are merely rubber-stamped with inexact statements such as "Aggregate critical care time was __________." This language simply parrots the critical care requirements so that EmCare can "check the box" for critical care billing. Indeed, EmCare EMRs contain literal boxes next to this type of formulaic language that a treating physician will click or check. Each click means more money for EmCare.

244. EmCare uses the falsified medical records to upcode for nonexistent or unnecessary critical care. With knowledge of the falsity of the medical records, EmCare knowingly submits false claims to CMS and other government payors for reimbursement at the higher critical care rates.

245. Relators observed the same policies with respect to critical care in every EmCare emergency department where they worked. At each of these facilities healthcare providers were encouraged and/or required to increase the amount of critical care they performed and were consistently told that critical-care billing was a priority.

246. In an e-mail from Helen Sievers CEDC, Clinical Documentation Educator-Emergency Medicine, Envision Physician Services, dated August 11, 2021 to Relator Dr. Chionesu Sonyika, MD and carbon copied to Paula Brathwaite, MD of Piedmont Fayette Hospital, titled, "PFH_Dr Sonyika_Doc Variances," she was reaching out to share an "educational opportunity" identified with [Dr. Sonyika's] Piedmont Fayette Hospital visits, identifying the e-mail an opportunity to share actual record details with [Dr. Sonyika] and eliminate similar down codes in the future." Helen Sievers CEDC then identified patients from May of that year, in the e-mail, which she stated had been listed on a report she received from EmCare complaining that a chart could not be coded and billed at level 5, and complaining that the chart had only been documented in way that could bill at a level 3. Although CMS requirements are that a physician, using medical judgment, determines when a patient is a certain level of care, Helen Sievers stated that "[t]his was a level 5 chart down coded to a level 3 for the HPI and physical exam," and that "[f]or a level 5 chart we need 8 organ systems for a comprehensive exam ... and that for a level 4 we need 2-7 body areas or organ systems with an extended exam of the affected area." What makes this significant is that CMS requirements are that no unnecessary medical services should be provided; nonetheless, Helen Sievers, acting on behalf of EmCare, had determined that a foot injury should have included charting for 8 organ systems so that the chart could be billed as a level 5.

247. Importantly, as with the charges for mid-level billing, EmCare is able to disguise these fraudulent claims in plain sight because a critical care claim is a "pass through" claim for billing purposes, meaning there is no front-end auditing of these charges. The absence of auditing risk emboldens EmCare to encourage with impunity the submission of fraudulent claims for reimbursement of critical care services. And, even if EmCare is required to submit underlying EMRs (such as, in accordance with an *ad hoc* audit or probationary period implemented by a MAC), the EMRs will theoretically evidence the provision of critical care, when in fact critical care was not required or medically necessary.

248. The Critical Care Scheme reflects company-wide policy, within each subsidiary concerned. In this, Envision Healthcare Corporation proliferated policies throughout its entire organization chart of Envision/EmCare companies, utilizing EmCare, Inc.'s Ethics & Compliance Department and Internal Audit Department to implement compliance with its policies to all of its "teammates." "Teammate(s)" is used "to refer to temporary, part-time and full-time employees, independent contractors, clinicians, officers and directors and the term Company to refer to Envision Healthcare Corporation and any of its subsidiaries, or companies managed by them." *See, e.g.,* VITAL SIGNS, CODE OF BUSINESS CONDUCT AND ETHICS, ENVISION HEALTHCARE CORPORATION at 3 (2024). (The same was stated in the Code of Business Conduct and Ethics from the year 2021.)[63]

249. As noted with examples herein, national and regional EmCare administrators often send emails to EmCare physicians and mid-levels instructing and reminding them of EmCare's critical care policies.

---

[63] On May 18, 2012, Kathy Coleman of EmCare sent the West Division Spring Newsletter to all EmCare personnel in the West Division, including Relator Dr. Caleb S. Hernandez, DO, via e-mail. That newsletter contained a section titled the "Studer Corner," which noted: "As CMS provides updated information regarding VBP calculations and indicators, it is important our teams are up-to-date on the latest rulings as well as understand key tactics to improve results." *See id*. at 4 of 6.

250. As noted below, these actions violate specific well-known CMS requirements for certification, as well as the Code of Federal Regulations.

**E. *THE MID-LEVEL SCHEME***

251. As noted herein, the Defendants, and principally the EmCare Defendants, violate the CMS certification requirements identified in the MEDICARE subsection, THE CRITICAL CARE SCHEME subsection, and in the INTRODUCTION TO THE MID-LEVEL SCHEME subsection, *supra*, violating those referenced provisions, as noted further herein.

252. In this, Relators witnessed firsthand the unlawful practices that EmCare utilizes to fraudulently increase billing to and reimbursement from the Government. Through their personal knowledge, experience, and investigation, Relators uncovered the unlawful Mid-Level Scheme that Defendants use systematically and purposely to submit false claims to CMS.

253. Under the Mid-Level Scheme, EmCare overbills for services provided by mid-levels (*i.e.*, PAs and NPs) by fraudulently submitting claims for reimbursement for those services under a physician's NPI to be paid at the higher physician rate. That is, although EmCare submits claims to CMS for reimbursement for mid-level services, it falsely indicates that a physician, rather than a mid-level, directed the medical care when, in fact, the physician had no input into the care of the patient.

254. Typically, services provided by mid-levels are reimbursed at 85% of the physician billing rate for E/M services.[64] To determine the allowable rate for a service

[64] The Medicare statute states that "with respect to services described in 1861(s)(2)(K) [42 U.S.C. § 1395x(s)(2)(K)] (relating to services furnished by physician assistants, nurse practitioners, or clinic nurse specialists), the amounts paid shall be equal to 80 percent of (i) the lesser of the actual charge or 85 percent of the fee schedule amount provided under section 1848 [42 USCS § 1395w-4], or (ii) in the case of services as an assistant at surgery, the lesser of the actual charge or 85 percent of the amount that would otherwise be recognized if performed by a physician who is serving as an assistant at surgery[.]" 42 U.S.C. § 1395l(a)(1)(O). Incident to billing rules, however, are not permitted in the emergency room (ER) setting. *See* 42 CFR § 415.140 (noting that the "incident to" rules are not permitted in the facility setting and setting forth the conditions of split/shared billing in a facility, such as the ER); CMS, MEDICARE CLAIMS PROCESSING MANUAL, pub

provided by a mid-level, Medicare will select the proper amount based on the physician fee schedule and discount that amount by 15% to reach the appropriate 85% mid-level billing rate. The Plaintiff States have enacted similar reimbursement protocols for their Medicaid programs. When a mid-level performs services alone, without physician involvement, the proper procedure is to submit a claim for those services under the mid-level's NPI so the claim will be paid at the appropriate mid-level rate. As per the requirements that govern the ER (*as opposed to a family medicine office where the physician is the employer of the mid-levels*), no physician signature for supervision is required when the mid-level has not been supervised.

255. However, EmCare ignores these rules. Instead, it submits claims for mid-level services under the NPIs of random on-duty physicians. To cover its tracks in case of a CMS audit, EmCare requires its providers to manipulate mid-level charts to falsely reflect what is called a "shared visit."

256. Because the emergency room is an environment where serious medical conditions are time-sensitive and an expert decision could be the difference between life and death, CMS and other government payors require that shared visits include a face-to-face interaction with the physician and the patient to ensure the safety of the patient for more serious matters where a mid-level's training and experience may not be enough to protect the patient from harm. This ensures patients receive the life-saving care they deserve and is a protective measure implemented by CMS and other government payors to make sure cost-cutting would not detrimentally impact patient safety—it is an extremely serious public safety issue.[65] (Significantly, it is because of the serious public safety concerns involved in the ER setting that the face-to-face visit is a requirement of split-shared billing.)

---

100-04, Ch. 12, § 30.6.1(B); CMS, MEDICARE CLAIMS PROCESSING MANUAL, pub 100-04, Ch. 12, § 30.6.18 ("**Facility setting** means an **institutional setting** in which **payment for services and supplies furnished incident to** a physician or practitioner's professional services is **prohibited under our regulations**.") (emphasis added).

[65] *See, e.g.,* https://www.bloomberg.com/news/newsletters/2024-07-25/ill-trained-nurse-

257. A true shared visit occurs when a physician and a mid-level treat a single patient in tandem with the physician documenting a face-to-face encounter with the patient as required by CMS and other government payors. Under an actual shared visit, CMS and other government regulations allow the submission and reimbursement of the mid-level's services under the physician's NPI along with the physician's services, as if the mid-level were an extension of the physician. **This is the *only* situation in the emergency department allowing reimbursement of mid-level services at the full physician rate.**

258. In most circumstances, mid-levels and physicians in EmCare's emergency departments treat patients separately. Under EmCare's business model, physicians and mid-levels rarely, if ever, work alongside each other to perform true shared visits. Mid-levels treat lower acuity patients and physicians treat higher acuity patients. Accordingly, the vast majority of claims EmCare submits for services provided by its emergency department mid-levels should be submitted under the mid-levels' NPIs. However, that is not what EmCare does. Although mid-levels perform the vast majority of their services alone (without the physician having any input into the case and without a face-to-face encounter by the physician), EmCare uniformly submits claims for services provided solely by mid-levels under physician NPIs claiming the physician directed the medical decision making after a face-to-face encounter with the patient.

259. The Mid-Level Scheme starts with the use of floor-management models EmCare employs to increase "flow." Again, in most EmCare facilities, physicians and mid-levels often work in different "zones" of the emergency department. Upon admission to the emergency department, patients are assigned to either a physician or a mid-level depending on the severity of the patient's condition or injury. Dividing the emergency department in this way all but eliminates direct interaction between physicians and mid-levels. This is intentional; the system prevents overlap (that is, prevents a physician and a mid-level from

practitioners-spook-us-health-care-big-take; https://www.bloomberg.com/news/videos/2024-07-24/the-miseducation-of-america-s-nurse-practitioners.

both seeing the patient together) and maximizes the number of patients each individual healthcare provider treats. However, the system also complicates communication between emergency department personnel and thereby facilitates EmCare's Mid-Level Scheme.

260. Those patients assigned to mid-levels typically receive care from the mid-level alone without any physician involvement at all and without the physician having any face-to-face encounter with the patient or input into the medical decision making.[66] Under EmCare's floor-management model, it is extremely rare that mid-levels and physicians ever see the same patient or even discuss a patient's diagnosis or treatment plan.

261. During or following treatment, the mid-level will create and complete an EMR for the patient, documenting all of the elements of treatment. This EMR will later inform the patient's bill and the reimbursement claim made to CMS. These EMRs includes a detailed or comprehensive medical history, physical examination, identification of medicines administered, tests ordered, images ordered, and a description of the medical decision making required. EmCare's Mid-Level Scheme continues here; EmCare requires mid-levels to indicate on their EMRs that they were supervised by a physician during the patient's treatment, whether or not the physician actually supervised the mid-level, or even knew the mid-level was seeing the patient, and without a face-to-face interaction by the physician with the patient or any physician input into the medical decision making.

262. After the patient visit is over and the mid-level completes the EMR, EmCare should code and submit the claim to CMS for the mid-level's services under the mid-level's NPI so that CMS will appropriately reimburse EmCare at the 85% rate for mid-level's

---

[66] This also violates the CMS requirements that "services provided/ordered be authenticated by the author" by means of a handwritten or electronic signature and that it be done at the time that the service is rendered. *See* https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/se1419.pdf (at 1 of 4); *see also* MEDICARE PROGRAM INTEGRITY MANUAL, CHAPTER 3 - VERIFYING POTENTIAL ERRORS AND TAKING CORRECTIVE ACTIONS (Rev. 12772; Issued: 08-09-24), at § 3.3.2.4 (D); *see also id.* at § 3.3.2.5 ("All services provided to beneficiaries are expected to be documented in the medical record at the time they are rendered."); *see also* ¶¶ 51-94, 99-112, § VII, particularly ¶¶ 193-289, and § VIII, *herein*.

services. But, that is not what EmCare does. Instead, after mid-levels complete their EMRs, EmCare requires them to assign and send each EMR to a physician for signature before the EMR can be sent on for coding and billing purposes. This requirement exists regardless of whether the physician supervised the mid-level and actually saw the patient. The result is that each mid-level chart is assigned to a physician for signature.

263. Once the mid-level completes the EMR and assigns it to a physician, EmCare requires physicians to add their signature to each EMR. EmCare requires physicians and mid-levels to document on every mid-level chart that the physician supervised the patient encounter and requires physicians to sign every mid-level chart, even when, as is overwhelmingly the case, no shared visit occurred.

264. This fraudulent workflow organization by EmCare creates two significant problems. First, it results in patients and government payors being improperly billed for physician medical services that were not necessary. Second, it compromises patient safety because many problems that require the expertise of a physician are not receiving that expertise (*e.g.*, warning signs for cancer masquerading as a mouth sore that require urgent coordinated care) are missed even though the patient is charged as if the physician provided that protective expertise.

265. Physicians have no option to disagree with the mid-level's care or documentation because mid-level charts are typically assigned to physicians *after* the patient has been treated by the mid-level and discharged—sometimes even days later. Nonetheless, EmCare requires emergency physician to sign and approve *every* mid-level chart assigned to him or her. This is true despite the fact that it would often be physically impossible for the physician to have actually supervised the number of mid-level charts EmCare requires the physician to countersign.

266. EmCare hounds its mid-levels to assign every chart to a physician and harasses physicians to countersign outstanding mid-level charts, as noted in the specific accounts and e-mails alleged herein. (As REPRESENTATIVE EXAMPLES OF FALSE CHARTS AND BILLINGS, § VIII, *infra*, also demonstrates, scribes are also used for such input.)

Further, EmCare ensures employee compliance with these requirements by admonishing its healthcare providers that physician signatures are required to bill for mid-level services, even though there is no such CMS requirement. Worse still, EmCare ensures that its employees comply with EmCare's charting requirements by threatening that failure to do so may result in pay cuts, suspension, or even termination.

267. EmCare employs billing coordinators—*whose primary job function includes collection of physician signatures on medical charts*—to press mid-levels and physicians to assign and countersign the charts. EmCare instructs its billing coordinators that of all the information on the patient charts, the physician signature is the most important because it allows EmCare to bill at the physician rate. This physician signature requirement is especially enforced for Medicare and Medicaid patients. Again, there is no CMS requirement that physicians sign mid-level charts in order to obtain reimbursement for mid-level services.

268. EmCare goes to great lengths to ensure that physician signatures are obtained. In fact, EmCare suspended Dr. Hernandez's privileges at Tucson Medical Center for failing to sign charts for patients he did not see and/or mid-levels he did not supervise.

269. As an example of the e-mails sent, on December 20, 2011, Relator Dr. Caleb S. Hernandez, DO received an e-mail from Michelle Serrano, Billing Coordinator, EmCare-West Division, which is located at 3916 State Street - Suite 300, Santa Barbara, CA 93105, telling him that he had to "complete" a chart that only needed to be electronically signed by the attending physician. She then explained EmCare's policy: "If the chart has been signed by the Physician Assistant, RTI (billing) also requires the attending Physicians signature." (As noted, this is an example of EmCare, making a requirement of something that actually contradicts the CMS requirements.) As an enforcement feature, the e-mail was also carbon copied (cc) to Greg Epperson and Gloria Naidoo. Although it was illegal for EmCare to deem such charts incomplete or delinquent in an effort to get Dr. Hernandez to sign them against CMS requirements, EmCare referred to such charts as "incomplete" and "delinquent."

270. As another example, on November 14, 2012, Martha Escamilla, Practice Manager, EmCare, Inc – TMC, located at 5301 E. Grant Rd., Tucson, AZ 85712 wrote an e-mail to Relator Dr. Caleb S. Hernandez, DO, notifying him that if he did not sign his deficient charts that he would have his privileges suspended. On March 6, 2013, she also wrote Relator Dr. Hernandez via e-mail stating" "You have a couple of incomplete charts, please complete before 3/20 otherwise your privileges at Tucson Medical Center will be suspended."

271. On Wednesday, March 20, 2013, Martha Escamilla, Practice Manager, EmCare, Inc. -TMC, located at 5301 E. Grant Rd., Tucson, AZ 85712 sent Dr. Hernandez an e-mail informing him that his privileges were suspended until he signed the charts (*which would mean doing so in contravention of CMS certification requirements*).

272. On Sunday, April 15, 2012, Greg Epperson sent an e-mail to Dr. Hernandez, Courtney Gray, MD, Gary Wright, MD, Howard Rodenberg, MD, and Joe Nieto, MD, reminding them of EmCare's requirement to co-sign the charts of the mid-levels *assigned to them* before their shift ends. Greg Epperson, MD, FACEP, Regional Medical Director, EmCare-West Division, recognized that this can be difficult and noted that there were several unsigned charts that month. (As noted, Physicians were reticent to sign charts because of the violations of CMS requirements and because of liability associated with attesting for someone who was assigned to the physician after the fact of care.)

273. Similarly, on July 2, 2012, Bobbi Faulkner, Credentialing Coordinator, West Division of EmCare, Inc., who was stationed at 1717 Main Street, Suite 5200, Dallas, TX 75201, notified Relator Dr. Caleb S. Hernandez, DO that he had lost his privileges at the Providence Medical Center facility (8929 Parallel Parkway, Kansas City, Kansas 66112-1689) for not "completing" documentation in the way required by EmCare, Inc., and that he would have to "complete" the documentation of charts are required by EmCare, Inc. as a condition to being reinstated.

274. As per an e-mail titled, "Piedmont Fayette Hospital - FINAL NOTICE" from Adam DiNolfi, Adam DiNolfi, Billing Supervisor - Southeast Region, located at 1000

River Road, Conshohocken, PA 19428, on July 9, 2021, to Dr. Philip Cannon (Envision), Elizabeth Dubois (Envision), and carbon copied (cc) to providers Relator Dr. Chionesu Sonyika, MD, A. Bernstein, MD, P. Kothari, C. McFarland, as well as Carolyn Galluccio (Envision), Joe Ortiz (Envision), Paula Brathwaite (Envision), EmCare admitted that there is a companywide expectation and policy for ER physicians to sign mid-level charts for billing purposes and to treat charts that do not have physician attestations for mid-levels as "incomplete" (despite the complete incongruence of that practice with CMS requirements).

275. As per an e-mail sent by Michelle Serrano, Billing Coordinator, EmCare-West Division, on Tuesday, December 20, 2011, to Relator Dr. Caleb S. Hernandez, DO and carbon copied to Greg Epperson and Gloria Naidoo, EmCare notified Dr. Hernandez that his chart was in complete, and that it "may just need to be electronically signed by the attending Physician," which was such a common e-mail from Michelle Serrano to providers that it was a form e-mail she sent. The e-mail also specifically notes: "If the chart has been signed by the Physician Assistant, RTI (billing) also requires the attending Physicians [sic] signature." Another of these for e-mails was sent to the same people by Michelle Serrano on January 16, 2012, February 8, 2012, and February 9, 2012.

276. As noted above, the demonization of physician reticence to document supervision that did not occur was clearly present in EmCare's implemented culture. As another example, Esther Alcantar, Billing Coordinator, ARI118, 2723, EmCare, Inc. at Tucson Medical Center, Tucson, AZ, sent the following e-mail to relator Dr. Caleb S. Hernandez, DO on October 30, 2012:

> Good evening Caleb,
>
> I will not send you bad boy reminders on the charts from the 26th to the 29th trusting you know what you got to do, , [sic] if you need my help my private email is ... , I work funky hours as I go to school out of town on weekends.

*Id.*

277. In addition to harassing and threatening its physicians, EmCare has instructed

customer service representatives to fraudulently sign unsigned claim forms on behalf of physicians. This practice is in violation of CMS signature requirements requiring authentication by the practitioner who provided the services for which reimbursement is being sought.

278. EmCare's billing coordinators maintain detailed records attributing mid-level services to physicians by means of these signatures. These records track in the aggregate the specific services and billing codes derived from the charts each physician signs for mid-level providers. These records do not indicate that the services were performed entirely by a mid-level; rather, they misleadingly attribute those services (and their corresponding billing codes) to the physician who signed the chart.

279. On May 31, 2012, Sharon Reidy working for EmCare at the Providence Medical Center facility where Relator Dr. Caleb S. Hernandez, DO worked, and who was training others on to "do the billing for the ED," sent an e-mail to Dr. Hernandez noting that eight (8) charts were considered "incomplete" because Dr. Hernandez had not signed for mid-levels (*although that is in contravention of CMS documenting and billing certification requirements in the ED*). The e-mail was also carbon copied (CC) to Gary Wright and Greg Epperson of EmCare.

280. On May 31, 2012, Michelle Serrano, EmCare-West Division Billing Coordinator, also sent an e-mail to all of the Emergency Department Physicians at the Providence Medical Center facility concerned stating:

> This is a reminder message that ***all ED charts need to be electronically signed*** by the attending Physician. If these charts have been signed by the Physician Assistant, ***RTI (billing) also requires*** the attending Physicians signature. This **rule** has not changed since moving to Epic. So, please remember to go back and co-sign those charts if needed.

*Id*. (emphasis added).

281. Gary Wright, MD, FACEP, Regional Medical Director, EmCare-West Division, had earlier requested this information from physicians also in an e-mail sent on

May 29, 2012.[67]

282. The experiences of EmCare employees confirm the unlawful lengths EmCare will pursue to obtain valuable physician signatures. Indeed, as noted earlier, *supra*, one RTI Call Center Supervisor was given a stack of CMS 1500 claims forms lacking physician signatures with instructions to distribute the forms to call center employees who should sign the forms on behalf of the physicians. This practice also violates the CMS requirements that "services provided/ordered be authenticated by the author" by means of a handwritten or electronic signature and that it be done so at the time that the service is rendered. *See* https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/se1419.pdf (at 1 of 4); *see also* MEDICARE PROGRAM INTEGRITY MANUAL, CHAPTER 3 - VERIFYING POTENTIAL ERRORS AND TAKING CORRECTIVE ACTIONS (Rev. 12772; Issued: 08-09-24), at § 3.3.2.4 (D); *see also id*. at § 3.3.2.5 ("All services provided to beneficiaries are expected to be documented in the medical record at the time they are rendered."); ¶¶ 185-187, *supra*. Instead, "providers need a system and software products that are protected against

---

[67] The providers concerned at Providence Medical Center included: Robert Doyle, Timothy Elliott, Ryan Geddes, Courtney Gray, Pamela Herbert, Joshua Hillen, Richard Jackson, Joseph Nieto, Charles Stewart, Ryan Weakley, Gary Wright. As per an e-mail sent on November 17, 2011, by Kimberly Harper, Senior Credentialing Specialist, West Division of EmCare, Inc., who was stationed at 1717 Main Street, Suite 5200 Dallas, TX 75201, EmCare West Division handled physicians and other providers at the Glen Oaks and Hunt Regional facilities (Mohanad Bakleh, MD, Violeta Bareikiene, MD, and David Okumbor, MD), at the Methodist Richardson Campbell and Bush/Renner facilities (Gary Gagnon, MD, Steven Hoel, DO, Jerome Lindsay, MD, and Shameem Nazeer, MD), at the Providence Medical Center and Saint John Hospital facilities (Lisa Casey, PA, Ryan Hall, DO, Richard Jackson, MD, Clarke Morton, MD, Thomas Pinson, MD, Ryan Weakley, MD, and Gary Wright, MD), at the St. Paul facility (Belinda Croff, PA and Michael Van Rainer, MD), among many others. The e-mail was carbon copied to Sean Williams (emcare.com); LaShawn Handy (emsc.net); Melissa Wilks (emcare.com); April Thurman (emcare.com); Cynthia McComb (emcare.com); Barbara James (emsc.net); Kathryn Jones (emcare.com) Crystal Stanley (emcare.com); Terri Harper (emcare.com); Terri Harper (emcare.com); Christina Plain (emcare.com); Ronald Jackson (emcare.com); Byron Scott (emcare.com); Janet Nelson (emcare.com); Scott Kizer (emcare.com); Brian Kenjarski; and Asim Usman (emcare.com).

modification, etc., and should apply adequate administrative procedures that correspond to recognized standards and laws." MEDICARE PROGRAM INTEGRITY MANUAL, Ch. 3, § 3.3.2.5 (B).

283. As also noted above, a former EmCare Billing Coordinator corroborated this practice, stating that EmCare required a physician's signature for every patient even if the physician did not treat the patient. The Billing Coordinator noted that this requirement was especially enforced for patients relying on Medicare or Medicaid coverage and was told that EmCare could bill at a higher rate with a physician signature on a chart than if only an mid-level provider signed the chart. Among the seven key pieces of information that the coordinator checked on each EMR received, the physician signature was mandatory, and EmCare impressed upon the coordinator that it was the most important piece of information because EmCare could not bill for physician services without it. If one of the key pieces of information, including the physician signature, was not included in a chart the coordinator forwarded, the chart would be returned to the coordinator to track down the information from the practitioner. *See* ¶ 183, *supra.*

284. Once the mid-level chart is signed by a physician, it automatically is sent to EmCare's coding and billing specialists, who reduce the falsified charts to CPT codes and select the physician's NPI for billing purposes, despite the fact that the physician performed no services at all. The NPI tied to the CPT code triggers the reimbursement rate CMS will apply. Thus, when EmCare uses a physician NPI to request reimbursement for mid-level services, CMS applies 100% of the physician rate to the request and, therefore, reimburses EmCare for the services of a mid-level as if a physician had performed them. This Mid-Level Scheme violates the FCA and state counterparts.

285. Importantly, the underlying EMRs are not submitted to CMS along with the claim for reimbursement, but EmCare must maintain the EMRs in case of a CMS audit. Thus, the manipulated charts provide some—*albeit, ultimately, flimsy*—cover for EmCare's fraudulent claims since the charts are made to superficially appear as if shared visits occurred. EmCare's stockpiles of manipulated EMRs cannot ultimately provide plausible

deniability in the case of an audit, as CMS has made clear that a physician's signature and statement of supervision alone are insufficient to support a shared visit claim.

286. EmCare employees are in siloed departments, with different departments—*sometimes even different legal entities*—handling chart completion, coding, billing, and customer service, respectively. These employees rarely communicate with one another. This ensures that no individual employee will be able to see the whole picture and detect the Mid-Level Scheme. Nonetheless, they are coordinated by the EmCare Defendants, as evident and noted in a review of all the specific examples in this Amended Complaint.

287. EmCare has employed this company-wide Mid-Level Scheme despite knowing it violates CMS requirements and results in the submission of false claims for overpayment to CMS. As early as 2007, EmCare published an internal policy in its Employee Handbook making it clear that submitting mid-level charts for reimbursement from CMS at the full physician rate was prohibited absent an actual face-to-face patient encounter by the physician.

288. Despite its knowledge of CMS regulations, EmCare has implemented a detailed Mid-Level Scheme that wholly ignores and contradicts CMS regulations and its own claimed policy regarding the submission of claims under the appropriate NPR and the proper documentation of shared visits. Accordingly, it is apparent that EmCare willfully has designed and perpetrated the Mid-Level Scheme with full knowledge of its unlawfulness. Thus, each fraudulent claim for mid-level services EmCare has submitted to CMS has been submitted with the requisite knowledge under the FCA. *See* 31 U.S.C. § 3729.

289. EmCare also submits these false claims to CMS and other government payers with knowledge of the falsity underlying the EMRs (*i.e.*, knowledge that a shared visit did not truly occur despite the physician attestations and signatures on the EMRs) and the falsity of the resulting claims for reimbursement at the full physician rate for services *never* provided by a physician. At the very least, EmCare submits a claim with reckless disregard for the truth or falsity of the information upon which the claims are made.

290. As with all practices within its model, EmCare systematically perpetrates the Mid-Level Scheme nationwide. Relators observed the exact same policies and procedures regarding mid-level charting and physician countersignatures at each of the 4 EmCare emergency departments they have worked in around the country. Additionally, the uniformity of EmCare's information systems, procedures, policies, training, and penalties confirms that the Mid-Level Scheme is embedded in EmCare's business model. Furthermore, reports of former EmCare customer service representatives who fielded persistent billing inquiries from patients across the country as to why the patients were being billed for physician services when they had not been seen by a physician confirm the pervasiveness of the Mid-Level Scheme.

291. EmCare's Mid-Level Scheme violates CMS regulations governing reimbursement for E/M services performed by mid-levels and thus the FCA, particularly those identified in the MEDICARE subsection and THE INTRODUCTION TO THE MID-LEVEL SCHEME subsection, *supra*.

292. In addition to all the direct admissions and examples of concerted action and of the EmCare Defendants functioning as separate departments of one company, it should also be noted that EmCare could not have fully executed the three schemes described above without conspiring with ScribeAmerica (*in addition to the evident concerted action and the admissions of practices that include becoming thought partners, etc*.), who provided also training related to the schemes and ensured scribe compliance with the schemes and, as noted in ¶¶ 51-94, 99-112, § VII, particularly ¶¶ 145-156, 193-289, and § VIII, *herein*, and without its concerted action with RTI, wherein RTI executed the billing consistent with and without questioning those schemes, as also evidenced and attested to in the accounts of RTI personnel and EmCare, Inc. personnel noted, *supra*. The extent of the false billing is strong evidence of RTI's participation in EmCare's conspiracy with ScribeAmerica, particularly in light of the afore-referenced factual accounts and examples, as well as REPRESENTATIVE EXAMPLES OF FALSE CHARTS AND BILLINGS, § VIII, provided below. A reputable billing company that was actually independent of EmCare, Inc. would monitor for such schemes

and would not cooperate in the implementation when detected. Instead, and as noted in the accounts above, RTI communicated to and through EmCare, Inc. personnel to ensure that physician charting included the features that it could then knowingly bill to CMS and it even complained when those features were absent.

## VIII. REPRESENTATIVE EXAMPLES OF FALSE CHARTS AND BILLINGS[68]

293. As indicated in the following allegations referencing patient charts, Defendants' schemes continue to the present and result in billings to government payors.

### A. PATIENT 1 (Date of Service on or About April 30, 2021):

294. The facts reflecting evident use of the fraudulent schemes—*in this case, the Mid-Level Scheme and the Scribe Scheme*—are present in Patient 1's chart. The chart for Patient 1, a Medicare patient,[69] demonstrates the Mid-Level Scheme because even though the chart is in different levels of completion, it shows what the physician is being required to cosign and—*as is evident from other exhibits*—that the patient left an hour before the record shows being seen by the physician. Thus, the physician could never have taken part in a shared visit in conformity with CMS standards.

---

[68] For purposes of complying with privacy interests, complying with HIPAA, and safeguarding protected health information, pursuant to HIPAA requirements, Relators identify patients by number. Relators can provide additional identifiers for all patients referenced in this Amended Complaint upon request by Defendants once a protective order in compliance with HIPAA requirements is in place, or an order of the Court, in compliance with HIPAA and associated governing law. *See* Pub. L. No. 104-191, 110 Stat. 1936 (1996); *see also U.S. ex rel. Lane v. Murfreesboro Dermatology Clinic, PLC*, No. 4:07-CV-4, 2010 WL 1926131, at *4 (E.D. Tenn. May 12, 2010), *amended sub nom. United States ex rel. Lane v. Mufreesboro Dermatology Clinic, PLC*, No. 4:07-CV-4, 2012 WL 13118450 (E.D. Tenn. Mar. 20, 2012) (HIPAA); *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 471 (6th Cir. 2011). Whenever a physician or a mid-level (NPP) is mentioned, they are an employee of EmCare. Whenever a scribe is mentioned, they are an employee of ScribeAmerica unless stated otherwise.

[69] TRICARE For Life (TFL) is Medicare-wraparound coverage if someone is TRICARE-eligible and has Medicare Part A and B, regardless of age or place of residence. Coverage is only for those with Medicare and who are TRICARE-eligible. https://www.tricare.mil/Plans/HealthPlans/TFL.

295. Patient 1's chart also refers to what time and by whom the patient was seen. The chart notes that the patient was seen by the mid-level at 5:16 p.m., but was not even "assigned" by the mid-level to the physician until 8:02 p.m. Significantly, given how EmCare utilizes the software chart program, a doctor is not even notified that the mid-level is assigning a patient to the doctor until the mid-level files the assignment, which in this case was 8:02 p.m. There is no way the physician supervised the mid-level if the physician did not even know about the treatment that the mid-level was providing or that the mid-level was thinking of later sending the assignment, when that assignment was ultimately filed, to the physician.

296. Patient 1's chart also demonstrates that the doctor has not had access to the chart. In the chart, which is an example of a "canned note,", the scribe placed information in the chart that the doctor could not have even known about, let alone directed or performed on the patient. Scribes should document only what they are actually seeing done by the physician; they are not to force information into the chart that is then practically impossible for a doctor to remove, particularly, as with the Mid-Level Scheme, when physicians are pressured and threatened by EmCare to approve and attest to such false information. The work process of the electronic charts and the notification system only send relevant information to the physician, such as the notification that he has been "assigned" a patient for cosigning until after the mid-level and the mid-level's scribe file their information and send it to the physician, *i.e.*, the "file time." Before this happens, the physician has no notification of what the mid-level and scribes have been entering or even doing.

297. The chart also notes the physician is "directing" the care. This is not only false, given the background information, but it is also non-compliant with CMS standards for a true shared visit. This patient was gone for two hours, rendering a true shared visit impossible.

298. The chart also shows that it was impossible for the physician to have a truthful face-to-face encounter charted for the patient because the time listed for the mid-level provider is "10:02." During their time in the emergency department, physicians have their

own patients to see and are only sent charts for cosign by mid-levels as something collateral to the care they are providing after the fact. This means that physicians—who are busy saving the lives of their own patients during their shift—will typically only have time to see the mid-level provider charts that they have been sent to cosign at the end of their shift, having never seen (nor ever having the opportunity to see) the patient for whom they are being asked to cosign. Evidence of this practice is also apparent in Patient 1's chart, which reflects a box for chart completion and lists the number of charts that a physician is being compelled by EmCare to "complete." Roughly half of such charts are mid-level charts for which a physician is being asked to cosign and provide an attestation for billing as a shared visit despite the fact that the physician has not conducted any face-to-face visit with the patient and was not even assigned the chart until the patient was already dispositioned from the emergency department.

299. Patient 1's chart also shows that the patient was discharged at 5:37 p.m. Because the "file time" was 8:02 p.m., this shows that it was impossible for the physician to have a true shared visit or for the physician to have seen the patient face-to-face because the physician did not even see the chart until 10:34 p.m. The shared visit billed along with this visit is therefore fraudulent and a false claim.

300. The names of the personnel involved on the chart are: (**1**) Jason McDowell, NP, Nurse Practitioner; (**2**) Relator Chionesu Sonyika, M.D., Physician; and (**3**) Christopher Aiken, Scribe.

301. The location is Piedmont Fayette Hospital, Fayetteville, Georgia.

302. Although the Relators do not have ready access to billings given the way that EmCare has segregated billings from physicians, the payor concerned was indeed billed with a statement date of July 21, 2021, being billed under the Physician's NPI in violation of CMS certification requirements.[70] (Relators only had access to two (2) bills of all the

---

[70] *See* Pub. L. No. 104-191, 110 Stat. 1936 (1996); *see also U.S. ex rel. Lane v. Murfreesboro Dermatology Clinic, PLC*, No. 4:07-CV-4, 2010 WL 1926131, at *4 (E.D. Tenn. May 12, 2010), *amended sub nom. United States ex rel. Lane v. Mufreesboro*

charts concerned: of those, 100% of the charts that were so accessed were billed.) In short, every single time that the Relators have been able to follow the charts to the point of seeing the bill, there has been a bill to a government payor for that chart: 100% of the time.

### B. Patient 2 (Date of Service on or About April 27, 2021):

303. The facts reflecting evident use of the fraudulent schemes—in this case the Critical Care Scheme and the Scribe Scheme—are present in the chart for Patient 2, a Medicaid patient.

304. Patient 2's chart shows that the scribe is creating the critical care note, which can be seen with regard to the core measures, sepsis protocol, and critical care attestations of the chart. It appears that all of this information was created by the scribe and are "canned notes," *i.e.*, examples of pre-populated text. Scribes have no critical care training that would give them the capacity to make a judgment call as to what actually is critical care pursuant to CMS guidelines. Nurses know that they are not qualified to make a judgment as to critical care, but scribes, who have no medical licensed training even approaching that of a nurse, have been falsely informed by ScribeAmerica and EmCare that they have been trained better at determining critical care than doctors. Significantly, scribes are also emboldened by the false notion that if they have entered something improperly, the coders and billers will not bill for it.

305. The chart also shows how scribes insert into the charts services and procedures for which EmCare bills. The chart reveals that the patient was not on a critical care floor but was on a "regular" floor. The "***" identified in the charts shows where there is a canned note awaiting input at a later time. In the context of Defendants' schemes, scribes have a computer that includes a number of items they are instructed to click to add to the chart. As per conversations Relators had with scribes working under EmCare's direction, scribes are instructed to click items such as "smoking cessation" whenever possible. Scribes

---

*Dermatology Clinic, PLC*, No. 4:07-CV-4, 2012 WL 13118450 (E.D. Tenn. Mar. 20, 2012) (HIPAA); *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 471 (6th Cir. 2011).

admitted that they are encouraged to do so because there is no way that the government can know what is happening because critical care is "pass-through billing."

306. The chart also shows that the scribe provided the critical care core measures and counseling information. If anyone amends the note, even a scribe, the doctor has to re-sign, which is evident in the chart. The different dates noted in the chart for when the physician saw the patient, when the scribe added new information, and when the physician was then compelled to attest to what the scribe added are all present in the chart.

307. The names of the personnel involved in the chart are: (**1**) Chelesie Leath, Scribe; and (**2**) Relator Chionesu Sonyika, M.D., Physician.

308. The location is Piedmont Fayette Hospital, Fayetteville, Georgia.

### C. PATIENT 3 (Date of Service on or About April 30, 2021):

309. The facts reflecting evident use of the fraudulent schemes—*in this case, the Mid-Level Scheme and the Scribe Scheme*—are present in the chart for Patient 3, a Medicare patient.

310. Patient 3's chart shows the Mid-Level Scheme along with the Scribe Scheme. The chart shows a discrepancy between when the mid-level saw the patient and when the physician provided an attestation. The chart shows that the mid-level saw the patient at "14:58," while the physician did not even get the chart until "19:56" and did not know before then that the mid-level would later send the chart to the physician. According to the chart, the scribe entered all of the notes.

311. The chart shows the time of service as being 11:23 a.m., with radiology at 12:41 p.m., medicines at 2:58 p.m., and the mid-level and scribe finishing their notes at 2:58 p.m. Most significantly, however, the patient was discharged at 3:12 p.m., hours before the physician even saw the chart and was then asked to "cosign" an attestation for a shared visit at 7:53 p.m. A shared visit with the required face-to-face component was impossible under these facts.

312. The names of the personnel involved in the chart are: (**1**) Christopher Aiken, Scribe; (**2**) Jason McDowell, NP, Nurse Practitioner; and (**3**) Jestina S. Mason, MD, Physician.

313. The location is Piedmont Fayette Hospital, Fayetteville, Georgia.

314. Although the Relators do not have ready access to billings given the way that EmCare has segregated billings from physicians, the payor concerned was indeed billed with a statement date of May 14, 2021, billed under the Physician's NPI in contravention of CMS certification requirements.[71] (Relators only had access to two (2) bills of all the charts concerned: of those, 100% of the charts that were so accessed were billed.) In short, every single time that the Relators have been able to follow the charts to the bill, there has been a billing to a government payor for that chart—100% of the time.

**D. PATIENT 4 (Date of Service on or About May 2, 2021):**

315. The chart for Patient 4, a Medicare patient, is an example of the Mid-Level Scheme. The chart shows via the time entries that the physician did not even know the patient was assigned to the physician until after the mid-level sent the assignment to the doctor. The background information demonstrates that a true shared visit was an impossibility.

316. The chart is an example of the Scribe Scheme and the Mid-Level Scheme. The "***" shows that the field is empty and that this is a "canned template" entered by the scribe. Every "***" in the progress notes shows that the scribe is selecting what will ultimately be billed as physician treatment even though there is no physician treatment that has happened yet: the physician is left only as a "***" in this chart, having not even been selected by the mid-level at this point. The "Time Seen By Mid-Level Provider" is "17:08," which is signed as if it were completed, although nothing has been filled in. This shows that

---

[71] *See* Pub. L. No. 104-191, 110 Stat. 1936 (1996); *see also U.S. ex rel. Lane v. Murfreesboro Dermatology Clinic, PLC*, No. 4:07-CV-4, 2010 WL 1926131, at *4 (E.D. Tenn. May 12, 2010), *amended sub nom. United States ex rel. Lane v. Mufreesboro Dermatology Clinic, PLC*, No. 4:07-CV-4, 2012 WL 13118450 (E.D. Tenn. Mar. 20, 2012) (HIPAA); *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 471 (6th Cir. 2011).

the scribe is populating the progress notes as a matter of course. Given how charting functions, the mid-level had not even started clicking boxes on the computer at the time the scribe started entering this information. In fact, if a physician had seen the patient at this time, the chart would show "Time Seen By Physician" alongside "Time Seen By Mid-Level Provider." Thus, all information the scribe entered charted attestations that the work had been done, even though the physician had not seen the patient.

317. The chart reflects time disparities proving an example of the Mid-Level Scheme. The most recent of the "Recent Notes" shows the chart was last notated at "19:28" on "Yesterday." The "Progress Notes" show the patient was discharged at "20:09," but the mid-level attestation sent the chart to the physician at "20:14." The physician did not see the chart until roughly 2:00 a.m. the next day, long after discharge.

318. The names of the personnel involved in the chart are: (**1**) Mackenzie Keith, Scribe; (**2**) Paula O Brathwaite, MD, Physician; and (**3**) Rachel A Helms, NP, Nurse Practitioner.

319. The location is Piedmont Fayette Hospital, Fayetteville, Georgia.

**E. PATIENT 5 (Date of Service on or About April 26, 2021):**

320. The chart for Patient 5, a Medicaid patient, shows entries by the scribe similar to what is required by mid-levels by EmCare in the Mid-Level Scheme and it also shows the Scribe Scheme through the "counseling" and "smoking cessation" entries on the chart, as noted further below. These entries were auto-populated, since the counseling did not happen. This chart also shows that a physician does not have the option to get rid of the information after the scribe enters it. The "cancel" command merely means the chart is not "completed" but will remain in limbo.

321. The chart also demonstrates that the scribe added information after the physician had seen the patient and left. The physician originally saw the patient on Monday. The scribe then added information on Tuesday, and the physician was compelled to approve what had been added to the chart, which he did on Friday.

322. The names of the personnel involved in the chart are: (**1**) Chelesie Leath, Scribe; and (**2**) Relator Chionesu Sonyika, M.D., Physician.

323. The location is Piedmont Fayette Hospital, Fayetteville, Georgia.

**F. PATIENT 6 (Date of Service on or About April 30, 2021):**

324. The chart for Patient 6, a Medicaid patient, shows that the scribe selected smoking cessation simply because the patient was a smoker. The chart also shows that the scribe supplied an entire "canned" portion of the chart not because it was witnessed, but as part of the scribe's instructions from ScribeAmerica and EmCare. The physician, however, confirmed that the patient did not receive smoking cessation counseling.

325. The names of the personnel involved in the chart are: (**1**) Shreya Kankunta, Scribe; and (**2**) Relator Chionesu Sonyika, M.D., Physician.

326. The location is Piedmont Fayette Hospital, Fayetteville, Georgia.

**G. Patient 7 (Date of Service on or About April 30, 2021):**

327. The chart for Patient 7, a Medicaid patient, is a clear example of the Mid-Level Scheme and the Scribe Scheme. According to this chart, the physician whom the mid-level and scribe assigned to see the patient did not do so until four hours after discharge—making a properly billable shared visit an obvious impossibility.

328. The names of the personnel involved in the chart are: (**1**) Christopher Aiken, Scribe; (**2**) Relator Chionesu Sonyika, M.D., Physician; and (**3**) Jason McDowell, NP, Nurse Practitioner.

329. The location is Piedmont Fayette Hospital, Fayetteville, Georgia.

**H. PATIENT 8 (Date of Service on or About May 2, 2021):**

330. The chart for Patient 8, a Medicaid patient, shows all of the features of fraud that are evident in Patient 4's chart, but with regard to another patient. The same schemes are demonstrated on this chart in the same ways.

331. The chart shows that the patient was discharged before the physician saw the patient. This can be seen from the fact that the most recent note in the chart's "Recent Notes" section is "Yesterday at 17:51." The patient was discharged at roughly "20:29." All

decisions in the "Progress Notes" were done the day before the physician even accessed the chart, which can be noted by referring to the "Progress Notes." The chart has no "Time Seen By Physician" entry, and the physician attestation has not been added, although EmCare used its machinery to send the chart to the physician to have a "cosign" added in an attestation for purposes of submitting a shared visit billing.

332. The names of the personnel involved in the chart are: (**1**) Mackenzie Keith, Scribe; (**2**) Rachel Helms, NP, Nurse Practitioner; and (**3**) Paula O Brathwaite, MD, Physician.

333. The location is Piedmont Fayette Hospital, Fayetteville, Georgia.

**I. PATIENT 9 (Date of Service on or About April 24, 2021):**

334. The chart for Patient 9, a Medicare patient, demonstrates the Mid-Level Scheme by identifying "Time Seen By Mid-Level Provider," while not including "Time Seen By Physician." Significantly, the physician did not see the patient since the physician did not even access the chart until four hours after the mid-level filed the note.

335. The chart shows that the physician did not even access the chart until after the patient was discharged. The patient was discharged at 10:35 p.m., but the physician did not access the chart until 2:26 a.m. the following day. The only thing the doctor provided was an electronic signature after the fact for what was billed as a shared visit.

336. The chart also demonstrates the Mid-Level Scheme by providing a picture of two days of care. On the first, the doctor was never involved in the care. The patient was discharged at 10:35 p.m. on Saturday, but the doctor was not sent the chart for attestation until 11:01 p.m. ("Filed"). The physician attestation shows the physician signed the chart on Sunday at 2:26 a.m. "Cosign Needed" is listed on the second day.

337. The names of the personnel involved in the chart are: (**1**) Rachel A. Helms, NP, Nurse Practitioner; and (**2**) Jason Gordon, MD, Physician.

338. The location is Piedmont Fayette Hospital, Fayetteville, Georgia.

///

///

**J. PATIENT 10 (Date of Service on or About April 24, 2021):**

339. The chart for Patient 10, a Medicare patient, is an example of the Mid-Level Scheme. The chart shows the physician did not see the chart until 2:38 a.m., long after the patient had already been sent to another floor (no longer in the emergency department).

340. The names of the personnel involved in the chart are: (**1**) Christopher Aiken, Scribe; (**2**) Jason McDowell, NP, Nurse Practitioner; and (**3**) Relator Chionesu Sonyika, M.D., Physician.

341. The location is Piedmont Fayette Hospital, Fayetteville, Georgia.

**K. PATIENT 11 (Date of Service on or About May 2, 2021):**

342. The chart for Patient 11, a Medicaid patient, shows a clear example of the Mid-Level Scheme. The mid-level discharged the patient at 7:52 p.m. ("Yesterday at 19:52"); nonetheless, the mid-level submitted the chart to the physician for an attestation at 8:23 p.m., as noted from the time it was "Filed." It was "cosigned" at 1:39 a.m. the following day.

343. The names of the personnel involved in the chart are: (**1**) Susan Davies, PA, Physician Assistant; and (**2**) Relator Chionesu Sonyika, M.D., Physician.

344. The location is Piedmont Fayette Hospital, Fayetteville, Georgia.

**L. PATIENT 12 (Date of Service on or About May 2, 2021):**

345. The chart for Patient 12, a Medicaid patient, shows both the Critical Care Scheme and the Scribe Scheme. The scribe included "canned content," such as "smoking cessation" counseling, in the chart for fraudulent billing purposes. The chart shows the scribe added the "canned language" for critical care despite the fact that the chart also lists the patient's condition as fair. The "***" at the end of the chart demonstrates that the chart was awaiting physician attestation at the time the scribe entered these determinations.

346. The names of the personnel involved in the chart are: (**1**) Wasiu Adisa, DO, Physician; and (**2**) Chelesie Leath, Scribe.

347. The location is Piedmont Fayette Hospital, Fayetteville, Georgia.

///

### M. 140 OTHER PATIENT EXAMPLES:

348. Relators have a list of one hundred and forty (140) additional patients evidencing these schemes in their charts which can be provided if the Court concludes that not enough specific examples of the Defendants creating and entering false records as part of an orchestrated billing system have been provided in the Complaint to give the Defendants notice of the nature of the fraud against which they would have to defend.[72] As is also evident—*in light of these examples*—from the accounts provided in this Amended Complaint, *supra*, where Billing Coordinators and other EmCare personnel reach out to providers in e-mails, there were numerous providers under whose NPIs these practices were billed as a standard course. Those accounts identify individuals concerned and providers at the various facilities where the Relators have worked.[73]

---

[72] In this, it should be noted that the entire purpose of the false information, in the context provided, is to have such information billed, as per numerous alleged admissions of EmCare, *supra*, wherein these examples serve as reliable indicia, particularly in light of all of the circumstances, raising—*at the very least*—of false billings. Additionally, actual false billings have also been alleged. It is highly doubtful that the Defendants have taken such efforts simply because they simply like placing false information in medical records, doing so for free, so to speak, despite the fact that they are actually doing so as part of a *billing operation* with the specific features outlined in the aforementioned facts. *See* ¶¶ 51-94, 99-112, § VII, particularly ¶¶ 145-156, 193-289, and § VIII, *supra*. As noted, billing CMS is a central feature of the EmCare model.

[73] At Alamance Regional, Burlington, NC (2007-2010), the following personnel were concerned, wherein EmCare personnel pressured the providers to document in accordance with the Critical Care Scheme and the Mid-Level Scheme. EmCare leadership informed Relator Dr. Chionesu Sonyika during this time that all charts had to be documented at level 5, wherein EmCare could then bill and code in accordance with an algorithm that it used. In this, the EmCare leadership personnel were: Medical Director Bryan Carducc Contract Coordinator, EmCare, Sherry Winstead; and EmCare Coordinator, Yvette Mckensie. The physician providers were Dr. Margeret Bowe, Dr. Melissa De la Roza, Dr. Alice Finnell, Dr. David Gerlach, Dr. Devainder Goli, Dr. Sheryl Gottlieb, Dr. Eugene Griner, Dr. David Kaminski, Dr. Paul Malenda, Dr. Noelle Mclaurin, Dr. James McShane, Dr. Margeret Rosier, Dr. Barbara Stiehl, Dr. Jade Sung, Dr. Linda Taylor, Dr. Mike Greenberg, Dr. Jonathan Woody, Dr. Rebecca Lord, and Dr. Thomas Veldhouse. The mid-levels were, Janice Bacon, PA, Kevyn J Miller, PA, Todd Mundy, PA, Roger Page, PA,

## IX. COUNTS

**COUNT 1: FEDERAL FALSE CLAIMS ACT**

**(Presentation of False Claims for Payment)**

**31 U.S.C. § 3729(a)(1)(A)**

349. Relators re-allege and incorporate by reference paragraphs 1 – 346.

350. This a claim for treble damages and penalties under the FCA.

351. The FCA, 31 U.S.C. § 3729(a)(1)(A), imposes liability upon those who knowingly present or cause to be presented false claims for payment or approval.

352. Through the acts described above and otherwise, Defendants knowingly presented, or caused to be submitted, materially false or fraudulent claims for payment or approval to the United States by billing, or causing to be billed, federal health care programs for services that were not rendered, were up-coded, or were performed solely by non-physician practitioners (*i.e.*, mid-levels) in EmCare emergency departments but billed as if they were performed by or in conjunction with a physician in violation of 31 U.S.C. § 3729(a)(1).

353. Each of the false or fraudulent claims submitted, or caused to be submitted, by Defendants is a separate violation of 31 U.S.C. § 3729(a)(1)(A).

354. The United States was unaware of the false or fraudulent nature of the claims Defendants submitted or caused to be submitted.

355. The false or fraudulent claims Defendants knowingly submitted or caused to be submitted to the United States were material to the United States' decisions to pay claims.

356. Had the United States actually known of the false or fraudulent nature of the claims, it would have been prohibited by law from making corresponding payments.

---

Heather Ratclife, PA, Ronda Summers, PA, and Rob Tumey, PA. As per the accounts of Relator Dr. Caleb S. Hernandez, DO and Relator Dr. Chionesu Sonyika, MD, and as per the facts identified above, the Scribe Scheme was not yet being implemented during the time period that Dr. Sonyika worked at Alamance Regional.

357. Because of these false or fraudulent claims Defendants submitted or caused to be submitted, the United States has been damaged in an amount to be determined at trial.

**COUNT 2: FEDERAL FALSE CLAIMS ACT**

**(Use of False Statements Material to False Claims)**

**31 U.S.C. § 3729(a)(1)(B)**

358. Relators re-allege and incorporate by reference paragraphs 1 - 346.

359. This is a claim for treble damages and penalties under the FCA.

360. The FCA, 31 U.S.C. § 3729(a)(1)(B), imposes liability upon those who knowingly make, use, or cause to be made or used false records or statements material to a false or fraudulent claim.

361. Through the acts described above and otherwise, Defendants knowingly made, used, or caused to be made or used false records or statements material to the payment of false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

362. Defendants' false certifications and representations were made for the purpose of ensuring that the United States paid the false or fraudulent claims, which was a reasonable and foreseeable consequence of Defendants' statements and actions.

363. Each false record and statement material to a false or fraudulent claim submitted to the United States is a separate violation of 31 U.S.C. § 3729(a)(1)(B).

364. The United States was unaware of the falsity of the records, statements, and claims Defendants made or submitted and, because of the inaccuracy of these records or statements, authorized payments to be made, made such payments, and has been damaged.

365. The false records or statements were knowingly made by Defendants and were material to the United States' decisions to make payments.

366. Had the United States actually known of the false nature of Defendants' representations, it would have been prohibited by law from making corresponding payments.

367. Because of these false records or statements, the United States paid claims, resulting in damages to the United States in an amount to be determined at trial.

368. By reason of Defendants' actions, the United States has incurred and continues to incur damages.

**<u>COUNT 3: FEDERAL FALSE CLAIMS ACT</u>**

**(Conspiracy)**

**31 U.S.C. § 3729(a)(1)(C)**

369. Relators re-allege and incorporate by reference paragraphs 1 - 346.

370. This is a claim for treble damages and penalties under the FCA.

371. The FCA, 31 U.S.C. § 3729(a)(1)(C), imposes liability upon those who conspire to commit a violation of another sub-section of the FCA.

372. Through the acts described above and otherwise, Defendants, by and through their agents and employees, knowingly conspired to commit a violation of the FCA in the manner set forth in Counts I, II, and III above in violation of 31 U.S.C. § 3729(a)(1)(C).

373. Had the United States actually known of the false or fraudulent nature of Defendants' representations and claims, it would have been prohibited by law from making corresponding payments.

374. Because of these conspiracies, and the resulting false or fraudulent claims Defendants submitted or caused to be submitted, the United States paid the claims, resulting in damages to the United States in an amount to be determined at trial.

**<u>COUNT 4: CALIFORNIA FCA</u>**

375. Relators re-allege and incorporate by reference paragraphs 1 - 346.

376. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented false or fraudulent claims for payment or approval, in violation of Cal. Gov't Code § 12651(a)(1).

377. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used false records or statements material to false or fraudulent claims, in violation of Cal. Gov't Code § 12651(a)(2).

378. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the state of California and/or its political subdivisions, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the state of California and/or its political subdivisions, all in violation of Cal. Gov't Code § 12651(a)(7).

379. At minimum, Defendants were beneficiaries of an inadvertent submission of a false claim, and failed to disclose the false claim to the state of California and/or political subdivisions within the time set forth by statute after discovery of the false claim, in violation of Cal. Gov't Code § 12651(a)(8).

380. The state of California and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid for benefits funded by the state of California and/or its political subdivisions.

381. As a result of Defendants' actions, the state of California and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT 5: COLORADO MEDICAID FCA

382. Relators re-allege and incorporate by reference paragraphs 1 - 346.

383. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of Col. Rev. Stat. § 25.5-4-305(1)(a).

384. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used false records or statements material to false or fraudulent claims, in violation of Col. Rev. Stat. § 25.5-4-305(1)(b).

385. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used false records or statements material to an obligation to pay or transmit money to the state of Colorado in connection with the Colorado Medical Assistance Act, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the state of Colorado in connection with the Colorado Medical Assistance Act, all in violation of Col. Rev. Stat. § 25.5-4-305(1)(f).

386. The state of Colorado and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid for benefits funded by the state of Colorado and/or political subdivisions.

387. As a result of Defendants' actions, the state of Colorado and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT 6: CONNECTICUT FALSE CLAIMS ACT

388. Relators re-allege and incorporate by reference paragraphs 1 - 346.

389. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of Conn. Gen'l Stat. § 4-275(1).

390. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used false records or statements material to false or fraudulent claims, in violation of Conn. Gen'l Stat. § 4-275(2).

391. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid or decrease an

obligation to pay or transmit money to the state of Connecticut and/or its political subdivisions, in violation of Conn. Gen'l Stat. § 4-275(7).

392. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed, avoided or decreased an obligation to pay or transmit money to the state of Connecticut and/or its political subdivisions, in violation of Conn. Gen'l Stat. § 4-275(8).

393. The state of Connecticut and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid for benefits funded by the state of Connecticut and/or its political subdivisions.

394. As a result of Defendants' actions, the state of Connecticut and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT 7: DELAWARE FALSE CLAIMS AND REPORTING ACT

395. Relators re-allege and incorporate by reference paragraphs 1 - 346.

396. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented false or fraudulent claims for payment or approval, in violation of 6 Del. C. § 1201(a)(1).

397. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used false records or statements material to false or fraudulent claims, in violation of 6 Del. C. § 1201(a)(2).

398. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the state of Delaware and/or its political subdivisions, or knowingly conceals or knowingly and improperly avoids or

decreases an obligation to pay or transmit money to the state of Delaware and/or its political subdivisions, all in violation of 6 Del. C. § 1201(a)(7).

399. The state of Delaware and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid for benefits funded by the state of Delaware and/or its political subdivisions.

400. As a result of Defendants' actions, the state of Delaware and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT 8: DISTRICT OF COLUMBIA FCA

401. Relators re-allege and incorporate by reference paragraphs 1 - 346.

402. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented to an officer or employee of the District and/or its political subdivisions, false or fraudulent claims for payment or approval, in violation of D.C. Code § 2-308.14(a)(l).

403. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be used false records or statements to get false claims paid or approved by the District and/or its political subdivisions, in violation of D.C. Code § 2-308.14(a)(2).

404. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the District and/or its political subdivisions, in violation of D.C. Code § 2-308.14(a)(7).

405. The District of Columbia and/or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the

accuracy of these claims and/or statements, paid for benefits funded by the District and/or its political subdivisions.

406. As a result of Defendants' actions, the District of Columbia and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT 9: FLORIDA FCA**

407. Relators re-allege and incorporate by reference paragraphs 1 - 346.

408. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented to an officer or employee of the state of Florida and/or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Fla. Stat. § 68.082(2)(a).

409. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used false records or statements to get false or fraudulent claims paid or approved by the state of Florida and/or its political subdivisions, in violation of Fla. Stat. § 68.082(2)(b).

410. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the state of Florida and/or its political subdivisions, in violation of Fla. Stat. § 68.082(2)(g).

411. The state of Florida and/or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid for benefits funded by the state of Florida and/or its political subdivisions.

412. As a result of Defendants' actions, the state of Florida and/or its political subdivisions have been, and may continue to be, severely damaged.

///

## COUNT 10: GEORGIA STATE FALSE MEDICAID CLAIMS ACT

413. Relators re-allege and incorporate by reference paragraphs 1 - 346.

414. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented false or fraudulent claims for payment or approval, in violation of Ga. Code Ann. § 49-4-168.1(a)(1).

415. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used false records or statements material to false or fraudulent claims, in violation of Ga. Code Ann. § 49-4-168.1(a)(2).

416. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the state of Georgia and/or its political subdivisions, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the state of Georgia and/or its political subdivisions, all in violation of Ga. Code Ann. § 49-4-168.1(a)(7).

417. The state of Georgia and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid for recipients of benefits funded by the state of Georgia and/or its political subdivisions.

418. As a result of Defendants' actions, the state of Georgia and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT 11: HAWAII FCA

419. Relators re-allege and incorporate by reference paragraphs 1 - 346.

420. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing

to be presented, to an officer or employee of the state of Hawaii and/or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Haw. Rev. Stat. § 661-21(a)(l).

421. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made and used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the state of Hawaii and/or its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(2).

422. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the state of Hawaii and/or its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(7).

423. The state of Hawaii and/or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of Hawaii and/or its political subdivisions.

424. As a result of Defendants' actions, the state of Hawaii and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT 12: ILLINOIS FCA

425. Relators re-allege and incorporate by reference paragraphs 1 - 346.

426. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of 740 ILCS § 175/3(a)(1)(A).

427. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of 740 ILCS § 175/3(a)(1)(B).

428. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the state of Illinois and/or its political subdivisions, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the state of Illinois and/or its political subdivisions, all in violation of 740 ILCS § 175/3(a)(1)(G).

429. The state of Illinois and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of Illinois and/or its political subdivisions.

430. As a result of Defendants' actions, the state of Illinois and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT 13: INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT

431. Relators re-allege and incorporate by reference paragraphs 1 - 346.

432. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented, or caused to be presented, and may still be presenting or causing to be presented, false claims to the state of Indiana and/or its political subdivisions, for payment or approval, in violation of Ind. Code § 5-11-5.5-2(b)(l).

433. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information,

knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to obtain payment or approval of false claims from the state of Indiana and/or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(2).

434. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to avoid an obligation to pay or transmit money to the state of Indiana and/or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(6).

435. The state of Indiana and/or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for benefits funded by the state of Indiana and/or its political subdivisions.

436. As a result of Defendants' actions, the state of Indiana and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT 14: IOWA FCA

437. Relators re-allege and incorporate by reference paragraphs 1 - 346.

438. Defendants, in reckless disregard or deliberate ignorance for the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Iowa Code § 685.2(1)(a).

439. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Iowa Code § 685.2(1)(b).

440. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still me making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the state of Iowa and/or its political subdivisions, in violation of Iowa Code § 685.2(1)(g).

441. The state of Iowa and/or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid for benefits funded by the state of Iowa and/or its political subdivisions.

442. As a result of Defendants' actions, the state of Iowa and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT 15: LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW

443. Relators re-allege and incorporate by reference paragraphs 1 - 346.

444. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly offered or paid remuneration, including but not limited to kickbacks, bribes, or rebates, directly or indirectly, overtly or covertly, in cash or in kind:

(1) In return for referring an individual to a health care provider, or for referring an individual to another person for the purpose of referring an individual to a health care provider, for the furnishing or arranging to furnish any good, supply, or service for which payment may be made, in whole or in part, under the medical assistance programs;

(2) In return for purchasing, leasing, or ordering, or for arranging for or recommending purchasing, leasing, or ordering, any good, supply, or service, or facility for which payment may be made, in whole or in part, under the medical assistance programs;

(3) To a recipient of goods, services, or supplies, or his representative, for which payment may be made, in whole or in part, under the medical assistance programs; or

(4) To obtain a recipient list, number, name, or any other identifying information, all in violation of La. Rev. Stat. § 46:438.2(A).

445. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of La. Rev. Stat. § 46:438.3(A).

446. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of La. Rev. Stat. § 46:438.3(B).

447. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the State of Louisiana or its political subdivisions, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the state of Louisiana and/or its political subdivisions, all in violation of La. Rev. Stat. § 46:438.3(C).

448. The state of Louisiana and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of Louisiana and/or its political subdivisions.

449. As a result of Defendants' actions, the state of Louisiana and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT 16: MARYLAND FCA**

450. Relators re-allege and incorporate by reference paragraphs 1 - 346.

451. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of MD Code § 8-102(b)(1).

452. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of MD Code § 8-102(b)(2).

453. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to an obligation to pay or transmit money to the state of Maryland and/or its political subdivisions, in violation of MD Code § 8-102(b)(7).

454. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed, or knowingly and improperly avoided or decreased, an obligation to pay or transmit money to the state of Maryland and/or its political subdivisions, all in violation of MD Code § 8-102(b)(8).

455. At minimum, Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the

information, knowingly made any other false or fraudulent claim against a governmental entity, in violation of MD Code § 8-102(a)(9).

456. The state of Maryland and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of Maryland and/or its political subdivisions.

457. As a result of Defendants' actions, the state of Maryland and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT 17: MASSACHUSETTS FCA

458. Relators re-allege and incorporate by reference paragraphs 1 - 346.

459. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of Mass. Gen. Laws c. 12 § 5B(a)(1).

460. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Mass. Gen. Laws c. 12 § 5B(a)(2).

461. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the Commonwealth of Massachusetts and/or its political subdivisions, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the Commonwealth of Massachusetts and/or its political subdivisions, all in violation of Mass. Gen. Laws c. 12 § 5B(a)(9).

462. At minimum, Defendants were beneficiaries of an inadvertent submission of a false claim, and failed to disclose the false claim to the Commonwealth of Massachusetts and/or its political subdivisions within the time set forth by statute after discovery of the false claim, in violation of Mass. Gen. Laws c. 12 § 5B(a)(10).

463. The Commonwealth of Massachusetts and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the Commonwealth of Massachusetts and/or its political subdivisions.

464. As a result of Defendants' actions, the Commonwealth of Massachusetts and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT 18: MICHIGAN MEDICAID FCA**

465. Relators re-allege and incorporate by reference paragraphs 1 - 346.

466. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information involved, solicited or offered a kickback or bribe in connection with the furnishing of goods or services for which payment was or may be made in whole or in part pursuant to the Michigan Medicaid program, in violation of Mich. Stat. § 400.604.

467. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of Mich. Stat. § 400.607(1)

468. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Mich. Stat. § 400.603.

469. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the state of Michigan and/or its political subdivisions, all in violation of Mich. Stat. § 400.607(3).

470. The state of Michigan and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of Michigan and/or its political subdivisions.

471. As a result of Defendants' actions, the state of Michigan and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT 19: MINNESOTA FCA

472. Relators re-allege and incorporate by reference paragraphs 1 - 346.

473. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of Minn. Stat. § 15C.02(a)(1).

474. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Minn. Stat. § 15C.02(a)(2).

475. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid or decrease an

obligation to pay or transmit money to the state of Minnesota and/or its political subdivisions, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the State of Minnesota and/or its political subdivisions, all in violation of Minn. Stat. § 15C.02(a)(7).

476. The state of Minnesota and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of Minnesota and/or political subdivisions.

477. As a result of Defendants' actions, the state of Minnesota and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT 20: NEVADA FCA

478. Relators re-allege and incorporate by reference paragraphs 1 - 346.

479. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false claims for payment or approval, in violation of Nev. Rev. Stat. § 357.040(1)(a).

480. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain payment or approval of false claims, in violation of Nev. Rev. Stat. § 357.040(1)(b).

481. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the state of Nevada and/or its political subdivisions, in violation of Nev. Rev. Stat. § 357.040(1)(g).

482. The state of Nevada and/or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of Nevada and/or its political subdivisions.

483. As a result of Defendants' actions, the state of Nevada and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT 21: NEW JERSEY FCA

484. Relators re-allege and incorporate by reference paragraphs 1 - 346.

485. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented or caused to be presented, and may still be presenting or causing to be presented, to an employee, officer or agent of the state of New Jersey and/or its political subdivisions, or to any contractor, grantee, or other recipient of state and/or political subdivision funds, false or fraudulent claims for payment or approval, in violation of N.J. Stat. § 2A:32C-3(a).

486. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the state of New Jersey and/or its political subdivisions, in violation of N.J. Stat. § 2A:32C-3(b).

487. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the state of New Jersey and/or its political subdivisions, in violation of N.J. Stat. § 2A:32C-3(g).

488. The State of New Jersey, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of New Jersey and/or by its political subdivisions.

489. As a result of Defendants' actions, the state of New Jersey and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT 22: NEW MEXICO MEDICAID FCA

490. Relators re-allege and incorporate by reference paragraphs 1 - 346.

491. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.M.S.A. 1978 § 27-14-4(A).

492. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.M.S.A. 1978 § 27-14-4(C).

493. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the state of New Mexico and/or its political subdivisions, in violation of N.M.S.A. 1978 § 27-14-4(E).

494. The state of New Mexico and/or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of New Mexico and/or its political subdivisions.

495. As a result of Defendants' actions, the state of New Mexico and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT 23: NEW MEXICO FRAUD AGAINST TAXPAYERS ACT

496. Relators re-allege and incorporate by reference paragraphs 1 - 346.

497. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.M.S.A. 1978 § 44-9-1(A)(1).

498. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.M.S.A. 1978 § 44-9-1(A)(2).

499. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the state of New Mexico and/or its political subdivisions, in violation of N.M.S.A. § 44-9-1(A)(4).

500. The state of New Mexico and/or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of New Mexico and/or its political subdivisions.

501. As a result of Defendants' actions, the state of New Mexico and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT 24: NEW YORK FCA

502. Relators re-allege and incorporate by reference paragraphs 1 - 346.

503. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.Y. State Fin. Law § 189(1)(a).

504. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.Y. State Fin. Law § 189(1)(b).

505. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to an obligation to pay or transmit money to the state of New York and/or its political subdivisions, in violation of N.Y. State Fin. Law § 189(1)(g).

506. The state of New York and/or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of New York and/or its political subdivisions.

507. As a result of Defendants' actions, set forth above, the state of New York and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT 25: NORTH CAROLINA FCA

508. Relators re-allege and incorporate by reference paragraphs 1 - 346.

509. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be

presented false or fraudulent claims for payment or approval, in violation of NC Stat. § 1-607(a)(1).

510. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of NC Stat. § 1-607(a)(2).

511. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the state of North Carolina and/or its political subdivisions, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the state of North Carolina and/or its political subdivisions, all in violation of NC Stat. § 1-607(a)(7).

512. The state of North Carolina and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of North Carolina and/or its political subdivisions.

513. As a result of Defendants' actions, the state of North Carolina and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT 26: OKLAHOMA FCA

514. Relators re-allege and incorporate by reference paragraphs 1 - 346.

515. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of Okla. Stat., tit. 63 § 5053.1.B.1.

516. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get a false or fraudulent claim paid or approved by the state, in violation of Okla. Stat., tit. 63 § 5053.1.B.2.

517. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the state of Oklahoma and/or its political subdivisions, in violation of Okla. Stat., tit. 63 § 5053.1.B.7.

518. The state of Oklahoma and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of Oklahoma and/or its political subdivisions.

519. As a result of Defendants' actions, the state of Oklahoma and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT 27: RHODE ISLAND FCA

520. Relators re-allege and incorporate by reference paragraphs 1 - 346.

521. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Rhode Island and/or its political subdivisions, or a member of Rhode Island's National Guard, false or fraudulent claims for payment or approval, in violation of R.I. Gen. Laws § 9-1.1-3(a)(1).

522. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false

records or statements to get false or fraudulent claims paid or approved by the State of Rhode Island and/or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(2).

523. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the state of Rhode Island and/or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(7).

524. The state of Rhode Island and/or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of Rhode Island and/or its political subdivisions.

525. As a result of Defendants' actions, the state of Rhode Island and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT 28: TENNESSEE FCA AND/OR TENNESSEE MEDICAID FCA

526. Relators re-allege and incorporate by reference paragraphs 1 - 346.

527. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of Tenn. Code § 4-18-103(a)(1) and/or § § 71-5-182(a)(1)(A).

528. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get a false or fraudulent claim paid or approved by the state of Tennessee and/or its political subdivisions, in violation of Tenn. Code § 4-18-103(a)(2) and/or § 71-5-182(a)(1)(B).

529. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the state of Tennessee and/or its political subdivisions, in violation of Tenn. Code § 4-18-103(a)(7) and/or § 71-5-182(a)(1)(D).

530. At minimum, Defendants were beneficiaries of an inadvertent submission of a false claim, and failed to disclose the false claim to the state of Tennessee and/or its political subdivisions within a reasonable time after discovery of the false claim, in violation of Tenn. Code § 4-18-103(a)(8).

531. The state of Tennessee and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of Tennessee and/or its political subdivisions.

532. As a result of Defendants' actions, the state of Tennessee and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT 29: TEXAS MFPA

533. Relators re-allege and incorporate by reference paragraphs 1 - 346.

534. Defendants, in reckless disregard of or conscious indifference to the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the benefit or payment that is authorized.

535. Defendants, in reckless disregard of or conscious indifference to the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose information that permitted a person

to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the benefit or payment that was authorized.

536. Defendants, in reckless disregard of or conscious indifference to the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, caused to be made, induced, or sought to induce the making of a false statement or misrepresentation of material fact concerning information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program.

537. Defendants, in reckless disregard of or conscious indifference to the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented a claim for payment under the Medicaid program for a service rendered by a person who was not licensed to render the service, if a license is required, or was not licensed in the manner claimed.

538. Defendants, in reckless disregard of or conscious indifference to the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made a claim under the Medicaid program for a service that had not been approved or acquiesced in by a treating physician or health care practitioner.

539. Defendants, in reckless disregard of or conscious indifference to the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made a claim under the Medicaid program and knowingly failed to indicate the type of license and the identification number of the licensed health care provider who actually provided the service.

540. Defendants conspired to commit the violations of the Texas MPFA at § 36.002, subds. (1), (2), (4), (6), (7), and (8).

541. The state of Texas and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on

the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of Texas and/or its political subdivisions.

542. As a result of Defendants' actions, the state of Texas and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT 30: VERMONT FCA**

543. Relators re-allege and incorporate by reference paragraphs 1 - 346.

544. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of VT Stat. § 631(a)(1).

545. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of VT Stat. § 631(a)(2).

546. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, a claim that includes items or services resulting from a violation of 13 V.S.A. chapter 21 ["Bribery"] or section 1128B of the Social Security Act, 42 U.S.C. § 1320A-7b [Medicare/Medicaid Anti-Kickback Statute], in violation of VT Stat. § 631(a)(2)

547. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to an obligation to pay or transmit money to the state of Vermont and/or its political subdivisions, in violation of VT Stat. § 631(a)(9).

548. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the state of Vermont and/or its political subdivisions, in violation of VT Stat. § 631(a)(10).

549. At minimum, Defendants were beneficiaries of an inadvertent submission of a false claim, and failed to disclose the false claim to the state of Vermont and/or political subdivisions within the time set forth by statute after discovery of the false claim, in violation of VT Stat. § 631(a)(11).

550. The state of Vermont and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of Vermont and/or its political subdivisions.

551. As a result of Defendants' actions, the state of Vermont and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT 31: VIRGINIA FRAUD AGAINST TAXPAYERS ACT

552. Relators re-allege and incorporate by reference paragraphs 1 - 346.

553. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of VA Code § 8.01-216.3(A)(1).

554. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of VA Code § 8.01-216.3(A)(2).

555. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the Commonwealth of Virginia and/or its political subdivisions, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the Commonwealth of Virginia and/or its political subdivisions, all in violation of VA Code § 8.01-216.3(A)(7).

556. The Commonwealth of Virginia and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the Commonwealth of Virginia and/or its political subdivisions.

557. As a result of Defendants' actions, the Commonwealth of Virginia and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT 32: WASHINGTON STATE MEDICAID FRAUD FCA

558. Relators re-allege and incorporate by reference paragraphs 1 - 346.

559. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of RCW § 74.66.020(1)(a).

560. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of RCW § 74.66.020(1)(b).

561. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information,

knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the state of Washington and/or its political subdivisions, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the state of Washington and/or its political subdivisions, all in violation of RCW § 74.66.020(1)(g).

562. The state of Washington and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the state of Washington and/or its political subdivisions.

563. As a result of Defendants' actions, the state of Washington and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT 33: BROWARD COUNTY FALSE CLAIMS ORDINANCE

564. Relators re-allege and incorporate by reference paragraphs 1 - 346.

565. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of Broward Cty Ord. § 1-279(a)(1).

566. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get a false, fraudulent or inflated claims paid or approve by the County of Broward and/or its political subdivisions, in violation of Broward Cty Ord. § 1-279(a)(2).

567. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or

causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the County of Broward and/or its political subdivisions, in violation of Broward Cty Ord. § 1-279(a)(7).

568. At minimum, Defendants were beneficiaries of an inadvertent submission of a false claim, and failed to disclose the false claim to Broward County and/or its political subdivisions within the time set forth by statute after discovery of the false claim, in violation of Broward Cty Ord. § 1-279(b).

569. The County of Broward and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the County of Broward and/or its political subdivisions.

570. As a result of Defendants' actions, the County of Broward and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT 34: CHICAGO FCA

571. Relators re-allege and incorporate by reference paragraphs 1 - 346.

572. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of Chicago Ord. § 1-22-020(1).

573. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the City of Chicago and/or its political subdivisions, in violation of Chicago Ord. § 1-22-020(2).

574. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information,

knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the City of Chicago and/or its political subdivisions, all in violation of Chicago Ord. § 1-22-020(7).

575. The City of Chicago and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the City of Chicago and/or its political subdivisions.

576. As a result of Defendants' actions, the City of Chicago and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT 35: COUNTY OF ALLEGHENY [PA] FALSE CLAIMS ORDINANCE

577. Relators re-allege and incorporate by reference paragraphs 1 - 346.

578. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of Allegheny Cty Ord. § 485-2(A)(1).

579. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Allegheny Cty Ord. § 485-2(A)(2).

580. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the County of Allegheny and/or its political subdivisions, all in violation of Allegheny Cty Ord. § 485-2(A)(7).

581. The County of Allegheny and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the County of Allegheny and/or its political subdivisions.

582. As a result of Defendants' actions, the County of Allegheny and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT 36: MIAMI-DADE COUNTY FALSE CLAIMS ORDINANCE

583. Relators re-allege and incorporate by reference paragraphs 1 - 346.

584. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of Miami-Dade Cty Ord. § 21-258(1)(a).

585. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved, in violation of Miami-Dade Cty Ord. § 21-258(1)(b).

586. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to Miami-Dade County and/or its political subdivisions, all in violation of Miami-Dade Cty Ord. § 21-258(1)(g).

587. At minimum, Defendants were beneficiaries of an inadvertent submission of a false claim, and failed to disclose the false claim to the County of Broward and/or its political subdivisions within the time set forth by statute after discovery of the false claim, in violation of Miami-Dade Cty Ord. § 21-258(2).

588. The County of Miami-Dade and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the County of Miami-Dade and/or its political subdivisions.

589. As a result of Defendants' actions, the County of Miami-Dade and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT 37: NEW YORK CITY FCA

590. Relators re-allege and incorporate by reference paragraphs 1 - 346.

591. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of NYC Ord. § 7-803(a)(1).

592. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of 7-803(a)(2).

593. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the City of New York and/or its political subdivisions, all in violation of 7-803(a)(7).

594. The City of New York and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the City of New York and/or its political subdivisions.

595. As a result of Defendants' actions, the City of New York and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT 38: PHILADELPHIA FCA

596. Relators re-allege and incorporate by reference paragraphs 1 - 346.

597. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval, in violation of Phil. Ord. § 19-3601(1).

598. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the City of Philadelphia and/or its political subdivisions, in violation of Phil. Ord. § 19-3601(2).

599. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the City of Philadelphia and/or its political subdivisions, all in violation of Phil. Ord. § 19-3601(7).

600. The City of Philadelphia and/or its political subdivisions, unaware of the falsity of the claims and/or statements made, or caused to be made, by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for benefits funded by the City of Philadelphia and/or its political subdivisions.

601. As a result of Defendants' actions, the City of Philadelphia and/or its political subdivisions have been, and may continue to be, severely damaged.

**WHEREFORE**, Relators, on behalf of themselves, the United States Government, and the State and Municipal Plaintiffs, demand judgment against Defendants, ordering that:

***As to the Federal Claims*:**

a. Pursuant to 31 U.S.C. § 3729(a), Defendants pay an amount equal to three (3) times the amount of damages the United States Government has sustained as a result of Defendants' actions, plus the maximum civil penalty available for each violation of 31 U.S.C. §§ 3729, *et seq.,* or such other penalty as the law may permit and/or require for each violation of other laws which governed Defendants' conduct;

b. Relators be awarded their relator's share of the judgment to the maximum amount available under 31 U.S.C. § 3730(d) of the False Claims Act and/or any other applicable provision of law;

c. Relators be awarded all costs and expenses of this action, including attorneys' fees, as provided by 31 U.S.C. § 3730(o) and any other applicable provision of the law; and

d. Relators and the United States of America be awarded such other and further relief as the Court may deem to be just and proper.

***As to the State and Municipal Claims*:**

e. Relators and the State and Municipal Plaintiffs be awarded statutory damages in an amount equal to three times (except for Texas, which is two times) the amount of actual damages sustained by each State and Municipality as a result of Defendants' actions, as well as the maximum statutory civil penalty for each violation by Defendants within each State and Municipality, all as provided by:

Cal. Gov't Code § 12651;

Colo. Rev. Stat. § 25.5-4-305(1);

Conn. Gen. Stat. § 17b-301b(b);

6 Del. Code Ann. § 1201;

Fla. Stat. Ann. § 68.082;

Ga. Code. Ann. § 49-4-168.1(a);

Haw. Rev. Stat. § 661-21;

740 Ill. Comp. Stat. § 175/3;

Ind. Code § 5-11-5.5-2(b);

46 La. Rev. Stat. Ann. ch. 3, § 438.6(B)(1);

Md. Code Ann. Health-Gen. §§ 2-601 – 2-611;

Mass. Gen. Laws ch. 12 § 5B;

Mich. Comp. Laws § 400.612;

Minn. Stat. § 15C.02(a);

Nev. Rev. Stat. Ann. § 357.050;

N.J. Stat. Ann. § 2A:32C-3;

N.M. Stat. Ann. § 44-9-3(C);

N.Y. Fin. Law § 189.1(g);

N.C. Gen Stat. §1-607(a);

63 Okla. Stat. Ann. § 5053.1(B);

R.I. Gen. Laws § 9-1.1-3;

Tenn. Code Ann. § 71-5-182;

Tex. Hum. Res. Code Ann. §§ 36.052;

Va. Code Ann. § 8.01-216.3;

Wash. Rev. Code §§ 74.09.210(2) and 74.09.230;

D.C. Code Ann. § 2-308.14;

Broward Cty Ord. § 1-279(c)(1);

Chicago Ord. § 1-22-020;

Allegheny Cty Ord. § 485-2A;

Miami-Dade Cty Ord. § 21-258(3)(a);

NYC Ord. § 7-803; and

Phil. Ord. § 19-3602.

f. Relators be awarded their relator's share of any judgment to the maximum amount provided pursuant to:

Cal. Gov't Code § 12652(g);

6 Del. Code Ann. § 1205;

Fla. Stat. Ann. § 68.085;

Ga. Code. Ann. § 49-4-168.2(h);

Haw. Rev. Stat. § 661-27;

740 Ill. Comp. Stat. § 175/4(d);

Ind. Code § 5-11-5.5-6;

46 La. Rev. Stat. Ann. c. 3, §§ 437.1, *et seq*.;

Mass. Gen. Laws ch. 12 § 5F;

Mich. Comp. Laws § 400.610a;

Nev. Rev. Stat. Ann. § 357.210;

N.J. Stat. Ann. § 2A:32C-7;

N.M. Stat. Ann. § 44-9-7;

N.Y. Fin. Law § 190.6;

63 Okla. Stat. Ann. § 5053.4;

R.I. Gen. Laws § 9-1.1-4;

Tenn. Code Ann. § 71-5-183(c);

Tex. Hum. Res. Code Ann. §§ 36.110;

Va. Code Ann. § 8.01-216.7;

D.C. Code Ann. § 2-308.15;

Broward Cty Ord. § 1-282;

Chicago Ord. § 1-22-030(d)(1)&(2);

Allegheny Cty Ord. § 485-2G(1)(&2);

Miami-Dade Cty Ord. § 21-261;

NYC Ord. § 7-804i; and

Phil. Ord. § 19-3603(8).

g. Relators be awarded all costs and expenses associated with each of the pendent State and Municipal claims, plus attorney's fees as provided pursuant to:

Cal. Gov't Code § 12652(g)(8);

6 Del. Code Ann. § 1205;

Fla. Stat. Ann. § 68.086;

Ga. Code. Ann. § 49-4-168.2(h);

Haw. Rev. Stat. § 661-27;

740 Ill. Comp. Stat. § 175/4(d);

Ind. Code § 5-11-5.5-6;

46 La. Rev. Stat. Ann. c. 3, § 438.6(D);

Mass. Gen. Laws ch. 12 § 5F;

Mich. Comp. Laws § 400.610a;

Nev. Rev. Stat. Ann. § 357.180;

N.J. Stat. Ann. § 2A:32C-7;

N.M. Stat. Ann. § 44-9-7(D);

N.Y. Fin. Law § 190.7;

63 Okla. Stat. Ann. § 5053.4;

R.I. Gen. Laws § 9-1.1-4,

Tenn. Code Ann. § 71-5-183(c);

Tex. Hum. Res. Code Ann. §§ 36.110;

Va. Code Ann. § 8.01-216.7;

D.C. Code Ann. § 2-308.15;

Broward Cty Ord. § 1-283;

Chicago Ord. § 1-22-030(d)(3);

Allegheny Cty Ord. § 485-2H(1);

Miami-Dade Cty Ord. § 21-262(2);

NYC Ord. § 7-804j; and

Phil. Ord. § 19-3603(9).

h. Relators and the State and Municipal Plaintiffs be awarded such other and further relief as the Court may deem to be just and proper.

///

## X. REQUEST FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Relators request trial by jury.

Dated: October 15, 2024

*/s/ J.D. Hernandez*
J.D. Hernandez (*Pro Hac Vice*)
**J.D. HERNANDEZ, OF COUNSEL**
6924 Bay Parkway
Brooklyn, NY 11204-5508
Telephone: (929) 627-4706
Fax: (718) 837-5555
j.d.hernandez@counsellor.com

*Attorneys for Plaintiffs-Relators*
*Caleb Hernandez, D.O., and*
*Chionesu Sonyika, M.D.*