1

2

3

4

5

6

7

8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10

11   UNITED STATES OF AMERICA, *et al.*,         Case No. 2:21-cv-04324-CV (ASx)
     *ex rel.* CALEB HERNANDEZ AND
12   CHIONESU SONYIKA
                                                 **ORDER GRANTING DEFENDANTS'**
13                  Plaintiffs-Relators,         **MOTIONS TO DISMISS**

14          v.                                   **[DOC. ## 137, 138, 140]**

15   SCRIBEAMERICA, LLC, *et al.*,

16

17                  Defendants.

18

19

20

21

22

23

24

25

26

27

28

Plaintiff-Relators Caleb Hernandez and Chionesu Sonyika ("Relators") are physicians who worked in emergency departments managed or operated by Defendants— a group of companies involved in medical staffing and billing. Relators allege that Defendants defrauded government healthcare programs by falsifying patient medical records to obtain reimbursement for services that were never provided. Relators bring this action on behalf of the United States and several state and local government entities pursuant to the federal False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq., and analogous state and local laws.

Before the Court are three motions to dismiss, all filed on November 15, 2024. Defendants ScribeAmerica, LLC ("ScribeAmerica") and KKR & Co., Inc. ("KKR") filed separate motions. Doc. # 137 ("ScribeAmerica Mot."); Doc. # 138 ("KKR Mot."). Defendants Envision Healthcare Corporation ("Envision Healthcare"), EmCare Holdings, Inc. ("EmCare Holdings"); EmCare, Inc. ("EmCare, Inc."); and Reimbursement Technologies, Inc. ("RTI," and together with Envision, EmCare Holdings, and EmCare, Inc., the "Envision Defendants") filed a joint motion. *See* Doc. # 140 ("Envision Mot."). On December 13, 2024, Relators filed a single opposition brief. Doc. # 144 ("Opp."). On January 10, 2025, Defendants filed reply briefs. Doc. ## 156–158.[1]

Having reviewed the parties' submissions, the Court finds Defendants' motions appropriate for resolution without oral argument. *See* Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15; *Willis v. Pac. Mar. Ass'n*, 244 F.3d 675, 684 n.2 (9th Cir. 2001). For the reasons explained below, the Court GRANTS Defendants' Motions, and DISMISSES Relators FCA claims (Counts 1–3) WITH PREJUDICE as to Relators and WITHOUT PREJUDICE as to the United States, and DISMISSES Relators State and Local Claims (Counts 4–38) WITHOUT PREJUDICE.

//

---

[1] The Court has also reviewed the notices of errata related to the opposition brief, Doc. ## 145–147, the requests for judicial notice, Doc. ## 139, 141, and the government's statement of interest. Doc. # 148.

## I.    **<u>INTRODUCTION</u>**

On May 24, 2021, Relators filed their initial complaint against Defendants under seal. Doc. # 1. On April 29, 2024, after the federal government, states,[2] counties,[3] municipalities[4] and the District of Columbia declined to intervene, the Court (the Hon. Fernando Aenlle-Rocha presiding) ordered the case unsealed. Doc. # 39.

On September 23, 2024, Defendants moved to dismiss the initial complaint. Doc. ## 105, 107, 111.

On October 15, 2024, before Defendants' September 2024 motions to dismiss were resolved, Relators filed the operative First Amended Complaint. Doc. # 123 ("FAC"). The FAC asserts three causes of action under the False Claims Act ("FCA"): (1) presentation of false claims for payment pursuant to 31 U.S.C. § 3729(a)(1)(A), (2) use of false statements material for false claims pursuant to 31 U.S.C. § 3729(a)(1)(B), and (3) conspiracy pursuant to 31 U.S.C. § 3729(a)(1)(C). *Id.* ¶¶ 349–74. The FAC also asserts causes of action under 35 state and municipal equivalents to the FCA. *Id.* ¶¶ 375–601. Relators request damages, attorney fees and costs, and other relief as the Court deems necessary. FAC at 154–57.

//
//
//
//
//
//

---

[2] California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Texas, Vermont, Virginia, and Washington.

[3] Allegheny, Broward, and Miami-Dade.

[4] New York, Chicago, and Philadelphia.

## II.    FACTUAL BACKGROUND

### A.    Parties

**Envision Healthcare** is a Delaware corporation formed in 2011,[5] and **EmCare Holdings**, **EmCare, Inc.** and **RTI (**collectively with Envision Healthcare, the "Envision Defendants") are Envision Healthcare's subsidiaries. FAC ¶¶ 15, 16, 17, 18. The Envision Defendants provide management and billing services for physicians staffed in emergency-departments throughout the United States and aim to maximize the reimbursement obtained for medical bills submitted to U.S. Centers for Medicare & Medicaid Services ("CMS") and other government entities. *See* FAC ¶ 8, 97–99, 142.

**ScribeAmerica** is the nation's largest medical scribe company. FAC ¶ 6. Medical scribes are typically college-aged students who shadow healthcare providers during patient visits and record the services they observe in patient charts for later review and approval by the provider. *Id*. ¶¶ 56, 196–97, 200. ScribeAmerica works with over 3,500 different entities located in all 50 states to provide a team of project managers to create and manage medical scribe programs specific to its partners' needs. *Id*. ScribeAmerica consults on how to maximize the reimbursement that can be obtained when bills are submitted for reimbursement. *See id*. ¶¶ 147–58.

**KKR** is a global investment company headquartered in New York that manages multiple alternative asset classes. *Id*. ¶ 14. In 2018, KKR acquired Envision Healthcare and conducts business through the Envision Defendants. *Id*.

//

//

---

[5] Envision was originally formed in 2011 under the name Envision Healthcare Holdings, Inc. to facilitate a corporate merger in which Emergency Medical Services Corporation became its wholly owned subsidiary. Following that transaction, both the parent and subsidiary operated under the name Envision Healthcare Corporation. In December 2016, Envision Healthcare Holdings, Inc. merged with AmSurg Corp. and subsequently changed its name to Envision Healthcare Corporation. After Envision Healthcare's bankruptcy proceedings in 2023, Envision Healthcare Operating, Inc. succeeded to its interests. *See* FAC ¶ 15.

Plaintiff-Relator Dr. Caleb S. Hernandez, D.O. ("**Hernandez**") is an emergency physician who has worked in hospital emergency departments managed and/or operated by the Envision Defendants in Arizona, Kansas, and Colorado. *Id*. ¶ 10.

Plaintiff-Relator Dr. Chionesu K. Sonyika, M.D. ("**Sonyika**," and with Hernandez, "**Relators**") is an emergency physician who worked in emergency departments managed by the Envision Defendants in North Carolina and Georgia.

**B.    Alleged Fraudulent Schemes to Submit False Claims**

A patient's chart is the electronic record of care that is created by healthcare providers and scribes contemporaneous to when the care is provided. *See* FAC ¶¶ 97–98, 226. When the patient's chart is finalized, the provider is asked to review and approve the accuracy of the chart, and a redacted version is given to the Envision Defendants' billing staff. *Id*. 99. The billers review the redacted patient chart to apply the appropriate reimbursement "codes" and generate bills to send to CMS and other government payors for reimbursement. *Id*. ¶¶ 99, 142.

Relators allege that from "at least 2007" until the present, Defendants have engaged in three interrelated schemes to create false patient charts and use these charts for claims for reimbursement from government payors for services that were never provided. *Id.* ¶ 2. The FAC refers to these schemes as the "Critical Care Scheme," "Mid-Level Scheme," and "Scribe Scheme." *See Id.* ¶¶ 3–5.

1.    Critical Care Scheme

"Critical care" is the highest level of emergency medical treatment. FAC ¶¶ 68, 217, 228. It is necessary when a patient has a high probability of imminent or life-threatening deterioration, and it requires healthcare providers to exercise a higher degree of medical decision-making and to devote more time to that patient's treatment. *Id*. True critical care conditions are rare and typically account for approximately 1% of all emergency department visits. *Id*. ¶ 229. Accordingly, when a provider submits bills for reimbursement to CMS and other government payors coded as "critical care," these bills are reimbursed

at a rate higher than standard emergency services, and there is a lower risk of government audits for such bills. *Id*. ¶¶ 62, 68, 218, 230–31, 247.

Relators allege that Defendants manipulate physicians into designating standard services as "critical care" on patient charts, which are then used by Defendants to generate and submit inflated and inaccurate bills for reimbursement to government payors. *Id*. ¶ 63. Relators allege that physicians were given "canned notes" and "templates" prepared by the Envision Defendants to use in patient charts whenever a patient "could have" critical care. *Id*. ¶ 64. Scribes were also instructed to insert this kind of canned "critical care" language into a patient's chart even when the rest of the patient's chart shows that there is no basis for a "critical care" classification. *Id*. ¶ 67, 220. Defendants also pressured Physicians to approve the designation of services as "critical care" by offering monetary incentives for physicians who designated more care as critical care, and penalizing those who did not. *Id*. ¶ 63, 224. The Envision Defendants and ScribeAmerica also use an electronic platform for reviewing patient charts that makes it difficult for medical providers to disapprove critical care designations inserted by scribes. *Id*. ¶ 221. Defendants' billers were then instructed to code for critical care whenever they saw critical care template language in a patient chart and to give negative feedback to doctors when charts did not document the highest-level care. *Id*. at ¶ 66. As a result of this "classic upcoding scheme," Defendants allegedly receive a much higher rate of reimbursement for false critical care bills. *Id*. ¶¶ 68, 218, 236.

### 2.    Mid-level Scheme

A "mid-level" is a non-physician medical care provider like a physician assistant or nurse practitioner. *See* FAC ¶ 254. Government payors typically pay reimbursements for medical care provided by different types of healthcare providers at different rates. FAC ¶¶ 131, 254. Typically, services provided by "mid-levels"—i.e., physician assistants and nurse practitioners—are reimbursed at 85% of a physician's billing rate for emergency medical services. FAC ¶ 254. In certain circumstances, however, government programs

reimburse mid-level's services at a physician's rate if the physician was sufficiently supervising the mid-level and involved in the patient's care. *Id*. at ¶ 257.

Relators allege that Defendants structure emergency departments such that patients are usually cared for by either a physician or a mid-level (but not both), but Defendants improperly bill for mid-level services under a physician's rates. *Id.* ¶¶ 253–54, 259–60. To execute this scheme, Defendants pressure mid-levels to include ambiguous language in a patient's chart about a physician providing personal supervision of the patient visit, regardless of whether they were actually supervised by the physician. *Id.* ¶¶ 79, 261, 266. Defendants then require the physician to sign an ambiguous attestation after the patient visit saying the physician supervised the mid-level's services, despite there being no true "shared visit" where the physician interacted with the patient face-to-face. *Id.* ¶¶ 262–63, 265. Government payors only require a physician's signature when seeking reimbursement for a true shared visit, but Defendants pressure physicians to provide this signature for any mid-level care. *Id*. ¶¶ 267, 274–75, 276–83. Defendants' billers then use these records to obtain reimbursement for the mid-level's services at the physician's rate, even when the physician did not have sufficient involvement in the patient's care to warrant reimbursement at the physician's rate. *Id.* ¶¶ 81, 278, 284.

        3.    <u>Scribe Scheme</u>

Relators allege that Defendants trained and directed medical scribes—typically young, pre-med or pre-nursing students—to insert information into patient charts that exaggerated the complexity of care provided or documented services that did not occur. *Id*. ¶¶ 54–56. For example, scribes were directed to use electronic templates to add standard language required to bill for different exams—such as for full neurological and organ-system examinations—regardless of whether those examinations occurred. *Id*. ¶¶ 58–59. Similarly, for patients with a documented history of smoking, scribes were allegedly instructed to record smoking cessation counseling of a specified duration, even when no such discussion took place. *Id*. ¶ 60. Scribes were also allegedly instructed to

record the highest possible level of patient care, including "critical care," even where such care was not warranted. *Id*. ¶¶ 57–58, 203–206. Relators contend that Defendants exploited the scribes' youth and lack of medical training or professional leverage to ensure compliance with their billing directives. *Id*. ¶¶ 196, 202. For example, scribes were allegedly warned that failure to follow instructions could jeopardize their prospects for admission to medical school. *Id*. ¶ 202.

Physicians, in turn, were allegedly pressured to "rubber stamp" charts drafted by scribes or sign standardized attestations prepared by the scribes. *Id*. ¶ 57. These records allegedly allowed Defendants to obtain millions of dollars in reimbursements for falsely up-coded claims. *Id*. ¶ 61.

## C.    Relators Disclosure to the Government Prior to Bringing Suit

The FAC includes allegations about Relators' pre-filing disclosures to the Government.

Relators allege that "as early as June 7, 2016," Hernandez was interviewed by the Attorney General of the United States[6] and representatives of the U.S. Attorney's Office for the Eastern District of Texas in connection with a separate FCA action in which he served as relator, *United States ex rel. Hernandez v. Team Health Holdings, Inc.*, No. 2:16-cv-00432 (E.D. Tex. Apr. 25, 2016). FAC ¶ 29. During that interview, Hernandez purportedly informed the government that the Envision Defendants were engaged in "the same fraudulent schemes" alleged against the "TeamHealth Defendants" in that action. *Id*. Relators provide no additional details regarding the substance, scope, or timing of this alleged disclosure.

Relators further allege that, "prior to April 25, 2017," Sonyika was interviewed by the U.S. Attorney's Office for the Southern District of Florida in connection with another

---

[6] The FAC does not explain why the Attorney General of the United States conducted this interview. Nonetheless, the Court accepts this factual allegation as true for purposes of addressing Defendants' Motions. *See Iqbal*, 556 U.S. at 678 ([F]or the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true[.]").

FCA case in which he was a relator, *United States ex rel. Sonyika v. ApolloMD, Inc.*, No. 1:20-cv-03213 (N.D. Ga. Jan. 3, 2017).[7] *Id.* According to Relators, Sonyika advised the government that the Envision Defendants were "perpetrating the same schemes as ApolloMD," and provided "further detail as to that fraud." *Id.* Relators allege that "[t]hese disclosures [to] the Government were predicates to bringing this FCA litigation against" the Envision Defendants. *Id.* Relators, however, do not provide further description of this purported disclosure, or why they characterized this disclosure as a "predicate" to bringing litigation.

Relators also allege that they provided information to the Government on the Critical Care Scheme and the Scribe Scheme, "although focusing more on the Mid-Level Scheme" before filing a prior FCA action against Envision Healthcare Corporation in 2017 (*U.S. ex rel. Hernandez v. Envision Healthcare Corp.*, No. 1:17-cv-23535 (S.D. Fla. Sept. 26, 2017) (hereinafter "*Envision I*")). *Id.* ¶ 30. Relators do not describe how they provided this information to the Government, what governmental entity they provided this information to, or specifically when this disclosure was made.

Finally, Relators allege that, prior to initiating the present action, they voluntarily disclosed "substantially all information in [their] possession" regarding the allegations in their initial complaint to the U.S. Attorney's Office for the Central District of California. FAC ¶ 28. Relators do not specify when this disclosure occurred or what information was conveyed. *See id.*

//

//

//

---

[7] The FAC does not explain why Relators made these disclosures to the U.S. Attorney's Office for the Southern District of Florida when the action was filed in the Northern District of Georgia. As with other factual allegations in Relators' FAC, the Court accepts this allegation as true. Nonetheless, the Court accepts this factual allegation as true for purposes of addressing Defendants' Motions. *See Iqbal*, 556 U.S. at 678.

1

2

III.   **LEGAL STANDARDS**

   A.   **False Claims Act**

3

4

5

6

7

The False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733, imposes civil liability on any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment to the United States. 31 U.S.C. § 3729(a)(1)(A). The statute serves both remedial and deterrent purposes by enabling the government to recover losses caused by fraud while discouraging future misconduct.

8

9

10

11

12

The FCA also permits private individuals, known as "relators," to bring *qui tam* actions on the government's behalf. 31 U.S.C. § 3730(b). When a relator's action results in a recovery through judgment or settlement, the relator is entitled to a share of the proceeds, typically between fifteen and thirty percent, depending on the government's participation and the relator's contribution. *Id*. § 3730(d).

13

14

15

16

17

18

19

After a relator files a *qui tam* complaint under seal, the government must investigate the allegations and notify the court whether it elects to intervene. *Id*. § 3730(a), (b)(4). If the government declines to intervene, the relator may proceed independently. *Id*. § 3730(b)(4)(B). As the Ninth Circuit has recognized, relators possess the necessary personal stake to pursue FCA claims because they must finance the litigation, bear potential liability for costs if unsuccessful, and stand to receive a significant portion of any recovery. *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 749 (9th Cir. 1993).

20

21

22

23

24

25

26

27

The FCA, however, limits who may bring suit. The "first-to-file bar" prohibits a relator from bringing an action based on the same underlying conduct while a related FCA case remains pending. 31 U.S.C. § 3730(b)(5). Similarly, the "public disclosure bar" requires dismissal where the alleged fraud has already been disclosed through certain public sources, unless the relator qualifies as an "original source" of the information. *Id.* § 3730(e)(4)(A)–(B). These provisions ensure that FCA actions advance the statute's purpose of uncovering and deterring fraud, rather than duplicating or exploiting prior disclosures. *See Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel.*

28

*Wilson*, 559 U.S. 280, 294–99 (2010); *United States ex rel. Sam Jones Co., LLC v. Biotronik, Inc.*, 152 F.4th 946, 949–50 (9th Cir. 2025).

### B.    Fed. R. 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." The purpose of Rule 12(b)(6) is to allow defendants to challenge the legal sufficiency of the claims asserted in a complaint. *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987). A claim is properly dismissed if the complaint fails to allege sufficient facts "to state a cognizable legal theory." *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016).

To survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While detailed factual allegations are not required, a plaintiff must provide more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* In evaluating a Rule 12(b)(6) motion, courts must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *Caltex*, 824 F.3d at 1159. However, legal conclusions "are not entitled to the assumption of truth" and "must be supported by factual allegations." *Iqbal*, 556 U.S. at 679.

Because the FCA is an anti-fraud statute, complaints asserting FCA violations must also satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001). Under Rule 9(b), a party alleging fraud must "state with particularity the circumstances constituting fraud," including "the who, what, when, where, and how of the misconduct charged." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (internal quotation marks omitted).

The complaint must also specify "what is false or misleading about a statement, and why it is false." *Yourish v. Cal. Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999).

Although the circumstances of fraud must be pleaded with particularity, mental states such as "malice, intent, [and] knowledge" may be alleged generally. Fed. R. Civ. P. 9(b); *see United States v. Corinthian Colls.*, 655 F.3d 984, 992 (9th Cir. 2011). Accordingly, under Rule 8(a), a plaintiff need only allege enough facts "to raise a reasonable expectation that discovery will reveal evidence" of a defendant's state of mind. *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (quoting *Twombly*, 550 U.S. at 556).

## IV.  **DISCUSSION**

Defendants move to dismiss the FAC in its entirety because (1) the public disclosure bar and first-to-file bar require the dismissal of Relators' FCA claims (Envision Mot. at 6–11); (2) Relators fail to plead fraud with sufficient particularity under Rule 9(b) (*id.* at 11–27; ScribeAmerica Mot. at 6–18; KKR Mot. at 4–17); (3) KKR is not a proper defendant in this action (KKR Mot. at 5–6); and (4) because Relators seek recovery outside the applicable statute of limitations period (ScribeAmerica Mot. at 26).

For the reasons set forth below, the Court DISMISSES Relators' FCA claims under the first-to-file bar and the public disclosure bar and declines to rule on the other issues raised by the parties, as they would not affect the Court's ruling here.

### A.  **First to File Bar**

Under the False Claims Act's first-to-file provision, no person other than the government may bring a related action "based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5); *State Farm Fire & Cas. Co. v. U.S ex rel. Rigsby*, 580 U.S. 26, 29–30 (2016). The purpose of this rule is to incentivize prompt disclosure of frauds to the Government, by incentivizing a "race to the courthouse" by eligible relators. *Campbell v. Redding Med. Ctr.*, 421 F.3d 817, 821 (9th Cir. 2005).

To determine whether the first-to-file bar applies, the Court compares the operative complaint in the later-filed case with the allegations in the earlier-filed action. *See U.S. ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d 1121, 1130-1132 (9th Cir. 2015), *overruled on other grounds by Stein v. Kaiser Found. Health Plan, Inc.*, 115 F.4th 1244 (9th Cir. 2024) (comparing operative complaint to allegations in an earlier lawsuit in assessing whether the first-to-file bar applies). A later-filed suit that "allege[s] the same material elements of fraud described in an earlier suit"—even if the later-filed lawsuit includes somewhat different details—is barred by the first-to-file rule if it alerts the government to the essential facts of the alleged fraud. *United States ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1189 (9th Cir. 2001); *Stein v. Kaiser Found. Health Plan, Inc.*, No. 22-15862, 2024 WL 4784915, at *1 (9th Cir. Nov. 14, 2024). For example, "if a parent company and its subsidiaries are engaging in the same fraud, a lawsuit pointing to fraud by the parent—or the parent and some subsidiaries—alerts the government to the possibility that other subsidiaries may be engaging in the same conduct." *United States ex rel. Rosales v. Amedisys N. Carolina, L.L.C.*, 128 F.4th 548, 558–59 (4th Cir. 2025), *cert. denied sub nom. Rosales v. Amedisys NC, L.L.C.*, No. 24-1179, 2025 WL 2823762 (U.S. Oct. 6, 2025).

Here, Relators filed their original complaint in this matter on May 24, 2021. Doc. # 1. Defendants argue that the first-to-file rule requires dismissal of this action because two cases involving the same material facts were pending on that date: *U.S. ex rel. Taylor v. Boyko*, No. 2:17-cv-04213 (S.D. W. Va. Sept. 17, 2019) [hereinafter "*Taylor*"] and *U.S. ex rel. Florence v. Envision Healthcare*, No. 3:19-cv-00493 (M.D. Tenn. June 12, 2019) [hereinafter "*Florence*"].[8] The Court agrees, as set forth below.

---

[8] The Envision Defendants ask the Court to take judicial notice of the Amended Complaint in *Taylor* and the Complaint in *Florence*. *See* Doc. # 141, Exs. D, E. The Court finds that as these pleadings are appropriate subjects of judicial notice because they are matters of public records which can "be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *United States ex rel. Jones v. Sutter Health*, 499 F. Supp. 3d 704, 709 (N.D. Cal. 2020). The Court also takes judicial notice of charts prepared comparing excerpted allegations in *Taylor* and

1.    _Taylor_ Includes the Same Material Allegations as the Mid-level
Scheme

_Taylor_ is an FCA action where the defendants were EmCare, Inc., Envision Healthcare, and other interrelated entities and officers. _See_ Doc. # 141-4 ¶¶ 3–10, 54–60. The relator, Cortney Taylor, alleged a scheme where the defendants conspired to create false medical records, submit false claims for reimbursement to Medicare, "illegally up charg[e] for services rendered solely by a nurse practitioner," and having physicians sign patient charts for "patients they did not actually provide medical services to and were listed as Attending Physicians in the medical record of . . . patients they did not see." _Id_. at 3–4 (¶¶ 4–6). The _Taylor_ amended complaint also included allegations that the Defendants used billing codes for more severe care than was warranted. _Id_. at ¶¶ 160–62.

As shown in the Envision Defendants' chart comparing allegations in the two operative complaints, the _Taylor_ Amended Complaint disclosed the same material allegations as the Mid-level Scheme—that physicians were required to sign medical charts for patients seen only by mid-level practitioners to obtain payments at a higher reimbursement rate. _See_ Doc. # 141-10. Although the present action includes greater detail than in the _Taylor_ complaint, the Court finds that the _Taylor_ action provided the government with notice of the essential facts of the Mid-level Scheme. _See Stein_, 2024 WL 4784915, at *2 (holding that although the relators provided more details about the earlier-filed action, the first-to-file rule barred the later-filed complaint because the allegations alerted the government to the essential facts of the fraudulent scheme).

//

//

//

_Florence_ to the allegations in Relators' FAC. _See_ Doc. # 141, Exs. F, J. _Tadros v. Celladon Corp._, No. 15-cv-1458, 2016 WL 5870002, at *8 (S.D. Cal. Oct. 7, 2016) (taking judicial notice of a chart comparing statements in pleadings because the "statements are unaltered but are simply presented in an organized, easy to use format").

-14-

Relators' Opposition does not contest that the *Taylor* Amended Complaint alleged the same essential facts of the Mid-level Scheme alleged in this case. *See* Doc. # 144 at 10–11. Accordingly, the Court deems that Relators have waived this argument.[9]

### 2. *Florence* Includes the Same Material Allegations as the Critical Care Scheme and the Scribe Scheme

*Florence* was an FCA action brought against Envision Healthcare and KKR & Co. Inc. Doc. # 141-5 at 11–13. The *Florence* relators, David Florence and Chelsea Bass, alleged that Envision Healthcare "through its subsidiaries . . . intentionally 'up-coded' emergency department visits to receive higher payment" from government payors. *Id*. at 6, 27–28. The *Florence* relators alleged that Envision Healthcare enacted this scheme by pressuring doctors to make patient charts as detailed as possible, by providing doctors with canned, ambiguous phrases to include in a patient's chart to suggest comprehensive systems examinations had been performed when they had not, and requiring doctors to use different codes in patient charts that suggested the patient suffered from more severe conditions than they actually did. *Id*. at 8–9. The *Florence* Amended Complaint noted that not only had doctors been trained to "chart aggressively" but also that "[t]hese lessons have been passed on to the nurses" who were also trained to include unnecessary and inaccurate detail in patient charts to support higher billing codes. *Id*. at 28, 33, 37–39.

As shown in the Envision Defendants' chart comparing allegations in the two operative complaints, the *Florence* action disclosed the same material allegations as the Critical Care Scheme—that physicians were pressured by Envision Healthcare and its affiliates to include false and extraneous detail in patient charts to suggest patients were

---

[9] *See Pac. Dawn LLC v. Pritzker*, 831 F.3d 1166, 1178 n.7 (9th Cir. 2016) ("[T]he plaintiffs did not raise that argument to the district court in their . . . opposition to the defendants' motion for summary judgment, so the argument was waived."); *accord., Mar Vista Ent., LLC v. THQ Nordic AB,* No. 2:23-cv-06924-MEMF-SSC, 2024 WL 3468933, at *5 (C.D. Cal. July 8, 2024), *motion to certify appeal denied*, No. 2:23-cv-06924-MEMF-SSC, 2024 WL 5642556 (C.D. Cal. Dec. 24, 2024) *see also*, C.D. Cal. L. Civ. R. 7-12.

provided the highest level of care that allowed for a higher rate of reimbursement than what was actually provided. *See* Doc. # 141-6.

The *Florence* Amended Complaint also disclosed the material allegations of the Scribe Scheme. Although the *Florence* relators did not mention scribes or the specific role that scribes play in drafting patient charts, their pleading describes how non-physicians supporting physicians in preparing patient charts—triage nurses— were trained to include language used to justify higher billing rates by default, regardless of the care provided to the patient.[10] And *Florence* includes allegations that non-physicians pressured physicians to include more detail (and inaccuracies) when physicians were asked to finalize patient charts.[11] Accordingly, the government would have been placed on notice not only that Defendants caused patient charts to be falsified, but that physicians were not the only potential source of inaccurate information inserted in the patient charts.

Again, Relators offer no argument in their Opposition that *Florence* does not trigger the first-to-file bar. *See* Doc. # 144 at 10–11. Thus, this argument is waived.[12]

### 3.    The *Campbell v. Redding Med. Ctr.* Exception Does Not Apply

Relators argue that *Taylor* and *Florence* do not trigger the first-to-file bar because, in their view, those actions were themselves barred when filed. Doc. # 144 at 10. They contend that the various public disclosures identified by Defendants not only bar this action but also render *Taylor* and *Florence* retroactively defective such that those cases cannot qualify as earlier "pending" actions for purposes of § 3730(b)(5). *Id.* Relators' argument rests on *Campbell v. Redding Med. Ctr.*, 421 F.3d 817 (9th Cir. 2005). Doc. # 144 at 10. A review of *Campbell* demonstrates why their argument is unpersuasive.

---

[10] *See, e.g.*, Doc. # 141-5 at 32–34 (noting that triage nurses, who see an emergency room patient shortly before the physician, have been "trained to chart aggressively," and have been given a "checklist that they run through to ensure an extended history check" that allows for billing at a higher rate).

[11] *Id.* at 44 (describing how an Envision Healthcare coder will return a chart to an attending physician with specific instructions about how to revise a patient chart to recoup more money in reimbursements).

[12] *See* note 7 above.

In *Campbell*, the FCA actions at issue arose from allegations that physicians at Redding Medical Center ("RMC") performed unnecessary cardiac procedures to fraudulently bill Medicare. *Id*. at 818. After the FBI publicly announced the execution of a search warrant regarding this alleged fraud and released the supporting affidavit, two FCA complaints were filed within days. *Id*. at 819. The first, brought by Corapi and Zerga, an RMC patient and his friend, was filed six days after the public disclosure; the second, filed three days later, was brought by Dr. Patrick Campbell, a local physician. *Id*. The government moved to dismiss Campbell's complaint under the first-to-file bar. *Id*. Campbell responded that the still-pending Corapi/Zerga suit was jurisdictionally defective because those relators were not "original sources," and therefore the first-filed action could not bar his action. *Id*. The district court assumed that Corapi and Zerga were not original sources but nonetheless held Campbell's complaint barred by the first-to-file rule. *Id*.

The Ninth Circuit reversed. It held that a first-filed action that does not satisfy the jurisdictional prerequisites of § 3730(e) cannot trigger the first-to-file bar, and it recognized a narrow limitation to its earlier holding in *Lujan* that there are no exceptions to the first-to-file rule. The Ninth Circuit did not overturn *Lujan*, but recognized that the *Campbell* case presented a different circumstance not considered by *Lujan* involving "publicly disclosed allegations that are particularly vulnerable to opportunistic qui tam suits." *Id*. at 821. The Court grounded this limited exception in the concern that a sham action should not preclude a later-filed meritorious suit. *Id*. at 821, 824–25.

Relators' reliance on *Campbell* here is misplaced for several reasons.

*First*, Congress amended the public-disclosure provision in 2010, eliminating its jurisdictional character. Thus, none of the public disclosures at issue here would render *Taylor* or *Florence* "not jurisdictionally cognizable," as was assumed in *Campbell*. *Id*. at 818.

*Second*, the present action is not the kind of "public disclosure case" the Ninth Circuit confronted in *Campbell*. There, a single, government-issued disclosure—the

publicly released FBI warrant and affidavit—preceded both qui tam actions by only days, allowing the court to assume Corapi and Zerga were non-original sources for purposes of its analysis. Here, neither *Taylor* nor *Florence* was dismissed on public-disclosure grounds, and neither case remains pending.[13] There is no indication that either case was a "sham," or that the public-disclosure bar was raised or considered. Nor is there a single, comprehensive disclosure that shows the government had actual notice of the fraud alleged in those cases, as was the case in *Campbell*.

Accepting Relators' theory would not only pose practical difficulties, it would create a broad exception to the first-to-file rule. This would improperly expand the narrow exception recognized in *Campbell* and would contravene the Ninth Circuit's continued adherence to the core of its "no exceptions" reasoning in *Lujan*. *See Campbell*, 421 F.3d at 822; *see also U.S. ex rel. Smith v. Yale New Haven Hosp.*, No. 3:02CV1205 (PCD), 2006 WL 387297, at *3 (D. Conn. Feb. 14, 2006) (explaining that *Campbell* did not overturn *Lujan*'s "exception-free" rule but addressed only the unique circumstances presented there). Accordingly, the Court finds that *Campbell* does not provide an exception for the first-to-file rule that would apply here.

---

[13] From a review of the publicly-available dockets, it appears that the public disclosure rule was rejected in *Taylor* and was not addressed in *Florence*. Pursuant to Federal Rule of Evidence 201(b), the Court takes judicial notice of certain pleadings in the *Taylor* and *Florence* actions. *Jones*, 499 F. Supp. 3d at 709. First, the Court takes notice of the May 14, 2020 order in *Taylor*, in which the district court concluded that "the public disclosure bar is not applicable and the motion to dismiss on that basis should be denied." *Taylor*, Doc. # 176 at 6. The Court also takes judicial notice of the Fourth Circuit's June 29, 2022 opinion in *Taylor*, which affirmed that ruling and found "no merit to Defendants' public-disclosure bar argument." *Taylor*, Doc. # 183 at 13.

The Court further takes judicial notice of the May 18, 2020 Report and Recommendation issued by the magistrate judge in *Florence*, which recommended dismissing that action without prejudice for failure to prosecute and did not address the public disclosure rule. *Florence*, Doc. # 56. The Court also notes the district court's June 14, 2021 order adopting the Report and Recommendation and dismissing the case without prejudice, along with the entry of judgment the same day. *Florence*, Doc. ## 57–58. Neither filing references the public disclosure rule.

Finally, to the extent that Campbell sought to exempt original source relators from the first-to-file bar, Relators have failed to plausibly allege they are original sources as defined by the FCA. *See* Section IV.B.2.

### 4. Relators' Amended Complaint Does Not Cure the First-to-File Bar

Relators filed their FAC after the *Taylor* and *Florence* actions were no longer pending. *See* Doc. #144 at 8, 11. The Ninth Circuit has not addressed whether a relator who files an FCA action while an earlier, related action is pending may cure a first-to-file defect by amending the complaint after the earlier case has been dismissed. Although the First Circuit has held that an amended complaint filed after the earlier action is no longer pending may cure an original complaint's first-to file defect, all other circuits that have addressed this issue have rejected this approach.[14]

In *United States ex rel. Gadbois v. PharMerica Corp.*, 809 F.3d 1 (1st Cir. 2015), the First Circuit allowed a relator to cure a first-to-file defect through a supplemental complaint under Rule 15(d) rather than refiling a new action. The court acknowledged that a related, earlier-filed qui tam action was pending when the relator filed suit, rendering the case barred under 31 U.S.C. § 3730(b)(5). *Id.* at 3. After the earlier case was dismissed, the relator sought to supplement the complaint to reflect the changed circumstances. The First Circuit permitted the supplementation, reasoning that because the first-to-file rule is no longer jurisdictional after *Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*, 575 U.S. 650 (2015), dismissal and refiling would be a needless formal exercise. *Gadbois*, 809 F.3d at *4–6. The court emphasized the policy favoring resolution on the

---

[14] *Compare U.S. ex rel. Gadbois v. PharMerica Corp.*, 809 F.3d 1, 6 (1st Cir. 2015) (reversing dismissal under the first-to-file bar and remanding to allow supplementation of the complaint), with *United States ex rel. Carter v. Halliburton Co.*, 866 F.3d 199, 210 (4th Cir. 2017) (holding that a first-to-file defect is not cured by amendment after dismissal of the earlier-filed complaint); *United States ex rel. Wood v. Allergan, Inc.*, 899 F.3d 163, 170–75 (2d Cir. 2018) (same); *United States ex rel. Shea v. Cellco P'ship*, 863 F.3d 923, 930 (D.C. Cir. 2017) (same); and *Cho on behalf of States v. Surgery Partners, Inc.*, 30 F.4th 1035, 1040–42 (11th Cir. 2022) (same).

merits and the liberal amendment principles of Rule 15, concluding that supplementation was "sound judicial practice" once the earlier action was no longer pending. *Id.* at *5.

The *Gadbois* approach promotes efficiency and fairness to the parties by avoiding the procedural costs and potential statute-of-limitations issues associated with dismissing and refiling. It is also consistent with the common practice of allowing amendments to cure defects raised under Rule 12(b)(6). *Id.* The opinion, however, does not engage in detailed textual analysis of the FCA, nor does it address the broader consequences of allowing amendments to circumvent the first-to-file bar.

While *Gadbois* has persuasive aspects, the Court is more persuaded by the majority approach, which aligns more closely with the statutory text and purpose of the FCA. As the Second Circuit explained, "the statute bars a person from *bringing*—not continuing to prosecute— a related action during the pendency of an FCA case." *Wood*, 899 F.3d at 172 (citing 31 U.S.C. § 3730(b)(5)) (emphasis in original). Thus, "an amended or supplemental pleading cannot change the fact that [Relators] *brought* an action while another related action was pending, as is prohibited by the first-to-file bar." *Id.* (emphasis in original). Under this approach, a first-to-file defect cannot be cured by amendment; the proper course is refiling as a new action (assuming no other defects exist).

This approach also preserves the first-to-file rule's core purpose: incentivizing prompt reporting of fraud and rewarding those who first bring information to the government. *See Campbell*, 421 F.3d at 821. Allowing later-filing relators to amend after dismissal to cure a first-to-file defect could invert incentives, encouraging strategic delays and filings in backlogged districts to gain an advantage. The D.C. Circuit illustrated these distortions in *Shea*:

> For instance, imagine a situation in which relators A, B, and C each file a *qui tam* action alleging the same fraud. Relator A reaches the courthouse first and his action therefore goes forward. Relator B reaches the courthouse second, but the district court determines his suit is blocked by the first-to-file bar and thus dismisses it per the ordinary course. . . . Relator C files last, and shortly

> thereafter, the first-filed action is dismissed. But suppose relator C filed her suit so late in the game that the district court fails to dismiss her action before dismissing the first-filed suit. Under [relator's] proposed rule, relator C would receive a windfall: she, unlike relator B, could simply amend her existing complaint and thereby secure herself pole position in the first-to-file queue. Relator C would jump past relator B for the opportunity to proceed with her suit (and to share in the government's reward).

*Shea*, 863 F.3d at 930 (internal citation removed); *see also, Wood*, 899 F.3d at 173 ("A rule that would permit a violation of the first-to-file bar to be cured by the filing of an amended or supplemental pleading would pose serious administrative concerns and disrupt the orderly operation of the FCA.").

Congress presumably did not intend a relator's prospects to depend on docket congestion or chance. The ordinary remedy of dismissal for a first-to-file violation—as *Shea* recognized—best promotes fairness among relators and preserves the statutory scheme Congress enacted. *Id.*; *accord Wood*, 899 F.3d at 174 ("Allowing a first-to-file defect to be 'cured' by amending or supplementing a complaint contravenes the FCA's purpose."). Accordingly, an amendment cannot cure Relators' first-to-file defect.

\*\*\*

For the reasons discussed above, the Court finds that Relators' FCA claims are barred by the first-to-file rule.

## B.    Public Disclosure Bar

The False Claims Act ("FCA") bars suits that merely repackage information already in the public domain while encouraging whistleblowers with genuinely new and material information to come forward. *See Biotronik, Inc.*, 152 F.4th at 953–54.

The applicable version of the FCA's public disclosure rule[15] states:

---

[15] Because Relators filed their original complaint in 2021, the post-2010 version of the FCA governs. *See id.* at 956 (explaining that the Ninth Circuit "applied the version of the FCA in effect when the relator filed the original complaint" and applying the post-2010 version where the relator filed his complaint in 2017). The degree of specificity required before a claim is deemed "substantially the same" is the same

> The Court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—
>
> > (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
> >
> > (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
> >
> > (iii) from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (2010).

Under the statute, a court must dismiss an action "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed" in specified sources—such as federal hearings, reports, audits, investigations, or the news media—unless the action is brought by the Attorney General or the relator qualifies as an "original source." 31 U.S.C. § 3730(e)(4)(A).

Courts apply a two-step inquiry to determine whether the public disclosure bar applies. *See United States ex rel. Calva v. Impac Secured Assets Corp.*, No. 16-cv-1983-JVS (JCGx), 2018 WL 6016152, at *3 (C.D. Cal. Oct. 29, 2018). First, the Court considers whether the allegations underlying the qui tam complaint were publicly disclosed through one of the enumerated sources. *Id*. Second, if a qualifying public disclosure occurred, the Court must determine whether the relator qualifies as an "original source" within the meaning of the statute. *Id*.

### 1. Defendants Have Identified Qualifying Disclosures that Trigger the Public Disclosure Bar

Defendants identify public disclosures pre-dating this action that they claim trigger the public disclosure bar as to some or all of Relator's claims. Although the FCA itself

---

as under the prior, 1986 version of the statute which prohibited claims "based upon" a public disclosure. *Id*. at 956.

does not provide guidance about the degree of specificity required for a claim to be deemed "substantially the same" as a publicly disclosed allegation, the Supreme Court has emphasized that the FCA's public disclosure bar is to be applied broadly. *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 408 (2011). The Ninth Circuit has indicated that the publicly disclosed facts need not be identical to the relator's allegations, contain every "specific detail" alleged in the complaint, or even explicitly accuse anyone of fraud to trigger the public disclosure bar. *United States ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565, 573 (9th Cir. 2016); *Amphastar Pharms. Inc. v. Aventis Pharma SA*, 856 F.3d 696, 704 (9th Cir. 2017); *A-1 Ambulance Serv., Inc. v. Cal.*, 202 F.3d 1238, 1243 (9th Cir. 2000); *United States ex rel. Solis v. Millennium Pharms., Inc.*, 885 F.3d 623, 626 (9th Cir. 2018).

Under the current standard applicable here, a qualifying disclosure triggers the bar when the allegations are "substantially the same" as what has been publicly disclosed in a qualifying source. A public source is considered "substantially the same" as an FCA claim when it reveals both the alleged misrepresentation and the true state of facts such that fraud could reasonably be inferred. *Biotronik, Inc.*, 152 F.4th at 957; *United States ex rel. Found. Aiding the Elderly v. Horizon W., Inc.*, 265 F.3d 1011, 1015 (9th Cir. 2001). In other words, the question is not whether the public disclosure mirrors the relator's allegations in every respect, but whether it conveyed enough information to "put the government on notice to investigate the fraud before the relator filed his complaint." *Solis*, 885 F.3d at 627 (quoting *Mateski*, 816 F.3d at 574).

Relators do not argue in their opposition that the public disclosures identified by Defendants fall outside § 3730(e)(4)(A). *See* Opp. at 9–10. Instead, they focus solely on their asserted status as "original sources." Although this argument is therefore waived,[16] the Court, out of caution and to provide context for the original-source analysis, reviews

---

[16] *See* note 7 above.

the alleged public disclosures to determine whether the bar is triggered and, if so, on what date.

### i.    Florence *and* Taylor *Complaints Disclosed the Basis for Relators' Action by August 6, 2020*

Allegations made in publicly available FCA qui tam complaints qualify as public disclosures under the statute. *See* 31 U.S.C. § 3730(e)(4)(A)(i); *Hagood v. Sonoma Cnty. Water Agency*, 81 F.3d 1465, 1473 n.13 (9th Cir. 1996) ("That documents filed with [a] court during . . . civil litigation are considered publicly disclosed is a firmly established principle."). The *Taylor* complaint was unsealed on September 6, 2018,[17] and the *Florence* complaint was unsealed on August 6, 2020.[18] Both complaints therefore became public well before Relators filed this action on May 24, 2021. See Doc. # 1.

As discussed above, the *Florence* and *Taylor* complaints disclosed the same essential elements of fraud underlying the Critical Care, Mid-Level, and Scribe schemes. *See* Sections IV.A.1 & IV.A.1.2. Without repeating the comparison already provided, the Court finds that both *Florence* and *Taylor* alleged "substantially the same" fraud as Relators' FAC. Despite some differences in emphasis and detail, the allegations in those actions were sufficient to "put the government on notice to investigate the fraud before Relators filed their complaint." *Solis*, 885 F.3d at 626 (quoting *Mateski*, 816 F.3d at 574). Accordingly, the public disclosure bar applies, and dismissal is required unless Relators plausibly allege that they are original sources.

//

//

//

//

//

---

[17] Order (Doc. # 19), *Taylor*, No. 2:17-cv-04213 (S.D. W. Va. Sept. 6, 2018).

[18] Order (Doc. # 41), *Florence*, No. 3:19-cv-00493 (M.D. Tenn. Aug. 6, 2020).

### ii.    Envision I *Disclosed the Mid-Level Scheme by March 24, 2020*

In 2017, Relators filed another FCA action against Envision Healthcare Corporation: *U.S. ex rel. Hernandez v. Envision Healthcare Corp.*, No. 1:17-cv-23535 (S.D. Fla. Sept. 26, 2017) ("*Envision I*").[19] In that case, Relators alleged that Envision Healthcare, EmCare Holdings, and EmCare, Inc. engaged in a fraudulent scheme to submit false claims to CMS by falsely characterizing services performed by mid-level providers in EmCare emergency rooms as physician services. Doc. # 141-3 ¶ 1. According to the complaint, shared visits were uncommon, yet defendants allegedly pressured physicians and mid-level providers to manipulate patient charts so they could bill CMS at the higher physician rate. *Id*. ¶¶ 39–59.

*Envision I* was unsealed on March 24, 2020,[20] more than a year before Relators filed the present action. *See* Doc. # 1. Publicly available qui tam complaints qualify as public disclosures under the FCA, including those previously filed by the relator. *See* 31 U.S.C. § 3730(e)(4)(A); *U.S. ex rel. Holloway v. Heartland Hospice, Inc.*, 960 F.3d 836, 845 (6th Cir. 2020); *U.S. ex rel. Schweizer v. Canon, Inc.*, 9 F.4th 269, 276 (5th Cir. 2021).

A review of Envision I makes clear that it contains allegations "substantially the same" as those in the FAC. The overlap is not subtle. As reflected in defendants' comparison chart, numerous passages in the FAC appear copied verbatim from *Envision I*. *See* Doc. # 141-9. Relators' own statements confirm the linkage: they voluntarily dismissed *Envision I* without prejudice "to continue to investigate the matters concerned in preparation for the filing of the present action." FAC ¶ 30.

---

[19] The Court takes judicial notice of the *Envision I* complaint (Doc. # 141-3) and the chart comparing allegations in *Envision I* and the FAC (Doc. # 141-9). Fed. R. Evid. 201(b); *United States ex rel. Jones v. Sutter Health*, 499 F. Supp. 3d 704, 709 (N.D. Cal. 2020); *Tadros*, No. 15-cv-1458, 2016 WL 5870002, at *8.

[20] The Court takes judicial notice of the March 24, 2020 Order (Doc. # 19) in *Envision I*.

Accordingly, Envision I constitutes a qualifying public disclosure of the Mid-Level scheme, and the public-disclosure bar applies unless Relators plausibly allege that they are original sources.

### iii.    2017 New York Times Article Did Not Trigger the Public Disclosure Bar

A news article may qualify as a public disclosure under the FCA if it discloses sufficient information to put the government on notice of the alleged fraud. *See* § 3730(e)(4)(A)(iii); *see, e.g.*, *Biotronik, Inc.*, 152 F.4th at 960 (assessing a N.Y. Times article as a potential FCA public disclosure). Despite some surface-level overlap, the 2017 N.Y. Article offered as a potential public disclosure by Defendants did not disclose the fraud schemes alleged in the FAC.

On July 24, 2017, the New York Times published an article by Julie Crewell titled "The Company Behind Many Surprise Emergency Room Bills." *See* Doc. # 141-1.[21] The article reported a pattern of "surprise" out-of-network emergency-room billing in facilities managed by EmCare and described EmCare as an particularly aggressive participant in the profit-driven and often opaque emergency-care market.

The FAC and the article have similarities. Both address EmCare. Both describe pressure on emergency room physicians to increase admissions and testing even when the doctors believed such services were unnecessary. Both suggest that EmCare exercised significant influence over physician decision-making. And both indicate that services provided by EmCare clinicians tended to involve higher-intensity billing codes that result in higher reimbursement rates. The article also recounts an anecdote about an emergency-

---

[21] The Court takes notice judicial notice of this news article. See <u>United States v. Orthopedic All., LLC,</u> No. CV 16-3966 MWF (SKx), 2020 WL 6151084, at *4 (C.D. Cal. July 13, 2020) (taking judicial notice of a news articles for purposes of assessing whether the FCA's public disclosure rule).

room patient who received an unexpectedly large bill for a brief physician encounter, though it does not suggest she was billed for services she did not receive.

But these facts would not put the government on notice of the fraud schemes alleged in the FAC. The article does not state that EmCare is engaging in fraud, and it is a stretch to say that the article even infers fraud by EmCare. Critically, the article says nothing about the core theory of all three alleged schemes in the FAC: that physicians and others falsify patient charts to support false claims submitted to government payors. In fact, the N.Y. Times article does not mention patient charts at all, nor does it reference reimbursement requests to CMS or any other government entity. Without this detail, a government investigator would not be alerted to where proof of the alleged fraud could be shown.

Accordingly, the Court concludes that the 2017 New York Times article does not trigger the public-disclosure bar.

### 2. Relators Have Not Plausibly Alleged They Are Original Sources

A relator may overcome the public disclosure bar by qualifying as an "original source." 31 U.S.C. § 3730(e)(4)(B). This exception preserves suits brought by individuals who meaningfully contribute to exposing fraud against the government, even when related information has already entered the public domain. *See Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 295 (2010); *Biotronik*, 152 F.4th at 949–50. "The FCA requires rigorous scrutiny of [a relator's] argument that she is an original source[.]" *United States ex rel. Jones v. Sutter Health*, 499 F. Supp. 3d 704, 718 (N.D. Cal. 2020) (citing cases).

There are two ways a relator may qualify as an original source. *First*, a relator is an original source if, before any Section 3730(e)(4) public disclosure, the relator "voluntarily disclosed to the Government" the information on which the allegations are based. 31

U.S.C. § 3730(e)(4)(B)(i) (2010).[22] *Second*, a relator may qualify as an original source by showing that the relator (1) possesses knowledge "independent of" the public disclosure that "materially adds" to the publicly disclosed allegations, and (2) provided that information to the Government before filing suit. *Id*. § 3730(e)(4)(B)(ii).

Relators contend they have alleged original-source status under the first theory—Section 3730(e)(4)(B)(i)—because they voluntarily disclosed the allegations forming the basis of this action before the public disclosures identified above. Opp. at 8–9. The FAC describes two categories of potential disclosures that could predate the relevant Section 3730(e)(4) public disclosures. FAC ¶¶ 28–30. Neither establishes that Relators qualify as original sources.

### i.    Conclusory Allegations About an Unspecified Disclosure to the C.D. Cal. USAO Fail to Show That Relators are Original Sources

Relators allege that "[p]rior to filing the Complaint in this action, Relators voluntarily provided substantially all information in Relators' possession on which these allegations are based to the United States Attorney's Office for the Central District of California." FAC ¶ 30.[23] This allegation does not establish that Relators qualify as original sources under Section 3730(e)(4)(B)(i).

At the pleading stage, the Court must accept as true all factual allegations in the complaint, but it need not credit "threadbare recitals" of legal elements or legal conclusions. *See Iqbal*, 556 U.S. at 678–81.

---

[22] The definition of an "original source" under the FCA was broadened in 2010. Before that amendment, a relator had to satisfy two requirements to qualify as an original source: (1) the relator must possess "direct and independent knowledge of the information on which the allegations are based," and (2) the relator must have "voluntarily provided the information to the Government before filing an action" based on that information. 31 U.S.C. § 3730(e)(4)(B) (1986). Because here the Relators filed their original complaint in 2021, however, the post-2010 version of the FCA governs. *Biotronik, Inc.*, 152 F.4th at 956.

[23] This allegation was substantially the same allegation that Relators included in their original Complaint. *See* Doc. # 1 ¶ 27 ("Prior to filing this complaint, Relators voluntarily provided substantially all information in Relators' possession on which these allegations are based to the United States Attorney's Office for the Central District of California.").

*Omni Healthcare Inc. v. U.S. Oncology, Inc.*, No. 23-1334-CV, 2024 WL 4751635 (2d Cir. Nov. 12, 2024), *cert. denied*, 145 S. Ct. 2704 (2025), is instructive. There, the Second Circuit affirmed dismissal under the public disclosure bar. *Id*. at *3. The court agreed that a relator cannot bypass the public disclosure bar by alleging that, before any public disclosures, it had "voluntarily" complied with the FCA's mandatory pre-filing requirement to serve on the government "[a] copy of the complaint and written disclosure of substantially all material evidence." *Id*. (quoting 31 U.S.C. § 3730(b)(2)).[24] The Second Circuit held that a statutorily required disclosure does not satisfy the statute's voluntariness requirement, and "to hold otherwise would erase the provision's voluntariness requirement." *Id*. The court further held that labeling a disclosure "voluntary" is a legal conclusion not entitled to acceptance without "plausible substantiating factual assertions." *Id*. (*citing Iqbal*, 556 U.S. at 681).

Relators' allegation regarding their supposed disclosure to the U.S. Attorney's Office for the Central District of California merely allows the inference that the disclosure occurred sometime before this action was filed on May 24, 2021. The FAC provides no basis to determine whether this disclosure predated the relevant public disclosures. Relators also rely on the same conclusory assertion—that the disclosure was made "voluntarily"—that *Omni Healthcare* found insufficient. 2024 WL 4751635, at *3. Without factual allegations showing whether the disclosure was made independent of a statutory requirement, the Court cannot infer voluntariness. Accordingly, the Court finds that the FAC does not plausibly allege that Relators are original sources under Section 3730(e)(4)(B)(i).

//

//

---

[24] The FCA requires a relator to serve on the Government of "[a] copy of the complaint and written disclosure of substantially all material evidence and information the person possesses" before bringing suit. 31 U.S.C. 3730(b)(2).

### ii.    Newly-Added Allegations of Disclosures to Other U.S. Attorney's Offices Are Insufficient to Show Relators Are Original Sources

On September 23, 2024, Defendants moved to dismiss the complaint in part on the ground that Relators' claims were barred by public disclosures that occurred "as early as 2017." *See* Doc. # 111 at 20. Twenty-two days later, Relators filed the FAC, adding new allegations that they disclosed information to the Government in 2016 and 2017. *See* FAC ¶¶ 29–30. Relators now contend that, before bringing this action, they made disclosures to U.S. Attorney's Offices in other districts in connection with different FCA cases—even though their original complaint indicated only that they had disclosed information to the U.S. Attorney's Office for the Central District of California. *See* Doc. # 1 ¶ 27.[25]

Although these new allegations contain more words than those in the original complaint, they remain conclusory and do not satisfy *Iqbal* and *Twombly*.[26] Specific facts—rather than legal conclusions or vague "details"—are especially important where, as here, the amended allegations diverge significantly from those originally pleaded. *See Morales v. City & Cnty. of San Francisco*, 603 F. Supp. 3d 841, 846 (N.D. Cal. 2022)

---

[25] Relators contend that dismissal is inappropriate because the public disclosure bar is an affirmative defense that they need not plead around. Doc. # 144 at 10. But Relators have already had an opportunity to account for that defense, as reflected in their amended complaint filed after Defendants' initial motions to dismiss. And dismissal under Rule 12(b)(6) is proper when the complaint's allegations—together with judicially noticeable materials—establish the affirmative defense. *See ASARCO, LLC v. Union Pac. R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014); *Smith v. City of Sacramento*, No. 2:24-cv-2268-DC-SCR, 2025 WL 1807420, at *6 (E.D. Cal. July 1, 2025), *report and recommendation adopted*, No. 2:24-cv-02268-DC-SCR (PS), 2025 WL 2732504 (E.D. Cal. Sept. 25, 2025). Indeed, courts routinely dismiss FCA claims when defendants successfully establish either the public disclosure bar or the first-to-file bar at the motion to dismiss stage. *See, e.g.*, Stein, 2024 WL 4784915, at *1 (upholding dismissal of FCA claims under the first-to-file bar despite noting the 2010 amendments converted the bar into an affirmative defense); *Calva*, 2018 WL 6016152, at *8 (dismissing FCA claims under the public disclosure bar).

[26] *See* FAC ¶ 29 ("Hernandez . . . inform[ed] the Government that EmCare was also committing the same fraudulent schemes as the TeamHealth Defendants were alleged to have committed[.]"); *id*. ("Sonyika . . . informed the Government, in detail, that EmCare was perpetrating the same schemes as ApolloMD, and going into further detail as to that fraud."); *id* ¶ 30 ("The Relators . . . provid[ed] information as to the Critical Care Scheme and as to the Scribe Scheme, although focusing more on the Mid-Level scheme.").

("The Court does not ignore the prior allegations in determining the plausibility of the current pleadings.").

For example, the FAC offers no factual detail about what Relators actually disclosed to the Government, beyond the assertion that Relators reported that the Envision Defendants engaged in the same fraud alleged in other actions and in this case. Allegations stated at that level of generality amount to legal conclusions that the Court need not accept as true. *See Iqbal*, 556 U.S. at 678–81; *Omni Healthcare Inc.*, 2024 WL 4751635, at *3.

The new allegations also remain too vague to determine whether Relators' purported disclosures were mandatory or voluntary. As one instance, the allegation concerning the disclosure made in connection with the *Envision I* lawsuit does not clarify whether the disclosure was the mandatory pre-filing submission required by 31 U.S.C. § 3730(b)(2)—the type held insufficient in *Omni Healthcare Inc.*—or a separate disclosure that could be considered voluntary. *See* FAC ¶ 30.

Relators' allegations regarding interviews conducted in connection with the *TeamHealth* and *ApolloMD* lawsuits likewise do not establish voluntariness. At most, those allegations permit the inference that the disclosures were oral rather than written, and thus not disclosures under Section 3730(b)(2). But the mere fact that an interview occurred does not show voluntariness. *See, e.g., U.S. ex rel. Barth v. Ridgedale Elec., Inc.*, 44 F.3d 699, 704 (8th Cir. 1995) (affirming dismissal where the relator was not an original source because the interview was initiated by a government investigator). Thus, the added detail that Relators participated in interviews does not convert their assertion of "voluntariness" into anything more than a legal conclusion.

Accordingly, the Court finds that Relators have not plausibly alleged that they are original sources under Section 3730(e)(4)(B)(i).

//

//

//

### iii.   *Relators Have Not Plausibly Alleged They are Original Sources Pursuant to Section 3730(e)(4)(B)(ii)*

In their Opposition, Relators do not argue that they qualify as an "original source" under Section 3730(e)(4)(B)(ii)—that is, by possessing independent knowledge that materially adds to the publicly disclosed allegations and by voluntarily providing that information to the Government before filing suit. *See* Doc. # 144 at 9. Accordingly, they have waived this argument.[27] They have not met this requirement in any event, as they allege no plausible facts showing that they voluntarily disclosed such information before filing. *See* Section IV.B.2 above. And to the extent Relators incorporate allegations not found in the qualifying public disclosures identified above, those additions do not materially advance the substance of the allegations. *See* Sections IV.A.1, A.2, B.1 above.

\*\*\*

For the reasons discussed above, the Court DISMISSES Relators' FCA claims pursuant to the public disclosure rule.

### C.   Leave to Amend Denied

Under Federal Rule of Civil Procedure 15(a)(2), courts should freely grant leave to amend "when justice so requires," and the Ninth Circuit has instructed that this policy is to be applied with "extreme liberality." *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (citation omitted). Even so, a court may deny leave to amend when amendment would be futile. *See Kroessler v. CVS Health Corp.*, 977 F.3d 803, 815 (9th Cir. 2020); *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986); *see, e.g., Seale v. GSK Consumer Health, Inc.*, 718 F. Supp. 3d 1208, 1223 (C.D. Cal. 2024) (denying leave to amend as futile where the plaintiff had already amended her complaint once to avoid the basis for dismissal).

Here, Relators have already amended their complaint in an attempt to avoid the

---

[27] *See* note 7 above.

public disclosure bar but still have not plausibly alleged that they are original sources. *See* Section IV.B.2 above. Relators also cannot amend their way around the first-to-file bar, as no amendment can change the fact that when this action was initially filed, related actions were pending. *See* Section IV.A.4 above; *see also Stein*, 2024 WL 4784915, at *2 ("Dismissal without leave to amend was appropriate because Relators made no showing . . . that any amendment could cure their first-to-file deficiency"). Accordingly, the Court concludes that further amendment would be futile and declines to grant Relators additional leave to amend.

## V.    **CONCLUSION**

For the foregoing reasons, the Court GRANTS Defendants' Motions. Relators' FCA claims (Counts 1–3) are DISMISSED WITH PREJUDICE as to Relators and WITHOUT PREJUDICE as to the United States.

Because Relators' federal FCA claims have been dismissed, the Court declines to exercise supplemental jurisdiction over Relators' state and municipal claims. *See Calva* 2018 WL 6016152, at *8 (declining to exercise supplemental jurisdiction over state claims after dismissing federal FCA claims). Accordingly, Relators' state and municipal claims (Counts 4–38) are DISMISSED WITHOUT PREJUDICE.


**IT IS SO ORDERED**.

Dated: 11/19/25

HON. CYNTHIA VALENZUELA
UNITED STATES DISTRICT JUDGE